1           UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA,      )
                                   )
4           Plaintiff,             )
                                   )
5       vs.                        ) CASE NO. 4:23-cr-00003-SLG
                                   )
6   JUNIOR GUFATASI TULALI,        )
                                   )
7           Defendant.             )
    _____)
8

9        TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 1
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10              Monday - April 15, 2024
                8:37 a.m. - 2:07 p.m.
11                 Fairbanks, Alaska

12

13  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
14       BY:  ALANA WEBER and CARLY VOSACEK
         101 12th Avenue, Suite 310
15       Fairbanks, Alaska 99701
         (907) 456-0336
16

17  **FOR THE DEFENDANT:**
         Camiel & Cheney, P.S.
18       BY:  PETER CAMIEL
         2800 First Avenue, Suite 309
19       Seattle, Washington 98121
         (206) 817-0778
20

21  _____

22                  **SONJA L. REEVES**
              **Registered Diplomate Reporter**
23              **Certified Realtime Reporter**
              **Federal Official Court Reporter**
24              222 West 7th Avenue, #4
                Anchorage, Alaska 99513
25      Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:37 a.m.)

2          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

3  United States District Court for the District of Alaska is now

4  in session, the Honorable Sharon L. Gleason presiding.

5          Please be seated.

6          Your Honor, we're on record in Case

7  4:23-criminal-3-SLG, *United States versus Junior Tulali*.

8          Will the parties please state their names for the

9  record.

10         MS. WEBER:  Good morning.  Alana Weber and

11 Carly Vosacek on behalf of the United States.

12         MR. CAMIEL:  Peter Camiel representing Junior Tulali,

13 who is in custody, seated to my left.

14         THE COURT:  Very good.  Good morning.  Well, we all

15 got an email last night.  So any update, Ms. Weber, you can

16 give us at this time?

17         MS. WEBER:  Your Honor, we haven't been able to get in

18 touch with the family yet.  So we don't have an update yet at

19 this time.

20         THE COURT:  All right.  So is -- why do you need until

21 tomorrow afternoon, as opposed to tomorrow morning?

22         MS. WEBER:  Your Honor, we would ask for a continuance

23 until tomorrow afternoon so we can speak to Ray Lee.  And,

24 obviously, it appears Jeffrey Lee will not be testifying, but

25 we want to discuss with Mr. Lee whether or not he does want to

 1   still be involved with testifying or watch the trial so we can

 2   appropriately give our opening statement without addressing any

 3   of the evidence or testimony that may or may not be given.

 4          THE COURT:  All right.  Mr. Camiel, your thoughts?

 5          MR. CAMIEL:  Your Honor, I don't have an objection to

 6   picking a jury today and delaying the opening for the specific

 7   reason that there was a medical emergency with not only a

 8   witness, but obviously it was his father, who is another

 9   witness, who would have to attend to that.  So I have no

10   objection to that.

11          The government had also raised the need to interview

12   an in-custody witness, and I don't think that's a reason to

13   delay anything.  But the medical emergency I understand and

14   don't object to that part of it.

15          THE COURT:  All right.  Thank you.

16          When can you get an update?  When do you anticipate

17   that, Ms. Weber?

18          MS. WEBER:  We anticipate our victim rights

19   coordinator is getting in today, and we anticipate being able

20   to get an update at some point today.

21          THE COURT:  All right.  So I think we should pick the

22   jury.  I think you should -- is she on the first flight this

23   morning?

24          MS. WEBER:  She is, Your Honor.

25          THE COURT:  Because, I mean, there are medical

 1  emergencies and then there are crises, and I certainly don't
 2  know where on this range this person's condition is.  So I am
 3  disinclined to have the trial delayed until tomorrow afternoon.
 4         I agree with the defense that the fact that you want
 5  to interview an in-custody is not a basis to delay.  You can do
 6  it in the evening or at lunch or in the morning, but we are not
 7  going to delay the trial for you to meet with the in-custody.
 8         So let's get an update.  We'll set a time for that
 9  after we get your update with regard to the status of the
10  family and go from there, but my hope is that we are able to
11  start at 8:30 a.m. tomorrow.  But I understand your issue about
12  the opening statement, that you want to present what you think
13  the evidence is going to be.  That's totally valid, but
14  hopefully that will be the case and you'll get that
15  confirmation later this morning or early in the afternoon.
16         The jury is getting called in at 8:30 because the
17  building didn't open until 8:00 a.m., and so it's going to be
18  close to an hour before they're ready to come into the
19  courtroom.
20         So are there any issues we can take up at this time?
21  I did review the voir dire and I had a couple of things I
22  wanted to raise, and then I can hear from each side.
23         The defense did not file a separate filing, as I saw
24  it on voir dire, unless I overlooked it.  You mentioned it in
25  your trial brief, to be sure to cover substance abuse issues.

1          MR. CAMIEL:  Right.  I provided the government with
2     the questions that I thought would be appropriate, and I think
3     we have agreed on some questions we'd like the Court to ask.
4          THE COURT:  And I will ask the bulk of the ones that
5     the government proposed at Docket 65 on substance abuse issues.
6     There are two questions that the government included that I
7     don't intend to ask, but when each side gets their 15-minute
8     follow-up, the government could pose those.  And those are
9     numbers 24 and 26.  And I'm assuming -- were there any --
10    Mr. Camiel, I should have asked you first -- that you object to
11    in the proposed voir dire by the government?
12         MR. CAMIEL:  No.
13         THE COURT:  All right.  So 24 and 26, I won't be
14    asking, but if the government sought to do that, that's fine.
15         I don't intend to ask any issues about race.  Do you
16    want me to raise that, Mr. Camiel?
17         MR. CAMIEL:  Your Honor, I don't think it's necessary
18    to raise it in this case.
19         THE COURT:  All right.  Very good.  Then I won't.
20         I need the names of the cooperators and the victim's
21    family names written down and provided to me.
22         It was appropriate, Ms. Weber, you had them initialed
23    in your trial brief, but give the names, if you would, to our
24    courtroom deputy so when I ask for names I can have those.
25         MS. WEBER:  Your Honor, we actually prepared a list of

1    names of all the law enforcement names that may come up, as

2    well as any residents that the jury might know.  If we can

3    maybe publish it briefly to the jury.  I have a copy for Court

4    and counsel.

5            THE COURT:  Okay.  That would be great.

6            And, Mr. Camiel, if there are other names you think

7    should be added here during voir dire, please let me know.

8            Why don't you give that to Mr. Camiel and our

9    courtroom deputy here.

10           Those were the topics I wanted to cover.  Ms. Weber,

11   anything further on the voir dire that you wanted to raise?

12           MS. WEBER:  No, Your Honor.

13           THE COURT:  Mr. Camiel?

14           MR. CAMIEL:  No.

15           THE COURT:  I did have a separate topic that I -- came

16   up when I was reviewing the jury instructions, and it relates

17   to the indictment and the enhanced penalties.

18           The cover page of the indictment -- this is Docket 2,

19   and I don't believe there was ever a superseding.  But the

20   cover page talks about an enhanced penalty under (b)(1)(A).

21   The next page talks about an enhanced penalty under (b)(1)(C),

22   but it sets out the test for (b)(1)(A).

23           And so I don't know if either -- well, is it the

24   government's intent to not proceed with this language about the

25   12 months or more and the 15 years of imprisonment, Ms. Weber?

1          MS. WEBER:  Your Honor, it appears that that was a

2     typo in the indictment.  Thank you for bringing that to our

3     attention.

4          Under the statute, the defendant is charged under --

5     the substantive count is under (b)(1)(C).  Because the

6     defendant was convicted of a serious drug felony offense, the

7     language in the indictment is (b)(1)(A).  The government is

8     prepared to prove that it was 15 -- that he served a term of

9     over one year within 15 years.  However, under the statute, the

10    standard is only a drug felony offense.

11         THE COURT:  And I understand that.  I learned that.  I

12    didn't realize that the language in (C) was different from the

13    language in (A) until very recently.  So you don't object,

14    then, to -- I mean, one could say there's a typo in saying (C)

15    instead of (A) because the language you have on the penalty

16    tracks the language of (A).  But regardless, I'm hearing the

17    government doesn't object to putting those questions to the

18    jury.

19         MS. WEBER:  Yes.

20         THE COURT:  Because as I recall the law, if it's

21    simply a felony drug conviction, then that doesn't even go to

22    the jury.  It's this new language that is the complication.

23         MS. WEBER:  I agree.  I was doing a lot of research on

24    the issue.  It seems as if when the First Step Act was drafted

25    under (b)(1)(C), they kept the original language for felony

1  drug offense.  So I believe under *Lane* (ph), we still would

2  need to put it to the jury.  It just wouldn't be the additional

3  factors, elements.

4        THE COURT:  But at the end of the day, you don't

5  object to including these questions in the verdict?

6        MS. WEBER:  Yes.

7        THE COURT:  All right.  Very good.  That solves that.

8        Mr. Camiel, anything on this topic?

9        MR. CAMIEL:  No.  I think this has to do with the

10  bifurcated part of the trial.

11        THE COURT:  Correct.  The second half, yes.

12        MR. CAMIEL:  And so the jury won't be hearing anything

13  about that.

14        THE COURT:  Thank you for making that clear.  Very

15  good.

16        I should be able to get a draft of the instructions to

17  both sides, especially if we have some free time this

18  afternoon.

19        So anything else we can take up until we're told the

20  jury is ready to be brought in here?

21        MS. WEBER:  Your Honor, as for the jury instructions,

22  as we were preparing witnesses in this case, we believe that it

23  would be appropriate to add an instruction regarding

24  independently sufficient clause, in addition to "but for," so I

25  have drafted additional language to the definition of

1    independently sufficient.

2             THE COURT:  Is there a model instruction on that?

3             MS. WEBER:  The instruction I have is from the *Spayd*

4    case, which was also in this district, and it's also the

5    language from *Birage* (ph).

6             THE COURT:  Let's take a look and see where we are on

7    that.  Do you have a copy you can give Mr. Camiel?

8             MS. WEBER:  Yes.

9             MR. CAMIEL:  Your Honor, I don't think there's a Ninth

10   Circuit model instruction yet on the enhanced penalty or on the

11   "but for" clause or independent.

12            THE COURT:  There's a comment that I drafted with my

13   colleagues on the committee on the enhancement because there's

14   no Ninth Circuit case law.  And there's a tension, to say the

15   least, between 851 and whether it's a fact -- a question for

16   the jury versus the trial judge at sentencing.  But we don't

17   need to resolve that.  I'll take a look at this and we can

18   discuss in due course.

19            Anything else, Ms. Weber, to bring up at this time?

20            MS. WEBER:  There is one last matter, Your Honor.

21            THE COURT:  That's fine.

22            MS. WEBER:  Again, during witness prep, we learned

23   more information regarding the series of events as it relates

24   to the investigation.  I know the Court has ruled that evidence

25   of other overdoses around the same time, the defendant's motion

1    was granted without prejudice.

2              The reason why law enforcement ended up searching

3    Andre Brown's house, where they recovered the fentanyl pills,

4    and his car, where they recovered additional pills, was based

5    on another overdose where that victim had told law enforcement

6    that he purchased the fentanyl at that address, 310 Tipperary

7    Court.

8              So the government would request that when Officer

9    Reuter testifies, he be allowed to explain the series of events

10   that led up to the search warrant at that residence and

11   vehicle.

12             THE COURT:  All right.  Mr. Camiel, are you ready to

13   weigh in on that at this time?

14             MR. CAMIEL:  Yes.  First of all, this isn't anything

15   new.  The information -- the person who overdosed and claimed

16   that they purchased stuff from the house, that's been in the

17   discovery since day one.  That wouldn't be something from a new

18   witness interview.  That's a man named --

19             THE COURT:  Where is it in the discovery?

20             MR. CAMIEL:  It's in the early discovery I received.

21   There's an interview with a witness Evan Slongwhite.  This

22   isn't something new at all.  This is something that's been out

23   there since the first day.

24             They don't have to explain why they were at this

25   residence.  The fact of the matter is, Mr. Brown, who is the

government cooperating witness who was leaving that residence,
was in a stolen vehicle and they pulled him over because he was
in a stolen vehicle.  They don't have to -- there is no need to
go into other overdoses to explain why the police were there,
why they had a search warrant.  Again, this isn't something new
that wasn't known before when we raised this as a motion in
limine.

THE COURT:  Ms. Weber, would you agree it's been in
the discovery since day one?

MS. WEBER:  It has, Your Honor.  And I disagree with
Mr. Camiel that they were separated off to be able to not
address the fact of the other overdoses at the time, but as we
were prepping with Officer Reuter and trying to word the
questions in a way that would avoid speaking about the other
overdoses, it became clear how inextricably intertwined the
series of efforts were and how they led to the discovery.

For example, Your Honor, the basis for the arrest and
the search was not the stolen vehicle.  It was, in fact, they
had the warrant signed, already authorized by the Court, to
search the residence.  And as they were waiting to execute the
warrant at the residence, Andre Brown and Chris Kearney left in
the vehicle, where they were pursued and stopped because the
warrant authorized the search of the vehicle as well.

So the reason why they were at the house, I think we
could sanitize it in that they received information about a

1   drug sale that occurred at that house.  However, it is
2   difficult to phrase the questions and have the officer answer
3   in a way that avoids the larger scale of the investigation as
4   to the reason why he even really became involved was because of
5   this search of overdoses in the short period of time where this
6   task force was formed and troopers, police officers, and DEA
7   agents were all collaborating for the purpose of investigating
8   these overdoses in a joint effort.

9            THE COURT:  So are you planning to introduce any
10  evidence that whatever drugs were found there are the same as
11  the one that is involved here?

12           MS. WEBER:  Yes, Your Honor.

13           THE COURT:  I mean the exact same, sold by Mr. Tulali?

14           MS. WEBER:  I believe that the evidence will show
15  that, yes.

16           THE COURT:  Well, for now, I am not at all persuaded
17  it's inextricably intertwined.  If you want to make an
18  application with the officer outside the presence of the jury,
19  you can do so, but no reference to it now.  And I would be
20  interested if, Mr. Camiel, you can track down when this was
21  discovered to you.  If that's difficult to do --

22           MR. CAMIEL:  Well, I can find it fairly quickly, Your
23  Honor.

24           THE COURT:  You can let me know at another time when
25  we're on the record outside the presence --

           MR. CAMIEL:  I know it was in production one of the

discovery.

           THE COURT:  All right.

           MR. CAMIEL:  The very first set of pages are the

medical -- I recall, are the medical records of the person who

overdosed.  And then following that are the -- is a report of

an interview with that person where they came in after they

recovered from their overdose and gave information to the

police about who they bought the pills from.  It was not

Mr. Tulali.  It was from a person named Mr. Kearney, who might

be a government witness in this case.  And they gave the

address where they bought the pills, which was the house that

Mr. Brown was leaving when he was arrested.

           I don't see that it would be difficult at all for the

government to simply ask the officer, you were at that house

because you had a search warrant.  You have to explain the

background.  And when you arrived at the house, you saw a car

leave.  It happened to be a stolen car.  You stopped it.  You

executed -- you got a warrant for the car.  You got a warrant

for the house.  They don't need to go into the other stuff to

be able to bring that out and explain what they found in the

house.

           THE COURT:  All right.  I would be inclined to go that

way.  I can understand the officer might want to share more

with the jury, but it seems that the testimony could be

```
 1   constructed in a way to comply with the existing order that
 2   limits that evidence.
 3            MS. WEBER:  Yes, Your Honor.
 4            THE COURT:  Very good, Ms. Weber.  Anything else?
 5   It's fine if you have more.
 6            MS. WEBER:  Nothing further.
 7            THE COURT:  Mr. Camiel?
 8            MR. CAMIEL:  No, Your Honor.
 9            THE COURT:  We'll let you know when the jury is ready
10   to proceed.
11            Before we go off record, I'll note there's some
12   spectators here.  That's fine.  Welcome.  I would ask when
13   we're -- we're going to bring into the courtroom -- I'm not
14   quite sure how many people.  We hope 50 or so.  And so I would
15   ask the spectators during jury selection -- the people are
16   going to be seated in the back of the courtroom -- if you could
17   sit in the last row on the far corner just for that one event.
18   And then after the jury is selected, you're welcome, any of
19   you, to sit where you'd like.  So back row on the far side.
20   And no communication, obviously, with any of the jurors.  So I
21   would appreciate that.
22            And we'll go off record, and we'll see you shortly.
23            DEPUTY CLERK:  All rise.  This court stands in a brief
24   recess.
25        (Recessed from 8:57 a.m. to 10:19 a.m.)
```

```
 1          DEPUTY CLERK:  All rise.  Her Honor, the Court, the
 2   United States District Court is again in session.
 3          Please be seated.
 4          THE COURT:  All right.  We're back on record here
 5   without the jury present.  And I think we have 38 -- is that
 6   correct, Madam Clerk -- 38 prospective jurors.  So we'll see
 7   how far we can get at this point in time.
 8          I was provided an email from the government about the
 9   statement of the case.  Mr. Camiel, have you seen that?
10          MR. CAMIEL:  Your Honor, if you could read it.
11          THE COURT:  It reads as follows:  "The indictment
12   charges that in October of 2020, Mr. Tulali distributed a
13   substance containing fentanyl which resulted in the death of
14   another person.  Mr. Tulali has entered a plea of not guilty to
15   this charge.  He is presumed innocent and the government bears
16   the burden of proving the charge beyond a reasonable doubt."
17          Is that acceptable?
18          MR. CAMIEL:  Yes.
19          THE COURT:  Very good.  Then --
20          SONJA:  I can't hear Mr. Camiel with the headphones.
21          THE COURT:  Mr. Camiel, has your client tested out the
22   headphones for sidebars?
23          MR. CAMIEL:  Not yet.
24          THE COURT:  So this is the microphone out in the --
25   yes.
```

1                Do they work, Mr. Camiel?

2                MR. CAMIEL:  Yes.

3                THE COURT:  Great.  Given some of the acoustic

4    challenges in here, I would ask counsel to remain seated when

5    you're talking, speak into the microphone, and please speak up

6    a bit.  When you're questioning witnesses, just be sure to go

7    to the podium and speak directly into the microphone.

8                I have the list of the witnesses from the government.

9    Are all the names that are on the right-hand side -- did you

10   get a copy of this, Mr. Camiel?

11               MR. CAMIEL:  Yes.

12               THE COURT:  All right.  Ms. Weber, are all the names

13   on the right-hand side residents of Fairbanks?

14               MS. WEBER:  No, Your Honor.

15               THE COURT:  All right.  Well, it's helpful to the jury

16   to know who is local, especially when there's some common names

17   here.

18               Who is not from Fairbanks on this list?

19               MS. WEBER:  They were all from or in Fairbanks on the

20   date of occurrence.

21               THE COURT:  But some have moved out of state?

22               MS. WEBER:  Correct.  Some of them.

23               THE COURT:  Ms. Weber, pull the microphone down and

24   slide it toward you, please.

25               MS. WEBER:  Is this better?

1          THE COURT:  Yes.

2          MS. WEBER:  Thank you.

3          THE COURT:  And so they were all residents of

4  Fairbanks in October of 2020.  Is that what you stated?

5          MS. WEBER:  Yes.  Andre Brown, I believe is from

6  Fairbanks and has been back and forth, but everyone else, I

7  believe, was living here at the time.

8          THE COURT:  Okay.  And the people on the left, I'm

9  going to assume the troopers and the Fairbanks police were all

10 here.  Are there people -- the people above there, the chemist

11 and stuff, are not local; is that correct?

12         MS. WEBER:  That is correct.

13         THE COURT:  And is your -- do you have, Mr. Camiel,

14 somebody that we should add to this list, or no?

15         MR. CAMIEL:  Your Honor --

16         THE COURT:  Mr. Camiel, I know it's not your habit to

17 remain seated, but it will help us make a better record.

18         MR. CAMIEL:  I'm sorry.  I'm from a court that

19 won't --

20         THE COURT:  I know.  Some of my colleagues are pretty

21 strict.

22         MR. CAMIEL:  There are some additional names, not of

23 people who will be testifying, but whose names I think will

24 come up during the trial.

25         THE COURT:  Okay.

1      MR. CAMIEL:  There's a Melvin Williams.

2      THE COURT:  William or Williams?

3      MR. CAMIEL:  Williams.  And Araka, A-r-a-k-a, Taylor.

4  Jamie Mobley, J-a-m-i-e, M-o-b-l-e-y.  And the last one is

5  Quinton Turner.

6      THE COURT:  Okay.  And same question, were these

7  residents of Fairbanks in October of 2020?

8      MR. CAMIEL:  I believe that Mr. Williams, Ms. Taylor,

9  and Mr. Mobley.  I'm not sure -- Mr. Turner may have been in

10 Anchorage at the time.

11     THE COURT:  Okay.  All right.  Very good.

12     Anything else to take up, Ms. Weber, before we bring

13 in the prospective jurors?

14     MS. WEBER:  No, Your Honor.

15     THE COURT:  Mr. Camiel, anything?

16     MR. CAMIEL:  No.

17     THE COURT:  Very good.  Then let's do so.

18     (Pause)

19     (Prospective jurors enter courtroom)

20     THE COURT:  Good morning, ladies and gentlemen.

21 Please come in and have a seat anywhere in the back there.

22     Good morning, ladies and gentlemen.

23     Have a seat anywhere in the back there.  You can come

24 up a little closer to the front, if you would.

25     All right.  Please be seated, everyone, and welcome.

1          Good morning, everyone.  My name is Judge Sharon

2    Gleason.  And you've been summoned as prospective jurors in the

3    case of *United States versus Junior Gufatasi Tulali*, which is a

4    criminal case here in Fairbanks, Case 4:23-CR-3.  And the jury

5    clerk has taken roll, and we're ready to select our jury.

6          Jury service is one of the highest duties and

7    responsibilities of American citizenship, and it certainly does

8    require some personal sacrifice, and yet it's an important

9    civic responsibility that we all share.  Under our system of

10   justice, we all have the right to have a jury of our fellow

11   citizens decide a case such as this, and that means that we

12   must all be prepared to serve as jurors when asked.  I hope

13   you'll all find this to be an interesting and rewarding

14   experience.

15         The trial in this case is expected to take

16   approximately five days, meaning most all of this week and

17   possibly into a few days of next week.

18         Our trial day begins not like today.  Around 8:30, we

19   hope to start tomorrow.  And it ends no later than 5:00 p.m.

20   We do take a lunch break each day and breaks in the morning and

21   afternoon, shorter breaks as well.

22         At this point, I'm going to ask the lawyers for each

23   side to introduce themselves and the people that are seated

24   with them, beginning with the government.  Ms. Weber, go ahead,

25   please.

1          MS. WEBER:  Good morning.  Alana Weber for the

2     United States.

3          MS. VOSACEK:  Carly Vosacek for the United States.  We

4     also have Special Agent Joshua Carr and my legal assistant

5     Cathy.

6          THE COURT:  Go ahead, Counsel.

7          MR. CAMIEL:  Good morning.  My name is Peter Camiel,

8     and I represent Junior Tulali, who will be sitting next to me

9     during the trial.

10          THE COURT:  Thank you, Counsel.  The trial of this

11     case will be conducted in accordance with established rules.

12     My job as the judge is to enforce those rules, determine what

13     evidence may be admitted and what law is to be applied in this

14     case.  The attorneys present the evidence according to these

15     rules, and it's the function of the jury to decide the facts,

16     the credibility of the witnesses, and the weight to be given to

17     the witnesses' testimony and to render a just verdict if the

18     jury is so able.

19          It will be the jury's sworn duty to accept the law as

20     given to you by the Court, and then you will apply that law to

21     the facts as you determine them to be.  As the trial proceeds,

22     I'll explain this in more detail, as well as explain more fully

23     the procedure that is followed and the order of the trial.

24          As I mentioned earlier, this is a criminal case.  The

25     defendant, Junior Gufatasi Tulali, has been charged by an

1    indictment, and the indictment charges that in October of 2020

2    Mr. Tulali distributed a substance containing fentanyl which

3    resulted in the death of another person.

4            Mr. Tulali has entered a plea of not guilty to this

5    charge.  He is presumed innocent and the government bears the

6    burden of proving the charges beyond a reasonable doubt.

7            I must caution you that an indictment is nothing more

8    than a formal method of accusing someone of a crime.  It's not

9    evidence of any kind.  Let me repeat, it is not evidence of any

10   kind.  And it is does not create any presumption or permit any

11   inference of guilt.  In other words, an indictment is merely an

12   allegation of the charge against the defendant and informs the

13   defendant of the specific crime with which he's been charged.

14   The fact that an indictment has been filed against a defendant

15   may not be considered by you for any purpose and is not

16   evidence in the case and must not be considered as such by you.

17           The defendant has pleaded not guilty to the charge in

18   the indictment.  A plea of not guilty means the government must

19   prove beyond a reasonable doubt all of the material allegations

20   and essential elements of the crime charged.

21           So ladies and gentlemen, we'll now select the trial

22   jury in this case.  This is a crucial stage in the trial, since

23   it's important to both sides to have a fair and impartial jury.

24   Both the government and the defendant are entitled to jurors

25   who approach this case with open minds and agree to keep their

1    minds open until a verdict is reached.  Jurors must be as free

2    as humanly possible from bias, prejudice, or sympathy, and must

3    not be influenced by preconceived ideas as to the facts or as

4    to the law.

5           In this case, the jury will be composed of 12 persons

6    and two alternates.  The jury clerk has randomly assigned each

7    of you a number, and I see you have them attached to your

8    clothing.  I will have some general questions for all of you.

9    I would ask when you are responding to a question that you give

10   me your juror number first and come to the microphone that I

11   see is there, and come and answer the question as appropriate

12   here.

13          But before we do all of that, I'm going to ask our

14   courtroom deputy to administer the jury oath.

15          (Oath administered to prospective jurors.)

16          THE COURT:  I'm now going to ask you a series of

17   questions to help determine whether you're generally qualified

18   as a juror in this case, and then once that's done, we will

19   call forward 32 of you and ask some additional questions.

20          First, is there anyone not a citizen of the

21   United States?  All right.  I don't see any hands raised.

22          Anyone under the age of 18?  No, I don't see hands

23   raised.

24          Does anyone have a physical condition or ailment that

25   would make it very difficult or inconvenient to sit as a juror

1    in this case?  And ladies and gentlemen, for this question and

2    any others that I pose this morning, please feel free to

3    indicate that you would like to answer it semi-privately, and

4    we'll have the lawyers and I hear from you privately about

5    that.

6              I don't see any hands raised there.

7              Does anyone have any difficultly reading or

8    understanding the English language?

9              All right.  I don't see any hands raised.

10             Is anyone currently taking any medication or has any

11    health issue that could affect your ability to serve as a

12    juror?

13             I see a hand raised.  If you can come to the

14    microphone, give us your juror number and tell me if you would

15    rather take this up privately.  That's fine, and we'll make a

16    note.

17             PROSPECTIVE JUROR NO. 13:  I had some issues come up

18    medically after I filled out the jury questionnaire.  I have

19    some doctor appointments already scheduled for next week.

20             THE COURT:  What days next week?

21             PROSPECTIVE JUROR NO. 13:  I've got the 23rd, which I

22    believe is Tuesday.

23             THE COURT:  All right.  Thank you.

24             PROSPECTIVE JUROR NO. 13:  And I have the 30th of

25    April, also.

```
 1              THE COURT:  Oh, we'll be done by then.  Thank you very
 2    much.  I appreciate that.
 3              Anybody else?
 4              All right.  Very good.
 5              These are some questions about lawsuits.
 6              Has anyone ever been a party to a lawsuit where they
 7    were sued or you sued someone else?  I'm not talking about
 8    custody or divorce cases or those types of family law cases.
 9    But anybody ever been a party to any other type of lawsuit?
10              Please come forward.  Give me your number and tell me
11    a little bit about it.
12              Good morning.
13              PROSPECTIVE JUROR NO. 32:  Good morning.  Juror 32.  I
14    was part of a civil lawsuit as part of a workplace accident.
15              THE COURT:  All right.  Anything about that that would
16    make it difficult to serve on a criminal case?
17              PROSPECTIVE JUROR NO. 32:  No.
18              THE COURT:  All right.  Thank you.
19              Anybody else have any experience as a litigant?
20              All right.  Has anyone ever testified as a witness,
21    meaning in the witness stand here or in another courtroom, in a
22    criminal case?
23              Ever served as a -- anybody served as a witness?
24              No?  Oh, yes, I see a hand raised.  Please come
25    forward and give us your number.
```

1          PROSPECTIVE JUROR NO. 15:  Just testified that someone

2     pulled in my driveway and they used it for an escape.

3          THE COURT:  Your number, sir?

4          PROSPECTIVE JUROR NO. 15:  15.

5          THE COURT:  How long ago was that?

6          PROSPECTIVE JUROR NO. 15:  It's been probably five

7     years.

8          THE COURT:  Very good.  Thank you.

9          Anybody else appeared as a witness, testified in a

10    criminal case?  All right.

11         Anyone have a dispute with a federal agency, the IRS

12    or Bureau of Land Management or any other federal agency where

13    you had a dispute?

14         All right.  I don't see any hands raised.

15         Has anyone been the victim of a crime where they have

16    been a crime victim of any sort?

17         Yes, I see a hand raised.  Please come up, if you

18    would.

19         PROSPECTIVE JUROR NO. 38:  Juror 38.  I was the victim

20    in a criminal case when I was 12.

21         THE COURT:  All right.  Anything about that that would

22    make it hard for you to be fair to both sides here today?

23         PROSPECTIVE JUROR NO. 38:  No, ma'am.

24         THE COURT:  Thank you, ma'am.

25         Anybody else been a crime victim?

 1          All right.  Then has anyone been the subject of a

 2   criminal investigation or charged with a crime?  On the other

 3   side of that coin.

 4          All right.  I don't see any hands raised.

 5          Has anyone here or someone close to you ever worked in

 6   the area of law enforcement?  What do I mean by close to you?

 7   I'm not talking about your uncle in Oklahoma, unless perhaps

 8   you're very close to that person.  But I'm talking about

 9   somebody that lives with you or that is a really close personal

10   friend.  So you or someone close to you ever worked in law

11   enforcement?

12          I see a hand raised way at the end there.  If you

13   could come up to the microphone and give us your number.

14          PROSPECTIVE JUROR NO. 33:  33.  My husband is a police

15   officer.

16          THE COURT:  All right.  For Fairbanks?

17          PROSPECTIVE JUROR NO. 33:  Yes.

18          THE COURT:  How long has he been on the force?

19          PROSPECTIVE JUROR NO. 33:  Here, for 13 years.

20          THE COURT:  Okay.  Anything about that that might make

21   it hard to be fair to both sides here if there were to be

22   Fairbanks police officers testifying?

23          PROSPECTIVE JUROR NO. 33:  No.

24          THE COURT:  All right.  Thank you.

25          Anybody else, have you or someone else close to you --

1  another person way at the end.  I apologize.  Please come up

2  and tell me.

3          PROSPECTIVE JUROR NO. 14:  Number 14.  My husband was

4  a special investigator with the Air Force.

5          THE COURT:  All right.  How long ago -- is he still

6  with that position?

7          PROSPECTIVE JUROR NO. 14:  No.  Retired.  He did it

8  all his career.

9          THE COURT:  How long ago did he retire?

10          PROSPECTIVE JUROR NO. 14:  I think 11 years.

11          THE COURT:  Anything about that might make it hard to

12  be fair to both sides here?

13          PROSPECTIVE JUROR NO. 14:  I don't think so.

14          THE COURT:  Anybody else?  Please come up to the

15  microphone.  You can all come up, and we'll go through each of

16  your points.

17          PROSPECTIVE JUROR NO. 20:  Juror Number 20.  I have a

18  retired brother and father who have been in the police force.

19  Retired dad was a chief of police at North Pole, and my brother

20  was a retired officer out of North Pole as well.

21          THE COURT:  All right.  And how long ago did they

22  retire, roughly?

23          PROSPECTIVE JUROR NO. 20:  My brother a couple years

24  ago and my father several years ago.

25          THE COURT:  Anything about that that might make it

1  hard to be fair to both sides here?

2          PROSPECTIVE JUROR NO. 20:  No.

3          THE COURT:  All right.  Thank you.

4          Hello.

5          PROSPECTIVE JUROR NO. 38:  Juror 38.  My dad is a

6  police officer on Fort Greely.

7          THE COURT:  All right.  And anything about that that

8  might make it hard to be fair to both sides here?

9          PROSPECTIVE JUROR NO. 38:  No, ma'am.

10          THE COURT:  Thank you.

11          Hello.

12          PROSPECTIVE JUROR NO. 17:  Hello.  Juror Number 17.

13  My former stepfather was a police officer, well, still is, in

14  Colorado.  My mom was married to him for nine years.

15          THE COURT:  Anything about that that might make it

16  hard to be fair to both sides?

17          PROSPECTIVE JUROR NO. 17:  No.

18          THE COURT:  Anybody else with law enforcement friends

19  or relatives?

20          All right.  Some witnesses in this case will be law

21  enforcement officers, and the law provides that the credibility

22  of these witnesses is to be judged by the same standards as any

23  other witness.  Their testimony is not entitled to any greater

24  or any lesser weight simply because that they're involved in

25  law enforcement.  Would anybody have any difficulty following

1    that instruction?

2            And I want to tell you here, and I will probably say

3    it several times this day, and that is that there are no right

4    or wrong answers.  We all have our perceptions or beliefs, and

5    no belief is wrong.  We just want to know about them and

6    appreciate your candor with us.

7            Has anyone here ever worked for a lawyer who did

8    either criminal defense work or was a prosecutor?  Please come

9    forward and tell me.

10           PROSPECTIVE JUROR NO. 36:  I have worked with numerous

11   attorneys in real estate, same with police officers, in the

12   past.

13           THE COURT:  Your occupation is in real estate?

14           PROSPECTIVE JUROR NO. 36:  Yes, ma'am.

15           THE COURT:  Has it been that they have been customers,

16   clients of yours?

17           PROSPECTIVE JUROR NO. 36:  Clients.

18           THE COURT:  All right.  Anything about that that might

19   make it hard to be fair to both sides here?

20           PROSPECTIVE JUROR NO. 36:  I don't believe so.

21           THE COURT:  All right.  Thank you.

22           Hello.

23           PROSPECTIVE JUROR NO. 18:  Juror 18.  I worked for a

24   local Fairbanks law firm for about 15 to 16, maybe 17 years,

25   and I'm currently work for the courthouse, Fairbanks State

1   Courthouse, and I'm a judicial assistant with a judge.

2          THE COURT:  And so the law firm you were with, did

3   they do criminal defense?

4          PROSPECTIVE JUROR NO. 18:  Yes.

5          THE COURT:  Anything about that that might make it

6   hard to be fair to both sides?

7          PROSPECTIVE JUROR NO. 18:  I don't think so.

8          THE COURT:  How long have you been with the state

9   court?

10         PROSPECTIVE JUROR NO. 18:  It will be 18 years.  It's

11  a long time.

12         THE COURT:  All right.  Very good.  Thank you.

13         Hello.

14         PROSPECTIVE JUROR NO. 14:  No. 14.  Me again.

15         THE COURT:  That's okay.

16         PROSPECTIVE JUROR NO. 14:  I worked as a paralegal and

17  did a lot of criminal defense work, but it was a long time ago,

18  probably more than 15 years ago.

19         THE COURT:  All right.  Thank you.  Here in Fairbanks?

20         PROSPECTIVE JUROR NO. 14:  No.  It was in Colorado and

21  Ohio and North Dakota.

22         THE COURT:  Very good.  Thank you.

23         Has anyone taken any classes or courses in law

24  enforcement or criminal justice, taken any classes at all?

25  Please come forward.

1          PROSPECTIVE JUROR NO. 18:  Juror 18.  Many, many,

2    many, many years ago, I did criminal justice classes up at UAF.

3          THE COURT:  Very good.  Thank you.

4          PROSPECTIVE JUROR NO. 35:  Juror 35.  I got my

5    bachelor's degree last year in psychology, with a minor in

6    political science.

7          THE COURT:  Did you take some classes in criminal

8    justice?

9          PROSPECTIVE JUROR NO. 35:  Yes.

10          THE COURT:  Congratulations to getting your degree.

11          PROSPECTIVE JUROR NO. 14:  My degree is criminal

12    justice administration.

13          THE COURT:  How long ago did you get it?

14          PROSPECTIVE JUROR NO. 14:  15 years ago.

15          THE COURT:  You're number 14?

16          PROSPECTIVE JUROR NO. 14:  Yeah.

17          THE COURT:  Anybody else?

18          All right.  And has anyone here or someone close to

19    you had a particularly bad or particularly good experience with

20    any law enforcement officer?  Anything that sticks out in your

21    mind as really good, really bad?

22          Yes.  Please come forward.

23          PROSPECTIVE JUROR NO. 17:  Juror 17.  My mom -- or the

24    police officer my mother was married to caused a lot of

25    problems.

 1          THE COURT:  In the home?

 2          PROSPECTIVE JUROR NO. 17:  Uh-huh.

 3          THE COURT:  Anything about that might make it hard for

 4    you to be fair to both sides?

 5          PROSPECTIVE JUROR NO. 17:  No.

 6          THE COURT:  Was that the Fairbanks police?

 7          PROSPECTIVE JUROR NO. 17:  No.  That was in Colorado.

 8          THE COURT:  I'm going to know everybody's location

 9    here pretty soon, but I'm having trouble keeping everyone

10    straight.

11          Go right ahead.

12          PROSPECTIVE JUROR NO. 36:  In high school, I had a

13    good friend.  She was married at the time to a police officer

14    and had some domestic violence issues.

15          THE COURT:  So this was in your past.  Anything about

16    that that might make it hard to be fair here --

17          PROSPECTIVE JUROR NO. 36:  As long as he doesn't show

18    up here today, and I doubt he is.

19          THE COURT:  Okay.  Very good.

20          All right.  Do any of you know any of the other

21    potential juror that you're seated with here?  Does anyone know

22    anyone else?

23          All right.  You know, I have been a judge for a lot of

24    years.  I'm not going to say how long.  And I've never had a

25    jury -- everybody always knows each other.  It's our state.

```
 1            PROSPECTIVE JUROR NO. 27:  I know this guy right here.
 2   He's a regular customer of ours.
 3            THE COURT:  All right.  Do you think you could
 4   disagree with him?
 5            PROSPECTIVE JUROR NO. 27:  I can disagree with him all
 6   the time.
 7            THE COURT:  Very good.  Thank you.
 8            PROSPECTIVE JUROR NO. 21:  I am 21.  And we are
 9   acquaintances.  I know his mother, No. 34.
10            THE COURT:  All right.  34?
11            PROSPECTIVE JUROR NO. 21:  Yeah.
12            THE COURT:  And do you think you could disagree and
13   still maintain a good relationship, such as it is?
14            PROSPECTIVE JUROR NO. 21:  Yes.
15            THE COURT:  Very good.
16            And I see you're nodding your head too, sir.
17            All right.  Very good.  Thank you.
18            PROSPECTIVE JUROR NO. 32:  I know number 19.  He was
19   my manager a few years ago.
20            THE COURT:  And no longer your manager?
21            PROSPECTIVE JUROR NO. 32:  No.
22            THE COURT:  Do you think you could disagree and still
23   be cordial on the street?
24            PROSPECTIVE JUROR NO. 32:  Yes.
25            THE COURT:  Would you agree?
```

1          PROSPECTIVE JUROR NO. 19:  Yes.

2          PROSPECTIVE JUROR NO. 31:  This is my wife.

3          THE COURT:  Well, this is a more difficult question.

4   Do you think you could disagree in a jury deliberation without

5   that affecting your relationship?

6          PROSPECTIVE JUROR NO. 31:  It would be somewhat

7   difficult if we were both there.  You know, you tell us we're

8   not allowed to talk about things.  If we were both sitting

9   there, I think --

10         THE COURT:  No.  I appreciate your candor.  And your

11  numbers again?

12         PROSPECTIVE JUROR NO. 31:  31.

13         PROSPECTIVE JUROR NO. 11:  11.

14         THE COURT:  All right.  And 11, ma'am, do you feel the

15  same way?

16         PROSPECTIVE JUROR NO. 11:  Yes.

17         THE COURT:  All right.  I appreciate you both letting

18  me know.  Thank you.

19         Anybody else?

20         All right.  Is there anyone who believes they are

21  personally acquainted with any of the lawyers in this case?

22  And that would be Ms. Weber, Ms. Vosacek, Mr. Camiel.  No?  All

23  right.  Very good.

24         And anyone personally acquainted with any of us, the

25  court personnel here?  Do you know any of us?

1          All right.  Very good.

2          There are -- anybody who is personally acquainted with

3   the defendant, Junior Tulali, or any member of his family?

4          All right.  I don't see any hands raised.

5          There are going to be a number of witnesses called in

6   this case, and I'm going to go through them, and in groups of

7   about six or seven names at a time, and then I'll ask you --

8   I'll ask all of you to raise your hand if you believe that you

9   know of any of these names.

10          So the first are a number of people who are federal

11  employees.  First would be Joshua Carr, the special agent here

12  in the courtroom.  Edward Halbert, a task force officer.

13  Son Hoang, a chemist.  Kelsey Roberts, another chemist.

14  Derik Stone, a special agent with the FBI.

15          Anybody feel they may know any of those five people?

16          Yes.  Please come forward.

17          PROSPECTIVE JUROR NO. 24:  I go to church with Derik.

18          THE COURT:  All right.  And your number, sir?

19          PROSPECTIVE JUROR NO. 24:  24.

20          THE COURT:  Is there anything about that that would

21  make it hard for you to be fair to both sides here?

22          PROSPECTIVE JUROR NO. 24:  I don't know him well, just

23  know who he is.

24          THE COURT:  Just know who he is from going to the same

25  church.  All right.  Very good.

1          PROSPECTIVE JUROR NO. 18:  18.  I know Ed Halbert.  He

2    was my son's hockey coach.  And I was the hockey mom for the

3    team, so I --

4          THE COURT:  How many years ago was that?

5          PROSPECTIVE JUROR NO. 18:  Four years ago, five years

6    ago.

7          THE COURT:  Is there anything about that that would

8    make it hard for you to evaluate his testimony the same as

9    other witnesses'?

10          PROSPECTIVE JUROR NO. 18:  No.

11          THE COURT:  Thank you.  Anybody else?

12          All right.  Next group of names, these are either

13    troopers or Fairbanks police officers, as follows:

14    Jack LeBlanc, Michael Roberts, and Joshua Cook.  Those are all

15    with the Alaska State Troopers.

16          And then the following with the Fairbanks police:

17    Clinton Brubeck, Anthony Laska, Caleb Reuter, Gerrit Butler,

18    and Nathan Werner.  Anybody know any of those law enforcement

19    officers?

20          Yes.  Please come forward.

21          PROSPECTIVE JUROR NO. 21:  So let's see.  Actually, I

22    know several.

23          THE COURT:  What's your number?

24          PROSPECTIVE JUROR NO. 21:  21.  So Gerrit Butler, I

25    don't know well, but he's my sister-in-law's brother, so we

have spoken a handful of times.  Mike Roberts, just an

acquaintance.  And Nate Werner is a friend, not super, super

close.  But, yeah.

        THE COURT:  Anything about that -- those facts that

would make it hard for you to be fair to both sides here?

        PROSPECTIVE JUROR NO. 21:  No.

        THE COURT:  When you say Nathan Werner is a friend,

are we talking --

        PROSPECTIVE JUROR NO. 21:  He's the husband of my good

friend.

        THE COURT:  Okay.

        PROSPECTIVE JUROR NO. 21:  So we don't have a whole

lot of interaction personally with each other, but I do with

his wife.

        THE COURT:  Thank you.  That clarified it.

        Anybody else with regard to those individuals?

        All right.  The next three are:  Sean Silva from the

Fairbanks Fire Department Emergency Medical Services.

Dr. Cristin Rolf, who is at the medical examiners.  And

Scott Larson, who is forensic toxicologist.  Anyone know any of

those three people?

        I don't see hands raised.

        The next people are not associated with -- they're

going to be witnesses or their names may come up in the course

of this trial, but they are not law enforcement or otherwise

```
 1   associated with an agency.
 2         The first are a -- they all resided in Fairbanks
 3   unless I tell you otherwise.  All of them -- I think the last
 4   name I'll give you was perhaps more in Anchorage, but all
 5   resided in Fairbanks in October of 2020.
 6         So the first are a number of people with the last name
 7   of Lee.  And that would be Jacob Lee, Raymond Lee, Deborah Lee,
 8   Jason Lee, Joshua Lee, and Jeffrey Lee.
 9         Anybody know any of the Lees here?
10         Yes.  Please come forward.
11         PROSPECTIVE JUROR NO. 24:  Juror 24.  Yeah, I go to
12   church with Jason as well.
13         THE COURT:  All right.  Same question, then.  Anything
14   about that that might make it hard to be fair to both sides
15   here?
16         PROSPECTIVE JUROR NO. 24:  No.  I mean, I'm sort of
17   aware of this situation, but he hasn't talked about details or
18   anything.
19         THE COURT:  You're getting to my next question -- one
20   of my further questions.  But thank you for your candor.
21         So anything about that that would affect your ability
22   to be fair here to both sides?
23         PROSPECTIVE JUROR NO. 24:  I don't think so.  Yeah.
24         THE COURT:  I appreciate that.  Very good.
25         Anybody else with regard to the Lees?
```

```
 1            All right.  Then the next group of names, I'll read
 2  off.  Same thing, resided in Fairbanks in October 2020.
 3            Kristen Stowe, Winston Crockett, Andre Brown,
 4  Christopher Kearney, and Ladarius Edwards.  Anybody feel they
 5  may know any of those individuals?
 6            All right.  I don't see hands raised.
 7            The next group, same group -- same thing, where they
 8  resided in Fairbanks in October 2020.
 9            Kweka Warner, Brooke Warner, Clifford Andrews,
10  Amy Ludwick, and Evan Slongwhite.
11            I want to stress, I don't anticipate all these people
12  are going to be called as witnesses, but you're likely to hear
13  their names in the course of the trial.
14            So go ahead.
15            PROSPECTIVE JUROR NO. 35:  Okay.  35.  And
16  Kweka Warner is my boyfriend's aunt and Brooke Warner is the
17  cousin.
18            THE COURT:  Have you spent time with them?
19            PROSPECTIVE JUROR NO. 35:  Yes.
20            THE COURT:  And how would you say?  Close
21  relationship?  Know of them?  Acquaintance?
22            PROSPECTIVE JUROR NO. 35:  Close relationship, I would
23  say.  We see each other at family events.
24            THE COURT:  When was the last time you saw either of
25  them?
```

1          PROSPECTIVE JUROR NO. 35:  Sunday.

2          THE COURT:  Okay.  Thank you for your candor.  And

3     your number again?  35.  Got it.  All right.

4          PROSPECTIVE JUROR NO. 25:  Number 25.  Amy Ludwick is

5     my close cousin.

6          THE COURT:  All right.  When did you last see

7     Ms. Ludwick?

8          PROSPECTIVE JUROR NO. 25:  It's been about a year.

9          THE COURT:  Okay.  Anything about that that might make

10    it hard to be fair to both sides?

11         PROSPECTIVE JUROR NO. 25:  No.

12         THE COURT:  All right.  Thank you.

13         PROSPECTIVE JUROR NO. 17:  Juror Number 17.  I work in

14    a dental clinic, or, actually, manage a dental clinic, and

15    Slongwhite is a patient of mine.

16         THE COURT:  All right.  Anything about that that might

17    make it hard to be fair to both sides?

18         PROSPECTIVE JUROR NO. 17:  I don't think so.

19         THE COURT:  Okay.  Thank you.

20         All right.  The next group of names are as follows:

21    Hunter Kemp, Melvin Williams, Araka Taylor, Jamie Mobley, and

22    Quinton Turner.  And Quinton Turner is the last name and was

23    more in Anchorage than Fairbanks.

24         Anybody know any of those individuals?  I don't see

25    any hands raised.

1          Are there any of you who believe you may have

2     knowledge of this case or who are familiar with the facts of

3     this case, either by having talked about it with others or

4     having read or heard anything about it?

5          There was somebody that thought they had heard about

6     it.  Just give me your number again, if you would, sir.

7          PROSPECTIVE JUROR NO. 24:  It's 24.

8          THE COURT:  24.  All right.  And we'll hold that

9     thought.

10         Anybody else, based on the very limited statement I

11    gave you?

12         All right.  Sometimes the nature of a case or the

13    charges involved can prevent persons from evaluating a case

14    impartially because of their past experiences or because they

15    have strong personal feelings, and it's important that jurors

16    come to a case without this bias or predisposition.  Here the

17    charges, as I have indicated, are that the defendant violated a

18    federal law prohibiting the distribution of controlled

19    substances, in this case fentanyl.

20         Does anyone here believe that they should not serve on

21    a jury in this particular type of case?

22         I don't see hands raised.

23         As I also indicated previously, it is my job to set

24    forth the law applicable in the case, and I will do so at the

25    end of trial with written instructions that I'll also read to

1   you at that time, before the jury retires to deliberate.

2   You'll also have written copies of the instructions in the jury

3   room during your deliberations.

4          Jurors must be willing to follow all the jury

5   instructions and apply the law as I set it forth and not as you

6   may think it should be or as others may have told you.

7          Is there anyone here who cannot commit to strictly

8   follow those instructions?

9          I don't see hands raised.

10          An important part of our criminal justice system is

11   that the law requires that a defendant is presumed to be

12   innocent and that the government must prove the defendant's

13   guilt beyond a reasonable doubt.  Is there anyone who cannot

14   follow that particular instruction?

15          All right.  I don't see hands raised.

16          And the law also provides that if a defendant chooses

17   to testify, the credibility of his testimony is to be judged by

18   the same standard as any other witness and is not entitled to

19   greater or lesser weight simply because it's the defendant that

20   is testifying.  Is there anyone who cannot follow that

21   particular instruction?

22          I don't see hands raised.

23          And the law also does not require a defendant to

24   testify in a criminal case and provides that the jury cannot

25   hold that fact against him if the defendant decides not to

1 testify.

2 Is there anyone who cannot follow that instruction?

3 All right. And the law also does not impose any

4 burden on a defendant in a criminal case to prove his

5 innocence, and the evidence that you will use to evaluate this

6 case is only what's presented to you here in the courtroom by

7 the witnesses that testify and by the exhibits that I admit

8 into evidence.

9 So is there anyone here who cannot follow that

10 particular instruction? Very good.

11 I have a set of questions on -- about substance abuse

12 topics, and I'll go back to reiterate what I stated earlier.

13 At any time if you would rather answer this question

14 privately, I'll make a note and we'll call you back in a more

15 private session to answer these questions.

16 So the first one is: Have you or a family member or a

17 close friend ever been treated for drug or alcohol or substance

18 abuse? Anybody in your families or close friends or -- please

19 come forward, and like I said, I can make notes here and have

20 you back another time.

21 PROSPECTIVE JUROR NO. 36: Juror 36. I have numerous

22 family members that suffer from addiction, numerous different

23 substances.

24 THE COURT: All right. Anything about that that would

25 make it hard for you to be a fair and impartial juror in this

1    case?

2            PROSPECTIVE JUROR NO. 36:  I've just seen the damage

3    that they've done, so possibly.  But I don't believe so.

4            THE COURT:  All right.  Thank you.

5            PROSPECTIVE JUROR NO. 2:  Juror 2.  My husband and my

6    brother-in-law.

7            THE COURT:  All right.  Are they here in Fairbanks?

8            PROSPECTIVE JUROR NO. 2:  Yes.

9            THE COURT:  Anything about that that would make it

10   difficult to be fair to both sides here?

11           PROSPECTIVE JUROR NO. 2:  No.

12           THE COURT:  Thank you.

13           PROSPECTIVE JUROR NO. 32:  Juror 32.  I used to

14   volunteer with a man I saw as a mentor who struggled with drug

15   addiction, and he had a severe relapse that ended our

16   mentorship.

17           THE COURT:  How long ago was that?

18           PROSPECTIVE JUROR NO. 32:  That was about six years

19   ago now.

20           THE COURT:  Anything about that that would make it

21   hard to be fair to both sides here?

22           PROSPECTIVE JUROR NO. 32:  No.

23           THE COURT:  All right.  Thank you for your candor.

24           PROSPECTIVE JUROR NO. 38:  Juror 38.  My uncle is

25   currently going through addiction treatment.

```
 1           THE COURT:  All right.  Here in Fairbanks or somewhere
 2    else?
 3           PROSPECTIVE JUROR NO. 38:  Yes, in Fairbanks.
 4           THE COURT:  All right.  Anything about that that would
 5    make it hard to be fair to both sides here?
 6           PROSPECTIVE JUROR NO. 38:  No, ma'am.
 7           THE COURT:  Thank you.
 8           PROSPECTIVE JUROR NO. 4:  Juror No. 4.  My dad has
 9    been in and out of substance abuse for the last 15 years.
10           THE COURT:  And is he here in Fairbanks?
11           PROSPECTIVE JUROR NO. 4:  Yeah.
12           THE COURT:  Anything about that that would make it
13    hard to be fair to both sides?
14           PROSPECTIVE JUROR NO. 4:  No.
15           THE COURT:  Thank you.
16           PROSPECTIVE JUROR NO. 18:  Juror 18.  My brother has
17    struggled with drug and alcohol abuse most of his life.
18           THE COURT:  Here in Fairbanks?
19           PROSPECTIVE JUROR NO. 18:  Yes.
20           THE COURT:  Anything about that that would make it
21    hard to be fair to both sides?
22           PROSPECTIVE JUROR NO. 18:  I don't think so.
23           THE COURT:  Thank you.
24           PROSPECTIVE JUROR NO. 24:  24.  My sister struggled
25    with drug problems in the past.
```

1          THE COURT:  All right.  And has she been able to

2   overcome those?

3          PROSPECTIVE JUROR NO. 24:  Yes.

4          THE COURT:  Here in Fairbanks?

5          PROSPECTIVE JUROR NO. 24:  No, down in Juneau.

6          THE COURT:  All right.  Anything about that that would

7   make to hard to be fair here?

8          PROSPECTIVE JUROR NO. 24:  No.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR NO. 17:  My husband has struggled

11  with alcohol abuse since we've been married.  It's been a rough

12  struggle.  So I'm not sure that I could be impartial.

13         THE COURT:  I appreciate that.  Alcohol, then, is the

14  issue in your home?

15         PROSPECTIVE JUROR NO. 17:  Uh-huh.

16         THE COURT:  Thank you.

17         PROSPECTIVE JUROR NO. 21:  Juror 21.  I have a

18  brother-in-law who has ongoing struggles with substance abuse

19  and has been in and out of treatment with that.  And his wife,

20  in recent years, has died from complications due to alcoholism.

21         THE COURT:  Here in Fairbanks?

22         PROSPECTIVE JUROR NO. 21:  No, out of state.

23         THE COURT:  Out of state?

24         PROSPECTIVE JUROR NO. 21:  Yeah.

25         THE COURT:  Anything about that that would make it

1    hard to be fair to both sides?

2              PROSPECTIVE JUROR NO. 21:  I don't think so.

3              THE COURT:  Thank you.

4              PROSPECTIVE JUROR NO. 33:  Hi.  33.  My sister Beth is

5    a drug addict.  She's in Idaho and she's been in and out of

6    prison and rehab, and she will probably be a lifetime addict.

7              THE COURT:  And anything about that that would make it

8    hard to be fair to both sides here?

9              PROSPECTIVE JUROR NO. 33:  I don't know.

10             THE COURT:  Okay.  I appreciate your candor.

11             And your number again?

12             PROSPECTIVE JUROR NO. 33:  33.

13             THE COURT:  33.  All right.  Very good.

14             Does anyone know anyone who has overdosed on any kind

15   of prescription or illegal drug, that has had an overdose?

16             I don't see -- oh.  Very good.

17             PROSPECTIVE JUROR NO. 36:  Juror 36.  I've had several

18   college roommates that have committed suicide with overdosing

19   on drugs.

20             THE COURT:  All right.  And were they outside or here

21   in Alaska?

22             PROSPECTIVE JUROR NO. 36:  This was back in Virginia.

23             THE COURT:  How long ago was that?

24             PROSPECTIVE JUROR NO. 36:  2011 is when I graduated,

25   so in the four years preceding that.

1          THE COURT:  Anything about that that would make it

2     hard to be fair to both sides here?

3          PROSPECTIVE JUROR NO. 36:  No, not at this time.

4          THE COURT:  Okay.  Thank you.

5          And then, does anyone have any experience in the field

6     of healthcare or medicine involving the treatment for drug

7     abuse or addiction?  Anybody work in the addiction field?

8          I don't see any hands raised.

9          You will hear testimony in this case of persons who

10    have cooperated with the government pursuant to a plea

11    agreement that will be introduced as evidence by the

12    government.  Does anyone have any strong feelings one way or

13    the other in connection with the use of witnesses who are

14    cooperating in exchange for a possible reduction in their

15    sentence?

16         All right.  I don't see any hands raised.

17         I'm winding down here, ladies and gentlemen, so that's

18    good.

19         So generally, is there anything in your personal or

20    professional life at this time that would distract you or

21    prevent you from giving your full attention to this case when

22    you're here in the courtroom, anything that is of a pressing

23    nature?

24         PROSPECTIVE JUROR NO. 36:  I'm a -- Juror 36.  I'm a

25    sole proprietor of a small real estate business.  I have

several clients and meetings and appointments and obligations
to those clients that I had to postpone for this week.

THE COURT:  All right.  I appreciate that.  I know the
inconvenience serving on a jury can be for everyone.  I was on
a jury for six weeks many years ago, and it was a challenging
time to try to do my day job in the night and also serve as a
juror.

So anybody else, is there -- as I mentioned, this
trial is expected to last approximately five days.  Does anyone
have any reason why it would be impossible for you to attend
trial every day?  I do have the note from Juror 13 about next
week and the appointments.  But anybody else have anything
critical that we should know about for the next -- into early
next week?

Yes, I saw a hand raised.

PROSPECTIVE JUROR NO. 31:  Number 31.  Due to the
nature of my work, I was supposed to go up north starting on or
about the 24th, on government orders for a project.

THE COURT:  24th, that's next Wednesday.  Is that
correct?

PROSPECTIVE JUROR NO. 31:  Yes.

THE COURT:  All right.  Thank you for the heads-up.
We should be done.

Anybody else?

PROSPECTIVE JUROR NO. 10:  Juror 10.  I was supposed

1   to be leaving Sunday for work meetings, Sunday to Tuesday.

2           THE COURT:  All right.  Do you have some flexibility

3   there?

4           PROSPECTIVE JUROR NO. 10:  If need be.

5           THE COURT:  All right.  Thank you.

6           PROSPECTIVE JUROR NO. 36:  I thought it would be

7   redundant, but the same as before.

8           THE COURT:  No, no.  It's fine.  Thank you for --

9           PROSPECTIVE JUROR NO. 36:  Juror 36.

10          THE COURT:  Thank you, sir.

11          PROSPECTIVE JUROR NO. 5:  5.  I'm on a state wildland

12  fire crew, and it wouldn't be impossible to make it those days,

13  but it would be difficult.

14          THE COURT:  This week?

15          PROSPECTIVE JUROR NO. 5:  This week and next week.

16          THE COURT:  So what's your job on the wildfire crew?

17          PROSPECTIVE JUROR NO. 5:  I'm a wildland firefighter.

18          THE COURT:  Now, I'm from Anchorage and I don't want

19  to have to say that, but is it fire season now?

20          PROSPECTIVE JUROR NO. 5:  No.  But next week is.

21  We'll have 15 new employees coming in, and there's a lot going

22  on leading up to that.

23          THE COURT:  Thank you.  Now my secret is out.

24          Very good.  As I -- well, maybe what we'll do here is

25  take a short break and I'll confer with counsel here briefly,

1  and then we'll call up 32 names.

2         But before we do that, I wanted to give you a very

3  important instruction, and that is, it goes back to this point

4  I said, that each side is entitled to have a case like this,

5  every case, determined just by the evidence that's presented in

6  the courtroom.  So in that regard, we have rules that we apply

7  in every case, and there are really two sets of rules.

8         The first rule is to feel free to get to converse with

9  one another.  Some of you already know each other, husband and

10  wife, for example, and others, and feel free to talk about

11  anything except for this case.

12         And I've told you very little about the case, but

13  please remember my admonition not to talk with each other about

14  anything to do with this case, not to do any research, not to

15  Google any names, nothing of that nature.

16         The second rule is with regard to the people that are

17  seated on this side of the half wall there, and that is not to

18  talk to them at all.  They have had that same instruction, and

19  not to even just share a hello or the time of day.  That is to

20  also ensure that we have this proceeding that is intended to

21  protect the rights of both sides.

22         So with that said, I will excuse you all, and you can

23  go out through the back of the courtroom.

24         Do they go back to jury assembly at the end of the

25  break?

1           The jury clerk will come and get you, and then at the
2   end of the break, we'll have you come back to the juror
3   assembly room where you started this morning.  We should, in
4   terms of scheduling, conclude the jury selection, my hope is by
5   very early afternoon.  So we'll take about 15 minutes here and
6   have you come back at 11:25 a.m. to the jury assembly room.
7   You can all be excused at this time.  Thank you all for your
8   candor on our questions today.

9           (Prospective jurors exit courtroom.)

10          THE COURT:  Please be seated, everyone.

11          Could I ask the -- to close the door.  Very good.

12          So I wanted to discuss with counsel, with the
13  prospective jurors out of the room, if there were any
14  challenges for cause at this time.

15          Ms. Weber on behalf of the government?  I've never had
16  a husband and wife, I have to say, on a jury.  Ms. Weber?

17          MS. WEBER:  Your Honor, there is one juror who is
18  cousins with Amy Ludwick, who may be testifying as a witness at
19  trial and did have a drug overdose it seems like maybe the
20  juror was not aware of.  I'm just looking for her number
21  quickly.

22          DEPUTY CLERK:  It's number 25.

23          MS. WEBER:  It was Juror 25.

24          THE COURT:  Are you seeking to excuse that juror for
25  cause?

1          MS. WEBER:  Yes, Your Honor.

2          MR. CAMIEL:  Your Honor, I agree.

3          THE COURT:  You agree?

4          MR. CAMIEL:  Yes.

5          THE COURT:  I will excuse 25.  Any others?  I'm not

6     going to now, by the way, not formally excuse them.  We'll do

7     that later on.  But we'll pull their name out.

8          Go ahead, Ms. Weber.  Any others?

9          MS. WEBER:  No, Your Honor.

10         THE COURT:  Mr. Camiel, others that you would propose?

11         MR. CAMIEL:  Yes, Your Honor.  Juror Number 24 is the

12    juror who indicates that he goes to church with Jason Lee and

13    is aware of the situation, and we didn't get into how much he

14    knows, but it seems like he knows about the case and what's

15    going on and he's -- I just think it would be very difficult

16    for somebody like that to come in with an open mind and keep an

17    open mind.

18         THE COURT:  Well, what I'll do with him -- you're at a

19    disadvantage, Mr. Camiel, because I don't know if I told you

20    this in the last trial.  I did trials in Unalaska for about ten

21    years, and everybody knew everybody else and we picked juries,

22    and out in the Aleutians.  And so from that standpoint, here we

23    are in Fairbanks, certainly a larger community, but going to

24    church in and of itself and knowing something about the facts

25    is not enough in the Court's mind to challenge for cause.  But

1    I will have him called in separately when the jury is back.

2    I'll make some inquiry and I'll allow a brief follow-up from

3    counsel, and then you can renew as warranted at that time.

4            So that's 24.  Any others?

5            MR. CAMIEL:  Just review my notes for just a second.

6        (Pause)

7            MR. CAMIEL:  Your Honor, Juror 36 has had -- he

8    described numerous family members with addiction issues.  He

9    talked about seeing the damage that was done.  If anything, I

10   think we need to further follow up with him.  He seemed to be,

11   without saying it, indicating that he might have a hard time

12   being fair in a drug case.

13           I also have in my notes Juror Number 33, who has a

14   sister who I believe is struggling with a drug addiction

15   problem, and when she was asked whether or not she could be

16   fair, she said, "I don't know."

17           THE COURT:  I had that note as well, Mr. Camiel.  I'm

18   going to reserve ruling on 33 and 36, and you can do the

19   follow-up with them during the 15 minutes.  I sensed more

20   disinterest than bias from 36, in all candor.  But I thought

21   33, some follow-up is warranted.

22           Very good.  Others that you wanted to take up?

23           MR. CAMIEL:  Yes.  There is -- I'm sorry.

24   Juror Number 35 indicated that she's friends with Kweka Warner

25   and Brooke Warner, who are two witnesses.  One is, I guess,

some connection to an aunt of hers. And just for the -- so the
court understands, the Warners are the people who lived at the
house where the drugs were found that Mr. Brown was leaving
that house. So that's the connection of those witnesses or
potential witnesses to the case, and she indicated it was a
close relationship.

THE COURT: She did. I'll do the same, reserve on
that. If you need some additional time in your questions, I
will go -- you can make that application, but I'm not persuaded
at this time that a for-cause challenge is warranted. But I
could see that eventually as a possibility.

Others at this time?

MR. CAMIEL: No, Your Honor.

THE COURT: All right. Very good. So those -- we'll
call in 24 when we come back at 11:25 a.m., then the clerk will
call forward 32 names, not including 25. Well, I guess you
already have the numbers. Correct? So that's going to -- I
will excuse 25, then. We used to do it randomly now, but
that's going to be kind of obvious. So we will excuse 25. And
we'll take up 24 after we talk with him and before we bring
back in the jurors.

Anything else at this time, Ms. Weber?

MS. WEBER: No, Your Honor.

THE COURT: Anything else?

MR. CAMIEL: No, thank you.

```
1           THE COURT:  Very good.  We'll go off record.
2           DEPUTY CLERK:  All rise.  This matter is now in recess
3  until 11:25 a.m.
4       (Recessed from 11:17 a.m. to 11:30 a.m.)
5       (Jury absent)
6           DEPUTY CLERK:  All rise.  Her Honor, the Court, the
7  United States District Court is again in session.
8           Please be seated.
9           THE COURT:  All right.  We are back on record here
10 without the jury.
11          I am inclined to excuse for cause Juror 31, who was
12 the higher number of the husband and wife as between 11 and 31.
13 Any objection there, Ms. Weber?
14          MS. WEBER:  No, Your Honor.
15          MR. CAMIEL:  No.  I was wondering how you were going
16 to handle that.
17          THE COURT:  Doing the higher number, especially 31, if
18 you didn't exercise all the peremptories, she'd be excused
19 anyway.
20          So 31 is excused.  25 will be excused.  And we'll call
21 in 24 if he's ready.
22          Is he ready?
23          DEPUTY CLERK:  She's bringing him in now.
24          THE COURT:  Very good.
25      (Pause)
```

1           THE COURT:  Hello, Juror 24.

2           PROSPECTIVE JUROR NO. 24:  Hello.

3           THE COURT:  If you could come up to the microphone

4    again.

5           I appreciate your candor earlier that you know

6    something about this case and know some of the names I read off

7    from church.  What all do you know about the case?

8           PROSPECTIVE JUROR NO. 24:  I just know that Jason's

9    brother died from an overdose.  That's really it.

10          THE COURT:  Knowing that fact, would it be difficult

11   for you to be fair to both sides here?

12          PROSPECTIVE JUROR NO. 24:  I think there could be a

13   challenge.

14          THE COURT:  Okay.  And how well did you know Jason?

15          PROSPECTIVE JUROR NO. 24:  I have been thinking about

16   this sitting in the room.  He's a friend, but more of a

17   peripheral friend.  Like, I have never talked to him about this

18   case.  He has never talked to me.  The last time we texted was

19   a few years ago.  But, you know, he has shared a little bit,

20   just kind of what he's gone through.

21          THE COURT:  Thank you.  I appreciate that.  I'm going

22   to ask the lawyers if they have any follow-up, ask you a couple

23   more questions.

24          PROSPECTIVE JUROR NO. 24:  Sure.

25          THE COURT:  Ms. Weber?

1          MS. VOSACEK:  Thank you for your honesty here today.

2     But as the judge has said, you know, we're here because we want

3     to make sure that everybody has a fair trial.  And that is the

4     defendant's constitutional right, and also the government has a

5     right to a fair trial.  And what we would be asking you to do

6     would be to not think about what you may have heard about the

7     case, but only listen to the evidence that's presented here in

8     court and then listen to the rules and the law that the judge

9     gives you, and just fairly weigh what you hear in court with

10     that application of the law.

11          Is that something that you think that you could you

12     do?

13          PROSPECTIVE JUROR NO. 24:  I think I could do that,

14     yes.

15          MS. VOSACEK:  I don't have any further questions.

16          THE COURT:  Mr. Camiel, any follow-up?

17          MR. CAMIEL:  Thank you, Your Honor.

18          Good morning.  You indicated that -- it's Jason, is it

19     not?  Right?

20          PROSPECTIVE JUROR NO. 24:  Yeah, Jason.

21          MR. CAMIEL:  You said he shared a little?

22          PROSPECTIVE JUROR NO. 24:  He didn't share any details

23     about what happened.  He just shared about the loss of his

24     brother, the feelings that he felt about that.  And so that's

25     really all I've seen and witnessed.

1        MR. CAMIEL: Okay. When did you first hear about his

2 brother overdosing?

3        PROSPECTIVE JUROR NO. 24: Oh, gosh. Timeframe is

4 really bad. Maybe a couple years ago. I am aware that there's

5 a previous trial for someone else involved in the case, and I

6 know how that ended, but.

7        MR. CAMIEL: What do you know about how the previous

8 case ended?

9        PROSPECTIVE JUROR NO. 24: Well, just that I do

10 believe that the person was found guilty, involved in the case.

11        MR. CAMIEL: Do you know other members of the Lee

12 family?

13        PROSPECTIVE JUROR NO. 24: No. Well, I mean, Jason's

14 wife, but none of the other folks.

15        MR. CAMIEL: Did he share -- did Jason share his

16 feelings or about what happened? Is it something he shared in

17 church as a part of a proceeding?

18        PROSPECTIVE JUROR NO. 24: It was just a moment of,

19 yeah, sharing, and he just shared his emotions that were going

20 on and how he ultimately forgave the person that -- in the

21 previous case. So...

22        MR. CAMIEL: I'm sorry. I didn't quite get the

23 last --

24        PROSPECTIVE JUROR NO. 24: Oh, just the -- again, he

25 didn't share details about the trial or anything that happened.

He just shared his personal thoughts on it all and how he as a
Christian ended up forgiving the person.

      MR. CAMIEL:  You mentioned when Judge Gleason asked
you how this would impact your ability to be fair, I think what
you said was it could be a challenge?

      PROSPECTIVE JUROR NO. 24:  Yeah.  I think about it's
trying to divide the evidence that's presented as well as just
what I know about Jason and the emotions that he felt and --
and seeing that, because it's a reality that I will have to see
him every Sunday, and so just trying to think of that impact
depending on how the case goes.  And I do believe that I could
be partial to the evidence that's provided, but I was just
thinking about how -- depending on how it plays out, how would
that impact my relationship with Jason.  And it all comes down
to, well, you can't go by what someone else wants to happen, it
has to be by the evidence.  But I guess I'm aware that that --
I don't know what that will do to my relationship with Jason or
how we would see each other on Sunday.  I don't.

      MR. CAMIEL:  Do you think that would be a
consideration when you're thinking about the evidence and which
way to go?

      PROSPECTIVE JUROR NO. 24:  No.  I would not make that
a consideration.

      THE COURT:  Mr. Camiel, I need you to wrap up.
Anything further?

1          MR. CAMIEL:  No.

2          THE COURT:  Thank you, sir.  You may be excused.

3  We'll get everybody back in here shortly.

4          DEPUTY CLERK:  Your Honor, Juror Number 21 stepped up

5  to Kendra and said she'd like to clarify her

6  answers regarding --

7          THE COURT:  All right.  When we come back in the

8  courtroom, not privately?

9          DEPUTY CLERK:  She didn't say privately.

10          THE COURT:  All right.  So we'll follow up with Juror

11  21 when we get everybody back in.

12          With regard to 24, any challenge, Ms. Weber?

13          MS. VOSACEK:  No, Your Honor.

14          THE COURT:  Mr. Camiel?

15          MR. CAMIEL:  Yes.  I would renew my challenge for

16  cause.  In addition to him having received some information

17  from the brother, he indicates he heard about the prior case

18  and how that turned out, and I just -- and he did say it could

19  be a challenge and he's thinking about his relationship or what

20  would happen to his relationship with Jason if he had to reach

21  a result that maybe he thought the brother wouldn't want.  I

22  just think he's got too much baggage here.  He knows too much.

23  And so I would renew my challenge for cause.

24          THE COURT:  Well, I'm going to deny that.  I perceived

25  this Juror 24 as one of the most thoughtful prospective jurors

1    I've seen, where he was aware of his responsibilities and

2    thinking about his relationships in a small community, or

3    relatively small such as Fairbanks, and yet indicated he felt

4    he could carefully consider -- apply the law and consider the

5    evidence and render a verdict.  So that's denied as to 24.

6         So I think we can bring the jury back in now.  We'll

7    hear from 21.  If either side seeks to make application as to

8    21, they can do so, but then we'll have the first 32 names

9    after I excuse 25 and 31.

10        So have you put out the questionnaires?  Why don't you

11   just put them in the jury box for now, and when you get the

12   rest seated, you can hand them out to them.

13       (Pause)

14           THE COURT:  This is the questionnaire I think both

15   sides were provided.  Very good.  We're ready to bring them all

16   back in.

17       (Pause)

18       (Prospective jurors enter courtroom.)

19           THE COURT:  Welcome back, everybody.

20           Please be seated, everyone.

21           I was informed that prospective juror 21 had an

22   additional comment to make.  Do we have 21 here?  Yes.

23           PROSPECTIVE JUROR NO. 21:  Thank you.  So when you had

24   asked about close family friend being an officer -- or law

25   enforcement officer, I -- I was thinking more about my personal

1    close friends.  I did mention that I know Nathan Werner, but I

2    wanted to clarify that, like, his wife and I are very close and

3    our families do get together occasionally for meals and things.

4            THE COURT:  All right.

5            PROSPECTIVE JUROR NO. 21:  Thank you.

6            THE COURT:  When was the last time you saw him?

7            PROSPECTIVE JUROR NO. 21:  Just this past week,

8    actually.  Yeah.

9            THE COURT:  Thank you.  I appreciate that.

10            Any follow-up?  Do we need any sidebar here?

11    Ms. Weber?

12            MS. WEBER:  No, Your Honor.

13            THE COURT:  Mr. Camiel?

14            MR. CAMIEL:  Your Honor, I have a question.

15            THE COURT:  Do you want to have a sidebar here?

16            MR. CAMIEL:  Please, yeah.

17        (Begin bench conference)

18            MR. CAMIEL:  Your Honor, I guess I would want to be

19    able to ask her a couple follow-up questions about, she said

20    that they had dinner just like a week ago, and I don't know if

21    he's talked about his work or an upcoming case or anything like

22    that.

23            THE COURT:  Why don't I have Lisa bring Juror 21 back

24    here.  All right.  Hold that thought.

25            (Pause)

1     (Juror 21 enters sidebar.)

2          THE COURT:  Sorry to put you on the spot, but the

3     lawyers --

4          PROSPECTIVE JUROR NO. 21:  I put myself on the spot,

5     so I needed to clarify that I do know him.

6          THE COURT:  Well, Mr. Camiel can come stand over here.

7     And he had some follow-up questions.

8          PROSPECTIVE JUROR NO. 21:  Okay.

9          THE COURT:  So go right ahead.

10          MR. CAMIEL:  So it sounded like you had dinner with

11     them.

12          PROSPECTIVE JUROR NO. 21:  Yeah.

13          MR. CAMIEL:  So he comes over with his wife or family

14     for dinner.

15          PROSPECTIVE JUROR NO. 21:  And family, yeah.  Our kids

16     are friends.  He and I don't have a lot of interaction.  But

17     within our church, like, his wife and I both have a -- like, we

18     teach the youth at our church, and so we have a lot of, like,

19     during-the-week conversations and things, but not -- so I don't

20     have that with him, but his wife.

21          MR. CAMIEL:  Do you talk to him or his wife about his

22     work?

23          PROSPECTIVE JUROR NO. 21:  It does come up, but not on

24     a regular basis.

25          MR. CAMIEL:  Has he talked about any of the cases that

1   he's working on currently?

2           PROSPECTIVE JUROR NO. 21:  No, not at all.

3           MR. CAMIEL:  Because of the relationship you have with

4   he and his wife, how would you feel about having to listen to

5   him testify and having to decide whether he's credible or not?

6   Do you think you already start out, because you know him --

7           PROSPECTIVE JUROR NO. 21:  I think I would probably

8   have a bias.  I would assume that he's credible.

9           MR. CAMIEL:  Knowing nothing else, that's where you

10  would start?

11          PROSPECTIVE JUROR NO. 21:  Yes, because I know him as

12  a person, and his family.

13          MR. CAMIEL:  If his testimony was being challenged,

14  either it was inconsistent with another witness or a lawyer is

15  asking him questions that seemingly challenge his credibility,

16  you'd automatically -- I don't want to put words in your mouth.

17  Where would you --

18          PROSPECTIVE JUROR NO. 21:  I've never been in that

19  position, so I would like to say I could have an unbiased

20  opinion, but without having been through it, I can't say for

21  sure I would be unbiased.

22          THE COURT:  Anything else?

23          MR. CAMIEL:  No, thank you.

24          THE COURT:  Any follow-up?

25          MS. VOSACEK:  So if he were to testify, and I guess

what we're asking you to do is weigh all of the evidence as it comes in, would you be able to just simply evaluate the evidence and impartially decide the case based on the evidence, not the fact that you might have a relationship with him?

PROSPECTIVE JUROR NO. 21: I think I would. Again, I've never done it before, and so -- but yes. I know that I'm a credible person, and so I would like to say yes, that I could weigh the evidence and make a judgment just based on that.

MS. VOSACEK: If he doesn't testify, do you feel any loyalty to the police department or --

PROSPECTIVE JUROR NO. 21: I do not.

MS. VOSACEK: Would you have a hard time finding someone not guilty?

PROSPECTIVE JUROR NO. 21: Would I have a hard time finding someone not guilty?

MS. VOCACEK: Yes.

PROSPECTIVE JUROR NO. 21: I don't think so. I don't have a particular loyalty to --

MS. VOSACEK: Even if he did testify, would you have a hard time finding somebody not guilty?

PROSPECTIVE JUROR NO. 21: I don't think so.

THE COURT: All right. Thank you. We'll send you back, and you guys can stay here. I'll come back in just a moment.

(Juror exits bench conference)

1          MR. CAMIEL:  I'm going to challenge for cause.  I
2    think the relationship is too close.  He's not the case agent,
3    but he's one of the key law enforcement people in the case.
4          THE COURT:  Would you concur he's one of the key?
5          MS. WEBER:  No.  Your Honor, again, he wasn't involved
6    with the overdoses necessarily.  It was just that one search
7    warrant, which it seems like the defense is saying isn't
8    necessarily related to the larger scheme of this case.  We
9    don't expect to call him to testify.  We expect to call
10   TFO Reuter, who will be the primary law enforcement witness in
11   this case, and I believe that she'd be able to assess his
12   credibility the same way she would assess any other witness.
13   Just because she's friends with his wife --
14         MR. CAMIEL:  I would just point out, just to make a
15   record, I think he was involved in the stop and the arrest of
16   Mr. Brown and Mr. Kearney, and I think he was involved in the
17   debriefing and he was present at their proffers.  So I think
18   that's why he's an important person in the case.
19         THE COURT:  Are you stating you are not calling him
20   definitively?
21         MS. WEBER:  I don't want to state that definitively,
22   but at this point we don't anticipate --
23         THE COURT:  If you're not going to say it
24   definitively, which is fine, you don't need to, I will grant
25   the motion as to 21, then, given what she stated about her

1   closeness to the family.  And that leaves your options open,

2   but we'll have 21 excused.

3           Any others to take up before I give you each

4   15 minutes here?  You've made your record on the one I denied.

5           Anyone?  All right.  Good.  Then we'll go back on

6   record.

7       (End bench conference)

8           THE COURT:  Please be seated everyone.  At this point,

9   I'm going to thank and excuse three people.  I'm going to thank

10  and excuse Juror Number 21, Juror Number 25, and I'm going to

11  thank and excuse Juror 31, who is the -- one of spouses of the

12  husband and wife pair.  I made that decision because 31 is a

13  higher number than 11.  And that was of the basis for it.

14  Somewhat arbitrary, but it did seem that we should not have a

15  husband and wife team on the jury if we wanted to preserve

16  marital relationships.

17          So with that, 31, 25 and 21 are excused.  You can stop

18  at jury assembly if you need a note for your employer.  Thank

19  you for your participation today.

20          As they leave the courtroom, our next step is that our

21  courtroom deputy is going to call forward 32 names, and the

22  first 14 will sit in the jury box and then the next 18 will sit

23  across the front of the back of the spectator section of the

24  courtroom.  We have a questionnaire that we'll then have each

25  of the 32 answer.  A few of you won't be called up, and I'd ask

1    you to remain in the courtroom, and toward the back of the

2    spectator section.  In the event another juror is excused, you

3    would be called in, one of you, to replace them.

4              Go ahead, please, Madam Clerk.

5              DEPUTY CLERK:  Juror Number 1.

6              Juror Number 2.

7              Juror Number 3.

8              Juror Number 4.

9              Juror Number 5.

10             Juror Number 6.

11             Juror Number 7.

12             Juror Number 8.

13             Juror Number 9.

14             Juror Number 10.

15             Juror Number 11.

16             Juror Number 12.

17             Juror Number 13.

18             Juror Number 14.

19             Juror Number 15.

20             THE COURT:  We want 15 over here, right?

21             DEPUTY CLERK:  Yes, all the way to the right in the

22    front row.

23             THE COURT:  Right.  Very good.

24             Thank you, sir.  All the way to the end.  Perfect.

25             Juror Number 16.

1          Juror Number 17.

2          Juror Number 18.

3          Juror 19.

4          Juror Number 20.

5          Juror Number 22.

6          Juror Number 23.

7          Juror Number 24.

8          Juror 26.

9          Juror Number 27.

10         Juror Number 28.

11         Juror Number 29.

12         Juror Number 30.

13         Juror Number 32.

14         Juror Number 33.

15         Juror Number 34.

16         And Juror Number 35.

17         I'm wondering if you've got to go all the way -- be in

18    the second row behind the first juror there.  Thank you, ma'am.

19         DEPUTY CLERK:  32 numbers have been called.

20         THE COURT:  Thank you, Madam Clerk.  And if you could

21    get the questionnaires distributed.

22         So the courtroom deputy is going to come around with a

23    questionnaire for each of you whose numbers have been called,

24    and I would ask you to look at that questionnaire and go ahead

25    and give us your answers after we get them all distributed

1   here.

2       (Pause)

3           THE COURT:  All right.  We can start with Juror

4   Number 1.  If you can give us the answers to those questions.

5   Go right ahead.

6           PROSPECTIVE JUROR NO. 1:  I'm Juror Number 1.  I live

7   in Fairbanks.  I've been here since 1988.

8           I'm currently -- I classify myself as retired.  Work

9   history for the last five years was in commercial construction.

10  I have a BS in fishery science from UAF.  I'm married.  My wife

11  is a deputy refuge manager of the Yukon-Kuskokwim Delta Refuge

12  out of Bethel.  We have no children.

13          Hobbies, basically, you know, doing Alaska things,

14  hunting, fishing, spending time out in the woods.

15          I've never been in the military.  I have served on

16  several juries, and they've all been criminal.  Some have

17  reached a verdict, some have not.  I was not a foreperson.

18  I've never been on a grand jury.  And I don't think there's any

19  reason why I could not or should not serve on this jury.

20          THE COURT:  Thank you, sir.  If you could pass that on

21  to Juror 2.

22          PROSPECTIVE JUROR NO. 2:  I live in North Pole.  I've

23  been here for 22 years.  My occupation is education support

24  staff for the North Star Borough School District.  I have

25  worked for them for the past five years at North Pole High

School.  Highest level of education is an associate's degree.
I'm married.  My husband is self-employed with -- he does home
maintenance.  I have two children, soon to be 14 and 10.

Hobbies, clubs and organizations, Everything Alaska
and 4-H with my children.

No military.  Prior service, I have always gotten the
letter but never actually got called.  And there is no reason I
can think of that I would not be able to serve on this jury.

PROSPECTIVE JUROR NO. 3:  Juror Number 3.  Place of
residence is North Pole.  I have lived here for five years.  My
occupation is a radar technician.  I work for Scientific
Research Corporation.  I have worked there for the last five
years.  Highest level of formal education would be technical
training.

I'm married.  My wife stays home with our children.  I
have four children, ages 12, 11, 8 and 6.  Hobbies would be
hunting, fishing, and doing outdoor things with my family.

I was in the military from 2010 to 2016, and I was an
E-4 at the time of discharge.  I have never served on a jury
previously, and there is no reason that I can think that I
could not serve.

PROSPECTIVE JUROR NO. 4:  I am Juror 4.  I live in
North Pole.  I've lived here 30 years.  I'm an assistant GM and
I've worked there for the past five years.  I have just gone to
high school.

```
 1          I'm single.  I don't have any children.  I'm super
 2  outdoorsy, everything Alaskan.
 3          I've done no military service, and I've never served
 4  on a jury and there's no reason I can't serve on this jury.
 5          PROSPECTIVE JUROR NO. 5:  Place of residence is here
 6  in Fairbanks.  I have been here since 2019.  My current
 7  employer is Division of Forestry.  I work on a fire crew.  I
 8  have been doing that for four years.  Before that, I worked as
 9  an installer at Street Sounds.
10          Highest level of education is just high school
11  diploma.  Not married.  No children.  Some hobbies are doing
12  outdoor things.
13          And no prior military service.  Never served on a
14  jury.  And just as I had mentioned earlier, it wouldn't be
15  impossible for me to make those days, but it would just be
16  difficult taking time off of work.
17          THE COURT:  This is next Monday going forward?
18          PROSPECTIVE JUROR NO. 4:  Yes.
19          THE COURT:  Very good.  Thank you.
20          PROSPECTIVE JUROR NO. 6:  I'm Juror 6.  I live in
21  Fairbanks.  I have been here since 1982.  I'm a retired
22  teacher.  In the past five years, I did some special education
23  testing work for the district.  I have a master's degree.
24          I'm married.  My spouse is also a retired teacher.  I
25  have two children.  My oldest son is deceased.  My younger son
```

1  works at UAF.  I like any outdoor activities.

2        Never served in the military.  I have been on grand

3  jury.  And there is no reason why I shouldn't serve.

4        THE COURT:  Thank you.

5        PROSPECTIVE JUROR NO. 7:  Juror Number 7.  Live here

6  in Fairbanks.  Born and raised here in Fairbanks.  Occupation

7  is retired, thank God.  Work history for the last five years,

8  retired.  Highest level of education was technical training.

9        Married.  My wife is also retired.  I have two boys.

10  They're grown.  One is a welder and one is a heavy equipment

11  mechanic.  Hobbies and clubs, hunting, fishing.  And I've

12  worked -- in the past, I've worked a lot with youth shooting

13  sports.

14        No military service.  Have served on a criminal jury.

15  A verdict was reached.  And I also served on a grand jury.  And

16  I don't think there is any reason why I can't serve.

17        PROSPECTIVE JUROR NO. 8:  Juror 8.  I live in

18  North Pole.  I have been in Alaska since 1969.  I'm a

19  receptionist at a local machine shop for the past 24 years.

20  High school diploma.

21        Not married, but live with someone for the past

22  24 years as well.  I have two adult children, who are both

23  cashiers, one at a convenience store and one at Fred Meyer.

24  Hobbies are mostly stuff with my grandkids.

25        No military service.  And the only jury service has

been grand jury, and I don't see anything that would stop me
from being on the jury.

PROSPECTIVE JUROR NO. 9:  Juror Number 9.  Currently
at North Pole.  We've been here since 2012.  Current occupation
is VTC technician, or BSET.  I have been working that job for
about five years now.  Bachelor's degree in aircraft
maintenance.

I'm married.  My spouse just took a break for school
district this year.  So she's taking her time off for that.  We
got two children, both are in college.  Timothy is 25 and Sarah
Mae is 19.

My hobbies are fishing, like everyone here, also
spending time with the family.  I served in the military,
retired as a master sergeant in the Air Force.  No prior jury
service.  And I don't see any reason that would prevent me to
serve this year.

PROSPECTIVE JUROR NO. 14:  Number 14.  Live in
North Pole.  I moved here in '03, but I had a nine-year gap in
Texas.  I'm an office manager for a Lutheran church, and that's
where I've worked for the last five years.  I have a BS in
criminal justice administration.

I'm married, and my husband is retired military.  My
children are both adults.  My daughter is executive director of
CARELINE, which is the suicide hotline, the statewide hotline
for the State of Alaska.  And my son is active duty

Coast Guard.

My hobbies are online gaming, and I'm an avid reader and I volunteer with my church.  No military service.  I have been called for jury service twice, but I have not been picked.  And I see no reason why I shouldn't serve.

PROSPECTIVE JUROR NO. 13:  I live in Fairbanks.  I was born and raised here, but I married a military man, so I've moved out several times.  And I'm back now for the third time.  I'm not employed.  I haven't worked for about 13 years, since we left Delta Junction.  I have two years of college, no degree.

I'm married, as I already stated.  My husband works on the airfield at Fort Wainwright.  I do have one adult daughter, and she has two children, 10-year-old and 6-year-old grandsons.  Both my daughter and son-in-law work for the city.

My hobbies are sewing, crafting, knitting.  No military service for me, just my husband.  I was on a grand jury in Kentucky a few years back.  And the only reason I wouldn't be able to serve is Tuesday I have a doctor appointment.

THE COURT:  I have a note on that.  Very good.

PROSPECTIVE JUROR NO. 12:  I live in North Pole, have lived in Alaska since '83.  I work as an account tech at the State of Alaska Office of Children's Services, and have been doing that since 2012.  Two years of college, no degree.

1      I'm married.  My spouse is a business owner, an
2  aircraft repair station.  We have an adult child.  He is a
3  northern lights tour guide.  Hobbies, everything Alaskan, just
4  looking out my window, seeing the birds, being outside.  No
5  military service.  Prior jury service, yes.  It was a criminal
6  trial and no verdict was reached.  And I can't think of another
7  reason.

8          PROSPECTIVE JUROR NO. 11:  North Pole, Alaska.  I have
9  been in Alaska for a total of 26 years, three in Anchorage, and
10 we were gone for three years and then we came back in the
11 military.  We have been here for 23 years since then.  I'm with
12 the U.S. Army Corps of Engineers, project assistant.  I have
13 been there for 15 years.  I have some college in early
14 childhood education.  I never finished the degree.

15         I have been married for a long time, and my husband is
16 a civil engineer tech with the Army Corps of Engineers also.
17 We have two adult children.  My daughter is a stay-at-home mom
18 to four lovely grandchildren, and my son is a registered nurse
19 in Pittsburgh.

20         Hobbies and clubs, hanging out with the grandkids,
21 getting out and seeing Alaska.  Like I said, my husband is
22 retired military.  I just stood by his side the whole time, so
23 no service for myself.

24         I had one summons.  There was no selection.  They
25 settled before they ever had us do anything.  And I see no

1 reason to not serve.

2      THE COURT:  Thank you.

3      PROSPECTIVE JUROR NO. 10:  Juror 10.  North Pole

4 resident.  I have been in Alaska for nine years.  I work for

5 Motion Industries as a branch manager.  I have been with them

6 more than five years.  High school graduate.

7      I'm married.  My spouse is a controller at Delta Power

8 Sports.  No children.  Hobbies are hunting, fishing, trapping.

9      I have never been in the military.  And I have never

10 served on a jury.  And I'm available for jury service.

11      PROSPECTIVE JUROR NO. 15:  Juror 15.  Fairbanks,

12 Alaska.  Been here since '91.  Mechanic for a demolition

13 company.  Highest grade is 12.

14      Married.  My wife is receptionist at Wright's Air.

15 One child.  Hunting.

16      And there's no reason why I shouldn't be able to

17 serve.

18      PROSPECTIVE JUROR NO. 16:  I reside in Fairbanks, and

19 I have resided there since 1987.  My occupation is program

20 director, Presbyterian Hospitality House.  That's been for the

21 last five years.  I have a bachelor's in science.

22      I'm married.  My wife is a social worker at Foundation

23 Health Partners.  We have four children, 18, 16, 14 and 1.

24 Enjoy outdoor activities and family time.

25      No military service.  I have served on a grand jury.

1    And I can't think of a reason why I should not serve.

2            PROSPECTIVE JUROR NO. 17:  Juror 17.  I live in

3    North Pole.  We've been up here since 2014.  I am currently an

4    office manager for Alaska Interior Dentistry.  I have -- prior

5    to being the office manager here, I was an assistant for eight

6    years in dental clinics.  My highest level of education is

7    certificate in dental assisting and certificate in medical

8    records.

9            I'm married.  My spouse works over at Denali

10   Industrial Supply as a purchaser.  I have two children, ages 11

11   and 16.  I enjoy reading and doing a lot of historical

12   research.

13           I have never been in the military, but my husband was.

14   That's what brought us up here.  I have only ever received a

15   letter for jury duty, but never been called.  And the only

16   other thing I can think of why I shouldn't serve would be just

17   because the topic of substance abuse is very close to home.

18           PROSPECTIVE JUROR NO. 18:  Juror Number 18.  I live in

19   Fairbanks.  I was born and raised here and have lived here with

20   the exception of a couple years in my 20s.  I'm a judicial

21   assistant for a superior court judge.  I have been there for

22   17 years.  I've got some college.

23           I'm single.  I have one child who is 22.  He's in

24   college in Washington.  Hobbies are all the Alaska things that

25   we do around here.

1          Never been in the military.  I have never been picked

2     for a jury, and I don't know any reason why I can't be.

3          PROSPECTIVE JUROR NO. 19:  Juror 19.  Place of

4     residence, here in Fairbanks.  I have been in Alaska since '03.

5     My occupation, I'm a dispatcher with Carlile Transportation.  I

6     have been there the last five years.  Highest level of

7     education would be high school.

8          I am not married, and I have no kids.  Hobbywise, I

9     like to travel.  Prior military service, I was in there for

10    less than a year and I was discharged at airman.

11         I've never been picked for jury duty, and I can't see

12    any reason why I couldn't serve.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR NO. 20:  I'm Juror 20.  I live here

15    in North Pole.  I've lived here my whole life.  I work as a

16    software engineer for BFG of Anchorage.  I have also worked,

17    for the last five years, as a -- in areas as a programmer

18    analyst and business analyst.  I have a master's in computer

19    science.

20         I'm married, and my wife is also a software engineer.

21    Hobbies are fishing, electronics and reading.  No military

22    service.  No prior jury service.  And I don't see any reason

23    why I should not be able to serve.

24         PROSPECTIVE JUROR NO. 22:  I am Juror Number 22.  I

25    live out in North Pole.  I've lived in Alaska my whole life.  I

am an office manager for a local residential appraiser, and
I've been there for the past five years.  My highest level of
formal education would be high school.

I'm not married.  I don't have kids.  I enjoy reading,
arts and crafts, various outdoor activities.

I got no military service, no prior jury service, and
there isn't a reason I wouldn't be able to serve.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR NO. 23:  I'm Juror 23.  I live in
Two Rivers, Pleasant Valley area of Fairbanks.  I have lived
here for 12 years.  Property manager and building maintenance,
supervisor for a local property owner here in Fairbanks.  I
have a high school diploma.

I'm single, no children.  And I like to fish and ride
ATVs.

No military.  I have been on a jury before, been
called quite a few times to check in.  But there was a criminal
trial that I was part of, and there was a verdict reached.

THE COURT:  Any reason you can think of why you
shouldn't serve on this jury?

PROSPECTIVE JUROR NO. 23:  There is no reason I think
I shouldn't serve.

THE COURT:  Thank you, sir.

PROSPECTIVE JUROR NO. 24:  Number 24.  I live in
Fairbanks, been in Alaska for 37 years.  I'm a civil engineer

1 with the nonprofit group called EMI, and before that, I worked

2 for a private firm called DOWL. I have a BS in civil

3 engineering.

4 I'm married. My wife is normally a librarian, but

5 currently taking time off to raise our one-and-a-half-year-old

6 daughter. Enjoy hunting, fishing, gardening, woodworking.

7 No military service. I have served on a criminal jury

8 before, and there was a verdict reached. And no.

9 THE COURT: Thank you.

10 PROSPECTIVE JUROR NO. 26: Number 26. I live out in

11 Gold Stream Valley. I have been in Alaska for 60 years. I'm

12 currently retired, but I was working as a residential

13 contractor, general contractor. I graduated from Lathrop High

14 School, went to the U of A for four semesters, I think.

15 I'm currently married. My wife works for Alaska

16 Biological Research. She does accounting for them. My older

17 daughter works on a grounds crew in Olympia, Washington. She's

18 married. My younger daughter works here in town at

19 Apocalypse Design as a sewer. She made this vest I'm wearing

20 today. Very proud of that. I sing with various groups around

21 town.

22 I was never in the military. I've been on juries

23 previously, civil cases, criminal cases, and grand jury, and we

24 have reached verdicts. I was never a foreperson. And I don't

25 see any reason why I can't serve on this jury.

```
 1              THE COURT:  Thank you, sir.
 2              PROSPECTIVE JUROR NO. 27:  27.  I live out in Gold
 3   Stream.  I have been here since '95.  I work in a machine shop,
 4   rebuilding engines.  I have worked there for the last four
 5   years.  Before that, I drove truck.  Nothing past high school.
 6              I'm divorced.  My two daughters are 20 and 13.
 7   Photography for hobbies.
 8              No military.  Served on a jury, criminal.  We did
 9   reach a verdict.  And there is no reason I can't serve.
10              PROSPECTIVE JUROR NO. 28:  28.  I'm from Denali.  I
11   have been there for 28 years.  I'm a water treatment operator
12   for the National Park Service.  Been doing that for over
13   15 years.  High school graduate.  Single.  No children.
14   Typical Alaska outdoor activities.
15              No military service, no jury service, and there is no
16   reason I can't serve.
17              PROSPECTIVE JUROR NO. 29:  Juror 29.  Live in
18   Fairbanks for 30 years.  I work as a civilian IT specialist for
19   the Army at Fort Wainwright.  I have a bachelor's degree.
20              I'm married.  My wife is retired but works part-time
21   in a pottery studio.  Adult daughter works as nursing assistant
22   at Fairbanks Memorial.  Hobbies are grandkids, outdoor sports,
23   travel.
24              I'm retired from the Air Force as an E-8.  I have had
25   prior jury service, criminal trial, verdict was reached.  I was
```

 1   not the foreperson.  And no reason I cannot serve.

 2            PROSPECTIVE JUROR NO. 30:  I'm Juror 30.  I live in

 3   North Pole.  I've lived here for nine years.  I'm a

 4   stay-at-home mom and I home school my kids.  I'm married.  My

 5   husband works at Orica.  He makes explosives for the mines.

 6   I've got two kids, 13 and 15.  I spend a lot of time outdoors

 7   in gardening.

 8            I have never been in the military or on a jury.  I

 9   don't think there is any reason I can't serve.

10            PROSPECTIVE JUROR NO. 32:  32.  I'm from North Pole.

11   I've lived here for 25 years.  I'm a telecommunications

12   apprentice through the IBEW, currently working for Alaska

13   Communications.  I graduated from high school.

14            I am not married.  Have no children.  I read, write,

15   game, and do home improvement as a hobby.

16            I have never served in the military.  I have never

17   been called to serve on a jury.  And there is no reason why I

18   cannot participate as a juror.

19            PROSPECTIVE JUROR NO. 33:  33.  I'm from North Pole.

20   I have been in Alaska since 1998, 11 years in Sitka.  I have

21   been a stay-at-home mom for the last five years.  High school,

22   but no college.

23            I am married.  My husband works for the State of

24   Alaska.  I have a 13-year-old son.  I enjoy photography and

25   camping and fishing.

1          I have never been in the military.  I had jury duty

2     twice.  I can't remember what the first one was for.  The

3     second one was grand jury.  And there is no reason why I

4     couldn't serve.

5          PROSPECTIVE JUROR NO. 34:  I'm 34.  I've been -- lived

6     here my whole life, for 24 years, in Fairbanks.  I work at

7     the -- I'm a shift supervisor at KFC/A&W and also over at

8     O'Reilly's.  I've stayed there for the last five years.  I have

9     pretty much a high school diploma.

10          I'm single.  I pretty much like to tinker around with

11     vehicles.  I've never been in the military.  I've never had any

12     jury service.  And there is no other reason I think I should be

13     able to serve on this jury.

14          THE COURT:  All right.  Thank you.

15          PROSPECTIVE JUROR NO. 35:  I'm Juror 35.  I live in

16     Fairbanks.  I've lived here my whole life, so 23 years.  I work

17     at Wood River as a reading tutor, worked there for five years.

18     In the summers, I work at the hospital.  I have received a

19     bachelor's degree and I'm currently getting my master's degree

20     in clinical mental health counseling.

21          My marital status is single.  I enjoy reading.  I have

22     no prior military service.  I have never served on a jury, and

23     I can't think of a reason why I should not serve on this one.

24          THE COURT:  Thank you.  Thank you all.  The next step

25     here is, I'm going to allow each side up to 15 minutes for any

1  follow-up questions.

2           So Ms. Weber.

3           MS. VOSACEK:  It will be me, Your Honor.

4           THE COURT:  All right.  Go right ahead.

5           MS. VOSACEK:  Good afternoon, everyone.  My name is

6  Carly Vosacek, and I'm just going to be following up on some

7  questions.  I know kind of like all directions here, so I'll

8  try my best to get around the room.  But I'm going to follow up

9  on your answers to the questions that you've already been

10 asked, and then I'm going to ask some of my own questions.

11          Juror Number 3, I believe you said you had military

12 service.  Is that right?

13          PROSPECTIVE JUROR NO. 3:  That's correct.

14          MS. VOSACEK:  Did you receive any emergency medical

15 training as part of your service?

16          PROSPECTIVE JUROR NO. 3:  The standard CPR.

17          MS. VOSACEK:  Pass to Juror Number 5, please.

18          I believe you said you worked in wilderness fire.  Is

19 that right?

20          PROSPECTIVE JUROR NO. 5:  Correct.

21          MS. VOSACEK:  Did you receive any kind of emergency

22 medical training?

23          PROSPECTIVE JUROR NO. 5:  Just the standard first aid

24 and CPR.

25          MS. VOSACEK:  Okay.  Could you pass it to Juror

Number 9?

       Juror Number 9, you were a retired master sergeant?

       PROSPECTIVE JUROR NO. 9:  That's correct.

       MS. VOSACEK:  What was your MOS?

       PROSPECTIVE JUROR NO. 9:  Crew chief, aircraft mechanic.

       MS. VOSACEK:  Aircraft mechanic.  Did you receive any emergency medical training?

       PROSPECTIVE JUROR NO. 9:  Just regular self-aid body care.

       MS. VOSACEK:  Okay.  Can we pass to Juror No. 14?

       Ma'am, you said that you were a paralegal for a criminal defense firm.  Is that right?

       PROSPECTIVE JUROR NO. 14:  Yes, I was.

       MS. VOSACEK:  So in your duties as a paralegal, were you kind of trained in legal concepts?

       PROSPECTIVE JUROR NO. 14:  In legal concepts?

       MS. VOCACEK:  Yes.

       PROSPECTIVE JUROR NO. 14:  Yes.

       MS. VOSACEK:  Are you aware of various criminal statutes?

       PROSPECTIVE JUROR NO. 14:  I was at the time, but it's been years since I worked as a paralegal.

       MS. VOSACEK:  Okay.

       PROSPECTIVE JUROR NO. 14:  I have lost most of that

1  that now.

2          MS. VOSACEK:  The judge is going to instruct you on

3  the law that's to be applied in this case.  Do you think you

4  could let go of your prior training and follow the law as given

5  to you by the Court?

6          PROSPECTIVE JUROR NO. 14:  Yes.

7          MS. VOSACEK:  Even if it contradicts maybe your

8  understanding of what the law should be?

9          PROSPECTIVE JUROR NO. 14:  Yes.

10          MS. VOSACEK:  Can you pass to Juror 17?

11          Ma'am, I appreciate you being candid with the court in

12  discussing that substance abuse might be a difficult topic for

13  you.  But, you know, we're here because Mr. Tulali has a

14  constitutional right to go to trial, and we want to make sure

15  that that's a fair and impartial process.  So we would be

16  asking you to just listen to the evidence as it comes in and

17  listen to the law as the judge instructs you, and then just

18  fairly apply the application of the facts of this case to the

19  law.  Is that something that you can do?

20          PROSPECTIVE JUROR NO. 17:  I think I could, yeah.

21          MS. VOSACEK:  You would be able to set aside any

22  issues you might have and just listen to what you hear in this

23  case and decide it based on the evidence that's presented?

24          PROSPECTIVE JUROR NO. 17:  Yeah.

25          MS. VOSACEK:  Okay.  Can we pass to Juror Number 18?

```
 1              Ma'am, I noticed that you also said that you worked
 2    for a law firm.
 3              PROSPECTIVE JUROR NO. 18:  Yes.
 4              MS. VOSACEK:  That did criminal defense?
 5              PROSPECTIVE JUROR NO. 18:  Yes.
 6              MS. VOCACEK:  And you said that was out of state,
 7    right?
 8              PROSPECTIVE JUROR NO. 18:  No, here in Fairbanks.
 9              MS. VOSACEK:  You also work at the courthouse?
10              PROSPECTIVE JUROR NO. 18:  Yes, the state courthouse.
11              MS. VOSACEK:  Are you familiar with legal concepts?
12              PROSPECTIVE JUROR NO. 18:  Yes.
13              MS. VOSACEK:  And kind of familiar with what the
14    status of the law is in Alaska?
15              PROSPECTIVE JUROR NO. 18:  Yes.
16              MS. VOSACEK:  You understand that we're here in a
17    different jurisdiction and that we're in federal court?
18              PROSPECTIVE JUROR NO. 18:  Yes.
19              MS. VOSACEK:  Do you think you would you be able to
20    follow the law as instructed by the Court and kind of let go of
21    your other training?
22              PROSPECTIVE JUROR NO. 18:  Yes, I would -- yes, I
23    could.
24              MS. VOSACEK:  Even if the status of the law differs
25    between the State of Alaska and the federal court?
```

1          PROSPECTIVE JUROR NO. 18:  I know it's very different,

2    so, yeah, I could do it.

3          MS. VOSACEK:  Okay.  Can we pass to Juror Number 19?

4          You indicated that you did serve in the military as

5    well?

6          PROSPECTIVE JUROR NO. 19:  Yes.

7          MS. VOSACEK:  Just again, do you have any emergency

8    medical training?

9          PROSPECTIVE JUROR NO. 19:  It was just of the basic

10   first aid, CPR.  But that was a little over 12 years ago.

11         MS. VOSACEK:  So no issue being fair and impartial or

12   listening to that kind of testimony?

13         PROSPECTIVE JUROR NO. 19:  Correct.

14         MS. VOSACEK:  Can we pass to Juror Number 23?

15         So Juror Number 23, Fairbanks is kind of a small

16   community, so we're just wondering if perhaps your dad worked

17   in law enforcement.

18         PROSPECTIVE JUROR NO. 23:  No.  None of my family

19   works in law enforcement, that's here in Alaska.

20         MS. VOSACEK:  Okay.  Thank you.

21         Can we pass to Juror Number 29?

22         Juror Number 29, you said that you are retired E-8

23   military?

24         PROSPECTIVE JUROR NO. 29:  Yes.

25         MS. VOSACEK:  What was your MOS?

1          PROSPECTIVE JUROR NO. 29:  Communications computers.

2          MS. VOSACEK:  Did you receive any kind of emergency

3     medical training?

4          PROSPECTIVE JUROR NO. 29:  Same as all the others,

5     basic CPR, self-aid and body care.

6          MS. VOSACEK:  Nothing about that that would make it

7     hard to listen to that kind of testimony?

8          PROSPECTIVE JUROR NO. 29:  Correct.

9          MS. VOSACEK:  Can you pass to Juror Number 33?

10         I believe that you indicated that you had a sister

11    that had substance abuse issues?

12         PROSPECTIVE JUROR NO. 33:  Correct.

13         MS. VOSACEK:  Like I stated before, right, we just

14    want everybody to have a fair trial and to listen to the

15    evidence as presented here today, or over the next couple of

16    days, and apply that to the law.  Do you think that you can

17    just cut out of your mind any issues with your family and

18    listen to the evidence as presented and be fair to the

19    defendant and be fair to the government in this case?

20         PROSPECTIVE JUROR NO. 33:  Yes.

21         MS. VOSACEK:  Okay.  Those are kind of the questions I

22    have for follow-up, so now I'm going to go into my general

23    questions.  And I'm going to try to make sure I see everybody,

24    but if I ask somebody a question that you're like, I wish you

25    would have asked me because I've got a great response or I've

got an opinion, please raise your hand and get my attention.
I'm trying to get to know how you think and how you might
approach the case.

I'm going to start with picking on Juror Number 7.

When the judge asked if anybody had any issues or
standing disputes with the federal government, you kind of
giggled, so I was kind of wondering what you were thinking when
the judge asked you that question.

PROSPECTIVE JUROR NO. 7:  Nowadays with the court
systems, you can't help but kind of wonder where things are
going with the federal court systems.

MS. VOSACEK:  Can you explain that for me?

PROSPECTIVE JUROR NO. 7:  Look at what they're doing
with President Trump.

MS. VOSACEK:  Okay.  So I think we all know that the
Department of Justice is talked about with various news
organizations and is in the news and kind of a political
talking point sometimes.  Is that fair to say?

PROSPECTIVE JUROR NO. 7:  Yeah, it's a political
point, I guess you'd say.  Sometimes I don't feel that the law
is equal to everyone.

MS. VOSACEK:  So do you think that the government --
or do you have, like, a bias against the Department of Justice?

PROSPECTIVE JUROR NO. 7:  No.  But I just feel
everyone should be treated equally, not singled out.

1          MS. VOSACEK:  I agree.  But I'm just wondering if you

2    have some sort of preconceived notion that the Department of

3    Justice is not fair and would not be fair in this case.

4          PROSPECTIVE JUROR NO. 7:  I can't say about this case.

5          MS. VOSACEK:  But in general?

6          PROSPECTIVE JUROR NO. 7:  No.

7          MS. VOSACEK:  Okay.  Does anybody else have any strong

8    feelings or any opinions about the Department of Justice as a

9    whole that they want to talk about?  I saw Juror Number 13

10   nodding your head a little bit when we were talking about

11   fairness.

12         PROSPECTIVE JUROR NO. 13:  I call it the Department of

13   Injustice because they are targeting President Trump unfairly.

14         MS. VOSACEK:  So is it fair to say that your have a

15   little bit of a bias against the Department of Justice?

16         PROSPECTIVE JUROR NO. 13:  You could say that, at

17   least this particular one.

18         MS. VOSACEK:  Many of the people in this courtroom

19   right now work for the Department of Justice.  You're going to

20   have witnesses that work for the Department of Justice.  So

21   what I'm hearing you say is you have bias against the

22   Department of Justice.

23         PROSPECTIVE JUROR NO. 13:  I don't like the people who

24   are running it currently.  I don't have a bias against the

25   Department of Justice per se, but the people who are running it

1    now, yes, I don't think they're doing a good job.

2          MS. VOSACEK:  Okay.  Anybody else in this quadrant

3    agree or want to make a comment about the Department of

4    Justice?  I feel like everybody has stopped moving their head

5    because I'll pick on you.

6          PROSPECTIVE JUROR NO. 13:  I don't want to be targeted

7    by you.

8          MS. VOCACEK:  That's fair.

9          PROSPECTIVE JUROR NO. 27:  Number 27.  And I would

10   say, you know, I didn't have any biases against it until the

11   last couple of years, where things just seemed a little

12   one-sided.

13         MS. VOSACEK:  Can you explain more about that for me?

14         PROSPECTIVE JUROR NO. 27:  I think a lot of decisions

15   are being made politically instead of what the law is or what

16   actions are done.

17         MS. VOSACEK:  Let me ask the same question I asked to

18   Juror 13.

19         A lot of people in this room work for the Department

20   of Justice.  A lot of witnesses are going to work for the

21   Department of Justice.  How does that make you feel being a

22   potential juror?

23         PROSPECTIVE JUROR NO. 27:  I would say that seeing as

24   how this case seems far removed from that big political case,

25   that it doesn't have the same weight.  I'm not thinking about

1    the same things.  But if you want my honest opinion, that's

2    what I'm thinking.

3              MS. VOSACEK:  I appreciate your honesty.

4              Does anybody else want to discuss the Department of

5    Justice?

6              Okay.  I'm going to move on and talk about controlled

7    substances.  Let's see who I can pick on in this corner.

8              How about Juror 20.  Can you pass the mic to Juror 20?

9              So as we all know, there have been some states that

10   have taken some different direction when it comes to

11   criminalization or decriminalization of controlled substances.

12   I'm just wondering if you have any thoughts about that.

13             PROSPECTIVE JUROR NO. 20:  I don't.  It's just

14   different jurisdictions that have different laws.  And this

15   one, being federal, kind of applies it broadly across all

16   states, as far as I would say I understand.

17             MS. VOSACEK:  Would you have any problem convicting

18   someone of a controlled substance crime?

19             PROSPECTIVE JUROR NO. 20:  I guess it would depend on

20   what the facts are and what's presented.

21             MS. VOSACEK:  Sure.  That makes sense.

22             What about you, Juror Number 19?

23             PROSPECTIVE JUROR NO. 19:  I mean, yeah, depending on

24   the facts and the evidence that's provided.

25             MS. VOSACEK:  You don't have any strong opinions about

```
 1   controlled substances, whether it should be a crime or not?
 2            PROSPECTIVE JUROR NO. 19:  Not really, no.
 3            MS. VOSACEK:  What about Juror 15?
 4            PROSPECTIVE JUROR NO. 15:  No, I don't have no
 5   comment.
 6            MS. VOSACEK:  No strong feelings?
 7            PROSPECTIVE JUROR NO. 15:  No.  No comment.
 8            THE COURT:  Just about one more minute here.
 9            MS. VOSACEK:  Yes, Your Honor.  I want to give the
10   front room an opportunity to answer.
11            What about Juror No. 3.  Do you have any thoughts
12   about the criminalization or decriminalization of controlled
13   substances?
14            PROSPECTIVE JUROR NO. 3:  I think the
15   decriminalization of controlled substances is like a war on
16   terror.  You can't beat an ideology.  With that, I mean, with
17   all the facts presented, the facts are facts.  You're talking
18   at a federal level as opposed to a state level, and, you know,
19   like, the State of Oregon, they're removing what they did,
20   decriminalizing a lot of their controlled substance because
21   they've had so many problems with it.  But, I mean, at a
22   federal level, you're looking at something completely
23   different.
24            MS. VOSACEK:  Do you think that given -- seems like
25   you're pretty knowledgeable on the topic.
```

1          PROSPECTIVE JUROR NO. 3:  I like to read.

2          MS. VOSACEK:  Do you think that you can be fair and

3    impartial to both sides in this case?

4          PROSPECTIVE JUROR NO. 3:  I absolutely do.

5          MS. VOSACEK:  Anybody else, one last chance, think

6    that I should have asked you something or something that you

7    want me to know about you before I sit down?  I see no hands.

8          THE COURT:  All right.  Thank you.

9          Mr. Camiel.

10          MR. CAMIEL:  Thank you, Your Honor.

11          I guess it's afternoon now, so good afternoon.  I'm

12    Peter Camiel.

13          Juror 14, if you could hand the mic.  Good morning.

14    My notes might be wrong, but I think I wrote down that you had

15    some work or did some work with suicide hotline?

16          PROSPECTIVE JUROR NO. 14:  With what?

17          MR. CAMIEL:  The suicide hotline.

18          PROSPECTIVE JUROR NO. 14:  My daughter is the

19    executive director.

20          MR. CAMIEL:  All right.  Do you ever talk to her about

21    the work and the kind of calls that come into that hotline?

22          PROSPECTIVE JUROR NO. 14:  To the extent that she's

23    able.  She doesn't work the line herself anymore.  She has

24    employees for that.

25          MR. CAMIEL:  Did she use to?

1          PROSPECTIVE JUROR NO. 14:  She used to work the line

2     herself.  That's how she started out.

3          MR. CAMIEL:  And did she have to deal with people

4     calling in who had substance abuse issues?

5          PROSPECTIVE JUROR NO. 14:  Some of them.  Some of them

6     still do.

7          MR. CAMIEL:  While we've got people in the box, why

8     don't we go to Juror -- let's see.  Juror No. 7.  Let me follow

9     up on some of counsel's questions about your feelings about the

10     justice system, the criminal justice system.  And you were

11     talking about, I think, how you felt it was politicized in a

12     lot of ways?

13          PROSPECTIVE JUROR NO. 7:  Yes.  I believe that some of

14     the criminal justice system is way out of line.  It's more

15     political in some sense -- places than it is factual and...

16          MR. CAMIEL:  Do you have an opinion either way about

17     whether somebody who is innocent can be charged with a crime?

18          PROSPECTIVE JUROR NO. 7:  Well, anybody can be charged

19     with a crime.  It's up to the state or the federal government

20     to prove that they've committed the crime.

21          MR. CAMIEL:  All right.  And do you think that the

22     government always investigates criminal cases fairly?

23          PROSPECTIVE JUROR NO. 7:  I believe that the

24     investigators do, yes.

25          MR. CAMIEL:  You think the people at the investigative

1 level do.  Your problem is with people in the administration,
2 the higher-up people?
3         PROSPECTIVE JUROR NO. 7:  I believe that's where a lot
4 of the problems are, personally.
5         MR. CAMIEL:  How often do you think it occurs that
6 somebody who is not guilty gets charged?
7         PROSPECTIVE JUROR NO. 7:  I don't think it's very
8 often that they get charged if they actually haven't done
9 something.
10        MR. CAMIEL:  Okay.  And let's go to Juror No. 3.  I
11 want to ask you a question that I'm going to ask other people
12 to chime in.  I wanted to ask you about your opinion about drug
13 addiction and whether you think that it's a disease or whether
14 you think it's more of a moral weakness.
15        PROSPECTIVE JUROR NO. 3:  Well, that's -- I mean,
16 that's a combination.  Depends on the person.  Sometimes
17 addiction can be very simply just like mental health struggles,
18 and sometimes, you know, it could be something that's -- I
19 don't want to say genetic.  I don't know that genetic would be
20 the right term.  But things that people struggle with
21 throughout their family history.  So there's so many different
22 factors that open up that door.  But I don't think somebody
23 just wakes up one morning and decides they want to be addicted
24 to drugs or alcohol or things like that.  Cascading effect for
25 different possible reasons.

1          MR. CAMIEL:  Have you ever known anyone who had a

2    substance abuse addiction?

3          PROSPECTIVE JUROR NO. 3:  I have met people that have

4    had substance abuse.

5          MR. CAMIEL:  Have you worked with them before?

6          PROSPECTIVE JUROR NO. 3:  I have worked with people

7    that have had substance abuse issues in the past, if that makes

8    sense.  Like, they didn't actively have an issue.  They had

9    either, whether it was drugs or alcohol or whatever, they had

10   overcome it and I had worked with them after it, which gave me

11   a lot of insight to their thoughts and ideas about how they

12   went about recovering and going through the process and the

13   struggles through it.

14         MR. CAMIEL:  Anybody else have a strong opinion about

15   drug addiction, whether you fall on the side of it's a disease

16   versus it's a moral weakness or just a choice that somebody

17   makes?  Any show of hands.  Okay.

18          I'm sorry.  I missed you.  Number 32.

19         PROSPECTIVE JUROR NO. 32:  Juror 32.  I have

20   volunteered with people who have come out of or trying to go

21   through addiction recovery from drugs, alcohol, other sorts of

22   things.  I believe it's a combination of factors.  There is a

23   biological factor that leads to people being addicted and

24   seeking out that chemical again.  I also believe that there is

25   a large behavioral element of how they were raised, with the

```
 1    environment that they put themselves in, and their own attitude
 2    and mental health that contributes to their relapses or their
 3    recovery.
 4            MR. CAMIEL:  When you say you've worked in that field,
 5    can you tell me more about the --
 6            PROSPECTIVE JUROR NO. 32:  It wasn't a formal -- I
 7    volunteered with a religious service that would -- that focused
 8    on meeting people who were in recovery and pairing them up with
 9    sponsors that could help them talk through the problems they
10    have been going through and meet other people also going
11    through recovery or have gone through the recovery process.
12            MR. CAMIEL:  Was that here in Fairbanks?
13            PROSPECTIVE JUROR NO. 32:  Yes.
14            MR. CAMIEL:  How long ago?
15            PROSPECTIVE JUROR NO. 32:  That was about seven years
16    ago now.
17            MR. CAMIEL:  Let's see.  Juror 33, since you're
18    sitting right next to 32, you talked a little bit about having
19    dealt with someone who had a substance abuse problem.
20            PROSPECTIVE JUROR NO. 33:  Well --
21            MR. CAMIEL:  I don't want to get into personal.
22            PROSPECTIVE JUROR NO. 33:  No.  I grew up around it.
23    I grew up on a reservation in Montana.  So I was surrounded by
24    it.  I actually smoke myself, so I have an addiction.  I
25    understand it.
```

1          What is your question?

2          MR. CAMIEL:  Yeah.  So in terms of your listening to

3    testimony about somebody who overdosed and died, how do you

4    feel about whether the personal experiences that you have had

5    will play into how you evaluate the evidence?

6          PROSPECTIVE JUROR NO. 33:  I don't know.  I have no

7    idea.

8          MR. CAMIEL:  Let's say you had a friend, a close

9    friend or family member who was charged with a crime like my

10   client is, like Junior Tulali is, and there was somebody who

11   had your experiences, your life experiences, who was going to

12   be sitting on the jury.  How would you feel about that?

13         PROSPECTIVE JUROR NO. 33:  I don't know if I would --

14   I don't know if I would like that.

15         MR. CAMIEL:  Why do you say that?

16         PROSPECTIVE JUROR NO. 33:  Well, I think because if

17   somebody has actually gone through that, they're more likely to

18   lean a certain way, and I would see how you would think that.

19         MR. CAMIEL:  Thank you.  Can we go to Juror No. 17?

20         You also had experiences that sound like they are

21   pretty emotional for you, in terms of dealing with somebody who

22   has got a substance abuse problem.  How would you feel if

23   somebody -- a friend of yours, let's say, or family member was

24   on trial, charged with the same kind of crime my client is

25   charged with, and there was a juror who had the kind of life

1    experiences that you've had, how would you feel about them

2    being a juror in this kind of case?

3            PROSPECTIVE JUROR NO. 17:  I don't know whether I'd be

4    comfortable with that or not, just because there could be a lot

5    of bias back behind that.

6            MR. CAMIEL:  So when you say you don't know whether

7    you would be comfortable, you'd be worried about --

8            PROSPECTIVE JUROR NO. 17:  Yes.  I would be concerned,

9    yes.

10           MR. CAMIEL:  All right.  Thank you.

11           Let me ask kind of a more -- couple more general

12   questions, just kind of with a show of hands.

13           How many people here believe that Fairbanks has a

14   severe drug problem?  I'm just going to -- so I see a lot of

15   hands up.  I don't know if the Court wants to take them down or

16   not.

17           THE COURT:  That's all right.

18           MR. CAMIEL:  Let me start -- show me the hands again,

19   people who think Fairbanks has as a severe drug problem?

20           Juror 22, why do you think that is?

21           PROSPECTIVE JUROR NO. 22:  Just like when I'm out and

22   about, I can observe that there are people who are -- I

23   wouldn't -- like, generally unwell, and there are people that I

24   know that know people who do have and struggle with drug

25   addictions that they have difficulties dealing with, and I just

 1    think -- I'm so sorry.  What was the question?

 2         MR. CAMIEL:  I'm just wondering why you think there's

 3    this severe drug problem here in Fairbanks.

 4         PROSPECTIVE JUROR NO. 22:  I guess it would also be

 5    access.  There just seems to be more and more of it that's

 6    coming from somewhere, that more people have access to and are

 7    friends or dealing with people who are trying to push the usage

 8    of these substances on their peers.

 9         MR. CAMIEL:  If you could pass the mic to Juror

10    No. 20, right next to you.

11         Do you share the views of Juror No. 22?

12         PROSPECTIVE JUROR NO. 20:  I can maybe relate -- or

13    not relate but I can understand.  My observation is that

14    Fairbanks in the cold winter months, there's not as much to do

15    outside or maybe as many activities as some other states or

16    cities.  There may be more access to time for something like

17    that, to fill their time.  Certainly games are a big thing now,

18    number of hours attributed to that is high, and certainly

19    there's quite a bit more time for an activity like that.

20         MR. CAMIEL:  Who do you blame for the severe drug

21    problem, if anybody?

22         PROSPECTIVE JUROR NO. 20:  I will be honest.  I

23    haven't thought much about it.  It's not a problem -- I think

24    of a lot of societal problems.  This is one I haven't thought

25    about or I could even -- would pick a root cause.

1              MR. CAMIEL:  If you could pass the mic to Juror No.

2     19, right next to you.

3              Are you one of the people who thinks that Fairbanks

4     has a severe drug problem?

5              PROSPECTIVE JUROR NO. 19:  I can't really comment or

6     say on it because I haven't really followed any of that.

7              MR. CAMIEL:  You haven't seen it around you and it has

8     not affected your life?

9              PROSPECTIVE JUROR NO. 19:  Personally, no.

10             MR. CAMIEL:  Why don't we have you move the microphone

11    over to Juror No. 18.

12             What's your opinion on whether or not Fairbanks has a

13    severe drug problem?

14             PROSPECTIVE JUROR NO. 18:  I work for state court and

15    I work for a superior court judge.  So I see -- I mean, every

16    red file crossing my desk is drugs or alcohol, domestic

17    assault, all of that.

18             MR. CAMIEL:  Who do you think is responsible for that?

19             PROSPECTIVE JUROR NO. 18:  I couldn't put a finger on

20    who is responsible for it.  I don't know where it's coming

21    from.

22             MR. CAMIEL:  I'm going to move the mic over to the

23    other side of the room.  Why don't we go to Juror No. 26.  I'm

24    picking on the guy with the nice vest.

25             So what are your thoughts about the drug problems in

1  Fairbanks?  Is there one?  Is it severe?  Is it overblown?

2          PROSPECTIVE JUROR NO. 26:  I can't speak from personal

3  experience.  Seems like maybe I need to get out more because

4  it's not something in my circle that I see.  But in reading the

5  newspaper or just keeping up with events, you hear about it a

6  lot, whether that's what people want to report.  I don't know.

7  I take issue with your idea that there's a severe problem

8  because I don't know how you define severe.

9          MR. CAMIEL:  All right.

10          PROSPECTIVE JUROR NO. 26:  But there could well be a

11  problem.

12          MR. CAMIEL:  Okay.

13          PROSPECTIVE JUROR NO. 26:  But that's what I'm

14  thinking sitting here.

15          MR. CAMIEL:  Why don't we have you hand the microphone

16  to Number 27.

17          THE COURT:  Mr. Camiel, I need you to finish up in the

18  next minute or two.

19          MR. CAMIEL:  Okay.

20          Any thoughts about this topic?

21          PROSPECTIVE JUROR NO. 27:  I would say I've seen a lot

22  of the dark sides of Fairbanks.  When I was driving truck, I

23  was delivering to almost every restaurant in town and some of

24  those are in the darker side of town.  So you do see it.  As to

25  severe versus -- I would label it more elevated versus other

1   communities, and I think a lot has to do with the environment.

2   There's a lot of down time for people in this town, especially

3   in the wintertime, where they're trapped inside, and I think

4   their demons get the best of them.

5           MR. CAMIEL:  Thank you.  That's all I have.

6           THE COURT:  Very good.

7           Why don't I meet with counsel briefly out here in the

8   hall, and we'll go from there.

9       (Begin bench conference)

10          THE COURT:  Any challenges for cause?

11          MS. WEBER:  No, Your Honor.

12          THE COURT:  Any challenges for cause?

13          MR. CAMIEL:  I would just -- let me find --

14          THE COURT:  Take a moment.

15          MR. CAMIEL:  My notes are not the best.

16          I don't think I have anything that rises to a

17  challenge for cause.

18          THE COURT:  All right.  I mean I think, it's kind of

19  evenly balanced.  You've got the DOJ issues.  You've got some

20  issues with others.

21          MR. CAMIEL:  I was waiting to hear your challenges.

22          THE COURT:  I think it all balances out.

23          What's the update on the victim family?

24          MS. WEBER:  We spoke to Ray Lee.  He's willing and

25  able to come in and testify tomorrow.

 1          THE COURT:  At 8:30?  Can we resume then?

 2          MS. WEBER:  Yes.

 3          THE COURT:  All right.  Wonderful.  So could we do

 4   openings this afternoon, then?

 5          MS. WEBER:  We would prefer to start on Tuesday, but

 6   it's up to the Court.

 7          THE COURT:  Are you ready to proceed?

 8          MR. CAMIEL:  I can be.

 9          THE COURT:  Would you prefer tomorrow also?

10          MR. CAMIEL:  Yeah.

11          THE COURT:  Are they going to be exceptionally

12   polished because you have an extra --

13          MR. CAMIEL:  No promises.

14          THE COURT:  All right.  Fair enough.

15          Did you get that down, no promises?

16          All right.  Let's do this, then.  I'll excuse -- we'll

17   go forward.  I'll excuse the jury for about half an hour.  I'll

18   give you about 15 minutes of that for you to confer with your

19   teams on peremptories.  I'll come back in.  We'll do the

20   peremptories without the jury present, and then we'll get the

21   whole group back in about a half an hour and have our jury, and

22   then I'll excuse them.  I might as well wait, then, until

23   tomorrow to impanel them.  I could have them impaneled,

24   administer the oath and do the opening instructions now.

25   What's your preference there?

1          MR. CAMIEL:  That would be fine by me.

2          THE COURT:  It's probably another 20 minutes.  That

3   was my guesstimate.  Let's do that, then.  We'll administer the

4   oath and do the instructions and excuse them.

5          MR. CAMIEL:  I don't remember how you do peremptories.

6          THE COURT:  The way I'm going to do it is, you have

7   11, government has 7.  We'll start with you.  I'm very

8   generous, Mr. Camiel, because I don't do the list that my

9   colleagues do, which can result in duplication.  We'll go back

10  and forth until they're used up.  If we have some left over, so

11  say the government says we're good and there's one left, it

12  will be whoever -- 35 or whoever is the highest number will

13  leave.  That's why I did the 31 instead of 11, because it's

14  consistent with that system.  Does that answer it?

15         All right.  Very good.  Go ahead.

16      (End bench conference)

17         THE COURT:  All right.  We are on the home stretch of

18  our jury selection.  We're now at a stage where each side gets

19  to exercise what are called peremptory challenges, and that --

20  I'm going to give them some opportunity to confer with their

21  respective people at the tables here about that and give you a

22  half-hour break so we can get that accomplished and they can

23  have time to confer.

24         So we'll have you back here, a little extra, 1:40.  At

25  that point, I'm going to thank and excuse all but 14 jurors.

1    We'll have our 14 jurors.  I have some instructions for the

2    jurors that will be serving, and then we'll end for today,

3    probably no later than 2:30, and the rest of you would be

4    excused with my thanks for serving.

5         So we'll excuse you now until 1:40.  Please remember

6    my admonition not to do any research, not to discuss the case,

7    and we'll see you back here at 1:40 and conclude the jury

8    selection at that time.  We'll go off record.

9         DEPUTY CLERK:  All rise.  This matter is now in recess

10   until 1:40 p.m.

11      (Recessed from 1:07 p.m. to 1:32 p.m.)

12        DEPUTY CLERK:  All rise.  Her Honor, the Court, the

13   United States District Court for the District of Alaska is

14   again in session.

15        Please be seated.

16        THE COURT:  All right.  We're back on record here,

17   ready for peremptory challenges, beginning with the defense.

18   Go ahead, please, Mr. Camiel.

19        MR. CAMIEL:  We would start with Juror Number 17.

20        THE COURT:  Government?

21        MS. VOSACEK:  Juror Number 13.

22        THE COURT:  Defense?

23        MR. CAMIEL:  Juror Number 18.

24        THE COURT:  Government?

25        MS. VOSACEK:  Juror Number 19.

```
 1            THE COURT:  Defense?

 2            MR. CAMIEL:  Juror Number 20.

 3            MS. VOSACEK:  Juror Number 23.

 4            MR. CAMIEL:  Juror Number 24.

 5            THE COURT:  24.  All right.

 6            MS. VOSACEK:  Juror Number 34.

 7            THE COURT:  34.  Okay.

 8            MR. CAMIEL:  Juror Number 33.

 9            THE COURT:  33.  All right.

10            MS. VOSACEK:  Juror Number 35.

11            THE COURT:  35.

12            MR. CAMIEL:  Juror Number 36.

13            THE COURT:  36.  Is that the person that was -- we

14    stop at 35.

15            MR. CAMIEL:  Actually, Juror Number 15.

16            THE COURT:  15, one five?  Okay.

17            Government?

18            MS. VOSACEK:  That's all from the government.

19            THE COURT:  All right.  So that's five by the

20    government, 13, 19, 23, 34, 35, correct?  Ms. Vosacek, is that

21    correct?

22            MS. VOSACEK:  That's correct.

23            THE COURT:  Go ahead, Mr. Camiel.

24            MR. CAMIEL:  Juror Number 7.

25            THE COURT:  All right.  You have up to four more.
```

```
 1              MR. CAMIEL:  Is it on me?

 2              THE COURT:  They're done.

 3         Correct?  You have no more?  The government?

 4              MS. VOSACEK:  We don't have any more, Your Honor.

 5              THE COURT:  Yep, it's yours.

 6              MR. CAMIEL:  Juror Number 27.

 7              THE COURT:  I have you now, Mr. Camiel, at a total of

 8    eight, so three more -- up to three more.

 9              MR. CAMIEL:  Juror Number 13.

10              THE COURT:  13.  Okay.

11              MR. CAMIEL:  Juror Number 14.

12              THE COURT:  Juror 14.  So now you're --

13              MR. CAMIEL:  We're at ten?

14              THE COURT:  That's correct.  One more.

15              MR. CAMIEL:  Juror Number 2.

16              THE COURT:  Juror 2.  Okay.  So let me make my list

17    and then make sure we're in agreement and who the 14 will be.

18              And as I said at the final pretrial, the alternates --

19    and counsel agreed, the alternates will be selected at the end.

20    It's not the last two.  Correct, Ms. Vosacek?

21              MS. VOSACEK:  That's right, Your Honor.

22              THE COURT:  Yes, Mr. Camiel?

23              MR. CAMIEL:  Yes.

24              THE COURT:  All right.  Very good.

25              MS. VOSACEK:  Your Honor, I think when looking at the
```

strikes, that the defense might have one more, because I think
we both perempted 13.  That was the government's first
peremptory.

THE COURT:  She's absolutely correct.  The government
preempted 13.  Thank you for pointing that out.  So if you
wanted to do one more, Mr. Camiel, you could.

MR. CAMIEL:  Juror Number 4.

THE COURT:  Juror 4?

MR. CAMIEL:  Yes.

THE COURT:  Okay.  Well, Ms. Vosacek, I appreciate you
pointing that out to the Court and counsel.

(Pause)

THE COURT:  All right.  So here are the 14 that the
courtroom deputy and I concluded remain of the lowest numbers.
It would be Jurors Number 1, 3, 5, 6, 8, 9, 10, 11, 12, 16, 22,
28, and 29.

Any disagreement there from the government?  Do you
need to hear the list again?

DEPUTY CLERK:  Your Honor, I have 26 also.

THE COURT:  26.  I overlooked 26.

MS. WEBER:  Yes, I believe that's correct.

THE COURT:  And then it's 14.  Thank you, Lisa.

Mr. Camiel, do you need to hear the list again?

MR. CAMIEL:  No.  I'm just running through them.

I agree.

1           THE COURT:  You agree.  All right.  Very good.  So

2      we'll have them -- the entire group come back in to the back of

3      courtroom.  We'll call out these numbers and then excuse the

4      rest of the jurors, and then I'll read the preliminary

5      instructions.

6           I think I had a note on here.  They were in large part

7      agreed to -- I think that -- a couple things.  Neither proposed

8      translators and interpreters.  The government doesn't

9      anticipate that anybody is speaking a different language?

10          MS. WEBER:  No, Your Honor.

11          THE COURT:  That wasn't -- likewise, Mr. Camiel?

12          And then I think the only one that wasn't on your

13     list, Mr. Camiel, that the government proposed, was 1.14 of the

14     pattern, which is only the Court and the lawyers can ask

15     questions.  I assume you have no objection to that.  It's the

16     model 1.14, "Only the lawyers and I are allowed to ask

17     questions of witnesses.  A juror is not permitted to ask

18     questions of witnesses.  If, however, you are unable to hear a

19     witness or lawyer, please raise your hand, and I'll correct the

20     situation."

21          Any objection to that?

22          MR. CAMIEL:  No.

23          THE COURT:  And then the rest I saw were not objected

24     to.

25          Very good.  That's what we'll do.  Is the jury ready

1    to come back?

2           MS. WEBER:  Just double-checking the list.  I'm not

3    sure if the Court had 18 as one of the numbers.

4           THE COURT:  18 is not one of the numbers that I had.

5    Let me double-check my list, because mine is showing it was the

6    second challenge by the defense.

7           MR. CAMIEL:  That's true.

8           THE COURT:  Very good.  So we'll take a couple

9    minutes.  We'll let you know when the jury is ready to come

10   back in.

11          Are you checking that?

12          DEPUTY CLERK:  I'm checking.

13      (Pause)

14          DEPUTY CLERK:  They're on their way.

15          THE COURT:  Oh, great, they're on their way.

16          So 8:30 tomorrow.  I'll tell the jury 8:45.  Does that

17   work for the government?

18          MS. WEBER:  Yes, Your Honor.

19          THE COURT:  Mr. Camiel?

20          MR. CAMIEL:  Yes.

21      (Pause)

22      (Prospective jurors enter courtroom.)

23          THE COURT:  Stay in the back of the courtroom.  Sorry,

24   I wasn't clear.  We're going to call up the names of the people

25   that are going to be serving as jurors in the case here once

1    everyone comes into the courtroom.

2            Well, welcome back once again, ladies and gentlemen.

3    Please be seated, everybody.

4            I'll wait until everybody gets seated.  Thank you.

5            All right.  Well, I have conferred with the attorneys

6    and we now have the group of individuals that will be serving

7    as jurors on this case.  It will be 14 people.  Two of you will

8    be alternates that will be selected at the end of the case.  So

9    I'm going to call forward your number.  If I call your number,

10    please come forward and have a seat in the jury box.  And then

11    after I've concluded that, I will excuse the rest of you here

12    in the courtroom with my thanks on behalf of the District of

13    Alaska.

14            I'll call first, Juror Number 1.

15            Juror Number 3.

16            Juror Number 5.

17            Juror Number 6.

18            Juror Number 8.

19            Juror Number 9.

20            Juror Number 10.

21            Juror Number 11.

22            Juror Number 12.

23            Juror Number 16.

24            Juror Number 22.

25            Juror Number 26.

1           Juror Number 28.

2           And finally, Juror Number 29.

3           Very good.  Thank you.  Well, I wanted to thank all of

4  you for coming today, for candidly sharing your opinions and

5  answering the questions that were posed of you.  We couldn't

6  have a functioning system without individual citizens like you

7  willing to come and serve on our jury, so thank you for being a

8  part of our justice system today.  You can all be excused.  You

9  can go back to jury assembly if you need a certificate for your

10  work, and you're free now, those of you in the back of the

11  courtroom, to do any research or talk about the case or not, as

12  it's your decision.  So thank you all, and you may all be

13  excused at this time.

14           All right.  Well, our other jurors, prospective

15  jurors, have left, so you are going to be our trial jury,

16  ladies and gentlemen.  If anybody has back issues and likes to

17  stand some of the time, that's absolutely fine.  Let our

18  courtroom deputy know.  She'll be escorting you to and from the

19  jury room, which is right through that door, I think.  It's

20  been many years.  So you'll find out.  And we have some snacks

21  in there for you.  And if anybody ever needs to take a break,

22  raise your hand, please let me know.  I'll be sure to

23  accommodate that.  But if people with back issues wanted to

24  switch and be in the back row and stand sometime, that's fine.

25  And you could sit and stand.  For some people, that helps them

1    a lot.  Otherwise, these will be your assigned seats.

2            And we are going to start tomorrow.  I'm going to meet

3    here with the parties at 8:30 a.m. but have you come at

4    8:45 a.m.  That way I will minimize what I hope would be any

5    inconvenience to you by taking up any issues that they've come

6    up with between now and then, in those first 15 minutes before

7    you come here.  But at 8:45 a.m., we'll start with the lawyers'

8    opening statements and then proceed to the presentation of the

9    evidence.

10           For this afternoon, the remainder of our court day, as

11   I indicated, I'm going to be reading some preliminary

12   instructions that are intended to help you understand the trial

13   process and how to approach this case.  But before I do that,

14   I'm going to ask the clerk of court -- the courtroom deputy, to

15   administer the oath.  You took one oath earlier today, as I'm

16   sure you recall, in which you promised to answer the questions

17   we put to you truthfully, and now you'll take your second oath

18   to take on this responsibility as being jurors in this case.

19           So I would ask our courtroom deputy to --

20           (Oath administered to jury.)

21           THE COURT:  All right.  Well, you are now the jury in

22   this case, and I wanted to take several minutes to tell you

23   something about your duties as jurors and to give you some

24   preliminary instructions.  At the end of trial, I'll give you

25   much more detailed written instructions that will control, and

1  they will be in writing and you can take them back to the jury

2  room with you.

3  When you deliberate, it will be your duty to recall

4  the evidence, to weigh and to evaluate all of the evidence

5  received in this case and, in that process, to decide the

6  facts.  To the facts as you find them, you will apply the law

7  as I give it to you.  Whether you agree with that law or not,

8  you must decide the case solely on the evidence and the law

9  before you.

10  Perform these duties fairly and impartially.  You

11  should not be influenced by any person's race, color, religious

12  beliefs, national ancestry, sexual orientation, gender

13  identity, gender, or economic circumstances.  Also, do not

14  allow yourself to be influenced by personal likes or dislikes,

15  sympathy, prejudice, fear, public opinion or bias, including

16  unconscious biases.  Unconscious biases are stereotypes,

17  attitudes or preferences that you may consciously reject but

18  may be expressed without conscious awareness, control, or

19  intention.  Conscious biases can affect how we receive

20  information and make decisions.

21  This is a criminal case that has been brought by the

22  United States government.  The government charges the defendant

23  with distribution of fentanyl resulting in death, in violation

24  of Title 21 of the United States Code, Section 841(a)(1), which

25  prohibits the distribution of controlled substances and

 1   possessing controlled substances with the intent to distribute.

 2         The charge against the defendant is contained in the

 3   indictment.  The indictment simply describes the charge the

 4   government brings against the defendant.  The indictment is not

 5   evidence and does not prove anything.  The defendant has

 6   pleaded not guilty to the charge and is presumed innocent

 7   unless and until the government proves the defendant guilty

 8   beyond a reasonable doubt.

 9         In addition, the defendant has the right to remain

10   silent and never has to prove innocence or present any

11   evidence.  To help you follow the evidence I'll now give you a

12   brief summary of the elements of the crimes that the government

13   must prove to make its case.

14         First, the defendant knowingly distributed fentanyl.

15   And second, the defendant knew that it was fentanyl or some

16   other federally controlled substance.

17         If you find that the government has proven beyond a

18   reasonable doubt these two elements, then you must consider

19   whether the fentanyl distributed by the defendant resulted in

20   the death of a person referred to in the indictment as J.L.  To

21   find a drug resulted in death, the government must prove beyond

22   a reasonable doubt that but for J.L.'s use of fentanyl, he

23   would not have died.

24         The evidence you are to consider in deciding what the

25   facts are consist of:

1          First, the sworn testimony of any witness.

2          Second, the exhibits that are received into evidence.

3          And third, any facts to which the parties may agree.

4          The following things are not evidence, and you must

5    not consider them as evidence in deciding the facts of this

6    case:

7          First, statements and arguments of the attorneys.

8          Second, questions and objections of the attorneys.

9          Third, testimony that I instruct you to disregard.

10         And fourth, anything you may see or hear when the

11   court is not in session, even if what you see or hear is done

12   or said by one of the parties or by one of the witnesses.

13         Evidence may be direct or circumstantial.  Direct

14   evidence is direct proof a fact, such as testimony by a witness

15   about what that witness personally saw or heard or did.

16   Circumstantial evidence is indirect evidence.  That is, it is

17   proof of one or more facts from which one can find another

18   fact.  By way of example, if you wake up in the morning and see

19   that the sidewalk is wet, you may find from that fact that it

20   rained during the night.  However, other evidence, such as a

21   turned-on garden hose, may provide an explanation for the water

22   on the sidewalk.  Therefore, before you decide that a fact has

23   been proven by circumstantial evidence, you must consider all

24   of the evidence in the light of reason, experience, and common

25   sense.

1   You're to consider both direct and circumstantial

2   evidence.  Either can be used to prove any fact.  The law makes

3   no distinction between the weight to be given to either direct

4   evidence or circumstantial evidence.  It's for you to decide

5   how much weight to give to any evidence.

6   There are rules of evidence that control what can be

7   received in evidence.  When a lawyer asks a question or offers

8   an exhibit in evidence and a lawyer on the other side thinks

9   that it's not permitted by the rules of evidence, that lawyer

10  may object.  If I overrule the objection, the question may be

11  answered or the exhibit received.  If I sustain the objection,

12  the question cannot be answered or the exhibit cannot be

13  received.

14  Whenever I sustain an objection to a question, you

15  must ignore the question and must not guess what the answer

16  would have been.  Sometimes I may order that evidence be

17  stricken from the record and that you disregard or ignore the

18  evidence.  That means that when you're deciding the case, you

19  must not consider that evidence that I told you to disregard.

20  In deciding the facts of this case, you may have to

21  decide which testimony to believe and which testimony not to

22  believe.  You may believe everything a witness says or part of

23  it or none of it.  In considering the testimony of any witness,

24  you may take into account, first, the witness's opportunity and

25  ability to see or hear or know the things testified to; second,

the witness's memory; third, the witness's manner while
testifying; fourth, the witness's interest in the outcome of
case, if any; fifth, the witness's bias or prejudice, if any;
sixth, whether other evidence contradicted the witness's
testimony; seven, the reasonableness of the witness's testimony
in light of all the evidence; and eighth, any other factors
that bear on believability.

You must avoid bias, conscious or unconscious, based
on a witness's race, color, religious beliefs, national
ancestry, sexual orientation, gender identity, gender or
economic circumstances in your determination of credibility.
The weight of the evidence as to a fact does not necessarily
depend on the number of witnesses who testify about it.  What's
important is how believable the witnesses are and how much
weight you think their testimony deserves.

I will now say a few words about your conduct as
jurors.  First, keep an open mind throughout the trial and do
not decide what the verdict should be until you and your fellow
jurors have completed your deliberations at the end of the
case.

Second, because you must decide this case based only
on the evidence received in the case and on my instructions as
to the law that applies, you must not be exposed to any other
information about the case or to the issues it involves during
the course of your jury duty.  Thus, until the case or -- until

the end of the case or until I tell you otherwise, do not
communicate with anyone in any way and do not let anyone else
communicate with you in any way about the merits of the case or
anything to do with it.  This restriction includes discussing
the case in person, in writing, by phone, tablet or computer,
or by any other means, via email, via text messaging, or any
internet chat room, blog, websites or application, including
but not limited to Facebook, YouTube, Twitter, Instagram,
LinkedIn, Snapchat, TikTok.  We're probably out of date.  I'm
sure there are more.  Or any other form of social media.  This
restriction also applies to communicating with your fellow
jurors until I give you the case for deliberation.  And it
applies to communicating with everyone else, including your
family members, your employer, the media or press, and the
people involved in the trial.  Although, you may notify your
family and your employer that you have been seated as a juror
in the case and how long you expect the trial to last.

          If you are asked or approached in any way about your
jury service or anything else in this case, you must respond
that you've been ordered not to discuss the matter.  In
addition, you must report the contact to the court.

          Because you'll receive all of the evidence and legal
instruction you properly may consider to return a verdict, do
not read, watch, or listen to any news or media, commentary
about the case, or anything to do with it, and don't do any

1   research, such as consulting dictionaries, searching the

2   internet, or using other reference materials, and do not make

3   any investigation or in any other way try to learn about the

4   case on your own.  Do not visit or view any place discussed in

5   the case and do not use the internet or any other resource to

6   search for or view anyplace discussed during the trial.

7        And also, do not do any research about this case, the

8   law, or the people involved, including the parties, the

9   witnesses, or the lawyers, until you've been excused as jurors.

10   If you happen to hear or read anything touching on this case in

11   the media, please turn away and report it to me as soon as

12   possible.

13        These rules are designed to protect each party's right

14   to have this case decided only on the evidence that has been

15   presented here in court.  Witnesses here in court take an oath

16   to tell the truth, and the accuracy of their testimony is

17   tested through the trial process.  If you do any research or

18   investigation outside the courtroom, or gain any information

19   through improper communications, then your verdict may be

20   influenced by inaccurate, incomplete, or misleading information

21   that has not been tested by the trial process.

22        Each of the parties is entitled to a fair trial by an

23   impartial jury, and if you decide the case based on information

24   not presented in court, you will have denied the parties a fair

25   trial.

1    Please remember that you have taken an oath to follow

2    the rules and it's very important that you do.  A juror who

3    violates these restrictions jeopardizes the fairness of these

4    proceedings and a mistrial that could result that would require

5    the entire trial process to start over.  So if any juror is

6    exposed to any outside information, please notify the Court

7    immediately.

8    At the end of trial, you will have to make your

9    decision based on what you recall of evidence.  You will not

10   have a written transcript of the trial.  I urge you to pay

11   close attention to the testimony as it's given.

12   If you wish, you may take notes to help you remember

13   the evidence.  If you do take notes, please keep them to

14   yourself until you and your fellow jurors go to the jury room

15   to decide the case.  Do not let note taking distract you from

16   being attentive.

17   When you leave court for recesses, your notes should

18   be left in the courtroom.  No one will read your notes.

19   Whether or not you take notes, you should rely on your own

20   memory of the evidence.

21   Notes are only to assist your memory.  You should not

22   be overly influenced by your notes or those of your fellow

23   jurors.

24   Only the lawyers and I are allowed to ask questions of

25   witnesses.  A juror is not permitted to ask questions of the

witness. If, however, you are unable to hear a witness or a lawyer, please raise your hand so I can correct the situation.

During the trial, I may need to take up legal matters with the attorneys privately, either by having a conference here in the courtroom when the jury is present or by calling a recess. Please understand that while you are waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error. Of course, we will do what we can to keep the number and length to minimum. I may not always grant an attorney's request for conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case of what your verdict should be.

The next phase of the trial will begin, as I said, tomorrow morning. And what it will consist of is, first, each side may make an opening statement. An opening statement by the lawyers is not evidence. It's simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement.

The government will then present evidence and counsel for the defendant may cross-examine. Then if the defendant chooses to offer evidence, counsel for the government may cross-examine.

1    After the evidence has been presented, I'll instruct

2 you on the law that applies in the case and the attorneys will

3 make closing arguments, and after that, you will go to the jury

4 room to deliberate on your verdict.

5    So those are the points I wanted to cover today.  I

6 will ask our courtroom deputy at this point to take the jurors

7 back to the jury room so you can get acquainted with that

8 space.  And we will see you at 8:45.  Thank you for your

9 participation today and your careful listening.  We'll see you

10 tomorrow morning at 8:45.  I hope you have a pleasant afternoon

11 and evening.

12    (Jury absent)

13    THE COURT:  All right.  Please be seated.

14    We're on record still without the jury present.

15    Anything we can take up today to make tomorrow more

16 efficient?

17    MS. WEBER:  Yes, Your Honor.  We just have a request

18 that the victim's brother, who lives in Texas, be allowed to

19 attend the trial remotely or set up some sort of call-in line

20 for him to listen.  He's not a witness and will not be called

21 to testify.

22    THE COURT:  Well, what about Rule 43?  We certainly do

23 this in civil cases, and I think there's a difference between

24 the videoconferencing that I allowed and the broadcasting,

25 which one could view as a -- as the public listen line.

```
 1          MS. WEBER:  We would just ask for a listen line.  It
 2   would just be audio without the visual of the courtroom.
 3          THE COURT:  This certainly has been discussed of late,
 4   post COVID, and I can't say I agree with this rule, but I'm
 5   obligated to follow it.  Although there is the rule that allows
 6   the -- rule one, in the interest of justice.
 7          Mr. Camiel, any objection?  The way the public listen
 8   line works, and I'm not sure if it's 43 -- let me check.  The
 9   way -- no.  That's defendant's presence.  I can find it.  But
10   the way the listen line works is, the people can call in, but
11   they are mute.  That would certainly, if I were in charge of
12   writing the rules, which clearly I'm not, I would allow that.
13          MR. CAMIEL:  Your Honor, we have no objection.
14          THE COURT:  All right.  Well, so -- then we'll set up
15   a public listen line.  But I'll state the reason for the ruling
16   on the record tomorrow, after I have an opportunity to study
17   the applicable rules, or let you know if I don't see that that
18   is feasible.  But we'll do one or the other.
19          Anything else?
20          MS. WEBER:  Thank you.  Nothing further, Your Honor.
21          THE COURT:  Very good.
22          Anything further today?  Did you get the list of
23   witnesses for tomorrow?
24          MR. CAMIEL:  No.  I was just going to ask who the
25   lineup was for tomorrow.
```

1          THE COURT:  Can you email that within the next hour to

2    Mr. Camiel?

3          MS. WEBER:  Yes, absolutely.

4          THE COURT:  Will that work?

5          MR. CAMIEL:  Yes.

6          THE COURT:  I'll see you at 8:30, and we'll go back on

7    record at that time.

8          DEPUTY CLERK:  All rise.  This matter is now

9    adjourned.  This court now stands in recess until 8:30 on the

10   16th.

11      (Proceedings concluded at 2:07 p.m.)

12

13                    CERTIFICATE

14      I, Sonja L. Reeves, Federal Official Court Reporter in and
     for the United States District Court of the District of
15   Columbia, do hereby certify that the foregoing transcript is a
     true and accurate transcript from the original stenographic
16   record in the above-entitled matter and that the transcript
     page format is in conformance with the regulations of the
17   Judicial Conference of the United States.

18      Dated this 17th day of December, 2024.

19

20                          /s/ Sonja L. Reeves
                            SONJA L. REEVES, RDR-CRR
21                          FEDERAL OFFICIAL COURT REPORTER

22

23

24

25