1                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF ALASKA

2

3  UNITED STATES OF AMERICA,    )
                            )

4          Plaintiff,       )
                            )

5      vs.               )  CASE NO. 4:23-cr-00003-SLG
                            )

6  JUNIOR GUFATASI TULALI,     )
                            )

7          Defendant.       )
  _____ )

8

9           TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 2
    **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**

10             Tuesday - April 16, 2024
             8:30 a.m. - 4:48 p.m.

11               Fairbanks, Alaska

12

13  **FOR THE GOVERNMENT:**
     Office of the United States Attorney

14       BY:  ALANA WEBER and CARLY VOSACEK
     101 12th Avenue, Suite 310

15       Fairbanks, Alaska 99701
     (907) 456-0336

16

17  **FOR THE DEFENDANT:**
     Camiel & Cheney, P.S.

18       BY:  PETER CAMIEL
     2800 First Avenue, Suite 309

19       Seattle, Washington 98121
     (206) 817-0778

20

21

22                 **SONJA L. REEVES**
           **Registered Diplomate Reporter**

23             **Certified Realtime Reporter**
         **Federal Official Court Reporter**

24            222 West 7th Avenue, #4
          Anchorage, Alaska 99513

25      Transcript Produced from the Stenographic Record

1                    I N D E X

2
     WITNESSES CALLED BY THE GOVERNMENT:                 PAGE
3
     RAY LEE
4        Direct Examination By Ms. Vosacek                 24
         Cross-Examination By Mr. Camiel                   40
5        Redirect Examination By Ms. Vosacek               46

6    CLINTON BRUBECK
         Direct Examination By Ms. Weber                   47
7        Cross-Examination By Mr. Camiel                   65
         Redirect Examination By Ms. Weber                 69
8        Recross-Examination By Mr. Camiel                 72

9    CALEB REUTER
         Direct Examination By Ms. Weber                   75
10       Cross-Examination By Mr. Camiel                  136
         Redirect Examination By Ms. Weber                164
11       Recross-Examination By Mr. Camiel                174

12   KELSEY ROBERTS
         Direct Examination By Ms. Vosacek                184
13       Cross-Examination By Mr. Camiel                  201

14   SON HOANG
         Direct Examination By Ms. Vosacek                205
15       Cross-Examination By Mr. Camiel                  217

16

17

18

19

20

21

22

23

24

25

1          (Call to Order of the Court at 8:30 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

4  United States District Court for the District of Alaska is now

5  in session, the Honorable Sharon L. Gleason presiding.

6          Please be seated.

7          Your Honor, we're on record in Case Number

8  4:23-criminal-3-SLG, *USA versus Junior Tulali*.

9          THE COURT:  All right.  Very good.  And Counsel, if

10  you could identify yourselves, please.

11          MS. WEBER:  Good morning.  Alana Weber and

12  Carly Vosacek for the United States.

13          MR. CAMIEL:  Good morning, Your Honor.  Peter Camiel

14  representing Junior Tulali, who is seated next to me to my

15  left.

16          THE COURT:  Good morning, everyone.  A couple of

17  matters I had, and we'll see if there are other issues we can

18  take up at this time.

19          With regard to the request yesterday for the victim's

20  brother to listen telephonically, we'll give the government a

21  phone number that he can call in and be on the overhead.  So we

22  won't broadcast, but he can listen in, and I think that

23  complies adequately with our applicable rules.

24          I wanted to urge, too, the parties that if there are

25  issues you anticipate with regard to a witness or any other

issue in the course of the day, the time to raise them -- and I
think Mr. Camiel knows this from prior cases -- the time to
raise it, let's say you've got a witness at 1 o'clock and I
said you could make application outside the presence of the
jury on an issue in these in limines, the time to raise that is
not 1 o'clock when we have the jury coming back from lunch, it
is at 12:00.  I wanted that crystal clear that people don't
make application outside the presence of the jury when the jury
is in the jury room, unless it's totally unanticipated.

Many of the issues, as best I can see, are anticipated
to be raised, and the time to raise them is, bring your witness
in, if they're going to testify tomorrow, say, "Could we end at
4 o'clock today to have a proffer made at 4:00 on that
witness," rather than saying at 8:30 when the jury is arriving,
"Let's take up this issue," that's going to take us some time.

Questions about that, Ms. Weber?

MS. WEBER:  No, Your Honor.  Thank you.

THE COURT:  And Mr. Camiel?

MR. CAMIEL:  No.

THE COURT:  All right.  Very good.  Any issues with
regard to openings?  I think I previously ordered that you were
to share any demonstratives or other expected exhibits with
each other.

So Ms. Weber, any that you anticipate?

MS. WEBER:  No, Your Honor.

1          THE COURT:  And Mr. Camiel?

2          MR. CAMIEL:  Your Honor, the government shared with me

3    exhibits they are going to use, and I shared with them the

4    exhibit that I'm going to use.

5          THE COURT:  Great.  Then no issues on either side?

6          MR. CAMIEL:  No.

7          THE COURT:  Very good.

8          Well, those were the only topics I had.  So Ms. Weber,

9    on behalf of the government, any other issues to raise this

10   morning?

11         MS. WEBER:  Yes, Your Honor.  There's two issues that

12   we wanted to bring to the Court's attention.

13         Firstly, one of the witnesses today who we anticipate

14   being called second, Sean Silva, was an EMS at the time in

15   2020.  She was an intern, was taking a course, and wrote a

16   report about responding to the scene that she submitted to her

17   professor.  We sent a subpoena for that report.  The City needs

18   to approve it before it can be released and disclosed to

19   counsel.  Her testimony should be fairly brief and

20   straightforward.  If there is anything contained in that report

21   after it's disclosed to counsel, we would ask that she be

22   available for recross if there's anything in there that defense

23   wants to question her about.

24         THE COURT:  Mr. Camiel?

25         MR. CAMIEL:  I guess I would prefer to have it

1  before --

2         THE COURT:  When did you do the subpoena, Ms. Weber?

3         MS. WEBER:  We interviewed Ms. Silva on Sunday.  We

4  did the subpoena yesterday.

5         THE COURT:  Well, I concur with the defense.  This

6  trial has been set for eight months.  Doing a subpoena the day

7  before or the day of the start of trial is not the best way to

8  solve this.  So insofar as you're seeking to present the

9  witness and then provide information at some later date and

10 recall, that's denied.  You can call her at a later time in

11 your case, after you've provided the report to the defense and

12 we've sorted out any issues.

13        Very good.  You said you had one other topic?

14        MS. WEBER:  There's one other 902 certificate from

15 Facebook that was disclosed to counsel for Witness

16 Winston Crockett's Facebook account, which I wanted to hand up

17 to the Court before Officer Reuter's testimony today.

18        THE COURT:  All right.

19        MR. CAMIEL:  I did get that.

20        THE COURT:  Any issues with that?

21        MR. CAMIEL:  No.

22        THE COURT:  Very good.  Then you can give that to the

23 courtroom deputy, if you would, Ms. Weber.

24        I did want to remind both sides, not so much

25 Ms. Vosacek, she's doing fine, but our IT person was trying to

 1  listen in remotely yesterday and could not hear you at all,

 2  Ms. Weber, and could not hear Mr. Camiel at all.  And it may

 3  well be the acoustics in the courtroom, too.  I don't know.

 4  But especially when we have the Zoom presentations and the

 5  person that wants to listen in, they're not going to be able to

 6  effectively do so if you're not speaking up.

 7          All right.  Very good.  Does that take care of your

 8  issues for today, or for this morning?

 9          MS. WEBER:  Yes, Your Honor.

10          THE COURT:  Thank you, Ms. Weber.

11          Mr. Camiel?

12          MR. CAMIEL:  Just one issue.  I know that the

13  government is re-interviewing or has re-interviewed the

14  cooperating witnesses, and I would ask for any reports or notes

15  from those interviews be provided.

16          THE COURT:  Ms. Weber?

17          MS. WEBER:  They will be provided later today.

18          THE COURT:  When are they expected to be testifying?

19          MS. WEBER:  Tomorrow, on Wednesday.

20          THE COURT:  All right.  When -- can you get them by

21  noon so he can look at them over the lunch hour?

22          MS. WEBER:  The report may take longer, but the notes,

23  absolutely we can get.

24          THE COURT:  That makes sense.  Notes by noon and the

25  report by the end of the day?

1          MS. WEBER:  Yes.

2          THE COURT:  You can't be two places at once.  I do get

3 that.  So very good.

4          Anything else, Ms. Weber?

5          MS. WEBER:  No, Your Honor.

6          THE COURT:  Mr. Camiel?

7          MR. CAMIEL:  No.

8          THE COURT:  Then we'll see you at 8:45 or as soon as

9 all the jurors are present.  We'll go off record.

10          DEPUTY CLERK:  All rise.  This matter is now in recess

11 until 8:45 a.m.

12    (Recessed from 8:38 a.m. to 8:47 a.m.)

13    (Jury present)

14          DEPUTY CLERK:  Please be seated.

15    (Pause)

16          DEPUTY CLERK:  All rise.  All rise.  Her Honor, the

17 Court, the United States District Court is again in session.

18          Please be seated.

19          THE COURT:  All right.  Well, good morning, ladies and

20 gentlemen.  And we're here back on record with the jury

21 present, and I'm going to start every day by reminding you, as

22 I did yesterday, how important it is to decide this case based

23 solely on the evidence and the law presented here.  And so you

24 must not learn any additional information about the case from

25 sources outside the courtroom.

 1          To ensure fairness to all parties in this trial, I'll

 2    now ask whether any of you have learned about or shared any

 3    information about this case outside of this courtroom, even if

 4    it was accidental.  Please raise your hand if that's the case.

 5          Thank you, ladies and gentlemen.  We finished the

 6    opening instructions yesterday, and that means we're going to

 7    proceed to the next phase of trial, which is the opening

 8    statement of each side.  And we'll begin with the government.

 9          So counsel, please go ahead.

10          MS. WEBER:  On October 28, 2020, Mr. Ray Lee got home

11    from work and found his youngest son dead in the bedroom of his

12    home.  You'll hear that two days prior, Jacob Lee bought what

13    he was told and believed to be two Percocet pills.  And the

14    evidence will show that those pills are what killed him.

15          The pills were not actually Percocet.  In fact, they

16    were fentanyl, which you'll hear is 100 times more lethal and

17    deadly than morphine.

18          So this is why we're here today.  The defendant is

19    presumed innocent and the burden of proof in this case rests

20    entirely on the government.  What the government is going to

21    prove beyond a reasonable doubt is the fentanyl pills that

22    killed Jacob Lee came from California.  The defendant,

23    Junior Gafatasi Tulali, shipped the pills from California to a

24    man named Andre Brown here in Fairbanks.  Andre Brown, in turn,

25    sold those pills to Winston Crockett, who sold the pills to

1  Jacob Lee.

2        Over the course of this trial, you're going to hear

3  about the life and the death of Jacob Lee.  He was 22 years

4  old.  He was born and raised in Fairbanks and lived with his

5  parents Deborah and Ray Lee.  He was the youngest of four sons

6  and recently become a father himself.  You'll hear that Jacob

7  Lee struggled with addiction to Percocet pills.  Percocet is a

8  medication commonly prescribed by doctors to treat pain

9  management.

10        THE COURT:  I'm so sorry to interrupt.  I think the

11  person that wants to listen in is trying to call.

12        (Pause)

13        MS. WEBER:  Jacob Lee was struggling with an addiction

14  to Percocet pills during the last two years of his life.  What

15  this case ultimately boils down to is people like the defendant

16  who are exploiting this addiction for their financial gain.

17  And the evidence is going to show that Andre Brown pled guilty

18  to his role and involvement in the death of Jacob Lee.  He's

19  going to testify over the course of this trial and said that he

20  pled guilty to the crimes that he was charged with, and he'll

21  testify as part of a plea agreement that he entered with the

22  United States.

23        He'll tell you that on October of 2020, Mr. Tulali,

24  who Mr. Brown knew as OJ, reached out to him because he knew

25  about Andre Brown's connections here in Fairbanks.  Now, why

1   Fairbanks?  The evidence will show that Mr. Tulali was able to

2   purchase these counterfeit Percocet pills for $4 to $5 per pill

3   in Los Angeles, and he knew they could be sold in Fairbanks for

4   a markup of around $60 per pill, which is significantly more

5   money than you can get anywhere else in the United States.

6           Andre Brown will testify that when the package arrived

7   with the pills, he started reaching out to other drug dealers

8   locally here in Fairbanks.  One of the drug dealers that he

9   contacted was Winston Crockett.  You will also hear testimony

10  from Mr. Crockett over the course of this trial.  Mr. Crockett

11  also pled guilty to his role in the death of Jacob Lee, and

12  he'll be testifying as part of the plea agreement that he

13  entered with the United States.  Mr. Crockett will tell you, on

14  October 26th of 2020, he met Mr. Brown and bought six of these

15  counterfeit Percocet pills.  Minutes later, he met up with

16  Jacob Lee and sold two of those pills to Mr. Lee.

17          After selling the pills to Jacob Lee, Mr. Crockett

18  took half of one pill.  Around 15 minutes later, he'll tell you

19  that he started feeling very odd, he started vomiting, had

20  constricted vision, and lost consciousness for about eight

21  hours.

22          When he regained consciousness in the hallway of his

23  apartment, he texted Jacob Lee to check on his wellbeing.

24  Jacob Lee never answered because within 24 hours, Jacob Lee was

25  dead.

1       You will hear from both Mr. Brown and Mr. Crockett.

2  You do not need to rely on their word alone.  There is also

3  going to be corroborating evidence in this case that show that

4  this is the course of events that took place.  For example,

5  you're going to see the text messages for yourself that are

6  going to show the timeline of exactly how things played out

7  when they met and when Jacob died.  You're also going to see

8  Facebook messages, call logs, location information,

9  photographs, and the defendant's own words.  You're also going

10  to hear about a search warrant executed by law enforcement on

11  November 6th of 2020.

12       Law enforcement got a warrant for Andre Brown's

13  vehicle and the address that the defendant, Mr. Tulali, sent

14  the pills to.  Inside of Andre Brown's vehicle was his jacket.

15  Inside the jacket pocket were 59 blue pills with an "M"

16  imprinted on the front and a "30" imprinted on the back that

17  was almost identical to legitimate Percocet pills.  Inside the

18  kitchen, in a cabinet above the microwave in the home where he

19  had the pills shipped to, there were another nine of the blue

20  M30 pills.  They were recovered, sent to the DEA lab for

21  analysis, and confirmed to be fentanyl.  Andre Brown will tell

22  you that these pills that were recovered by the agents were

23  from the shipment the defendant had sent to him in October of

24  2020.

25       You'll also hear from the toxicologist that tested

samples from Mr. Lee after he died.  Those samples came back with three times the potentially lethal dose of fentanyl in Jacob Lee's blood.  You will also hear from the medical examiner who conducted the autopsy of Mr. Lee.  She's going to tell you that in her professional opinion, the cause of Mr. Lee's death was fentanyl intoxication.

At the end of this case, after all of the evidence is presented, my co-counsel, AUSA Vosacek, is going to explain to you exactly all of the evidence that was brought in, and she's going to go through it and tell you exactly how the government had met its burden and proved each and every element of the events charged beyond a reasonable doubt.  And she's going to ask you to return the only verdict that's consistent with the facts in this case, a verdict finding the defendant guilty of distribution of fentanyl resulting in the death of Jacob Lee.

THE COURT:  Thank you, Ms. Weber.

Mr. Camiel?

MR. CAMIEL:  Good morning.  Again, my name is Peter Camiel and I represent Junior Tulali.  May it please the Court, counsel, ladies and gentlemen and Junior Tulali.  The death of Jacob Lee is terribly tragic and it's going to be difficult and painful to have to explore what happened in a public trial, particularly painful to his family.  But my client is charged with a very serious offense, and it is critical to challenge and question and confront the

1    government's evidence because they are trying to hold the wrong
2    person accountable for the death of Jacob Lee.

3          My client, Junior Tulali, has entered a plea of not
4    guilty.  He's not from Alaska.  He's never been to Alaska.
5    Until he was charged and arrested in California, he had never
6    been here.  He didn't know Jacob Lee, never met him, sent him
7    anything, messaged him.  He didn't know government cooperating
8    witness Winston Crockett, never met him, never sent him
9    anything.

10         He did know government cooperating witness Andre
11   Brown, the man who is trying to blame Jacob Lee in order to get
12   himself out from under his own problem.  He knew him from about
13   ten years ago in California, and they Facebook messaged more
14   recently.  But Junior Tulali is not the person who sent
15   Andre Brown any pills or any fentanyl or any package.

16         You're not going to hear any evidence of Junior Tulali
17   being found or arrested with any pills or any fentanyl.  You're
18   not going to hear any evidence of any fingerprints or DNA
19   connecting Junior Tulali to any of the pills that were found up
20   here on any of the plastic bags that were containing the pills
21   that were seized during various searches that took place.
22   You're not going to hear or see any evidence of anybody saying
23   that Junior Tulali was seen mailing anything to Andre Brown.

24         Now, you're going to hear talk about a package.  There
25   is no package.  The police never recovered any package.  What

1   they recovered were photographs on Andre Brown's phone,

2   photographs of a label, a shipping label.  That label, the

3   sender's name isn't Junior Tulali or OJ Tulali or anybody

4   Tulali, and the address of the sender isn't connected to

5   Junior Tulali in any way.

6          I want to talk to you, kind of give you an overview of

7   the government investigation, because it was a flawed

8   investigation.

9          Instead of carefully investigating and thoughtfully

10  following leads, the government took shortcuts.  What they

11  decided to do was to rely on the testimony of drug dealers who

12  had already repeatedly lied to them and offered them lenient

13  deals in return for their testimony knowing that they had

14  already repeatedly lied.

15         There are two issues that are going to be presented to

16  you in this case that are important.  The first is whether the

17  government can prove beyond a reasonable doubt that

18  Junior Tulali mailed any fentanyl-laced pills to Andre Brown.

19  And I suggest to you that they won't be able to do that.  The

20  second issue that you have to consider is whether whatever it

21  is that caused the death of Jacob Lee came from Junior Tulali

22  as opposed to from somewhere else, some other source.

23         Now, you're going to hear testimony from the medical

24  examiner and you're going to hear testimony from a

25  toxicologist, and it's important testimony.  You're going to

1  hear that Jacob Lee was found at his home, in his bedroom in

2  the lower level of the house, on the evening of Wednesday,

3  October 28th.  He was deceased.  And the medical examiner did

4  an autopsy and an examination and sent Jacob Lee's blood off to

5  a toxicologist to be examined, and the toxicologist issued a

6  report.

7          Now, you're going to hear that there were some

8  problems at the toxicology lab with quality control.  But the

9  toxicologist issued a report to the medical examiner, and based

10 on that report, the medical examiner concluded that Jacob Lee

11 died from a lethal dose of fentanyl that was found in his

12 blood, and the medical examiner classified the death as

13 accidental.

14         But it's also important that you pay attention to what

15 the medical examiner and the toxicologist are not able to tell

16 you.  One of the things you're going to learn about is you're

17 going to learn about fentanyl.  It's a prescription medication,

18 but it's also manufactured illicitly.  And it comes in many

19 different forms.  It comes on patches that doctors prescribe to

20 people for pain.  It comes in pill form.  It comes in liquid

21 form.  The people who use it illicitly, sometimes it's in

22 pills, sometimes blue pills, sometimes other colored pills.

23 Sometimes it's found in other drugs, like Xanax or heroin or

24 methamphetamine.  Sometimes it's in powder form.  The medical

25 examiner is not going to be able to tell you what it was that

1    Jacob Lee ingested.  Yes, based on the toxicology report, there

2    was fentanyl in his blood, but the medical examiner is not

3    going to be able to tell you whether he took a blue pill or a

4    white pill or any pill at all, whether it was powder or some

5    other form of fentanyl that he ingested.

6         In addition, the medical examiner is not going to be

7    able to tell you how it was that he ingested the fentanyl.  And

8    that's important, because how you ingest it impacts how quickly

9    it affects you and can affect the time of death estimate.  The

10   medical examiner is not going to be able to tell you whether he

11   smoked something containing fentanyl or whether he swallowed

12   something or whether he snorted it or whether he injected it.

13   There were some needle marks in his arm.  But the medical

14   examiner is not going to be able to tell you how it got in his

15   bloodstream.  The medical examiner is not going to be able to

16   tell you exactly when he took it or where he was when he

17   consumed whatever it was that had the fentanyl.  The medical

18   examiner is not going to be able to tell you where it came from

19   or who provided it or whether anyone was with him at the time

20   that he ingested it.

21        But as I indicated, the medical examiner is going to

22   tell you that in addition to examining Jacob Lee and examining

23   the toxicology report, the medical examiner took a history and

24   learned that Jacob Lee had a history of substance abuse,

25   ethanol, marijuana, heroin, methamphetamine, and also opiates.

I want to talk to you a little bit about Jacob Lee's addiction. And I'm not -- you're not going to hear about this because there's any attempt to disparage him. Addiction is a terrible thing. It's a disease, and a lot of people suffer from it. But Jacob Lee had struggled with addiction for a long time and, in fact, the addiction was so strong that in late October of 2020, he was sick. He was sent home from work. They thought he might have COVID. He had a fever. He had a cough. He had bronchitis. And he was supposed to stay home in bed, but the addiction was so strong, he got up out of bed and went out looking for drugs because that was the pull of the addiction that he suffered from.

Now, like a lot of addicts, he hid his addiction, and like a lot of addicts, he needed to have more than one source in case one person didn't have what he needed, another person would. Some of the evidence of his addiction are found on his own phone. Although he was told by the people he was getting his drugs from to erase the messages, some of them were recovered.

And just as an example, some of the evidence that you're going to hear, in January of 2020, January of 2020, ten months before he died, there were a series of messages with Winston Crockett, one of the government's cooperating witnesses. January 11th, asking for -- Jacob Lee asking if Crockett had any Xanax, any Xani bars was the term he used.

Jan 12th, any Percs, Percocets.  January 15th, anything.
That's all he needed to say to Crockett was "anything," and
Crockett knew what he meant.  January 21st, "anything."
January 22nd, "Can you get any yellow bars," more Xanax.

And earlier in October -- now, you heard and you're
going to hear evidence that he died on October 28th, that he
met with Winston Crockett on October 26th and got some pills
from him on that day.  But even earlier in October, you will
see the messages with Winston Crockett.  And the reason that's
important is, Winston Crockett claims he didn't get anything
from Andre Brown, who is trying to say he got stuff from
Junior Tulali until October 26th.  But October 10th, you're
going to see a message from Jacob Lee to Winston Crockett,
"PLS," question mark, pills.  October 12th, "anything."
October 24th, you're going to see a message where they arrange
for Jacob to pick up two pills on October 24th.  Those pills
were gone very quickly.  And October 26th, he was asking for
more.

His family didn't know he was going through this.
They thought he was recovered and all right.  He hid his
addiction, like many people would.  He hid the sources that he
was getting his drugs from, like many addicts would.

Let's talk for a minute about Andre Brown, the
government witness.  You're going to hear Andre Brown is
serving a sentence of 168 months in prison based on his

1    conviction.  That might sound like a long time until you hear

2    that when he was first arrested, he was looking at a

3    mandatory -- possibly mandatory life sentence.  Think about

4    that.

5           And if the government chose not to charge him in that

6    manner, he was at least looking at a mandatory 20-year

7    sentence.  But despite the fact that, as you're going to hear,

8    he repeatedly lied to the police, they offered him a deal so he

9    could get out from under those mandatory minimum sentences.

10          Now, you're going to hear that Andre Brown was

11   arrested on November 6, 2020, driving a stolen Hummer, coming

12   away from a house in Fairbanks.  How did he get that Hummer?

13   What you're going to hear is Andre Brown isn't from Alaska;

14   he's from Florida.  But once or twice a year, he would come up

15   here to visit and sell drugs.

16          When he came up here in early September of 2020, he

17   flew from Fairbanks to Anchorage and rented a Hummer, except he

18   didn't rent it in his own name.  He used somebody else's name

19   and ID.  He picked up the Hummer and he drove a load of heroin

20   from Anchorage to Fairbanks to sell that heroin here in

21   Fairbanks.  When he got back up here, he also got a load of

22   methamphetamine to sell here in Fairbanks.  He was never

23   charged with anything to do with the heroin or the

24   methamphetamine.  That's the government witness.

25          So he gets stopped leaving a house on November 6th in

1  that stolen Hummer, and the police asked him about the car that

2  he's driving. They say, "Well, you know, it's stolen." So

3  what does he tell them? He tells them, "Oh, I just borrowed it

4  from a guy here in Fairbanks earlier today," gives them a name,

5  Terrell, says where he met the guy. Of course, none of it's

6  true. So then the police search the Hummer and they find a

7  black jacket. And they asked him if he knows anything about

8  the jacket, and he says he knows nothing about it.

9        Then they tell him they found a baggie of pills in the

10  jacket. He says, "I don't know who has been using the car. I

11  don't know anything about any of the pills." So then they

12  confront him with the fact that in that black jacket where they

13  found the pills, they also found a bunch of money and they

14  found his ID and his name.

15        So now they've got him and they tell him, "Do you want

16  to cooperate," and so he says, finally, "I will tell you the

17  truth, I'll cooperate." And they say, "Where did you get the

18  pills from?" He says, "From a guy named Melvin Williams here

19  in Fairbanks. I got two batches of pills from Melvin

20  Williams," tells him where he met with Melvin, tells him he

21  used to sell cocaine with Melvin, tells them what Melvin

22  drives. That's the guy they made a deal with, except now he's

23  telling a different story.

24        Well, one of the things you're going to hear about

25  Winston Crockett is he liked to travel. And you're going to

see evidence that after he got up here to Fairbanks, he was not
only running back and forth to Anchorage, you're going to see
that he had been recently to Arizona, he had been to Seattle,
and you're going to see a message -- this is a message on
October 26th that Winston Crockett -- that Andre Brown sent to
Winston Crockett:  "Just touched the soil out here with some
30s.  Remember you'd be in that lane."  Just got back to town
with some 30s, not something that came through the mail, not
something that came in a package.  He'd flown in with those 30s
that he sold to Winston Crockett that Winston Crockett sold to
Jacob Lee.

          Now, you're going to hear from Winston Crockett as
well, somebody else the government made a deal with.  He's
serving an 84-month sentence.

          Winston Crockett was looking at a mandatory minimum of
20 years.  When he was first contacted by the police and they
told him they had found all of these messages between he and
Jacob Lee, they asked him if he sold any pills to Jacob Lee,
and he flat out said, "No, I didn't sell him anything."

          Several days later, they arrested him, and at the
police station they questioned him again and they said, "Here
is your chance to cooperate.  Did you sell any pills to Jacob
Lee?"  He said, "No."  The third time they interview him, that
time he says, "Yeah, I did sell those pills to Jacob Lee, and I
have been selling those to him for a while."

1        But what else does he say?  He says, "After I took
2  those pills to him, I took one.  I had a bad reaction.
3  Something is wrong with these pills.  So I flushed them all
4  down the toilet."  Well, the police who made a deal with him
5  knew that wasn't true because his own messages showed after
6  October 26th, after he claimed he'd flushed all of those down
7  the toilet, he was still selling them to his other drug
8  customers.

9        Based on the evidence you're going to hear in this
10  case about Winston Crockett and his prolific selling of drugs,
11  he clearly had multiple sources for the drugs he was reselling.
12  And based on the evidence you're going to hear about
13  Jacob Lee's addiction, whatever he would have got from
14  Winston Crockett on October 26th wouldn't have lasted until the
15  28th, just like what he got from Winston Crockett on the 24th
16  didn't last until the 26th.  He was an addict.  He needed these
17  drugs and he would have used them as soon as he got them.

18        So clearly, after October 26th, he got something else,
19  and the government is not going to be able to tell you what he
20  got or where it came from.

21        But in the end, it comes down to this:  "Just touched
22  the soil with some 30s," just got back to town with some 30s,
23  not something that came in a mail package, not something that
24  came from my client, Junior Tulali.

25        At the end of the case, after you have heard all the

1  evidence, we're going to ask you to return a verdict of not

2  guilty.  Thank you.

3          THE COURT:  Thank you, Mr. Camiel.

4          Are you ready to call your first witness or do you

5  need a few minutes here?

6          MS. WEBER:  We're ready, Your Honor.

7          THE COURT:  Very good.

8          MS. VOSACEK:  The government calls Ray Lee.

9          THE COURT:  Good morning, sir.  Come to the witness

10 stand here, around the corner, and when you get there, remain

11 standing and the clerk will administer an oath to you.

12     (Oath administered to the witness)

13         DEPUTY CLERK:  Please state and spell your name for

14 the record.

15         THE WITNESS:  My name is Ray Lee.

16         THE COURT:  Go ahead, please.

17         MS. VOSACEK:  Thank you, Your Honor.

18                 RAY LEE, GOVERNMENT WITNESS, SWORN

19                      DIRECT EXAMINATION

20 BY MS. VOSACEK:

21 Q   Mr. Lee, where are you from?

22 A   I was born and raised in Pasco, Washington.  I've been in

23 Alaska since '74.

24 Q   What brought you to Alaska?

25 A   The pipeline, with my parents.

```
 1   Q    And what is it that you do for work?

 2   A    I'm an equipment operator for the State of Alaska.

 3   Q    How long have you done that?

 4   A    About 29 -- almost 29 years.

 5   Q    What kind of equipment do you operate?

 6   A    Various loaders, dump trucks, skid steers, whatever they

 7   offer there.

 8   Q    Can you tell me a little bit about your family?

 9   A    I have four boys, my wife.  Close family.

10   Q    How long have you been married?

11   A    That's a good question.  I fail every time.  38 years, I

12   believe.

13   Q    You said you have four boys?

14   A    Yeah, I did.

15   Q    What are their names?

16   A    Jason, Josh, Jeffrey, and Jacob.

17   Q    So they're "J" names?

18   A    Yes.

19   Q    Why is that?

20   A    Well, my dad's name was JR, initials only, so we kind of

21   just stuck with that.  Their middle initials are Rs and their

22   last name is Lee.  Made it really easy when they played hockey

23   and baseball.  Just hand them down the same initials.

24   Q    Can you tell me their ages?

25   A    37, 35, 33 and 22.
```

1   Q    Do they all live in Alaska?

2   A    Josh is in Texas.

3   Q    Where do the others live?

4   A    Jeffrey lives with me and Jason is here in Fairbanks.

5   Q    Can you tell me a little bit about your youngest son,

6   Jacob?

7   A    Everybody liked him.  He had a heck of a smile.  I mean,

8   he -- just good-going kid.  You know he wasn't afraid to help

9   people.  I didn't ask to him a lot.  If I needed help, he was

10  there.

11  Q    Mr. Lee, if we could turn to what's been marked as

12  Government Exhibit No. 7.01.  There's tabs on the side that

13  should indicate.

14  A    It just has letters.

15          MR. CAMIEL:  He's looking at the wrong binder.

16          MS. VOSACEK:  You might be looking in a different

17  binder.

18          THE WITNESS:  7.01?

19          MS. VOSACEK:  7.01.

20  BY MS. VOSACEK:

21  Q    Do you recognize this?

22  A    Yes.

23  Q    How do you recognize it?

24  A    That's my son Jacob with his son Chase.

25  Q    Is that a fair and accurate representation of Jacob Lee?

```
 1   A    Yes.
 2             MS. VOSACEK:  I would offer Exhibit No. 7.01.
 3             MR. CAMIEL:  No objection.
 4             THE COURT:  That's admitted.
 5        (Exhibit 7.01 admitted)
 6             MS. VOSACEK:  Permission to publish.
 7             THE COURT:  Yes, go ahead.
 8   BY MS. VOSACEK:
 9   Q    Do you know when this photo was taken?
10   A    It was the day when Chase was born.  I can't remember the
11   day.
12   Q    And how old is chase now?
13   A    He is four, I believe.
14   Q    Chase was Jacob's son?
15   A    Yes.  I'm terrible with dates.
16   Q    Do you remember how old Jacob was when he died?
17   A    22.
18   Q    So as Jacob was growing up, was he a healthy kid or was he
19   prone to being sick?
20   A    He was healthy.  Had a little anxiety.
21   Q    But he didn't have, like, any chronic illness?
22   A    No.
23   Q    What did he do for work?
24   A    He was kind of in between jobs.  He was just trying to find
25   himself, trying to.  Typical teenager.
```

1  Q  Do you remember if he was working at some fast-food chains

2  when he died?

3  A  He was working at Wendy's and McDonald's at the same time.

4  Q  Where did he live?

5  A  At our house.

6  Q  Did he have a girlfriend?

7  A  He did.  But they were separated at the time.

8  Q  For a time, did they also live with you?

9  A  All three of them, the baby and his girlfriend.

10  Q  Do you remember when his girlfriend moved out?

11  A  Not approximately, no.

12  Q  Was it, like, short in time to Jacob's death or a long time

13  before?

14  A  It was only like a week or two.

15  Q  Can you tell the jury about Jacob's struggles with his

16  chemical dependency and substance use?

17  A  Like I said, he had anxiety and he was trying to find

18  himself, trying to figure out how to take care of the anxiety.

19  Q  Do you know how long he had been using?

20  A  Probably about a year.

21  Q  In October of 2020, did you think that he was using at the

22  time or did you think he was sober?

23  A  In October?  I'm sorry.

24  Q  In October of 2020.  What was your impression of his

25  chemical dependency at that time?

1   A   He was sober most of the time.  There was maybe once or

2   twice that I caught him on something.  And a lot of it was

3   because of his girlfriend.  She would tell us.

4           MR. CAMIEL:  I'm having a little trouble hearing.

5           THE COURT:  Can you try to get the microphone a bit

6   closer, sir?  Thank you.  I appreciate it.

7           Go ahead.

8   BY MS. VOSACEK:

9   Q   Okay.  Do you know who was Jacob's dealer?

10  A   Winston Crockett.

11  Q   How do you know that?

12  A   His girlfriend had told me he had mentioned -- Jacob had

13  mentioned it, and text messages on his phone after he passed

14  away.  I had noticed them.

15  Q   In October of 2020, did Jacob have a car?

16  A   He did, but it was broke down.

17  Q   So how did he get to work?

18  A   He walked.  He was only like a half a block away.

19  Q   Do you know if he ever had an opportunity to borrow his

20  brother's car?

21  A   I talked to his brother about it and he said --

22          MR. CAMIEL:  Your Honor, I'm going to object to

23  hearsay.

24          THE COURT:  That's sustained.

25  BY MS. VOSACEK:

```
 1   Q   Were there other vehicles at the residence?

 2   A   Mine.

 3   Q   What about the other brother that lived with you at the

 4   time?

 5   A   That was Jeffrey's car.

 6   Q   So that would have been at the residence as well?

 7   A   Yes.

 8   Q   What kind of car was that?

 9   A   It was just a Subaru, '98 Subaru.

10   Q   Did Jacob have a phone?

11   A   Yes.

12   Q   This is probably a hard question, but do you know what his

13   phone number was?

14   A   No.

15   Q   That's okay.  Can you describe Jacob's phone habits?  Did

16   he have it with him all the time?  Was he on it a lot?

17   A   As far as I know, he had it with him most of the time.

18   Q   Did you communicate with him over the phone?

19   A   Mainly texted.

20   Q   What were his response times?  Did he get back to you

21   quickly?

22   A   Yeah.

23   Q   Did he always respond?

24   A   As far as I recollect, yes.

25   Q   Can you just give a general outline of the layout of your
```

1    house, your residence?

2    A    It's just a two-story house.  Master bedroom was added on

3    to the house.  Basically, I call it a third floor now.  Then

4    the main house and then the basement.  Two bedrooms downstairs

5    in the basement, two on the main floor.

6    Q    Now, in October of 2020, you had cameras installed inside

7    your residence?

8    A    I had two.

9    Q    Can you tell the jury where they were?

10   A    I had one in the kitchen, where I could catch the front

11   door and the back door of my house.  And then I had one down in

12   the garage, which would catch the man door and the garage door.

13   Q    So was this the kind of system that would come to your

14   phone or alert you if somebody was home?

15   A    It was.

16   Q    And it covered all of the main entrances and exits to the

17   house?

18   A    Yes.

19   Q    Okay.  If someone entered the residence, would it shown up

20   on your camera?

21   A    For the most part, yes.  It wasn't the best top-quality

22   cameras.

23   Q    Do you remember what Jacob Lee was doing on October 26th

24   of 2020?

25   A    Well, I was working most of the day.  The camera had caught

1  him later that night, before he passed.  He was upstairs in the

2  kitchen fixing spaghetti.

3  Q   Was there a reason that Jacob Lee was home?

4  A   He had a cold.

5  Q   What was Jacob Lee's kind of normal practice when he got

6  sick?  What he would do?

7  A   My boys were the kind of guys to where they didn't want to

8  be bothered when they had a cold, they just wanted to be left

9  alone, rest, and then when they felt better, they would come

10  out and visit with us.

11  Q   From your perspective, where was Jacob Lee from

12  October 26th until you found him?

13          MR. CAMIEL:  Your Honor, I'm going to object.

14          THE COURT:  That's sustained as to foundation.

15  BY MS. VOSACEK:

16  Q   Did you have any knowledge that Mr. Lee left the residence

17  between when he came home from work and the 28th?

18  A   No.

19  Q   Did you -- do you recall talking with Jacob on the 27th at

20  all?

21  A   No.

22  Q   So when you came home from work on the 28th, what did you

23  do?

24  A   I came through the garage door and I noticed the light was

25  on.  From the garage, I go down the hallway.  There's a

bedroom.  And then I go upstairs to the main floor.  I noticed
the light was on.  And because I noticed he was on the camera
earlier that day, I figured he was in bed.  So I went in,
opened the door to see how he was feeling.  I assumed he was
feeling good.  And that's when I found him dead on the bed.

Q   Do you remember when was the last time you saw him in
person?

A   It was probably the 24th.

Q   Do you remember the last time you spoke to him on the
phone?

A   Probably the same time, on the 24th.

        MS. VOSACEK:  Can I have a moment, Your Honor?

        (Pause)

BY MS. VOSACEK:

Q   Do you remember the exact -- or do you remember giving a
statement to law enforcement a little bit closer in time to
Mr. Lee's death, I believe it was December of 2021?

A   Could you repeat that?

Q   Do you remember giving a statement to law enforcement
December of 2021?

A   Yes.

Q   And do you also remember being interviewed by law
enforcement on October 28th of 2020?

A   All I remember is they were asking for the phone that I
had.

```
 1   Q   Fair to say that it's been quite a while since October
 2   of 2020?
 3   A   Yes.
 4   Q   Would it refresh your recollection to view the reports
 5   generated from those two interviews?
 6   A   Yes.
 7   Q   Did you also give an interview in March of 2024?
 8   A   I don't recollect.
 9   Q   Like a month ago?
10   A   Yeah, I don't remember.
11   Q   Do you remember coming into my office with investigators
12   and myself?
13   A   Yes.
14   Q   In March.
15           MS. VOSACEK:  Your Honor, I'm showing defense counsel
16   the reports.
17           THE COURT:  All right.
18           MS. VOSACEK:  May I approach the witness?
19           THE COURT:  Go ahead.
20           (Ms. Vosacek approaches witness)
21           MR. CAMIEL:  Your Honor, I would ask that the witness
22   be allowed to review the reports to himself, but not read them
23   out loud.
24           THE COURT:  Is that your intent, Ms. Vosacek?
25           MS. VOSACEK:  It is, Your Honor.
```

1      THE COURT:  Very good.  Do you want him to read all

2  reports?  Would it be helpful to take a break here?

3      MS. VOSACEK:  I have them highlighted, but if it would

4  be better to take a break, that's fine.

5      THE COURT:  I don't know how much you have

6  highlighted.

7      MS. VOSACEK:  It's not a lot.

8      THE COURT:  Are you asking him to read the highlighted

9  portions only?

10     MS. VOSACEK:  The highlighted portions, Your Honor.

11     THE COURT:  You can go back to the podium, then, and

12  let him read the highlighted portions.

13    (Pause)

14     THE COURT:  Ready to proceed, Counsel?

15     MS. VOSACEK:  Yes, Your Honor.

16  BY MS. VOSACEK:

17  Q    Did that refresh your recollection?

18  A    Yes.

19  Q    Do you remember the last time that you talked to Jacob?

20  A    It was right around -- as far as I can remember, it was

21  right around the 24th, 25th.

22  Q    So when you went to -- as you said, you went to check up on

23  Jacob, what did you do when you found him?

24  A    Pretty much anything any other parent would do, just lost

25  it.  I called 911, ran upstairs and told the wife what was

going on.  The wife was just hysterical, you know, and I had a

hard time hearing 911 telling me what had happened -- asking me

what had happened.  I'm trying to explain to them.  There was

just a lot of chaos going on at that time.

Q    Did officers respond to the scene?

A    They did.

Q    Okay.  Did you have an opportunity to go through Jacob's

phone?

A    After the police had left, yes.  I was looking at it while

the police were there.

Q    Did you go through some --

A    His girlfriend had showed up, gave me the password to his

phone, and I started going through it.

Q    Did you see any messages?

A    I did.

Q    Did you see any conversations that were significant?

A    Yes.

Q    Without going into the content of those conversations, can

you just say who Jacob was communicating with?

A    Winston Crockett.

Q    And were they communicating about drugs?

A    Yes.  About 30s, they were called.

Q    And did you give the phone to law enforcement?

A    I did.

Q    Did you also have an opportunity while law enforcement was

1   present to go on your phone and review your cameras?

2   A    When they were there, no.

3   Q    Do you remember going through your phone to see the last

4   time he was on the camera?

5   A    Yes.

6   Q    And do you recall the date or time that he was last seen on

7   the cameras?

8   A    It was the day before, it was the 25th, day before he died.

9   Q    To be clear, I want to clarify dates.

10      You found Mr. Lee on the 28th; is that right?

11  A    Yes.

12  Q    So given that context, I know it's been a long time, but do

13  you recall what day you saw him on the camera?

14  A    On the 27th.  I'm sorry.  Yeah.  For some reason, I keep

15  thinking it's the 26th he passed.  Yeah, it's the 28th.

16  Q    When you -- what was he doing on the cameras?

17  A    From what I saw on the cameras, he was fixing himself some

18  spaghetti.  And then after his plate was -- he had it dished on

19  his plate, he had went downstairs.  He was smiling.  He looked

20  like he was in a really good mood.  I assumed he was feeling

21  better.  And he was not real fast, but just kind of trotting

22  down the stairs to the bedroom.

23  Q    So kind of based on the confusion that we had about dates,

24  do you think that --

25              MR. CAMIEL:  Your Honor, I'm going to object to the

```
 1   form of the question.
 2           THE COURT:  Sustained.
 3   BY MS. VOSACEK:
 4   Q   When you said the last time you talked to Jacob was on the
 5   25th, is that still your memory?
 6   A   The 26th.
 7   Q   Do you recall if Jacob looked intoxicated in the video?
 8   A   No.
 9   Q   I know this is going to be difficult, but I would you ask
10   you to turn to Government Exhibit No. 1.  Do you recognize it?
11   A   Yes.
12   Q   What is it?
13   A   It's a CD recording of the 911 that I placed.
14   Q   How do you know that that's what that is?
15   A   Because I listened to it and signed it yesterday.
16   Q   And that's the markings that you put on that disc?
17   A   That's my signature there.
18   Q   Is it a fair and accurate depiction of the 911 call you
19   made?
20   A   Yes.
21           MS. VOSACEK:  I would offer Exhibit No. 1.
22           MR. CAMIEL:  No objection.
23           THE COURT:  One is admitted.
24       (Exhibit 1 admitted)
25           MS. VOSACEK:  Permission to publish.
```

```
 1              THE COURT:  Go ahead.
 2              (Exhibit No. 1 playing in open court.)
 3              MS. VOSACEK:  I don't have any further questions, Your
 4    Honor.
 5              THE COURT:  Would you like to take a short break?
 6              All right.  Mr. Camiel, are you ready to proceed?
 7              I actually wanted to have one very quick sidebar with
 8    counsel here.  If we could do that first.
 9         (Begin bench conference)
10              MR. CAMIEL:  The court reporter said she can hear.
11              THE COURT:  I meant to tell you that yesterday.
12    You're not going to bring up the other sons --
13              MR. CAMIEL:  No, no.
14              THE COURT:  I knew that, but I just wanted to confirm
15    that.
16              All right.  Very good.
17              MS. WEBER:  Your Honor, we actually spoke to Jeffrey
18    Lee, and we hope he may actually be able to testify.
19              THE COURT:  Very good.  All right.  Well, then we'll
20    take that up again.  Let's go on back.  Thank you.
21              MR. CAMIEL:  I'm not going to bring up that he
22    overdosed, but he did give a statement --
23              THE COURT:  Now we're talking about Jacob or Jeff?
24              MR. CAMIEL:  Jeff.
25              THE COURT:  Okay.  Just want to make sure I have the
```

1  right one.

2          MR. CAMIEL:  In a report that I got from a recent

3  interview that the government did with Jeff, he talked about

4  how during the time period of October 2020, he was using heroin

5  at the time, and other drugs.  He was also getting drugs from

6  Winston Crockett.  And he also talked about his brother was

7  using heroin.  I think I'm allowed to get into that.

8          THE COURT:  You're going to get into that with Jeff,

9  not this witness.

10          MR. CAMIEL:  Fine.

11          THE COURT:  I assume no objection there?

12          MS. WEBER:  No.

13          THE COURT:  Thanks for the heads up on that.

14     (End bench conference)

15          THE COURT:  Whenever you're ready, Mr. Camiel.

16                      CROSS-EXAMINATION

17  BY MR. CAMIEL:

18  Q   Mr. Lee, I understand this is very, very hard for you.

19      When you listened to the 911 call, you heard -- I think you

20  heard yourself say, didn't you, that Jacob came upstairs

21  yesterday and he said he felt better?

22  A   (Nodding head)

23  Q   So you had actually talked to him the day before?

24  A   I don't remember talking to him the day before.  Two days

25  before.

```
 1  Q    Okay.  You mentioned that Jacob had a girlfriend and Jacob
 2  and his girlfriend Kristen, they had a little boy, a son
 3  together, right?
 4  A    Correct.
 5  Q    And she had been living at your house up until shortly
 6  before Jacob died?
 7  A    Yes.
 8  Q    And you could overhear that they had been arguing right
 9  before she moved out, right?
10  A    Yes.
11  Q    Did you know what they were arguing about?
12  A    A little bit of everything.  They had a rough relationship
13  at that time.
14  Q    Okay.  Did you understand one of the things they were
15  arguing about was his drug use?
16  A    Yes.
17  Q    And is it possible that she moved out on October 25th,
18  about three days before he died?
19  A    I don't recollect exactly what day she left.
20  Q    All right.  You talked a little bit about the surveillance
21  cameras you had in your home, and you said they weren't the
22  best quality, right?
23  A    Yes.
24  Q    And Jacob knew you had those cameras?
25  A    Yes.
```

```
 1   Q   And one of the things that you told the police when they
 2   showed up at the house and was asking about Jacob's movements
 3   was you indicated it was possible that he left his room by a
 4   window.  Remember that?
 5   A   Not by a window.
 6   Q   There was a window in his bedroom?
 7   A   There was a window in his bedroom.
 8   Q   And that was a way that he could get out of the house and
 9   avoid the cameras?
10   A   He could have.
11   Q   You didn't know anything about him using his brother's
12   Subaru on October 26th, did you?
13   A   No.
14   Q   You mentioned that Jacob had been sick.  Now, he was
15   working at the time.  You said he had two fast-food jobs, at a
16   Wendy's and at the McDonald's?
17   A   Yes.
18   Q   And, in fact, he had been sent home from work because he
19   was sick, right?
20   A   Yes.
21   Q   And there was a concern, because this is back in 2020, he
22   might have COVID, so he went and got tested?
23   A   Yes.
24   Q   But he had a cough and he had a fever and he had cold-like
25   symptoms?
```

```
 1   A    Correct.
 2   Q    And so he was just staying in his bedroom, trying to feel
 3   better?
 4   A    (Nodding head)
 5          THE COURT:  We need you to answer audibly, sir, "yes"
 6   or "no."
 7   A    Yes.  Sorry.
 8          THE COURT:  That's all right.
 9   BY MR. CAMIEL:
10   Q    After your son died, did you get a chance to talk to the
11   medical examiner?
12   A    No.
13   Q    Did somebody else from your family talk to the medical
14   examiner?
15   A    Not that I'm aware of.
16   Q    You had thought by October 28th, or at least on
17   October 28th, you thought that Jacob was better, that he wasn't
18   using anymore?
19   A    Yes.
20   Q    Okay.  So if he was using at that time, he hid it pretty
21   well from you?
22   A    Yes.
23   Q    And then it was after you found him, you started looking
24   through his phone and you saw messages that he had with this
25   guy Winston Crockett?
```

1  A   Correct.

2  Q   Do you recall seeing a message where Winston Crockett had

3  asked him to delete messages?

4  A   No.

5  Q   You don't know from your own personal knowledge where Jacob

6  got his drugs, do you?

7  A   Just from the text messages and from my two other sons.

8  Q   Okay.  So from talking to other people.  But in terms of

9  your personal knowledge, you don't know?

10 A   No.

11 Q   You don't know whether he had just the one drug dealer

12 source or whether there were other people he went to if the one

13 guy didn't have it?

14 A   He was the only one I was aware of.

15 Q   You were also aware that Winston Crockett was asked to stop

16 selling drugs to your son, right?

17 A   Yes.

18 Q   Did you get ahold of Mr. Crockett and ask him to stop?

19 A   No, but I should have.

20 Q   In fact, what, about a year before, you learned he had been

21 asked by one of your other sons to stop selling drugs to your

22 son Jacob?

23 A   Correct.

24 Q   When the police showed up and were starting their

25 investigation, what parts of your house did they look in?

```
 1   A    They went directly downstairs.

 2   Q    To Jacob's bedroom?

 3   A    Yes.  Officer Laska stood in the doorway so that nobody

 4   would go in there.

 5   Q    Did they search any other parts of your house?

 6   A    No.

 7   Q    Did they search any of the vehicles?

 8   A    No.

 9   Q    And that includes they didn't search your son Jeff's

10   Subaru?

11   A    No.

12   Q    Or Jacob's vehicle?

13   A    No.

14   Q    Did they bring a dog into the house, like a drug-detection

15   dog?

16   A    No.

17   Q    Did you ever personally see Jacob use any drugs?

18   A    I have never seen him take them, but I seen him when he was

19   on one.

20   Q    But you didn't see how it was that he consumed drugs?

21   A    No.

22   Q    So you don't know whether he just swallowed or he smoked or

23   snorted or injected?

24   A    All I know is he was taking pills.

25   Q    Did you know anything about him using any other kinds of
```

1    drugs?

2    A    No.

3              MR. CAMIEL:  Thank you.

4              THE COURT:  Redirect?

5              MS. VOSACEK:  Yes, Your Honor, briefly.

6                        REDIRECT EXAMINATION

7    BY MS. VOSACEK:

8    Q    Briefly, Mr. Lee.  There was a bit of questions on

9    cross-examination about if Jacob would go out a window.  Do you

10   recall that?

11   A    Yes.

12   Q    Was Jacob an adult?

13   A    Yes.

14   Q    Was he free to come and go from the residence as he

15   pleased?

16   A    Yes.

17   Q    He wasn't grounded or anything?

18   A    No.

19   Q    He wasn't forced to stay home?

20   A    No.  He just stayed in his bedroom because he thought he

21   had COVID and didn't want anybody else to catch it.

22   Q    So no reason for him to go out a window?

23   A    No.

24             MS. VOSACEK:  Nothing further.

25             THE COURT:  On that topic?

 1          MR. CAMIEL:  No.

 2          THE COURT:  Thank you, sir.  You may be excused.

 3     (Witness excused)

 4          THE COURT:  Your next witness.

 5          MS. WEBER:  The government calls Police Officer

 6 Brubeck.

 7          THE COURT:  All right.

 8     (Pause)

 9          THE COURT:  Good morning, sir.  If you could come all

10 the way up to the witness stand up here at the front of the

11 room.  And when you get up there, if you could remain standing,

12 the clerk will administer an oath to you.

13     (Oath administered to the witness)

14          DEPUTY CLERK:  Please state and spell your name for

15 the record.

16          THE WITNESS:  Clinton Brubeck, C-l-i-n-t-o-n,

17 B-r-u-b-e-c-k.

18          CLINTON BRUBECK, GOVERNMENT WITNESS, SWORN

19                    DIRECT EXAMINATION

20 BY MS. WEBER:

21 Q   By whom are you employed?

22 A   The Fairbanks Police Department.

23 Q   For how long have you been employed by the Fairbanks Police

24 Department?

25 A   Almost seven years.

1  Q   What did you do prior to working for the Fairbanks Police

2  Department?

3  A   I -- I was in the Army.

4  Q   How long?

5  A   Retired.  I retired.

6  Q   How long were you in the Army for?

7  A   About 21 years.

8  Q   What is your current rank and assignment?

9  A   I'm a patrol officer.

10  Q   Can you please describe your duties and responsibilities as

11  a patrol officer?

12  A   Yes.  So on a daily basis, I respond to calls that come in

13  through the 911 system, and also patrol and enforce traffic.

14  Q   Over the course of your career, approximately how many drug

15  overdoses have you responded to?

16  A   Probably 10 or 11.

17  Q   I would like to direct your attention to October 28th

18  of 2020, at approximately 5:22 p.m.

19     Were you working for the Fairbanks Police Department on

20  that date?

21  A   Yes, I was.

22  Q   Did there come a time when you responded to a residence

23  located at 1806 Hilton Avenue?

24  A   Yes, I did.

25  Q   What was the nature of that dispatch?

1    A    It was for a death.

2    Q    Was the cause of death described in the dispatch?

3    A    The dispatch had "death, not breathing," in the notes.    It

4    stated that a subject had been sick.

5    Q    Did you learn the name of the deceased individual?

6    A    Yes.

7    Q    What was that individual's name?

8    A    Jacob Lee.

9         I was just trying to remember if Jacob or Jason.    I believe

10   it was Jacob.

11   Q    What did you do upon responding to that residence?

12   A    Whenever I first responded, spoke to his father outside,

13   and then went down to his room in the basement, at which time

14   the medics were clearing the room.

15   Q    Did you take any photographs?

16   A    I did.

17   Q    Officer Brubeck, can you please take a look in that binder

18   in front of you at what's been marked as Government's Exhibit

19   Nos. 4, 5 and 6.

20   A    Yes.

21   Q    Do you recognize those exhibits?

22   A    Yes.    These are photographs that I took at the scene.

23   Q    Are Government's Exhibits 4, 5 and 6 a fair and accurate

24   representation of what Jacob Lee looked like at the time you

25   took those pictures?

1  A   Yes.

2            MS. WEBER:  Your Honor, I move to admit.

3            MR. CAMIEL:  No objection to 4, 5 and 6.

4            THE COURT:  4 and 5 and 6 are admitted.

5       (Exhibits 4, 5 and 6 admitted)

6  BY MS. WEBER:

7  Q   Officer Brubeck, can you please describe what a body-worn

8  camera is?

9  A   Yes.  A body-worn camera is a digital recording device that

10 we wear on our uniforms, and when going to a call, we turn them

11 on and record the interaction.

12 Q   What form of recording does it do?

13 A   Audio and digital -- audio and visual.

14 Q   Have you received training in operating a body-worn camera?

15 A   Yes.

16 Q   Have you been issued a camera?

17 A   Yes.

18 Q   When were you issued the camera?

19 A   I was issued a camera in 2017, when I started working on

20 patrol.

21 Q   How often do you use it?

22 A   Daily, multiple times a day.

23 Q   Can you describe how you wear the camera?

24 A   I have it on my vest, attached to my vest on my left side.

25 Q   How do you turn it on?

1  A    There's button on the front that you press.

2  Q    Does the camera start recording immediately when you press

3  the button?

4  A    It begins recording immediately, and it backs up to

5  30 seconds prior to me turning it on, so the first 30 seconds

6  of video, there is no audio.

7  Q    How is the camera turned off?

8  A    You have to press the button twice to turn the camera off.

9  Q    How is the recording stored while you're wearing the

10  camera?

11  A    It's on the device itself.  When you return back to the

12  station, you put it in a mounting dock, which downloads the

13  video to -- based on the storage device.

14  Q    Can the recording be edited or deleted while you're wearing

15  the camera?

16  A    No.

17  Q    After it's downloaded on the storage device, can the

18  recording be viewed at a later date?

19  A    Yes.

20  Q    Turning back to October 28th of 2020, was the camera you

21  were wearing working in proper order?

22  A    Yes.

23  Q    Was your response to Jacob Lee's death captured by your

24  camera?

25  A    Yes.

1  Q   When did it begin to record?

2  A   I turned it on when I exited my vehicle, so outside the

3  home.

4  Q   Was the recording subsequently downloaded or removed in

5  your body camera?

6  A   Yes.

7  Q   Prior to it being removed, did you or anyone else to your

8  knowledge tamper with or attempt to tamper with the recording?

9  A   No.

10  Q   Have you had an opportunity to review the recording prior

11  to testifying today?

12  A   Yes.

13  Q   If you could please take a look at a disc marked

14  Government's Exhibit No. 2.

15  A   Yes.

16  Q   Do you recognize it?

17  A   I do.

18  Q   What is it?

19  A   It's a disc of the recording that I signed and dated.  It's

20  the whole recording, I think.

21  Q   It's the recording from your body camera on 10-28 of 2020?

22  A   Yes.

23  Q   Is that recording a fair and accurate representation of the

24  actual events that you observed on that date and time?

25  A   Yes, it is.

1   Q    Has the recording been edited or altered in any way?

2   A    No.

3   Q    Is that recording approximately 40 minutes long?

4   A    Yes.

5           MS. WEBER:  Your Honor, I move to admit Government's

6   Exhibit No. 2.

7           MR. CAMIEL:  No objection.

8           THE COURT:  All right.  Two is admitted.

9       (Exhibit 2 admitted)

10  BY MS. WEBER:

11  Q    Next, I would like you to look at what's been marked

12  Government's Exhibit No. 2.1.

13  A    Yes.

14  Q    Do you recognize that?

15  A    I do.

16  Q    What's Government's Exhibit No. 2.1?

17  A    It's a disc containing a portion of the full recording.

18  Q    So it's just a clip from Exhibit No. 2?

19  A    Yes.

20  Q    And how do you know what's on that disc?

21  A    I signed it and made a note that it was a clip from the

22  body-worn camera.

23  Q    Other than the length, has the recording been altered in

24  any way?

25  A    No, it has not.

          MS. WEBER:  Your Honor, I'd move to admit Government's

Exhibit No. 2.1.

          MR. CAMIEL:  2.01.  No objection.

          THE COURT:  2.01 is admitted.

     (Exhibit 2.01 admitted)

BY MS. WEBER:

Q   Officer Brubeck, before I ask the Court permission to

publish these exhibits, can you please tell the jury whether

these exhibits are graphic or generally describe what's

depicted in the photographs and the video?

A   Yes, they are graphic.  It is -- you will see images of the

deceased in the photographs and on the body-worn camera.

          MS. WEBER:  Your Honor, may we publish Government's

Exhibit 4 to the jury?

          THE COURT:  Four?  Okay.  Yes, go ahead.

BY MS. WEBER:

Q   Officer Brubeck, how did the positioning of Mr. Lee's body

relate to your investigation?

A   As you can see from the photograph, he was sitting on the

edge of the bed, his feet on the ground, and his hand was down

his pants, fondling himself, when he passed away.

Q   You testified that when you were dispatched to the

location, it was a death and that the individual had been sick.

     When you saw the positioning of the body, what significance

did that have to you?

1          MR. CAMIEL:  Object unless there's further foundation.

2          THE COURT:  I'll allow the question.  I think there's

3  an adequate foundation given the testimony that we've heard

4  about the officer's background.  So that's overruled.

5          THE WITNESS:  Could you ask the question again?

6          MS. WEBER:  Madam Court Reporter, could you please

7  repeat the question?

8          (Question read back by court reporter)

9          THE WITNESS:  It did not strike me as the position of

10  someone who was sick.  Often I've seen through my experiences,

11  when someone is sick or ill, they are curled up on their bed,

12  usually on their side, not fondling themselves.  So it struck

13  me as odd.

14  BY MS. WEBER:

15  Q   Would you describe it in the state of anguish or a state of

16  relaxation?  What was your impression of the scene?

17          MR. CAMIEL:  Objection.

18          THE COURT:  That's sustained.

19          MS. WEBER:  I'll rephrase the question, Your Honor.

20          THE COURT:  All right.

21  BY MS. WEBER:

22  Q   May I ask, what was your impression of the scene when you

23  walked in?

24          THE COURT:  That's fine.  Go ahead.

25          THE WITNESS:  My impression of the scene when I walked

1  in is initially that the individual had not passed from being

2  sick.

3          MS. WEBER:  Permission to publish Exhibit No. 5.

4          THE COURT:  Go ahead.

5  BY MS. WEBER:

6  Q   Officer Brubeck, what's depicted in Exhibit No. 5?

7  A   This is Jacob's face photograph of him.  There's excrement

8  coming out of the side of his mouth and he was passed at this

9  point.  He's deceased.

10 Q   What was significant about his appearance in this

11 photograph?

12 A   First, there's no markings around his throat and his eyes,

13 anything that would show strangulation or anything like that,

14 and that he passed away.  There is the spittle coming out of

15 the side of his mouth.

16 Q   What was the significance to you of the spittle coming out

17 of his mouth?

18 A   It just -- with the -- with deceased, significant that he

19 had died laying on his back.  When he had thrown up, it ran

20 down the side of his face.

21 Q   In your experience, is vomiting consistent with a drug

22 overdose?

23 A   It is.

24          MS. WEBER:  Your Honor, may we publish Exhibit No. 6,

25 please?

1          THE COURT:  Go ahead.

2    BY MS. WEBER:

3    Q    Officer Brubeck, what was the reason for taking this

4    photograph?

5    A    This was to make sure that his positioning he was found in

6    was the position, that he had not been moved.  So I rolled him

7    on his side, and as you see from the picture, he had been

8    laying on his back, and after he died, his blood settled to his

9    back.

10   Q    What did that tell you about his time of death?

11             MR. CAMIEL:  Objection.  Foundation.

12             THE COURT:  That is sustained as to foundation.

13   BY MS. WEBER:

14   Q    What was the significance of the way the -- the blood

15   pooled in his back to your investigation?

16             MR. CAMIEL:  Objection.  Foundation.

17             THE COURT:  It is foundation.  It's sustained.

18             MS. WEBER:  I will move on.

19             THE COURT:  All right.

20   BY MS. WEBER:

21   Q    Officer Brubeck, can you please describe to the jury what's

22   depicted in the video clip that's been admitted into evidence

23   as 2.01?

24   A    Yes.  This is where I first went down the hall to his room.

25   Passed the -- the medics were coming out of the room at the

```
 1   time, and then I interviewed him and began my investigation,
 2   began taking photographs and viewing -- and looking around.
 3          MS. WEBER:  Permission to publish 2.01 to the jury.
 4          THE COURT:  Tell us how long this is.  You said the
 5   other was four minutes.  How long is this one?
 6          MS. WEBER:  The other one is 40 minutes.
 7          THE COURT:  Oh, 40.
 8          MS. WEBER:  This one is around four minutes.
 9          THE COURT:  Very good.  Thank you.
10          (Exhibit No. 2.01 playing in open court.)
11   BY MS. WEBER:
12   Q   I'm just going to pause it here for a second.  We're about
13   1 minute and 25 seconds into Government's Exhibit 2.01.
14          THE COURT:  Can you get a bit closer to the
15   microphone?
16          MS. WEBER:  Yes.
17          THE COURT:  Thank you.
18   BY MS. WEBER:
19   Q   I'm just going to briefly pause it.  For the record, we're
20   about 1 minute and 25 seconds into Government's Exhibit 2.01.
21       Officer Brubeck, what were you looking for when you first
22   entered Mr. Lee's bedroom?
23   A   I just began taking pictures right away.  I'm looking for
24   anything that's out of place, anything that would cause
25   suspicion.  I'm photographing everything as I go in, in case I
```

miss something that afterwards investigators can look through
and just confirm and look and see if there was anything that I
missed.  So it's an overall -- just getting an overall view of
the scene.

Q   Did there come a time when this -- when your investigation
focused on something other than the death of someone from an
illness?

A   Yes.  I think you'll observe it in this clip.  I begin
looking around.  Because of the whole situation and the way it
looked, I suspected it may have to do with drugs, so I began,
during that, looking in what may have been drug kits, looking
in trash cans, looking around.

Q   So fair to say you were investigating it as a drug-related
case at this point?

A   I was -- yes, I was leaning that way.

        THE COURT:  Can you pull the microphone a bit closer
to you, sir?

        THE WITNESS:  Yes.

        THE COURT:  Great.  Thank you.

        THE WITNESS:  So like I was saying, at this point, I
began -- after the review, I began looking -- it's in there, I
believe that you'll see.  I started looking more -- I began
looking at it more as a possible drug case.  I'm looking for
drug kits.  I'm looking in trash cans, looking around for what
were the causes.

1   Q    What is a drug kit?

2   A    Often, drug addicts will have a kit that they use, using a

3   small container that will contain their syringes, so on and so

4   forth, just depending on what the drug of choice is, what it

5   will contain.

6   Q    What are other sort of drug paraphernalia you may expect to

7   find at the scene of a drug case?

8   A    Often we'll find foil, syringes, cotton balls, rubber for

9   tying off the vein, that sort of thing.

10  Q    Were any of those items found?

11  A    I did not find any of those items.

12  Q    Do you ever find straws at --

13  A    Yes.

14  Q    -- drug scenes?

15  A    Yes.

16  Q    What are straws used for?

17  A    They are used for sniffing.  Whatever they've got, they've

18  crushed up and will sniff it.

19  Q    Were there any straws recovered?

20  A    Not that I observed.

21          MS. WEBER:  You can continue playing the exhibit.

22          (Exhibit No. 2.01 continues playing in open court.)

23  BY MS. WEBER:

24  Q   Officer Brubeck, at the end of the clip, can you please

25  explain why you looked in the hoody pocket?

```
 1   A    Once again, looking to see if there was any paraphernalia,
 2   anything placed in his pockets.
 3   Q    Was there?
 4   A    Not that I found.
 5   Q    And at the end of the clip, you also roll up Jacob Lee's
 6   sleeve.  Can you please explain why you did that?
 7   A    I was looking for track marks, so needle marks, in case he
 8   had been injecting.
 9   Q    What -- can you expand a little bit about what the needle
10   marks would indicate?
11   A    It would -- often indicates heroin use.
12   Q    What did you see when you rolled up Mr. Lee's sleeve?
13   A    I did not find any fresh track marks.
14   Q    Did you speak with investigators from the State of Alaska
15   Medical Examiner's Office?
16   A    Yes, I did.
17   Q    What did you tell them?
18   A    I described the scene.  I described what the family told me
19   about Jacob, also what I knew about Jacob.  And at that point,
20   they took jurisdiction of the body.
21   Q    Did you describe -- how did you describe the condition of
22   the body?
23   A    He was in full rigor.
24   Q    What does that mean?
25   A    That means he was -- he is -- all his limbs were stiff, and
```

1  depending on the amount of rigor, it's how they judge

2  approximately how long he had been deceased.

3  Q   What about the rigidity of Mr. Lee's body?

4  A   Yes.  So being rigid and in full rigor, it meant that he

5  had been -- probably had -- just in general, since he was still

6  in rigor, he was approximately 12 hours, I believe.

7  Q   Did you describe the temperature of Mr. Lee's body to the

8  investigators?

9  A   Yes.  Yes.

10 Q   What was the temperature?

11 A   It was cold to the touch.

12 Q   And lividity?

13 A   The lividity, that's the pooling of the blood, was

14 consistent with position he was lying in.

15 Q   Did it appear that Mr. Lee had passed away close in time to

16 when you responded?

17 A   No.  It had been hours before.

18 Q   Now, later, after this clip that was played in Government's

19 Exhibit No. 2.01, but in the video, in the full video contained

20 in Exhibit No. 2, was there a time when you looked in Mr. Lee's

21 pants pocket?

22 A   Yes.

23 Q   Was a cell phone recovered from his pocket?

24 A   Yes.  And it -- actually, in this video you can see when

25 I'm walking up to him, I take a picture of his pants pocket.

1  That was where the phone was.

2  Q    Was Mr. Lee's phone password protected?

3  A    Yes.

4  Q    Were you able to unlock it?

5  A    Yes.

6  Q    How did you get into it?

7  A    His girlfriend was able to unlock it.

8  Q    Did you look through Mr. Lee's phone while you were at the

9  scene at the time?

10  A    Mr. Lee's father began looking through the phone, and there

11  were some messages on the phone that were of interest.

12  Q    Did Mr. Ray Lee look through the phone in your presence?

13  A    Yes.

14  Q    When you say that there were messages of some interest, can

15  you please explain what you mean by that?

16  A    It appeared he was contacting an individual and purchasing

17  drugs from him.

18  Q    Did it -- were there more than one individual or did you

19  see messages -- did you see messages from multiple individuals

20  regarding drugs?

21  A    I believe it was one.  It was one.

22  Q    What did you do with the phone after looking through it

23  with Mr. Lee?

24  A    I asked for Mr. Lee's permission to take the phone, and he

25  gave permission.  The phone was seized and it was taken back,

and individuals from the drug unit downloaded the phone and he

kept the phone.

Q    Who in the drug unit did you give the phone to?

A    Investigator Caleb Reuter.

         MS. WEBER:  Your Honor, I have no further questions

for this witness.

         THE COURT:  Thank you.  Is this a good time for our

morning break here?  We've been going about an hour and a half.

         MR. CAMIEL:  That's fine.

         THE COURT:  We'll take 15 minutes, ladies and

gentlemen.  Please remember my admonition not to discuss the

case or do any research of any sort.  Please leave your

notebooks on the chair in the courtroom, and nobody will look

at them, and we'll have you back in 15 minutes.  We'll go off

record.

         DEPUTY CLERK:  All rise.  This matter is now in recess

for 15 minutes.

    (Recessed from 10:22 a.m. to 10:40 a.m.)

    (Jury present)

         DEPUTY CLERK:  Please be seated.

    (Pause)

         DEPUTY CLERK:  All rise.  Her Honor, the Court, the

United States District Court is again in session.

         Please be seated.

         THE COURT:  All right.  We are back on record and

1    ready to proceed, Mr. Camiel.

2            MR. CAMIEL:  Thank you, Your Honor.

3                        CROSS-EXAMINATION

4    BY MR. CAMIEL:

5    Q    Good morning, Officer.

6    A    Good morning.

7    Q    When you arrived at the Lee home on October 28th, we see on

8    the video, as you're going down, there are some medics that are

9    coming back up or coming out?

10   A    Yes.

11   Q    And do you know who those medics were?

12   A    I do not know off the top of my head.

13   Q    Do you know what, if anything, they did?  Could you see any

14   marks or tape or devices indicating they did anything?

15   A    Yes.  There were leads on the body.

16   Q    And can you explain to the jury what leads are?

17   A    The small sticky electronic patches that you saw on the

18   video.  You saw some on his abdomen that were clear.  They use

19   that to hook to the medical devices to check for signs of life.

20   Q    And how long that day were you actually at the Lee home?

21   A    Probably 45 minutes to an hour.

22   Q    How many police officers responded to the home that day?

23   A    Myself and Sergeant Laska.

24   Q    So besides you and Sergeant Laska, no other police officers

25   came to the home?

1    A    Not that I recall.

2    Q    Do you know how long Sergeant Laska was at the home?

3    A    I'm not sure.

4    Q    Did you leave before him?

5    A    No.

6    Q    So you were there longer?

7    A    Yes.

8    Q    So that would be 45 minutes to an hour?

9    A    Yes.

10   Q    Okay.  We saw you on the video.  As soon as you entered

11   Jacob Lee's bedroom, you started taking pictures, and we saw

12   that.

13        What areas of the bedroom did you search?

14   A    I searched primarily around the bed, but in his reach.  But

15   I checked the closet.  I checked the room in general.  I

16   checked behind the bed.  If you watch the whole thing, I

17   check -- there's some dressers at the foot of the room.

18   Q    Okay.  Did you go and search any other rooms of the house?

19   A    I went to the bathroom next door and photographed that as

20   well.

21   Q    Other than photographing the bathroom, did you search it?

22   A    A cursory, yes.

23   Q    What do you mean by cursory?

24   A    Cursory, looking in the trash can, looking in the medicine

25   cabinet.

1  Q    Were you still -- let me put it another way.

2      Did you remain at the house after Jacob Lee had been taken

3  from the house?

4  A    No.  I came back later that day, I believe.

5  Q    When you came back, what was the purpose of coming back?

6  A    It was for the phone.

7  Q    When you came back, did you conduct any further search of

8  the home?

9  A    No.

10 Q    So you looked in Jacob Lee's bedroom and you did the

11 cursory search of the bathroom, but you didn't look in any

12 other parts of the home?

13 A    That is correct.

14 Q    I take it you didn't have -- well, you suspected a drug

15 overdose, right?

16 A    That is correct.

17 Q    So one of the things you looked for were signs of drug use?

18 A    Yes.

19 Q    And you talked about not seeing any straws or syringes or

20 rubber strips that would be used, somebody tying off a vein,

21 right?

22 A    Yes.

23 Q    Also, you didn't see -- in Jacob Lee's bedroom, you didn't

24 see any pills or pill fragments?

25 A    No.

```
 1   Q    Or powder?

 2   A    No.

 3   Q    You didn't see any smoking devices?

 4   A    No.

 5   Q    Or burnt foil?

 6   A    No.

 7   Q    And you said, when you looked at -- at Jacob Lee, you said

 8   there were no fresh track marks?

 9   A    Yes.

10   Q    You did see some marks that could be track marks, but they

11   weren't fresh, right?

12   A    I do not recall, honestly.

13   Q    Did a medical examiner investigator ever come to the home

14   while you were there?

15   A    No.

16   Q    So -- okay.  So you -- you -- you called in information to

17   the medical examiner?

18   A    Yes.

19   Q    All right.  Do you know if the medical examiner talked to

20   anyone else that day from the home?

21   A    I don't know.

22   Q    You said you -- you described for the medical examiner what

23   you saw, what you found.  You also said you told the medical

24   examiner what you knew about Jacob.

25   A    Yes.
```

1  Q   And what was that?

2  A   From previous contacts, I knew that he had been a drug

3  user.

4  Q   Did you explain to the medical examiner the types of drugs

5  that he had been known to use?

6  A   I do not remember.  I believe I may have.

7  Q   What types of drugs did you know him to use?

8  A   I knew him to use methamphetamines.

9  Q   Did either you or Sergeant Laska search any of the vehicles

10  that were outside the home?

11  A   No.

12  Q   Did you inspect the windows in Jacob Lee's bedroom?

13  A   Just to look at, but not closely, no.

14  Q   Did you ever look under his mattress?

15  A   No.

16  Q   Did you look under the bed?

17  A   No.

18         MR. CAMIEL:  Thank you.

19         THE COURT:  Redirect?

20         MS. WEBER:  Briefly, Your Honor.

21                         REDIRECT EXAMINATION

22  BY MS. WEBER:

23  Q   Officer Brubeck, you were asked by Mr. Camiel about

24  searching the bedroom.  And in the video it looks like you

25  found a box with knives.  Is that correct?

```
 1   A    That is correct.

 2   Q    Is that typically considered drug paraphernalia?

 3   A    Not directly.  It can go one way or the other.

 4   Q    And you didn't inspect the windows, correct?

 5   A    That is correct.

 6   Q    Why weren't -- why didn't you inspect the windows?

 7   A    I had no reason to inspect the windows.

 8   Q    When you first arrived, was it being treated as a crime

 9   scene?

10   A    No.

11   Q    Why wasn't it being treated as a crime scene?

12   A    It was a death.  So death investigation.  At that point,

13   started as death investigation.  As we gained information

14   through the call, it -- it appeared to be a drug overdose.

15   Q    You were asked on cross-examination whether or not the

16   track marks you saw on Mr. Lee's arm were fresh.  If they were

17   fresh, would that have changed -- altered the course of your

18   investigation in any way?

19   A    Yes.

20   Q    In what way?

21   A    If they were fresh, then it would indicate that he had been

22   using hypodermic needles, at which point the search for -- we

23   would have searched harder, we would have asked the family more

24   questions, if someone had been in there to clean up.

25   Q    So since you did not find any needles or ask the family
```

1   those questions, do you remember whether or not the track marks

2   you saw on his arm were fresh?

3   A   They were not fresh.

4   Q   You also testified that you had previous interactions with

5   Jacob and you knew him to use meth.  Is that correct?

6   A   That is correct.

7   Q   Were those previous contacts drug related?

8   A   If I remember correctly, they were related to domestic

9   violence.

10   Q   So he was not arrested with methamphetamine?

11   A   Not that I recall.

12   Q   Had you ever had any interaction with Mr. Lee where you

13   arrested him and you recovered any other substances?

14   A   Not that I recall.

15   Q   So when you told the medical examiner investigators that

16   you knew him to use methamphetamine, what was the basis for

17   that?

18   A   Often, just when it was interactions, speaking with people,

19   I'll often ask them, you know, what they use and they come

20   forward with what type of narcotics they use or prefer.

21   Q   So was this -- it was your opinion based on prior

22   conversations you had with Mr. Lee or just your investi -- your

23   training and experience?

24   A   Conversation with Mr. Lee.

25         MS. WEBER:  No further questions, Your Honor.

```
 1              THE COURT:  Go ahead, Mr. Camiel.
 2                      RECROSS-EXAMINATION
 3   BY MR. CAMIEL:
 4   Q    Just on this last topic.
 5        So you had had conversations with Jacob Lee about his using
 6   meth?
 7   A    Yes, sir.
 8   Q    Did he indicate how he used it?
 9   A    I do not recall, sir.
10   Q    Did he indicate where he got it from?
11   A    No.
12   Q    In your experience working in the Fairbanks Police
13   Department, have you known of meth to be mixed with other
14   substances?
15   A    I have personally not had it mixed with other substances.
16              THE COURT:  Thank you, sir.  You may be excused.
17        (Witness excused)
18              THE COURT:  Ready for your next witness?
19              MS. WEBER:  Your Honor, the government is going to
20   call Officer Caleb Reuter.
21              THE COURT:  All right.
22        (Pause)
23              MS. WEBER:  I apologize, Your Honor.  We were
24   expecting -- can I run and get my folder, if we can get a brief
25   recess?
```

1                THE COURT:  How long are you requesting?

2                MS. WEBER:  I apologize.  Maybe just five minutes.

3                THE COURT:  Five minutes.  All right.  Let's take a

4    very short recess, and we'll come back in five minutes.  We'll

5    go off record.

6                DEPUTY CLERK:  All rise.  This matter now stands in a

7    brief recess.

8         (Recessed from 10:54 a.m. to 11:03 a.m.)

9         (Jury absent)

10               DEPUTY CLERK:  All rise.  Her Honor, the Court, the

11   United States District Court is again in session.

12               THE COURT:  All right.  Please be seated.

13               What's -- where are we here?  Ms. Weber, what's up?  I

14   didn't see you there.  Go ahead.

15               MS. WEBER:  Your Honor, can we just have a brief

16   sidebar before the jury comes back in?

17               THE COURT:  Can we do it here?  We don't have a jury.

18               MS. WEBER:  The government is prepared to call

19   Officer Reuter.  Considering the Court's order on the

20   testimony, we would ask him about his involvement with the

21   Jacob Lee investigation, and I think that might be a good time

22   to break for lunch, and then we can call him back to get into

23   the search warrant and rest of his testimony perhaps after the

24   lunch break.

25               THE COURT:  I'm sorry.  I couldn't hear you there.

 1          MS. WEBER:  So we can ask him now about his
 2  involvement with the Jacob Lee investigation, and then perhaps
 3  break for lunch, and then come back and talk about the search
 4  warrant and sort of next part transition of the investigation.
 5          THE COURT:  All right.  So you would be making the
 6  application -- how long do you anticipate the first half of his
 7  testimony to be?
 8          MS. WEBER:  Maybe a half hour.
 9          THE COURT:  So we would break for lunch early and
10  then --
11          MS. WEBER:  Yes, please.
12          THE COURT:  All right.  Thoughts on that approach?  No
13  opinion.  All right.
14          Well, let's go ahead and do that.  Although, this
15  would be a perfect example of it would have been good to have
16  brought up at 8:35 when we didn't have a jury waiting.  But
17  we'll just send them to lunch early.
18          But for future reference, I said about eight things, I
19  could list them out, in those orders that you all have of
20  things where application can be made, and it should be done
21  when we don't have 14 citizens waiting in a room.
22          All right.  With that said, let's bring in the jury.
23      (Pause)
24      (Jury present)
25          THE COURT:  Very good.  Please be seated, everyone.

1          And we're ready for our next witness.

2          Good morning.  If you could come up to the witness

3 stand, remain standing, and the clerk will administer an oath

4 to you.

5      (Oath administered to the witness)

6          DEPUTY CLERK:  Please state and spell your name for

7 the record.

8          THE WITNESS:  Yes.  Caleb Reuter, C-a-l-e-b,

9 R-e-u-t-e-r.

10              CALEB REUTER, GOVERNMENT WITNESS, SWORN

11                      DIRECT EXAMINATION

12 BY MS. WEBER:

13 Q    Good morning.  Mr. Reuter, by who are you employed?

14 A    Fairbanks Police Department.

15 Q    How long have you been employed by Fairbanks Police

16 Department?

17 A    Since 2016.

18 Q    What is your current rank and assignment?

19 A    I'm a patrol sergeant.  So I supervise a group of patrol

20 officers, respond to calls, review use of force reports, things

21 like that.

22 Q    What was your assignment between 2020 and 2022?

23 A    I was assigned to the Fairbanks Area Narcotics Team as an

24 investigator.

25          THE COURT:  Sir, can you pull that microphone right in

1 front of you a bit?  Much better.  Thank you.

2 BY MS. WEBER:

3 Q    Can you please describe some of your duties as an officer

4 with the Fairbanks Area Narcotics Team?

5 A    Sure.  What it comes down to is, basically, any

6 drug-related crime or incident, we would investigate.

7 Q    Approximately how many investigations related to the

8 distribution of controlled substances have you personally

9 worked on or assisted with over the course of your career?

10 A    You know, I don't really keep exact track, but I would have

11 to say over 100.

12 Q    Are you familiar with the substance fentanyl?

13 A    Yes.

14 Q    What is fentanyl?

15 A    So it's an opioid which is approximately 100 times more

16 powerful or potent than morphine, approximately 50 times more

17 potent than heroin.

18 Q    Over the course of your career, did there come a time when

19 you were assigned to investigate the death of Jacob Lee?

20 A    Yes.

21 Q    Before this investigation, how many times have you

22 encountered the substance fentanyl prior to that?

23 A    Personally, I have not done that.

24 Q    Subsequent to the case involving Jason Lee [sic],

25 approximately how many cases have you responded to or were

1  involved in relating to fentanyl?

2  A    I wouldn't feel comfortable putting a number on it, but

3  almost all of the cases after that, that related to opioids,

4  had fentanyl in one way or another.

5  Q    What was your role in the investigation?

6  A    So I received a call on the 28th of October, 2020, about

7  the suspected overdose death of Jacob Lee.  The officer

8  informed me that he had a phone and some possible leads, so I

9  received the phone and did a forensic extraction of the

10  contents of the phone and reviewed it.

11  Q    Who was the officer that you spoke to?

12  A    Officer Brubeck from FPD.

13  Q    You stated you got a phone from Officer Brubeck?

14  A    Correct, a phone that was belonging to Jacob Lee.

15  Q    Officer Reuter, if you could please take a look at what's

16  been marked as Government's Exhibit 7.

17  A    Okay.

18  Q    Do you recognize it?

19  A    Yes.  We previously reviewed it, and I -- I believe it was

20  the contents -- the report from the extraction of Jacob Lee's

21  phone.

22  Q    Did you create the report?

23  A    Yes.

24  Q    How did you create the report?

25  A    So we have software called Cellebrite.  We do an extraction

1    of the phone, which basically takes a copy of all the files.

2    After you get the extraction, you use a program called -- oh,

3    man.  I'm trying to remember off the top of my head.

4    Basically -- oh, the physical analyzer.  So it takes all of

5    that data and it translates it into a readable format.  After

6    that, you can generate a report in a couple different formats.

7    Q    And is that what's contained on Government's Exhibit 7?

8    A    Yes, the report.

9         MS. WEBER:  Your Honor, I move to admit Government's

10   Exhibit 7 into evidence.

11        MR. CAMIEL:  No objection.

12        THE COURT:  All right.  Seven is admitted.

13       (Exhibit 7 admitted)

14        THE COURT:  Now I'm confused.  There was a 7.01.  I

15   have a placeholder 7, and then there is a 7.02 that appears to

16   be the extraction report.

17        Madam Clerk, am I correct?  Was 7.01 admitted, the

18   photo?  Yes.

19        So are you talking about 7 or 7.02?

20        MS. WEBER:  Seven is the entire extraction and 7.02

21   are specific portions from that extraction.  So --

22        THE COURT:  There was no objection to 7, then?

23        MR. CAMIEL:  No.

24        THE COURT:  Okay.  Seven is admitted.  Go ahead.

25       (Exhibit 7 admitted)

1    BY MS. WEBER:

2    Q    Sergeant Reuter, if you could you please take a look at

3    what's been marked for identification as 7.02.

4    A    Okay.

5    Q    And do you recognize this?

6    A    Yes.

7    Q    What do you recognize it to be?

8    A    This is part of the PDF report that I generated from the

9    extraction of the phone.

10   Q    From Jacob Lee's phone?

11   A    Correct.

12   Q    And it was contained in the PDF in Exhibit No. 7?

13   A    Correct.

14   Q    Has it been altered, modified, or deleted in any way?

15   A    So Exhibit No. 7 is the entire PDF.  Exhibit 7.02 is just a

16   portion.  It has not been changed, other than it's not the

17   complete -- the complete extraction, as in Exhibit No. 7.

18   Q    Does it contain data logs from the phone from a certain

19   timeframe?

20   A    Yeah.

21   Q    What's the timeframe contained in 7.2?

22   A    So it looks like there's about nine lines there.  There are

23   other dates, but it looks like it starts on October 26, 2020,

24   after that.

25   Q    What's the end date?

1   A   That would be October 28, 2020, at 9:22 p.m.

2           MS. WEBER:  Your Honor, we would move to admit what's

3   been marked as 7.2 into evidence.

4           MR. CAMIEL:  No objection.

5           THE COURT:  7.02 is admitted.

6       (Exhibit 7.02 admitted)

7           MS. WEBER:  Permission to publish.

8           THE COURT:  Go ahead.

9   BY MS. WEBER:

10  Q   Can you describe what we're looking at on this first page?

11  A   So that's just the front page of the extraction report.

12  You see the case number there, the examiner name.  I didn't

13  happen to change the name.  That's Detective Thompson, a former

14  detective at FPD that ran a lot of the forensic program.

15  Q   If we could turn to page 2, please.

16      Directing your attention to line numbers 1 through 8 in the

17  timeline, what type does the extraction indicate that those

18  items are?

19  A   Those are calendar items.  So they look like, basically,

20  reminders from the calendar.

21  Q   Turning to line number 10, it was the type of activity?

22  A   Correct.

23  Q   What type of information did the phone gather under

24  "Activities"?

25  A   The iPhone will detect steps taken, movement, flight of

```
 1   stairs climbed, things like that.
 2   Q   Have you reviewed the entire phone that was extracted from
 3   Jacob Lee?
 4   A   Sure, within reason.
 5   Q   Were you able to estimate approximately how many steps
 6   Jacob Lee had taken on October 25, 2020?
 7   A   Yes.  It was over 11,000 steps.
 8   Q   Approximately how many steps did Jacob Lee take on
 9   October 26th of 2020?
10   A   I believe it was approximately 3,600, a little bit more
11   than that.
12   Q   Were you able to determine, based on the phone data, how
13   many steps Jacob Lee took on October 27, 2020?
14   A   Yes.  The phone recorded 59 steps.
15   Q   And how many steps did the phone record Jacob Lee took on
16   October 28th of 2020?
17   A   So nothing until the investigation, when the phone was
18   picked up by other people.
19   Q   So is that after 5:22 p.m. on the 28th that there was
20   movement?
21   A   Correct.
22   Q   When you were looking through the phone, did you find
23   anything -- any messages of value to the investigation?
24   A   Yes.
25   Q   What did you find?
```

1   A   So I found a conversation with a contact labeled

2   Winston Crockett, where it appeared that he purchased two

3   pills.  He was looking for oxy pills on the 26th, and it

4   appeared that he met up around 2:15 p.m. to purchase them for

5   $120.

6   Q   Who was looking for oxy pills?

7   A   Jacob Lee.

8   Q   Did there come a time when you applied for a search warrant

9   for Jacob Lee's Facebook account?

10   A   Yes.

11   Q   If you could please take a look at what's been marked as

12   Government's Exhibit No. 8 for identification.

13   A   Okay.

14   Q   Do you recognize this?

15   A   Yes.  This is the contents of the return I got from

16   Facebook for Jacob Lee's Facebook account.

17   Q   How are you able to recognize it as the records from the

18   Facebook return?

19   A   So first of all, in the Cellebrite extraction, there's a

20   number generated -- or a number associated with the account

21   which matches the target number there you see at the top left.

22   And other than that, it has his name, it has pictures of him,

23   it matches what's in his phone.

24   Q   And by "his," you mean Jacob Lee's, correct?

25   A   Correct.

1          MS. WEBER:  Your Honor, I move to admit what's been

2    marked as Government's Exhibit No. 8 into evidence.

3          MR. CAMIEL:  No objection.

4          THE COURT:  Eight is admitted.

5     (Exhibit 8 admitted)

6    BY MS. WEBER:

7    Q    Sergeant Reuter, if you could please take a look at what's

8    been marked as 8.1.

9    A    Okay.

10   Q    Do you recognize 8.1?

11   A    Yes.

12   Q    What do you recognize it to be?

13   A    This is a conversation between Jacob Lee's Facebook account

14   and Winston Crockett's Facebook account.

15   Q    Is it taken from what's been moved into evidence as Exhibit

16   No. 8?

17   A    Yes.  I correct myself.  I think I said that was the

18   entire.  It looks like it only goes up to page 146.  But, yeah,

19   this page on 1459 is -- reflects the conversation between Jacob

20   Lee and Winston Crockett.

21   Q    Is this the same conversation that you saw on Jacob Lee's

22   phone when you were looking through it?

23   A    Yes.

24          MS. WEBER:  Your Honor, I would move to admit

25   Government's Exhibit No. 8.1.

1          MR. CAMIEL:  No objection.

2          THE COURT:  8.01 is admitted.

3      (Exhibit 8.01 admitted)

4          MS. WEBER:  Permission to publish.

5          THE COURT:  Go ahead.

6  BY MS. WEBER:

7  Q   If we could please take a look at the first message.

8  A   Okay.

9  Q   I first want to start with the sent time.  It says

10 10-26-2020, 06:15 UTC.  Can you explain what UTC is?

11 A   That's basically Greenwich time, and it's going to equal

12 Alaska time -- or Alaska time is going to be equal to minus

13 eight hours.  So if that says 6:15 UTC, that would be, if my

14 math is right, 10:15 p.m. on the 25th of October of 2020.

15 Q   Who is sending the message?

16 A   Jacob Lee is the author, so he would be the one sending it.

17 Q   Who did he send it to?

18 A   To Winston Crockett.

19 Q   Can you read what Winston Crockett responded?

20 A   The response from Winston Crockett.  Yeah.  So one line

21 down, at 6:20 UTC, he says, "I'm working on it right now.  As

22 soon as I come across that, I'll let you know."

23 Q   What did Jacob Lee respond?

24 A   "Cool."

25 Q   And then the next message was at 2149 UTC.  What time is

1   that Alaska standard time?

2   A    1:49 p.m. on the 26th.

3   Q    What was the message that Winston Crockett sent?

4   A    "What's good, brother?  I got some 30s.  They're 60

5   apiece."

6   Q    Based on your training and experience, what's the

7   significance of 30s at 60 apiece?

8   A    So that would be pretty common for referring to

9   30-milligram oxycodones and the price would be $60 apiece.

10  Q    And was that helpful -- was that information useful to your

11  investigation?

12  A    Yes.

13  Q    Now, approximately just a few seconds later, what did

14  Jacob Lee respond?

15  A    He said, "I'll take two."

16  Q    And then three minutes later?

17  A    Winston Crockett says, "Okay.  Give me, like, 15 minutes

18  because my phone is shut off because I'm using WiFi over at the

19  library.  I have to run to my house.  Text me right now where

20  you want me to meet you at in 15, and then I swear I'll meet

21  you at -- meet me on the back side of Pioneer Park, you know,

22  where we used to meet at.  I'll be there in 15 minutes."

23  Q    And a few seconds later, what did Mr. Lee respond?

24  A    "Cool."

25  Q    Did Mr. Crockett respond?

1  A    Yes.  About 20 minutes later, 19 minutes later, Winston

2  says he's four minutes away.

3  Q    And what did Mr. Lee respond?

4  A    Lee says he's four minutes away, and then says, "Okay, on

5  my way in a blue Subaru."

6  Q    What time was the next message?

7  A    So the next message says October 27th at 6:58 UTC, so that

8  would be, I believe, 10:58 p.m. on the 26th.

9  Q    What does the message say?

10  A    "How are you doing?"

11  Q    Did Mr. Lee respond?

12  A    No.

13  Q    Can you please just highlight what time Jacob Lee stated

14  that he was on his way?

15  A    It was 2213 UTC.  So that would be approximately 2:13 p.m.

16  on the 26th.

17         MS. WEBER:  And if we can please pull up Exhibit

18  No. 702 [sic].

19         If we could have it next to Exhibit No. 801 [sic],

20  please.  BY MS. WEBER:

21  Q    I would like to direct your attention to a search that was

22  conducted on 10-26.  It's on the -- on page 3, line 28.

23  A    Okay.

24  Q    Can you please read line 28?

25  A    So yes.  It's search items, October 26, 2020, 2:26 UTC.  He

1   searched for pill identifier using Google.

2   Q   And is the time in this document UTC or already converted

3   to Alaska time?

4   A   So on the PDF, that's UTC.  So that would be -- sorry,

5   sorry.  That's already converted.  See where it says "UTC minus

6   eight," so it's already done the math.  So that's 2:26 p.m.

7   Alaska time.

8   Q   What was -- when was that search in relation to the timing

9   in Exhibit No. 801 that Mr. Lee told Mr. Crockett he was on the

10  way?

11  A   So that would be about 13 minutes later, I believe.

12  Q   After reviewing the messages on Mr. Lee's phone, what, if

13  any, investigative significance did that have?

14          MR. CAMIEL:  Objection to form of the question.

15          THE COURT:  The form of the question?

16          MR. CAMIEL:  Yes.

17          THE COURT:  That's overruled.  I'll allow that.

18          THE WITNESS:  So basically, it appeared that he was

19  trying to purchase drugs, pills specifically, from

20  Mr. Crockett, and then within a reasonable timeframe there

21  where they would have met up as indicated, he looked up pill

22  identifier.  Significant because it seems like he probably

23  received something and wanted to identify it.

24  Q   Can you please explain for the jury what pill identifier

25  is?

1  A    Sure.  That's basically open-source information that you

2  can use to identify a pill.  We use it all the time on search

3  warrants, things like that.  If we come across something we're

4  not sure what it is, you can describe it, basically what it is,

5  and come up with a -- it will return pretty good information

6  for you so you can know what you're dealing with.

7  Q    After identifying Winston Crockett as a person of interest

8  in the overdose, did there come a time when you applied for a

9  search warrant for Mr. Crockett's Facebook account?

10  A    Yes.

11  Q    And if you could please take a look at what's been marked

12  as Government Exhibit 23.

13  A    Okay.

14  Q    Do you recognize Government's Exhibit 23?

15  A    Yes.  That was previously reviewed and identified as

16  Mr. Crockett's Facebook return.

17  Q    And how are you able to recognize it?

18  A    By reviewing it.  And, again, you know, the target number

19  and the contents, messages, pictures, it matched with

20  Winston Crockett's Facebook account.

21          MS. WEBER:  Your Honor, I don't have any further

22  questions on this topic for this witness at this time.

23          THE COURT:  All right.  So is this where you're asking

24  for us to break for lunch?

25          MS. WEBER:  Yes, please.

1           THE COURT:  So ladies and gentlemen, we're going to
2   have lunch early today, our lunch break, so I can address an
3   issue with the lawyers while you have fun.
4           And so I'll ask you to leave your notepads here.
5   Remember my admonition not to discuss the case or do any
6   research.  Let's have you back here at 12:45.  And I know Lisa
7   has given me advice, and I bet she will you too, of good places
8   to go in this area for lunch.
9           Am I correct?  Yes, put you on the spot now.
10          All right.  We'll see you back at 12:45 p.m.
11      (Jury absent)
12          THE COURT:  All right.  Please be seated.
13          Ms. Weber, what's our plan here to get this issue
14  resolved?  What's your proposal?
15          MS. WEBER:  I'm sorry, Your Honor.  I'm not entirely
16  sure what issue.
17          THE COURT:  What is it -- why are we taking a break
18  now, from your perspective?
19          MS. WEBER:  I think narratively it's a good place to
20  break for the jury and, after lunch we can discuss the search
21  warrant of Andre Brown's house and car --
22          THE COURT:  I thought you wanted to take up, outside
23  the presence of the jury, the issue that I precluded you from
24  bringing up.  Is that still the case or are you not intending
25  to inquire on that?

1          MR. CAMIEL:  I thought we were going to be hearing an

2   offer of proof?

3          THE COURT:  You were going to do an offer of proof on

4   drugs in Fairbanks, the severity of the problem, as I recall

5   the topic.

6          MS. WEBER:  I apologize, Your Honor.  I don't believe

7   I made clear that Sergeant Reuter is likely going to be

8   testifying for a very long time, if not the remainder of the

9   afternoon, so I believe that this would be a good time for a

10  natural break in the testimony to --

11         THE COURT:  I should have made clear, I don't do

12  natural breaks by stopping a half hour early.  Five minutes

13  early is fine, but a half hour, because people might have made

14  plans to meet family or friends from 12:00 to 1:00 today

15  because I told everybody 12:00 to 1:00.  I misunderstood.  I

16  thought you were going to be making an application.  You do not

17  intend to ask me to revisit the in limine on that topic, which

18  is what I think you raised yesterday morning?

19      (Pause)

20         MS. WEBER:  At this point, Your Honor, I believe that

21  we will move forward in accordance with the Court's order.  If

22  the defense opens the door to evidence of the other overdoses

23  or other drugs that are in Fairbanks, at that point we would

24  renew the application.

25         THE COURT:  So there is not going to be -- as I

```
 1   recall, I can go back and look at your statement yesterday, I
 2   believe it was, that you sought --
 3           Sir, you can be excused.  We'll see you at 12:45 p.m.
 4           The issue was whether you wanted to get into the whole
 5   scope of the investigation, or was it just about going to
 6   Mr. Brown's house?  Was it Mr. Brown?  I'll go back and read
 7   what you stated.  But just so you're clear, my recollection is
 8   you represented that this officer couldn't testify in the
 9   way -- he couldn't tell a complete story, based on my order.
10   And now you're saying he can and we're good to go.
11           Just so you're clear, my order has not been amended,
12   so -- which would be to say we went, we had a search warrant,
13   and we went and did the search, not why they got the search
14   warrant or on what basis or what application was made.
15           MS. VOSACEK:  At this time we don't -- we have figured
16   out a way to sanitize the testimony of Officer Reuter in
17   accordance with Your Honor's order.  Should that change based
18   on cross-examination, we will --
19           THE COURT:  We can make an application, and you
20   couldn't predict that, outside the presence of the jury after
21   cross-examination, but during direct, then there would be no
22   inquiry on this, the overdose issue, apart from the one I
23   already permitted to have discussion of.  Are we all clear
24   there?
25           MS. VOSACEK:  Yes, Your Honor.
```

 1          THE COURT:  Very good.  Well, then I thought we were

 2  going to be doing some work here now, but we're not.  We'll be

 3  back at 12:45 p.m., and we'll go off record at this time.

 4          DEPUTY CLERK:  All rise.  This matter is now in recess

 5  until 12:45 p.m.

 6      (Recessed from 11:36 a.m. to 12:46 p.m.)

 7      (Jury absent)

 8          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

 9  United States District Court is again in session.

10          Please be seated.

11          THE COURT:  We're back on record here without the

12  jury, and I just wanted to be crystal clear where we are,

13  before we bring this witness in, on the next topic.

14          Yesterday the Court ruled that evidence of other

15  overdoses -- I'm reading from the draft transcript.  It's not

16  official.  That other overdose evidence could not come in.

17  Government said that it would request, quote, "that when

18  Officer Reuter testifies, he be allowed to explain the series

19  of events that led up to the search warrant at the residence

20  and any vehicle," closed quote, and said it was inextricably

21  intertwined.

22          Mr. Camiel clarified that this was a witness disclosed

23  in early discovery, Evan Slongwhite.  So I assumed when the

24  government stated it was going to be making an application to

25  do so, that that's what was intended.

 1          And then what was said this morning, when the request
 2     was made to break at 11:30 a.m., Ms. Weber stated, "The
 3     government is prepared to call Officer Reuter.  Considering the
 4     Court's order on the testimony, we would ask him about his
 5     involvement with the Jacob Lee investigation, and I think that
 6     might be a good time to break for lunch."

 7          I read that to mean the government wanted to take up
 8     the very issue they had asked to take up the day before.  I'm
 9     hearing now they don't, and that's fine.  But I want to make it
10     crystal clear, we're all on the same page, because we're not
11     communicating well, that there will be no mention by this
12     witness of Evan Slongwhite.

13          MS. WEBER:  Yes, Your Honor.  The testimony that the
14     government expects is, when asked the nature of the search
15     warrant, it was based on information about drug sales at that
16     location.

17          THE COURT:  Is that agreeable?

18          MR. CAMIEL:  Yeah.

19          THE COURT:  Just to be clear too, when I tell the jury
20     lunch is at 12:00, lunch is always at 12:00, maybe three
21     minutes or five minutes early, not a half hour.

22          Let's get the jury in.  Please also try to be here two
23     to three minutes before I tell the jury.  I know the marshals
24     try hard to get the defendant up here so they are not waiting
25     as they have been these few minutes.

1          MR. CAMIEL:  Just quickly.  The government indicated

2     they were going be getting me the witness prep notes.

3          THE COURT:  Oh.  Where are the witness prep notes?

4          MR. CAMIEL:  I did receive an email from the

5     government with prep notes for Ray Lee, who has already

6     testified, Officer Reuter who has already testified.  There's

7     nothing in there that I'm complaining about.  And a couple

8     other witnesses.  But there are no prep notes for the

9     cooperating witnesses who have already been interviewed.

10         MS. WEBER:  Your Honor, as to the other witnesses, any

11    notes that were taken during the interview were made into a

12    report which had been disclosed to counsel, and the notes

13    actually were -- the handwritten draft notes were provided as

14    well.  As to the interviews that we conducted last night,

15    again, it was witness prep, not necessarily an interview.  If

16    there was anything inconsistent, then that would be made into a

17    report and provided.  We'll get the handwritten notes to

18    counsel.  Agent Carr indicated that the notes are -- are just

19    sort of --

20         THE COURT:  I thought the agreement and order of the

21    Court this morning was that the notes be provided by noon.

22         MR. CAMIEL:  That's what I understood.  The notes they

23    gave me are witness prep notes, but not --

24         THE COURT:  Can we take this up at the next break?

25    When the jury has a break, we'll make sure.  It's not this

1  witness that you need the notes?

2          MR. CAMIEL:  No.

3          THE COURT:  All right.  Let's get the officer back in,

4  and the jury.

5          But Mr. Camiel, remind me if I overlook that.

6      (Jury present)

7      (Witness resumes witness stand.)

8          THE COURT:  Please be seated, everyone.  Welcome back,

9  ladies and gentlemen.  And we're going to resume with the

10  government's questioning of the witness, who I'll remind, sir,

11  you're still under oath.

12          Whenever you're ready, Ms. Weber.

13  BY MS. WEBER:

14  Q   Hi, Sergeant.

15      I want to back up a little bit because I understand that

16  the evidence that we went through prior to the break was a

17  little technologically heavy.

18      Can you please explain to the jury again what the

19  Cellebrite program is?

20          MR. CAMIEL:  This has been asked and answered, about

21  the Cellebrite report, already.

22          THE COURT:  Do you plan to immediately move more

23  questions on Cellebrite?

24          MS. WEBER:  Clarifying about the program and the

25  information that's obtained.

```
 1          THE COURT:  I'll allow it.  Go ahead.  That's fine.
 2          THE WITNESS:  Cellebrite program basically takes a
 3   copy of the files held within the phone and then, again,
 4   analyzes them and is able to make a report where you can review
 5   the contents.
 6   BY MS. WEBER:
 7   Q    What do you mean when you say it analyzes the phone?
 8   A    Well, all the files that you pull up on the phone are just
 9   kind of raw data that the phone can read.  So the analyzer
10   software is basically like a mirror of that.  It reads the
11   files like the phone reads the files.  Otherwise, you just have
12   these big files that it just looks like computer language,
13   basically.
14   Q    What sort of information are you able to get from a cell
15   phone?
16   A    Really depends on the phone and the software version and
17   things like that, but generally we get messages, application
18   data, location data, call logs, pictures, any kind of
19   multimedia file held on -- and there's other things.  Like we
20   discussed before, you can get health data, depending on the
21   phone, typically Apples, will track things like steps, things
22   like that.  The list kind of goes on.
23   Q    So if you have an iPhone, then will the Cellebrite show all
24   the applications that a user may have downloaded onto the
25   phone?
```

1    A   It can.

2    Q   Can it give you information from those applications or just

3    which ones are on the phone?

4    A   It depends on the application.  Sometimes it can.

5    Sometimes it can't.  Like, for instance, sometimes you'll get

6    Facebook data, other times you won't.  It really just depends

7    on the software version on the phone and factors like that.

8    Q   Does it give you the call log contained on the phone?

9    A   Yes.

10    Q   And is there any other sort of data that we may have on our

11    phones that may or may not be contained in the Cellebrite?

12    A   Yeah.  Pretty much anything that you have on your phone may

13    or may not be extracted.  Again, it depends on the software

14    version and the software that we use to do the extraction.

15    Q   And the cell phones that you extracted in this case, what

16    sort of information did you obtain?

17    A   Quite a wide variety of information.

18    Q   Now, I would like to jump ahead a little bit to

19    November 6th of 2020.

20        Were you working with the Fairbanks Police Department as a

21    task force officer on that date?

22    A   Yeah.  The Fairbanks Area Narcotics Team.  So that's

23    troopers, FPD, local and federal agencies.

24    Q   And did you obtain a search warrant for 310 Tipperary

25    Court?

1    A    Yes.

2    Q    Is that a location here in Fairbanks?

3    A    Not in the city proper, but in the North Star Borough out

4    towards Farmers Loop.

5    Q    Can you describe what that location is?

6    A    It's a duplex on that -- at that address where Kweka Warner

7    was renting.

8    Q    So it's a residential location?

9    A    Yes.

10   Q    Is it an apartment building?

11   A    No.  It's like a side-by-side duplex.

12   Q    What was the basis for a warrant at that location?

13   A    Drug-related activity.  Also a stolen vehicle that we

14   observed when we got there.

15   Q    What kind of vehicle was it?

16   A    It was a Humvee, or like a civilian model, Hummer.  I guess

17   they call it a Hummer.

18   Q    What happened while you were preparing to execute the

19   search warrant?

20   A    So we were waiting to get our team together, and the Hummer

21   left, so we followed it until it had trouble getting started at

22   an intersection, at a stop sign, because it was a heavy winter

23   storm that day.  So we decided this would be a safe time to

24   approach and detain the occupants.

25   Q    Did you, in fact, approach the Hummer?

1  A    Yes.

2  Q    How many occupants were inside?

3  A    Two occupants.  The driver was Andre Brown and the

4  passenger was a guy named Christopher Kearney.

5  Q    Were you alone or with other law enforcement authorities?

6  A    I was with AST Trooper Halbert and North Pole

7  Detective Werner.

8  Q    Did you remove Mr. Brown and Mr. Kearney from the vehicle?

9  A    I believe Mr. Brown was already outside, trying to figure

10  out how to get unstuck, and I believe Mr. Kearney was in the

11  passenger seat still.

12  Q    And what happened next?

13  A    So we detained them and talked to them and ended up

14  executing our search warrants.

15  Q    What were the search warrants for?

16  A    So the 310 Tipperary Court address, the Humvee, and

17  occupants of either.

18  Q    And by Humvee, do you mean the stolen Hummer?

19  A    Correct.

20  Q    Sergeant Reuter, if you could please take a look at what's

21  been marked as Government's Exhibit 10, 11, 12, 13 and 14.

22  A    Okay.

23  Q    Do you recognize those?

24  A    Yes.

25  Q    What do you recognize them to be?

1   A   So those are photos taken from the Hummer, inside the

2   Hummer, and inside the 310 Tipperary Court.  And the last one

3   was taken at a trooper post in Fairbanks, in the evidence room.

4   Q   Are they a fair and accurate depiction of how those items

5   appeared to you at the time the photos were taken?

6   A   Yes.

7           MS. WEBER:  Your Honor, I move to admit Government's

8   Exhibits 10, 11, 12, 13 and 14.

9           MR. CAMIEL:  No objection.

10          THE COURT:  All right.  10 through 14 are admitted.

11      (Exhibits 10 through 14 admitted)

12  BY MS. WEBER:

13  Q   Just to back up a little bit, when you stopped the Hummer,

14  did you have a conversation with Andre Brown and

15  Christopher Kearney?

16  A   Yes.  Trooper Halbert interviewed Andre Brown, and I

17  believe Detective Werner talked to Christopher Kearney.  I was

18  somewhat involved in the conversation with Mr. Brown.

19  Q   And after that conversation, did you look inside of the car

20  based on what was discussed?

21  A   Yes.

22  Q   What did you find in the car?

23  A   So in the back seat, on the seat as you see it here in the

24  picture, was a jacket.  Inside the jacket was some banded cash,

25  about 59 blue pills, and an ID for Mr. Brown.

1          MS. WEBER:  Permission to publish Exhibit 10, please.

2          THE COURT:  Go right ahead.

3   BY MS. WEBER:

4   Q    Please describe what's depicted in Government Exhibit 10.

5   A    So the jacket, the gray jacket on the seat.  That's the

6   focus of the picture.

7   Q    Did you have an idea of who the jacket belonged to?

8   A    I had a suspicion, because he had asked about getting his

9   jacket out of the vehicle.

10  Q    Who did?

11  A    Mr. Brown.

12  Q    And did you look -- you looked inside the jacket?

13  A    Correct.

14         MS. WEBER:  Permission to publish Government

15  Exhibit 11.

16         THE COURT:  Go ahead.

17  BY MS. WEBER:

18  Q    Can you describe what's depicted in this exhibit?

19  A    Yes.  That's the banded U.S. currency.

20         MS. WEBER:  Permission to publish Exhibit 12.

21         THE COURT:  Go ahead.

22  BY MS. WEBER:

23  Q    Can you please describe what's depicted in this exhibit?

24  A    Yes.  Those -- that's a bag.  It contains 59 blue M30

25  pills.  I believe ten of those were inside a dime bag, which is

1   also contained within the same bag.

2   Q   What is a dime bag?

3   A   That's a type of bag generally used to -- or commonly used

4   to distribute smaller amounts of drugs, like user amounts.

5           MS. WEBER:  Can we please publish Exhibit 13?

6           THE COURT:  Go ahead.

7   BY MS. WEBER:

8   Q   Sergeant, what's depicted in this exhibit?

9   A   That was a phone that was taken inside of 310 Tipperary

10  Court.  This is a cabinet above a microwave.  That baggie, I

11  believe it had nine blue M30 pills that had the same appearance

12  as the pills found in the jacket.

13          MS. WEBER:  Can we publish Exhibit 14?

14          THE COURT:  Go ahead.  I'm sorry.

15  BY MS. WEBER:

16  Q   Sergeant, what's depicted in Government's Exhibit 14?

17  A   So this is going to be the same baggie that was found

18  inside the jacket, just a picture while processing the evidence

19  to put into storage.

20  Q   Was there anything else inside of that jacket to indicate

21  who it belonged to?

22  A   Yes, a state ID for Mr. Brown.

23  Q   What state was the ID from?

24  A   I honestly don't recall off the top of my head, so I

25  wouldn't feel comfortable saying.

```
 1   Q    Is there anything that may refresh your recollection?
 2   A    Oh, it's probably in a report.
 3            MS. WEBER:  Your Honor, may I approach?
 4            THE COURT:  Why don't you show Mr. Camiel.  Go ahead.
 5   Thank you.  Go right ahead.
 6            (Ms. Weber approaches witness.)
 7            THE WITNESS:  All right.  So, yeah, after looking at
 8   the report, it's a Florida ID card.
 9   BY MS. WEBER:
10   Q    Were you able to refresh your recollection as to the state
11   that the ID was from?
12   A    Yes, Florida.
13   Q    The pills that you recovered from the Hummer and the
14   kitchen, were they sent to the lab for analysis?
15   A    Yes.
16   Q    Did you receive any response from the lab?
17   A    Yes.
18   Q    What did the response indicate?
19   A    So they contained fentanyl, I believe, among some other
20   compounds.
21   Q    Do you recall if the other compound was a controlled
22   substance?
23   A    I don't recall off the top of my head, no.
24   Q    Is there anything that may refresh your recollection?
25   A    I would assume it was in the report.
```

```
 1   Q   If you look in the binder that's in front of you at what's
 2   been marked as Government Exhibits 18 and 17.
 3   A   Okay.  17 and 18?  It's a pretty dense document there.
 4           MR. CAMIEL:  He's supposed to be refreshing his
 5   recollection, rather than reading.
 6           THE COURT:  So the question is, take a look at 17 and
 7   18, and let us know when you're done looking at them.
 8           THE WITNESS:  Okay.
 9   BY MS. WEBER:
10   Q   The following one, 17.1, is rather dense.  17 is a one-page
11   document.  18 is also a one-page document.
12   A   Okay.  Sorry about that.  I was looking at the -- oh, okay.
13   So --
14           THE COURT:  Let her ask a question.
15   BY MS. WEBER:
16   Q   Does that refresh your recollection as to what other
17   substances were identified?
18   A   Yes.
19   Q   What other substances were identified?
20   A   Acetaminophen.  I don't know if I'm pronouncing that right.
21   I understand it's like Tylenol or something like that.
22   Q   Is it a controlled substance, do you know?
23   A   It's over the counter.
24   Q   Going back again to when you stopped the Hummer, did you --
25   you testified that the warrant authorized you to search
```

```
1   Mr. Brown and Mr. Kearney's person as well, correct?
2   A    Correct, since they were occupants of the residence and the
3   vehicle.
4   Q    Did you recover anything from Andre Brown?
5   A    A phone, a cell phone.
6   Q    Did you do anything with regards to that cell phone on the
7   scene at the time?
8   A    He opened the phone to show us a conversation that he
9   alleged happened, and then since he had unlocked it, we secured
10  it so that we could apply for a search warrant.
11  Q    Could you explain a little more about the circumstances of
12  how Mr. Brown -- why Mr. Brown opened the phone?
13  A    He wanted to show us a conversation that he alleged
14  happened where he -- I believe he said he borrowed the vehicle
15  from a fellow named Terrell.
16  Q    It was the fact he was operating a stolen vehicle, right?
17  A    Right.
18  Q    If you could please take a look at what's been marked as
19  Government's Exhibit 15 and 15.01.
20       Do you recognize those?
21  A    Yes.
22  Q    What are those exhibits?
23  A    So at the time, I was not able to do an extraction, so I
24  did a physical search of the phone, and these are pictures I
25  took while searching the phone.
```

1  Q    To clarify, was this a digital search or looking through,

2  scrolling through his actual phone?

3  A    It is a physical search, scrolling through the phone and

4  taking pictures of the screen.

5  Q    Are those photos a fair and accurate depiction of what the

6  phone looked like at the time that you saw them?

7  A    Yes.

8           MS. WEBER:  Your Honor, move to admit 15 and 15.01.

9           MR. CAMIEL:  I would object to 15 in that it's been

10  redacted.  I would not object to an unredacted 15.

11          THE COURT:  15, where -- just that first page that has

12  the redaction?  I think that's the only page with the

13  redaction.

14          MR. CAMIEL:  Right.

15          THE COURT:  Any objection to have an unredacted

16  version of 15?

17          MS. WEBER:  Your Honor, there is an unredacted version

18  in 16.04, which we'll --

19          THE COURT:  16.04?

20          MS. WEBER:  Yes, Your Honor.

21          THE COURT:  So can we substitute that with -- or take

22  a minute.

23          Is that acceptable?  What's the defense position if

24  the first page of 16.04 is substituted?

25          MR. CAMIEL:  I have no objection.  My only concern was

1  the information was redacted.

2          THE COURT:  I understand.

3          So 15 is admitted, except for page 1 of 15 is

4  substituted with 16.04, the first page -- it's only one page --

5  is substituted for the first page of 15.  And it was 15 and

6  15.01 to which there's no objection, 15.01?  Did you move both

7  in?

8          MS. WEBER:  Yes, Your Honor.

9          THE COURT:  Mr. Camiel?

10          MR. CAMIEL:  No objection to 15.01.

11          THE COURT:  Those are both admitted with that one

12  change.

13      (Exhibits 15 and 15.01 admitted)

14  BY MS. WEBER:

15  Q   After doing the physical scroll-through of Andre Brown's

16  phone, did there come a time when you applied for a search

17  warrant and court authorization to do an extraction of that

18  phone?

19  A   Yes.

20  Q   And was that search warrant granted?

21  A   Yes.  Actually, I'll correct myself.  That was later, and

22  that was a consent search.  So I got consent from Mr. Brown to

23  do an extraction.  I was not able to do the extraction with the

24  search warrant initially because I didn't have a password for

25  the phone.  Depending on what the phone is, depending, you

```
 1   know, the software, what year it is, it's always -- the
 2   technology is always progressing, so you might not be able to
 3   get into a phone with a password one day, six months later you
 4   might be able to do it.  In this case, I ended up getting the
 5   passcode from Mr. Brown on a later date and doing the
 6   extraction.
 7   Q   Just to clarify a little bit.
 8       Did you obtain a search warrant but were unable to get into
 9   the phone because you didn't have the password?
10   A   Exactly.  So that's why I did a physical search of the
11   phone and took photos.
12   Q   So then later down the line, Andre Brown consented to let
13   you into the phone?
14   A   Correct.
15   Q   And that's when you did the extraction?
16   A   Correct.
17   Q   If you could please take a look at what's been marked as
18   Government's Exhibit 16.  Do you recognize that?
19   A   Yes.
20   Q   What do you recognize it to be?
21   A   So that's a CD on -- or DVD that contains the extraction of
22   Mr. Brown's phone.
23   Q   Is it a fair and accurate copy of the extraction you did on
24   Mr. Brown's phone?
25   A   Yes.
```

1  Q    Was there any alterations or deletions?

2  A    No.

3           MS. WEBER:  Your Honor, I move to admit Exhibit 16.

4           MR. CAMIEL:  I have -- I don't actually have 16.  I

5  have 16.01.  I assume 16 is the entire extraction?

6           MS. WEBER:  That's correct.

7           MR. CAMIEL:  No objection.

8           THE COURT:  16 is admitted.

9      (Exhibit 16 admitted)

10  BY MS. WEBER:

11  Q    If you could take a look at what's been marked as 16.01.

12  A    Okay.

13  Q    Can you describe what's contained in 16.01?

14  A    This is a text conversation from the phone, from

15  Andre Brown's phone, with a contact labeled "OJ" with a phone

16  number 310-482-1267.

17  Q    I apologize.  I'm going to back up before we get to those

18  text messages.

19      When you extracted the phone and looked through it, did you

20  see anything in Andre Brown's phone that aided into your

21  investigation into the death of Jacob Lee?

22  A    Yes.

23  Q    Can you describe what it is you saw in the phone?

24  A    So I found a conversation between Andre Brown and

25  Winston Crockett that coincided with the conversation I found

1  on Jacob Lee's phone.  What I mean by that is, basically the

2  same time or just prior to the conversation with Jacob Lee and

3  Winston Crockett, there was a conversation between Andre Brown

4  and Winston Crockett where Andre agreed to provide Winston with

5  pills.

6  Q   Had you made that connection between Winston Crockett and

7  Andre Brown prior to the execution of the search warrant and

8  looking through the phone?

9  A   I don't believe so.

10  Q   Were there any text messages that also aided in your

11  investigation between Andre Brown and somebody else?

12  A   Yes.

13  Q   Who was that with?

14  A   So that's what we were referring to in Exhibit 16.01.

15  That's the conversation between Andre Brown and the contact

16  labeled as OJ.

17  Q   After making this connection, did there come a time when

18  you applied for a search warrant on Andre Brown's Facebook

19  account?

20  A   Yes.

21  Q   If you could please take a look at what's been marked for

22  identification as Exhibit 9.

23  A   All right.

24  Q   Do you recognize what's been marked as Government's

25  Exhibit 9?

1   A   Yes.

2   Q   What do you recognize it to be?

3   A   So that's a DVD that contains the Andre Brown Facebook

4   files.

5   Q   Did you -- was this given -- provided to you via Facebook

6   pursuant to a search warrant?

7   A   Yes.

8   Q   Did you review the contents of Andre Brown's Facebook --

9   A   Yes.

10  Q   -- account?

11  A   Yes.

12  Q   Were there any alterations or deletions made to the

13  information contained on Exhibit 9?

14  A   No.

15          MS. WEBER:  Your Honor, I would move to admit

16  Exhibit 9.

17          MR. CAMIEL:  No objection.

18          THE COURT:  All right.  Nine is admitted.

19      (Exhibit 9 admitted)

20  BY MS. WEBER:

21  Q   Officer Reuter, if you can take a look at what's been

22  marked for identification as 16.2.

23      Do you recognize 16.2?

24  A   Yes.

25  Q   What is it?

```
 1   A    That's a conversation on Facebook between Andre Brown and
 2   Winston Crockett.
 3   Q    Is this conversation contained on Exhibit 9?
 4   A    Yes.
 5           MS. WEBER:  Move to admit Exhibit 16.2.
 6           MR. CAMIEL:  No objection.
 7           THE COURT:  16.02 will be admitted.
 8       (Exhibit 16.02 admitted)
 9   BY MS. WEBER:
10   Q    And the Facebook messages in 16.02, are those the same
11   messages that you saw on Andre Brown's phone when you scrolled
12   through it in Exhibit 16.01?
13   A    Yes.
14           MS. WEBER:  Permission to publish 16.02.
15           THE COURT:  Go ahead.
16   BY MS. WEBER:
17   Q    Sergeant, can you please note the date and time of the
18   first few messages and the parties?
19   A    Okay.  That's Andre Brown says, "What up, Playboy?"  That's
20   October 26, 2020, 1754 UTC, which again, Alaska time is minus
21   eight, so that would be 11:54 a.m. on the 26th.
22       And then Winston Crockett responds to him October 26th at
23   2133 hours, which would be 1:33 p.m., "What's good, Fam?"
24   Q    And what's the next message that Mr. Brown sent?
25   A    He says, "Just touched the soil out here with some 30s and
```

1  remembered you be in that lane."

2  Q   I'm going to skip ahead a little bit to the next page.

3  BY MS. WEBER:

4  Q   Midway down the page at 10-26 at 2148 UTC.

5  A   Okay.

6  Q   Can you please read the message sent by Mr. Crockett at

7  that time?

8  A   Yes.  This is again October 26, 2020, at 1:48 p.m. Alaska

9  time.  "I'm going to shoot a word to one of my buyers and let

10  them know.  Yes, sir.  Right by Anderson, the little gray

11  apartment complex right on the corner."

12  Q   You testified that the significance of these texts to your

13  investigation into Jacob Lee was the timeframe, correct?

14  A   Correct.

15        MS. WEBER:  Ms. Peterson, if we could please pull up

16  Exhibit 8.01, which has already been admitted into evidence.

17  BY MS. WEBER:

18  Q   Officer Reuter, can you remind the members of the jury what

19  Exhibit 8.01 is?

20  A   Yes.  This is from Winston Crockett's Facebook records

21  obtained by search warrant, and this is a conversation with

22  Jacob Lee on the 26th of October, 2020.

23        MS. WEBER:  Ms. Peterson, if you could highlight the

24  message that we just read from 16-2.

25  BY MS. WEBER:

1   Q   And then the next sequential text or message was 2149, from

2   Winston Crockett to Jacob Lee.  So what was the message that

3   Mr. Crockett sent to Lee?

4   A   He said, "What's good, Brother?  Got some 30s.  They are 60

5   apiece."  And that was approximately 60 seconds after saying he

6   was going to shoot word to one of his buyers.

7   Q   And who did he -- which conversation did he say, "I'm going

8   to shoot a word to one of the buyers"?

9   A   That's the conversation with Andre Brown.

10      And then he contacts Jacob Lee.  He says, "What's good,

11   brother?  I got some 30s.  They are 60 apiece."

12   Q   And then at 2149 UTC, what did Jacob Lee respond?

13   A   "I'll take two."

14   Q   And then three minutes later?

15   A   So Winston tells Jacob, "Okay.  Give me, like, 15 minutes

16   because my phone is shut off because I'm using WiFi over at the

17   library.  I have to run to my house.  Text me right now where

18   you want to meet you at in 15 minutes.  And then I swear I'll

19   meet you at -- meet me on the back side of Pioneer Park, you

20   know, where we used to meet at.  I'll be there in 15 minutes."

21   Q   I'm going to jump back to 16-2 on the third page.  One

22   minute later, at 2153, what was -- what did Mr. Crockett send

23   to Mr. Brown?

24   A   "I have a buyer for two of them.  72 get two from you

25   largest to start, but I'm leaving WiFi now.  So I'm on my way

1  to the house.  Be there in a few minutes."

2  Q   Again, how did this aid your investigation in any way?

3  A   So just the inference I get from that is that he got -- he

4  received pills from Andre Brown and then he sold them to

5  Jacob Lee like within a matter of less than an hour.

6  Q   As a sergeant and police officer and investigator, is that

7  enough to arrest and charge somebody?

8  A   No.  No.  That's evidence, but you need more than that.

9  Q   If somebody -- if Winston Crockett just said, "Yeah, I got

10  the pills from Andre Brown," would that be enough for you to

11  arrest somebody?

12  A   No.

13  Q   What sort of evidence do you look for when you're building

14  a case?

15  A   I mean, you want to get any evidence that you can, and you

16  start to accumulate evidence and it starts to paint a picture

17  of what happened.  You don't ever just take what one person

18  said and rest on that.

19  Q   Fair to say you look for corroborating evidence as well?

20         MR. CAMIEL:  Objection.

21         THE COURT:  That's sustained.

22  BY MS. WEBER:

23  Q   If you could please take a look at what's been marked for

24  identification as Government's Exhibit 16-1, 16.03, 16.04 and

25  16.06.

1   A    Okay.

2   Q    Do you recognize these exhibits?

3   A    16-01 is the conversation between the contact OJ and

4   Andre Brown.  16-3 is a larger version of a picture from the

5   text message sent from Andre -- or sorry, sent from the OJ

6   contact to Andre Brown.  Same with 4 and 5.  And then 6 is a

7   different -- 16.06 is a DVD.

8   Q    Where are these messages taken from?

9   A    From Andre Brown's phone.

10  Q    Was this from the extraction or from the physical search

11  that you did?

12  A    From the extraction.

13  Q    Are they a fair and accurate representation of the messages

14  and images contained on Andre Brown's phone?

15  A    Yes.

16          MS. WEBER:  Move to admit 16.1, 16.3, 16.04 and 16.06.

17          MR. CAMIEL:  No objection.

18          THE COURT:  Those will be admitted.

19      (Exhibit 16.1, 16.3 and 16.04 and 16.06 admitted)

20  BY MS. WEBER:

21  Q    If you could please take a look at what's been marked for

22  identification as 16.06.

23  A    Okay.

24          THE COURT:  16.06 was just admitted.  Maybe you meant

25  5?

BY MS. WEBER:

Q   Can you please take a look at 16.05?

A   Yes.

Q   What is depicted in 16.05?

A   So that's an image, again, of the messages between the OJ contact and Andre Brown that was sent from OJ to Andre.

Q   And it was obtained the same way as 16 -- the other exhibits under number 16?

A   Yes.

          MS. WEBER:  Move to admit 16.05.

          MR. CAMIEL:  No objection.

          THE COURT:  That's admitted.

     (Exhibit 16.05 admitted)

BY MS. WEBER:

Q   If you could please go back to 16.06.  What is 16-06?

A   It's a DVD.  There's nothing on it to really suggest to me what it is.  I know I reviewed it before, but I don't remember just based on the exhibit number.

          THE COURT:  Did you mean to move to admit 16-06?
There's no objection to it.  I don't know what it is.

          MS. WEBER:  16-06 is a voicemail from the contact OJ that was taken from the phone extraction.  1605 was a photograph from the phone extraction.

          THE COURT:  You don't object to 1606, correct?

          MR. CAMIEL:  No.

1          THE COURT:  That's fine.  Go ahead.

2          MS. WEBER:  Permission to publish 16.01, Your Honor.

3          THE COURT:  Go ahead.

4   BY MS. WEBER:

5   Q   Can you -- can you explain why it looks -- it doesn't look

6   like a regular phone what we're looking at?

7   A   That's from the digital extraction.  It's not going to just

8   show the contents of the message.  It's going to show data

9   associated with it, who sent it, what time, who received it,

10  sometimes whether someone read it or not.  And then as far as

11  the picture, it shows kind of the source file.

12  Q   And how do you read what we're looking at on the top of

13  Exhibit 16.01?

14  A   It says, from the phone number for contact OJ and to the

15  iCloud account for the phone owner, which would be Andre Brown.

16  Q   I'll rephrase that a little bit.

17      Because it doesn't really look -- it doesn't really look

18  like what we see on our phones, correct?

19  A   Right.

20  Q   As an investigator, as a police officer, how -- what

21  information do you take from this that is important?

22  A   So it's a picture that was sent from a contact, OJ, to

23  Andre's phone.

24  Q   And is that picture the same one that's contained in 16.03?

25  A   Yes.

```
 1              MS. WEBER:  Permission to publish.
 2              THE COURT:  Go ahead.
 3  BY MS. WEBER:
 4  Q   Can you describe what's depicted in 1603?
 5  A   Yes.  Those are round blue pills printed with "M" and a
 6  "30."  They have the same appearance as the oxycodone
 7  30-milligram pills that are commonly counterfeit.
 8              MR. CAMIEL:  Objection.  She asked what's depicted in
 9  the picture.
10              THE COURT:  That's sustained.  Go ahead.
11  BY MS. WEBER:
12  Q   And based on the information -- that bubble is his
13  picture -- who sent this photograph?
14  A   The OJ contact sent it to Andre Brown.
15  Q   Over the course of the investigation, did you learn the
16  identity of the person saved in the contacts as -- in the
17  contacts as OJ?
18              MR. CAMIEL:  I'm going to object as to hearsay.
19              THE COURT:  If we need to do a sidebar, you can both
20  educate me on this, so why don't we do that.  Or you can
21  withdraw the question.  Do we need to do a sidebar?  It's fine
22  if we do.
23              MS. WEBER:  Yes, Your Honor.
24              THE COURT:  Good time to stand and stretch, ladies and
25  gentlemen.
```

1    (Begin bench conference)

2          THE COURT:  All right.

3          MS. VOSACEK:  The court reporter would like to remind

4    everyone to speak into the microphone.

5          THE COURT:  What's the foundation going to be?

6          MS. WEBER:  The basis of knowledge for Andre knows who

7    OJ is.

8          THE COURT:  Uh-huh.

9          MS. WEBER:  So the phone number saved as OJ is the

10   same phone number that they got a GPS warrant for and was

11   pinging, which is how they located Mr. Tulali in California,

12   and the voicemails that were from that phone number to

13   Andre Brown had the same voice as inmate calls made to --

14         THE COURT:  He knows not to --

15         MS. WEBER:  That's why I'm not asking -- I'm just

16   asking if you learned the identity of OJ, and then also be

17   connected through when Andre Brown testifies, he'll say that,

18   yes, OJ is who I know as the defendant.

19         MR. CAMIEL:  So Andre Brown is going to testify to

20   this.  But this witness, all he can say is what phone tracking

21   did or what -- he can't say OJ is Mr. Tulali.

22         THE COURT:  So -- but do you have an objection to him

23   saying he got a GPS warrant and here is the number and

24   information he got?

25         MR. CAMIEL:  I don't have an objection to him getting

1    a GPS warrant and that warrant led to them tracking and

2    arresting Mr. Tulali, as long as they bring out it was three

3    years later that they arrested him with that phone.

4         THE COURT:  You can do that on cross, too.  I mean,

5    that's fine.  I'm hearing, then, your objection is to he

6    figured out this was Mr. Tulali.

7         MR. CAMIEL:  Based on hearsay.

8         THE COURT:  All right.  You don't have an objection to

9    him giving testimony as to what he learned about this phone

10   number?

11        MR. CAMIEL:  Well, unless he was personally involved

12   in the GPS tracking.

13        THE COURT:  I guess that's the question.  Was he?

14        MS. WEBER:  He was part of the investigation.  He was

15   on this task force.

16        THE COURT:  Are you going to have the person that got

17   the -- that did the warrant on the phone number?

18        MS. WEBER:  Yes.  He's going to be called last to talk

19   about the arrest.  Just, I think for clarity for the jury, just

20   did you learn who OJ is, yes, Junior Gufatasi Tulali.

21        THE COURT:  When did this person learn all of this

22   about the phone number?  In preparation for trial?

23        MS. WEBER:  No.  No, no, no.

24        MS. VOSACEK:  He learned it immediately during the

25   investigation.

```
 1              MS. WEBER:  Once they got these text messages, they
 2    ran the number, saw the jail calls, identified it as OJ, and
 3    then the other individuals were arrested first, signed the --
 4    the reason why --
 5              THE COURT:  I understand that.
 6              MS. WEBER:  But he was identified as soon as these
 7    text messages were found.
 8              MR. CAMIEL:  There are no jail calls until after
 9    Mr. Tulali is arrested.
10              MS. WEBER:  I know.  It's strange.  They weren't
11    Mr. Tulali's jail calls.  They were jail --
12              THE COURT:  We got the door a little bit opened.
13              MS. WEBER:  Oh, shoot.  I'm sorry.
14              THE COURT:  I've been telling you to be louder.
15              MS. WEBER:  They were calls made by other inmates to
16    that phone number.  So Mr. Tulali was not incarcerated.  It was
17    other inmates calling this phone number.
18              MR. CAMIEL:  But in terms of who was arrested with a
19    phone that matched that number, he wasn't involved in the
20    arrest.  He doesn't -- they didn't seize the phone, as far as
21    I --
22              THE COURT:  He wasn't involved in the arrest of
23    Mr. Tulali?
24              MS. VOSACEK:  Carr was the arresting agent.
25              MS. WEBER:  I know it was for sure Carr.  He went down
```

1  to California, I believe with Agent Halbert.

2          THE COURT:  Well, it doesn't sound like this person

3  did a lot in the next step of the investigation, so.

4          MS. WEBER:  For the arrest, that's correct.

5          THE COURT:  Well, then I think you've got other

6  witnesses that are going to bring in this evidence, so I'll

7  sustain that as best I understand it, which is that he was a

8  less active player in the investigation and you've got other

9  witnesses that will come in that took over at some point.

10          MS. WEBER:  Yes.

11          THE COURT:  All right.  So then it's sustained.

12          MS. WEBER:  Thank you.

13          THE COURT:  All right.  Very good.  I think we're

14  ready.

15      (End bench conference)

16          THE COURT:  All right.  Please be seated, everyone.

17          Whenever you're ready, Ms. Weber.

18          MS. WEBER:  Thank you.

19  BY MS. WEBER:

20  Q   We're going to move ahead a little bit.

21      Looking past the pills, was there anything else of value

22  that's contained in this photo?

23  A   There's a little bit of identifying information that you

24  can see if you look.  Obviously, this is a piece of mail

25  regarding Proposition 22, and it looks like it has something to

1  do with services available in underserved neighborhoods.  It

2  says "California - Hawaii State Conference."

3  Q   If we could please go back to 16.01 on the second page.  If

4  we could please highlight the first three messages.

5      Sergeant Reuter, what is the area code number used by the

6  contact saved as OJ?

7  A   310.

8  Q   To your knowledge, do you know what state that area code

9  is?

10 A   Yeah.  It's been quite a while, but I believe that was

11 somewhere in Southern California.

12 Q   Can you read the message sent by OJ on October 13, 2020, at

13 4:45 p.m.?

14 A   "Hit my line."

15 Q   And what was the response?

16 A   So there's a couple hours of delay, and then there's

17 Marley Warner, 310 Tipperary, Apartment A, Fairbanks, Alaska

18 99712.

19 Q   What was said in response to that address?

20 A   "Got it."

21     MS. WEBER:  Skipping ahead a little for now to page 4.

22 If we could please highlight those last two messages.

23     Let's go to the first message first, since it's a

24 little small.

25 BY MS. WEBER:

1  Q   Can you please note the message date and time?

2  A   Yes.  October 14, 2020, 11:54 a.m.  That's already been

3  converted to Alaska time.

4  Q   What's the message?

5  A   "I have a gift wrap, but I need to know if it's worthy."

6  Q   And then afterwards, it looks like there were two

7  photographs sent, correct?

8  A   Correct.

9  Q   Are those two photographs 16-4 and 16-5?  The thumbnail

10  images in these photographs are 16.04 and 16.05, the blown-up

11  versions of those?

12  A   Correct.

13  Q   If we could please take a look at 16.04, what's depicted in

14  Exhibit 16.04.

15  A   That's a U.S. Postal Service shipping label.

16  Q   And is that the same shipping label depicted in Exhibit 15

17  that had the address redacted?

18  A   Correct.

19  Q   And, again, 15 is just the photos you took of Andre Brown's

20  physical phone; is that right?

21  A   You said 15?

22  Q   Yes.

23  A   Yes.  I believe so.  Let me double-check.  Yes.

24  Q   What we're looking at now is your extraction, right?

25  A   That's the actual file that was sent, enlarged.

Q    Did you create the highlights that are depicted on this
exhibit?

A    No.

Q    Was this altered or changed in any way, or was this how the
photograph was sent to Mr. Brown?

A    Yeah, this is how it would have been received on
Mr. Brown's phone.

Q    Can you note the address, the mailing address where it was
sent to?

A    Yes.  Marley Warner, 310 Tipperary Court, Apartment A,
Fairbanks, Alaska 99712.

Q    And can you please note the sender address where it says
"from"?

A    It says Tana Manuya (ph), 817 West 134th Street, Gardena,
California 90247.

Q    What was the significance of that address?

A    The address to or the address from?

Q    The address to.

A    That's what the -- what Andre Brown provided to OJ in a
text message we just read.

Q    Is that the address -- have you had any law enforcement
contact at that address?

A    That's where we served the warrant that he talked about
earlier.

Q    That was the house that you searched where you saw

1  Andre Brown with the Hummer on November 6th?

2  A   Correct.

3  Q   Over the course of your career, you testified you have

4  worked over 100 drug investigations, right?

5  A   Right.

6  Q   In your experience working with these investigations, if

7  you see the sender's address, does that mean that Tana Manuya

8  was the actual sender?

9       MR. CAMIEL:  Your Honor, I'm going to object.  Lack of

10  foundation and calls for speculation.

11       THE COURT:  As phrased, I will sustain.

12  BY MS. WEBER:

13  Q   In your experience, do people who deal drugs use real names

14  and addresses in their dealings?

15       MR. CAMIEL:  Object.

16       THE COURT:  Well, are you saying ever or always or

17  sometimes?

18  BY MS. WEBER:

19  Q   In your experience in these investigations, is it common

20  for people who deal drugs to use their real name and address?

21       MR. CAMIEL:  Same objection.

22       THE COURT:  I'll allow that.

23       THE WITNESS:  It's very uncommon.  I don't know that I

24  can think of any time where someone sent drugs through the mail

25  using their real name, but it's certainly possible they would.

But in my experience, almost always they use an assumed name or
fake name or someone else's name.

BY MS. WEBER:

Q    Over the course of your career, have you interviewed people
who are engaged in selling and buying drugs?

A    Yes.

Q    Have they discussed with you their means and methods of how
they deal with their drugs?

A    Yes.

Q    And based on your experience, what's the reason why people
don't typically use their real names?

         MR. CAMIEL:  Objection.  Speculation, based on
hearsay.

         THE COURT:  I'm going to allow generalized testimony
on this topic by this officer based on his experience, but not
specific to here.  So with that understanding, go ahead.

         THE WITNESS:  Well, obviously, it's illegal.  There's
a lot to lose by engaging in this kind of enterprise, so people
take as many steps as they can to hide their identities,
conceal what they're sending, and things like that.

BY MS. WEBER:

Q    Are you familiar with an individual named Marley Warner?

A    Yes.  I believe that's a daughter of Kweka Warner.

Q    Can you remind the members of the jury who Kweka Warner is?

A    She was the renter and occupant of 310 Tipperary,

Apartment A.

Q   Are you aware of how -- of Marley Warner's age in 2020?

A   You know, it's been almost four years, so I don't remember exact age.  But I know she was not an adult.

Q   I'm going to now go back to November 6th, when you found Andre Brown's phone and subsequently reviewed it.  Were there other messages that you identified that aided in your investigation about Jacob Lee's death in addition to the Facebook messages between Brown and Crockett and the text messages between Brown and the person saved as OJ?

A   You're asking if there was additional messages that were relevant to the investigation?

Q   Yes.

A   Yes, I believe there were a few.

Q   Were there other messages that you saw from Facebook in particular?

A   Oh, yes.  Yes.

Q   If you could please take a look at what's been marked as Government's Exhibit No. 9.01.

A   Okay.

Q   Do you recognize 9.01?

A   Yes.  This is an excerpt of a conversation -- Facebook conversation between OJ Tulali account and Andre Brown's account.

Q   Are they a fair and accurate representation of the Facebook

1  messages that you received?

2  A    Yes.  It's not the whole conversation, but it is accurate.

3  Q    What's the timeframe for the conversation?

4  A    Looks like the first message we have starts

5  October 15, 2019, and it goes through until November 13, 2020.

6  Q    Who are the parties?

7  A    OJ Tulali and Andre Brown.

8          MS. WEBER:  Move to admit Exhibit 9.01.

9          MR. CAMIEL:  No objection.

10          THE COURT:  9.01 is admitted.

11      (Exhibit 9.01 admitted)

12  BY MS. WEBER:

13  Q    Do you recognize what's been marked for identification as

14  Government's Exhibit 9.02?

15  A    It's another DVD that we went through previously.  I

16  believe it's another audio file.

17  Q    Is it an audio file taken from Andre Brown's Facebook

18  account?

19  A    I believe so.  But, again, just based on the exhibit

20  number, I couldn't say 100 percent which it is.

21  Q    Did you review the audio prior to testifying today?

22  A    Yes.

23  Q    And did you review a voicemail from the user OJ on

24  Andre Brown's Facebook account?

25  A    Yes.

Q   And do you recognize the disc that's been marked as 9.02 as
the audio of that voicemail?

A   Yes, I believe so.  There was two discs, two audio files,
one from a phone, one from a Facebook message.

Q   One from whose phone?

A   Andre Brown's phone.

Q   And one from whose Facebook messages?

A   Andre Brown's Facebook messages.

        MS. WEBER:  Move to admit 9-02 into evidence.

        MR. CAMIEL:  No objection.

        THE COURT:  All right.  9.02 is admitted.

     (Exhibit 9.02 admitted)

BY MS. WEBER:

Q   And if you could please take a look at 26.

A   Okay.

Q   Do you recognize what's been marked as Government's
Exhibit 26?

A   Yes.

Q   Was that taken from Andre Brown's Facebook account?

A   Yes.

Q   And were there any alterations or deletions to the
conversation?

A   No.

        MS. WEBER:  Move to admit Exhibit 26.

        MR. CAMIEL:  No objection.

```
 1                THE COURT:  26 is admitted.
 2         (Exhibit 26 admitted)
 3    BY MS. WEBER:
 4    Q    And can you please take a look at what's been marked for
 5    identification as 23.01?
 6    A    Yeah.
 7    Q    And do you recognize that exhibit?
 8    A    I do.
 9    Q    Are those Facebook messages taken from Winston Crockett's
10    Facebook?
11    A    Yes, they are.
12    Q    And that account is in evidence as Exhibit 23, correct?
13    A    Correct.
14    Q    Is 23 the ones contained on the disc in evidence as 23?
15    A    Yes.
16    Q    And was there any alterations or deletions?
17    A    No.
18                MS. WEBER:  May I have one moment, Your Honor?
19                THE COURT:  Yes.
20         (Pause)
21    BY MS. WEBER:
22    Q    Briefly.  I would like to just pivot back to the search
23    warrant and the pills that were recovered on November 6th and
24    clarify some things.
25         So the nine pills that were recovered from the kitchen, you
```

1    testified that those were sent to the lab for analysis,

2    correct?

3    A    Correct.

4    Q    And was there a DEA exhibit number assigned to those pills

5    when they were sent to the analysis -- sent to the lab?

6    A    There would have been, yes.

7    Q    Can you explain for the members of the jury the process of

8    how Fairbanks Police Department handles evidence?

9    A    Sure.  You -- specifically?

10   Q    Or in 2020 as a member of the FANT team, the chain of

11   custody, what you would do once you recovered pills or

12   substances.

13   A    Okay.  So you would either immediately package them up and

14   send them to the lab or you would enter them into evidence, put

15   them in a secure locker.

16   Q    Is that what you did in this case?

17   A    Yes.

18   Q    So what did you do with the pills that you had recovered

19   from Andre Brown's jacket?

20   A    So I don't know that I personally processed them myself,

21   but they were taken back to AST evidence room and packaged and

22   secured and then sent to the lab for testing.

23   Q    Were you present when that happened?

24   A    Not when -- I don't believe I was when they were sent to

25   the lab.  I honestly don't recall, as it was about four years

ago.  We packaged a lot of drugs and sent a lot of drugs for

testing.

Q   Were you present when they were brought back to AST, Alaska

State Troopers?

A   Yes.

Q   Was an exhibit number assigned?  And if there is anything

that would refresh your recollection --

A   Yeah.  I would have to refer to the report.

Q   Which report?

A   Whichever report talked about the exhibit number or the

evidence number that was assigned.

Q   Is it contained in the report that was previously handed

up?

A   I could take a look, if that's all right.

    (Pause)

A   So looks like --

        THE COURT:  Go ahead.

BY MS. WEBER:

Q   Did that refresh your recollection?

A   Yes.

Q   What was the exhibit number assigned to the pills recovered

from Mr. Brown's jacket?

A   Exhibit No. 1.

Q   And how many pills were recovered?

A   From the jacket, 59.

```
 1   Q   Was there an exhibit number assigned to the pills recovered
 2   from the residence?
 3   A   I would have to again refer to the report.  Looks like
 4   Exhibit 2.  No, no, Exhibit 3.
 5   Q   Did you have a chance to look at the report?
 6   A   Yes.
 7   Q   Did it refresh your recollection?
 8   A   Yes.
 9   Q   Was an exhibit number assigned to the pills recovered from
10   the residence?
11   A   Yes, Exhibit 3.
12   Q   Who shipped Exhibit 3 to the lab?
13   A   Trooper Halbert.
14   Q   And who shipped Exhibit 1, the pills from the jacket, to
15   the lab?
16   A   It looks like Trooper Halbert and Agent Carr.
17   Q   And those were both law enforcement officers that were part
18   of your team that day?
19   A   Correct.
20          MS. WEBER:  I have no further questions for this
21   witness, Your Honor.
22          THE COURT:  All right.  Very good.
23          Mr. Camiel, go ahead, please.
24          MR. CAMIEL:  Thank you, Your Honor.
25          THE COURT:  Everybody doing okay?  Anybody need a
```

1  break?  No.  All right.  Very good.

2          MR. CAMIEL:  Can we have Government Exhibit 16-04 put

3  back up?  It's been admitted.

4          THE COURT:  Are you asking the government to put 16.04

5  up for you?

6          MR. CAMIEL:  Yes.

7          MS. VOSACEK:  It's up, Your Honor.  I think they need

8  to switch the screens.

9          THE COURT:  Thank you for letting me know.  Very good.

10 Thank you.

11                         CROSS-EXAMINATION

12 BY MR. CAMIEL:

13 Q   Sir, you talked about how people involved in drug activity

14 try to conceal their identities?

15 A   Correct.

16 Q   They want to conceal their sources as well, right?

17 A   Right.

18 Q   And you testified about finding a picture on Andre Brown's

19 phone of this label, this postal label, right?

20 A   Right.

21 Q   It's got a sender name, Tana Manuya with an address in

22 Gardena, California, right?

23 A   Right.

24 Q   So did you or, to your knowledge, any agents go to that

25 residence?

1  A   I don't know that anyone went to the residence physically.

2  We researched the name and the residence.

3  Q   All right.  So you don't know that anybody went there?

4  A   Not that I know of physically.

5  Q   Okay.  And there's a postal tracking number, right?

6  A   Right.

7  Q   Do you know what postal tracking is?

8  A   Yes.  It's the process whereby the postal service tracks

9  shipments.

10 Q   And law enforcement can contact the postal service to find

11 out if they have a postal tracking number where something was

12 mailed from, right?

13 A   Right.

14 Q   Okay.  You can find out exactly which post office was used

15 to mail a package, right?

16 A   Right.

17 Q   And you can find out whether that post office had video

18 surveillance, right?

19 A   Right.

20 Q   And you can find out the date that the package was mailed,

21 right?

22 A   Right.

23 Q   So you can find out whether there is video to show who

24 might have mailed the package, right?

25 A   You could do that.

1  Q   Okay.  Did anyone do that in this case?

2  A   I believe they may have, but I didn't, so I couldn't

3  100 percent say.

4  Q   You don't know?

5  A   No.

6  Q   You talked a little bit about some information that you got

7  off of Jacob Lee's phone, right?

8  A   Right.

9  Q   Activity, number of steps he took?

10  A   Yes, sir.

11  Q   All right.  And of course that -- you understand that if he

12  didn't have his phone with him, if he went out without his

13  phone, it wouldn't record any activity, right?

14  A   Right, unless he had a watch or something.

15  Q   You don't know that he had an Apple Watch to track his

16  steps, do you?

17  A   I don't believe that he did.

18  Q   If his phone was turned off or the battery was dead, it

19  wouldn't track your steps?

20  A   Right.

21  Q   Okay.  Let's move to talk about what happened on

22  November 6th at 310 Tipperary Court.  You talked about how you

23  were out there, it was this blizzard-type weather that day, and

24  you were there to serve a search warrant on the house, right?

25  A   Correct.

1   Q    And you saw this Hummer?

2   A    Correct.

3   Q    And you knew already that it was stolen, right?  You had

4   report that it was stolen?

5   A    Once we looked at the license plate number, yes.

6   Q    Out of Anchorage?

7   A    Correct.

8   Q    Okay.  And you had information that that Hummer had been

9   seen a few weeks before in Fairbanks at another house where

10  there was suspected drug activity?

11  A    Correct.

12  Q    But at that time, there wasn't a sufficient team in place

13  to stop the vehicle, right?

14  A    Exactly.

15  Q    So you approached the Hummer with another officer, and

16  Mr. Brown and Mr. Kearney are present, right?

17  A    Right.  After it had left the address, yeah, that's

18  correct.

19  Q    Okay.  And you asked Mr. Brown about being in a stolen

20  vehicle?

21  A    Correct.

22  Q    And he told you he borrowed that vehicle earlier that day

23  from someone in Fairbanks?

24  A    Correct.

25  Q    And he even gave you a name, Terrell?

```
 1   A    That's right.
 2   Q    And, in fact, what you learned was that that vehicle had
 3   been rented under somebody else's name and somebody else's ID
 4   in Anchorage about a month before?
 5   A    Correct.
 6   Q    Where, in fact, Mr. Brown had rented that vehicle using
 7   somebody else's name and ID?
 8   A    That's right.
 9   Q    When you looked in the Hummer, you found a black jacket,
10   right?
11   A    Correct.
12   Q    And initially, Mr. Brown denied that that was his jacket?
13   A    I believe so.
14   Q    And you told him you found some pills in the car, blue
15   pills?
16   A    Right.
17   Q    He denied any knowledge of those pills?
18   A    I believe so.
19   Q    And then you told him that in the jacket with the pills,
20   there was also some currency?
21   A    Right.
22   Q    And he denied knowledge of that?
23   A    I believe so.
24   Q    And then you told him that in the jacket that he denied
25   knowing about were not only the pills and the currency, but his
```

1    Florida ID?

2    A    Right.

3    Q    So later that day, he was questioned and you were present?

4    A    I wasn't present for that.  I was present in the building,

5    but not in the interview.

6    Q    You went to -- one of the things you asked Mr. Brown was

7    where he was staying, right?

8    A    I believe we discussed that.

9    Q    He told you he was staying at the 7 Gables motel?

10   A    Yes.

11   Q    Okay.  So you've arrested Mr. Brown.  You found 59 pills in

12   a jacket that belonged to him, along with his ID and some

13   currency.  Did you or anybody from the Fairbanks Police

14   Department execute a search warrant at the 7 Gables motel where

15   Mr. Brown was staying?

16   A    No.

17   Q    You did execute a search warrant at 310 Tipperary Court?

18   A    Correct.

19   Q    Okay.  When you searched that residence, did you find a

20   package?

21   A    No.  I mean, not that we noted, no.

22   Q    You didn't seize anything that you thought might be a

23   package associated with the pills?

24   A    Not like a shipping package or anything like that, no.

25   Q    All right.  The label that we've seen, that we looked at,

there was a picture of it on Mr. Brown's phone.  Did you find

that shipping label anywhere in the house at 310 Tipperary

Court?

A    No.

Q    Now, you did -- you talked about finding some pills in the

kitchen, right?

A    Correct.

Q    Up above the microwave.  The nine pills in a baggie?

A    Right.

Q    You also found some other drugs in the house, right?

A    Yes.

Q    In a shoe in the garage, you found some cocaine?

A    Correct.  I think it was 27 ounces of cocaine.  Sorry,

27 grams, an ounce.  That would be a lot.

Q    In addition, when you searched the house, you found some

mail belonging to different people, right?

A    Right.

Q    One of the pieces of mail belonged to named Araka Taylor

(ph), right?

A    Right.

Q    And she was somebody who had been arrested just a little

before that, a few months before, for selling cocaine laced

with fentanyl, right?

A    So I wasn't a part of that investigation, but it was

either -- it was something laced with fentanyl, I believe.

1  That was before I was on the unit.

2  Q   All right.  And you also found some mail connected to a

3  Jamie Mobley (ph)?

4  A   Right.

5  Q   And that was somebody else connected to a house that had

6  been searched where fentanyl patches were found?

7  A   As far as I know.

8  Q   That was found in the house at 310 Tipperary Court?

9  A   Right.

10  Q   All right.

11  A   In the garage.

12  Q   That's the same place you found the cocaine, was in the

13  garage, right?

14  A   There was like a pile of items in one part of the garage,

15  and that's where the mail was found, within those items.  It

16  looked just like storage.

17  Q   I want to ask you a little bit about -- now, how many

18  fentanyl cases have you worked?

19  A   I couldn't say exactly, but several, several dozen for

20  sure.

21  Q   Okay.  And fentanyl comes in a number of different forms,

22  doesn't it?

23  A   Right.

24  Q   You've seen it in powder form?

25  A   Correct.

1   Q   When it's in powder form, what color is it?

2   A   Generally, white.

3   Q   And you've seen it mixed in with other drugs?

4   A   Right.  Typically, you will find it, like, in a tar heroin

5   kind of format or with the blue or other color pills.

6   Q   Okay.  And you've found or heard of it being mixed in with

7   Xanax?

8   A   Yes.

9   Q   And in addition to being in powder form, of course you've

10   found it in pills, right?

11   A   Right.

12   Q   Not just blue pills, but other color pills?

13   A   Correct.

14   Q   And you've recovered patches before, fentanyl patches?

15   A   I believe I did on one case, yes.

16   Q   And you're aware that sometimes drug addicts will scrape

17   the fentanyl off the patch to use it in a nonmedical way?

18   A   Sure.

19   Q   Did you find a rental agreement for the Hummer?

20   A   I don't recall whether I did or not.  It's possible.

21   Q   So the pills that were found in the jacket, the black

22   jacket that was found in the Hummer, those were in a plastic

23   baggie, right?

24   A   Correct.

25   Q   And the pills that were found in the kitchen of that house

1  at 310 Tipperary Court, they were in another baggie?

2  A   Correct.

3  Q   Okay.  And in addition to submitting the pills themselves

4  to the lab for analysis, you sent those baggies in to have

5  fingerprint analysis done, right?

6  A   I believe someone did.

7  Q   Okay.  Did any -- did you get any hits on the fingerprints,

8  to your knowledge?

9  A   Not to my knowledge.

10  Q   In working drug cases, I wanted to ask you a little bit

11  about some slang terms that you've come across that are used

12  sometimes.

13      What are Xani bars?

14  A   Xani bars, that's just Xanax.  They typically come in a

15  bar, in little sections.

16  Q   Okay.  And what are opis?

17  A   I would assume that would be opiates, but that's not one

18  I've come across.

19  Q   How about white girl?

20  A   White girl would be cocaine, generally.

21  Q   When the house at 310 Tipperary Court was searched, you

22  found some luggage tags, didn't you?

23  A   I don't personally remember the luggage tags, but --

24  Q   Okay.  I'm going to be asking you some questions about some

25  exhibits that are in the defense trial exhibit notebook.  Those

1  exhibits are labeled with letters rather than numbers.

2  A   Okay.

3      (Pause)

4  BY MR. CAMIEL:

5  Q   Let's start at the beginning.  Let's start with Defense

6  Exhibit A, if you would turn to that page.

7  A   Okay.

8  Q   Do you recognize that?

9  A   Yes.  That's from the pictures I took of Andre Brown's

10  phone, I believe.

11  Q   All right.

12          MR. CAMIEL:  I'm going to move to admit Exhibit A.

13          THE COURT:  Any objection?

14          MS. WEBER:  It's already admitted under 15.

15          THE COURT:  I think it would be fine to separately

16  admit it.  I think for the jury, if they're note takers, to say

17  where it was already admitted would be helpful.  So with that,

18  I'll admit Exhibit A.  But what's the corresponding government

19  exhibit?

20      (Exhibit A admitted)

21          MS. WEBER:  I believe 15.01.

22          THE COURT:  All right.  With that understanding, A is

23  admitted.

24          MR. CAMIEL:  I would move to publish.

25          THE COURT:  Go ahead.

BY MR. CAMIEL:

Q   This has been admitted as Defense Exhibit A.  This came
from Mr. Brown's phone when you examined -- you were taking
pictures, screen shots, of his phone?

A   Yeah.  I was taking pictures of the phone itself.

Q   So unlike looking at a Cellebrite report or the phone
extraction report where the time and date might be in UTC time,
this is in the time -- the local time wherever the message was
sent or received, right?

A   Generally, or however they have their phone set up.  But in
this case, it looks like Alaska time.

Q   All right.  And did you have -- so you see the message.
The blue, the dark blue, that's Mr. Brown, right?

A   Yes.

Q   Okay.  And this is him messaging Mr. Crockett?

A   Correct.

Q   Okay.  Did you have information that Mr. Brown had been
traveling?

A   Not on that day.

Q   Okay.  Any time recently?

A   I believe there was September 11th that he flew from
Florida to Anchorage.

Q   Okay.  Well, let's now look at Exhibit -- Defense Exhibit
B.  I'm going to put that up.

     Do you recognize that as one of the screen shots you took

```
 1   from Mr. Brown's phone?
 2   A    Yes.
 3             MR. CAMIEL:  I would move to admit Defense Exhibit B.
 4             THE COURT:  This is also from Exhibit 15; is that
 5   correct?
 6             MR. CAMIEL:  I don't think this is in part of 15.
 7             THE COURT:  Ms. Weber?
 8             MS. WEBER:  Your Honor --
 9             THE COURT:  Is this exhibit in evidence already, this
10   page?
11             MS. WEBER:  No, Your Honor.
12             THE COURT:  All right.  Is there any -- is there any
13   objection to its admission, then?
14             MS. WEBER:  No, Your Honor.  However, I would ask that
15   the defense not publish the exhibit, if possible, show it to
16   the witness before projecting it.
17             MR. CAMIEL:  He's got a notebook.  He's got a copy of
18   it in front of him.
19             THE COURT:  Are you going to be asking to publish
20   this?
21             MR. CAMIEL:  Yes.
22             MS. VOSACEK:  Your Honor, it's already been published,
23   is the point.  It's on the screen.
24             THE COURT:  There we go.  All right.  So any
25   objection?
```

```
 1          MS. WEBER:  No, Your Honor.

 2          THE COURT:  B is admitted and can be published.  Let's

 3  try to do better on timing, then.

 4     (Exhibit B admitted)

 5  BY MR. CAMIEL:

 6  Q   This is another screen shot from Mr. Brown's phone?

 7  A   Correct, of messages.

 8  Q   Okay.  The date at the top?

 9  A   October 7th.

10  Q   Wednesday, October 7th?

11  A   Correct.

12  Q   And in the dark blue, what is Mr. Brown messaging someone?

13  A   "I'm out here in" Arizona, or "AZ," Arizona, "about to

14  catch a flight to Alaska in a second.  What up?  You ain't even

15  been fucking with the book."  Then emoji.

16  Q   So does this refresh your recollection that Mr. Brown had

17  not only been traveling in September, but in October?

18  A   So it refreshes my recollection about him saying that.

19  Q   Okay.  I asked you about whether or not you recalled during

20  the search of the Tipperary Court house you recalled any

21  luggage tags, and I'm going to have you look at, but not yet

22  publish, Defense Exhibit D.

23  A   D.  Okay.

24  Q   Excuse me.  That's the wrong one.

25          Do you have D in front of you?
```

1   A    Sorry.  I'm looking at -- yeah, yeah, I have D.

2   Q    Do you recognize that as something that you or one of your

3   colleagues took a picture of during the search of the 310

4   Tipperary Court residence?

5   A    I believe so.  It isn't one I took personally, but I

6   believe one of our team did.

7   Q    So have you seen this before?

8   A    Yes.

9   Q    It's something that was found during the search of the

10  house on November 6th?

11  A    Right.

12          MR. CAMIEL:  I would move to admit Defense Exhibit D.

13          THE COURT:  Any objection to D?

14          MS. WEBER:  No objection.

15          THE COURT:  D is admitted.

16      (Exhibit D admitted)

17          MR. CAMIEL:  Move to publish.

18  BY MR. CAMIEL:

19  Q    What does this appear to be?

20  A    Looks like a luggage tag from when he traveled on the 10th

21  of September.

22  Q    From where to where?

23  A    Fairbanks -- or let's see.  It says "Seattle" and

24  "Fairbanks."  So I would guess from Seattle to Fairbanks, but I

25  can't tell just from looking at it.

Q   Okay.  Now, in addition to looking at the various phones

that you've talked about, you were also sent a video of screen

shots that were found on Jacob Lee's phone.  You were sent that

from his family?

A   Right.

Q   And those were screen shots of other conversations with

Winston Crockett, or messages?

A   I believe it was like a video where they were scrolling

through the messages.

Q   I'm going to ask you to take a look at Defense Exhibit O.

A   Okay.

Q   It's several pages, if you could flip through it.

A   Oh, sure.

    (Pause)

A   Okay.

Q   Do you recognize those as screen shots from the video you

were sent from Jacob Lee's phone?

A   Yes.

Q   And you were sent those from a family member?

A   Correct.

        MR. CAMIEL:  I would move to admit Defense Exhibit O.

        THE COURT:  Any objection to O?

        MS. VOSACEK:  No objection, Your Honor.

        THE COURT:  O is admitted.

    (Exhibit O admitted)

1          MR. CAMIEL:  I would move to publish.

2          THE COURT:  Go ahead.

3    BY MR. CAMIEL:

4    Q    We'll start with the first page, toward the top.  This

5    shows Jacob Lee messaging with Winston Crockett; is that right?

6    A    Correct.

7    Q    The date on this is what?

8    A    January 11, 2020, it looks like.

9    Q    And he was -- he died on October 28, 2020?

10   A    Correct.  Yeah, between the 27th and 28th, yeah, right

11   about.

12   Q    So Jacob Lee's part of the messages would be the dark?

13   Would they be the light or the dark?

14   A    I believe they would be the dark blue.

15   Q    Okay.  So what does Winston Crockett message to Jacob Lee?

16   A    He's telling him, "Only two Xani bars, they're 2-milligram,

17   $20."  I think it's supposed to say apiece.  "Make sure you

18   keep my business to yourself."

19   Q    You told us before, Xani bars, that means Xanax?

20   A    Right.  Correct.

21   Q    And in your experience, sometimes Xanax is mixed with

22   fentanyl?

23   A    It can be.  Yeah, I think we've recovered counterfeit Xanax

24   bars before.

25   Q    Let's scroll down.

1       After the message, "Make sure you keep my business to

2  yourself," what does Jacob Lee respond?

3  A   "Of course.  And I got 40 for you if you can meet.  Car's

4  got to warm up."

5  Q   And then the response from Winston Crockett?

6  A   "I'm on my way back in from North" --

7  Q   Seems like that one got cut off?

8  A   It's kind of cut off.

9  Q   Okay.  Let's go to another January 11th message.  The dark

10  blue, can you read that at the top?

11  A   "Hey Bro, you got anything?"

12  Q   This is Jacob Lee contacting Winston Crockett again?

13  A   Correct.

14  Q   So this is the next day?

15  A   I think it's the same day.

16  Q   Okay.

17  A   Yeah.

18  Q   All right.  And the response from Winston Crockett?

19  A   Oh, you know what?  It looks like this is the one we

20  already read.  That was just what led into it.

21  Q   All right.

22  A   Because this is 9:48 p.m., and he says, "Hey, Bro, you got

23  anything," then it goes right into the 11:22 response that we

24  just read, "Only two Xani bars.  They're 2 milligrams, $20

25  apiece," et cetera.

```
 1   Q   All right.  And then I want to look at the third page of
 2   that exhibit, Exhibit O.
 3   A   Okay.
 4   Q   And at the top, what does it say?
 5   A   The top of the messages?
 6   Q   Yeah.
 7   A   "Cool.  Getting now."
 8   Q   And then Winston Crockett?
 9   A   "I am home.  Just let me know when you be close.  Pull by
10   da dumpster, lights off."
11   Q   And then below that, there's a January 12th message from
12   Jacob Lee to Mr. Crockett?
13   A   Correct.
14   Q   What's he asking?
15   A   He's asking, "Any Percs?"
16   Q   And the response?
17   A   "No."
18   Q   And then if we go on to the next page.
19   A   So it looks like on January 15th, again Jacob asks,
20   "Anything."
21       Winston says, "No."
22       Jake says, "Okay.  What's your phone?  My phone is on now."
23   Q   So shows that sometimes he's got his phone off?
24   A   Yeah.
25   Q   Going on to the next page.  After the "My phone is on now,"
```

1 let's go to January 21st.

2 A   Okay.  Want me to just go ahead --

3 Q   Yeah.  Okay.

4 A   Jacob says, "Anything?"

5       Winston says, "I might be able to get a couple number 15,

6 but I won't be for about 30 minutes because I'm at work right

7 now."

8 Q   And then it continues on?

9 A   Yes.  Let's see.  "I'm at work right now.  You're 35

10 apiece.  If I can get them, they'll let you know.  Make sure

11 you answer back when I text.  435MPs.  I can try to get two of

12 them for you if you want them.  Let me know.  If you don't, let

13 me know, because I only got a 40-minute lunch break."

14 Q   And then Jacob Lee's response?

15 A   "Okay.  Cool.  "Ops or just 15s?"

16 Q   Now, what is "ops"?  Do you know what that's slang for?

17 A   Honestly, off the top of my head, no.

18 Q   Opiates?

19 A   It could be.  But, I mean, 15s would also be opiates.

20 Q   All right.

21 A   So I'm not sure exactly.

22 Q   All right.  And then January 21st?

23 A   "I can possibly get you an old P, maybe two, but one for

24 sure, and I got $60 worth of white girl.  Don't you just go

25 ahead and get both of them so I can" --

```
 1   Q    Before I move on, you indicated, in your experience, white
 2   girl is cocaine?
 3   A    Typically is referring to cocaine.
 4   Q    And then the message continues?
 5   A    -- "both of them so I can re-up.
 6        "The opi is 25, and I got the $60 worth of girl.  I need to
 7   get rid of both of them so I can re-up.
 8        "Erase the message.  I was a little upset that your brother
 9   knew our business.  Okay then, I'll move on.  You have a good
10   night."
11   Q    Did you have -- when you were examining Jacob Lee's
12   phone or Winston Crockett's phone, did you discover that
13   messages had been deleted?
14   A    When I was looking at Winston Crockett's Facebook account,
15   I saw that some messages had been deleted.
16   Q    All right.  And so on January 22nd --
17   A    Okay.  Do you want me to just keep going with that?
18   Q    Yes.  Jacob Lee says -- where it says "I know."
19   A    Oh.  I was looking at the wrong page.
20        "I know, and my bad.  I fell asleep and my phone didn't
21   even alert me of this message."
22        Winston says, "Well, I got a hundo in white girl and one op
23   10 for $25.  I'm trying to get" -- it gets cut off.
24        And then --
25   Q    On January 22nd?
```

1  A   So you can't really make out the first message.  Second
2  message says, "Chilling.  Just pulled into the driveway.
3  Trying to get rid of the rest of this white girl, and I got one
4  op ten for $25."
5  Q   And how does Jacob Lee respond?
6  A   "How long you going to have the ten, you think?  Can you
7  get any yellow bars?"
8  Q   What are yellow bars?
9  A   I assume that he's talking about Xanax.
10  Q   Okay.  And now we're up to January 28th.
11  A   Jacob says, "Got anything?"
12      Winston says, "One op number 10.  Let me know."
13      Jake says, "Dammit, my phone never fucking alerts me."
14      Winston replies, "I still have that one."
15  Q   All right.  Let's move to Defense Exhibit X.
16  A   Okay.
17  Q   First of all, do you recognize what Defense Exhibit X is
18  from?
19  A   Yes.  This is from the Facebook conversation between
20  Jacob Lee and Winston Crockett.
21  Q   Now, the government asked you earlier about messages
22  between Jacob Lee and Winston Crockett, but they were focused
23  just on the October 26th messages, right?
24  A   Correct.
25  Q   So these are earlier in October of 2020?

```
 1   A    Correct.
 2   Q    All right.  And you pulled this up off of Jacob Lee's
 3   Facebook; is that right?
 4   A    I can't say exactly, just from looking at it, if it was
 5   Jacob or Winston's.  I take your word for it that it's from
 6   Jacob's.
 7   Q    It's either from Jacob Lee's Facebook or Winston Crockett's
 8   Facebook, but it's messages between the two of them?
 9   A    Exactly.
10            MR. CAMIEL:  I would move to admit Defense Exhibit X.
11            MS. WEBER:  Your Honor, no objection.  But it is
12   hearsay.
13            THE COURT:  All right.  If there is no objection, X is
14   admitted.
15      (Exhibit X admitted)
16            MR. CAMIEL:  Move to publish.
17            THE COURT:  Go ahead.
18   BY MR. CAMIEL:
19   Q    Starting at the top -- first of all, what's the date of the
20   very first message here?
21   A    October -- so it would be October 6th Alaska time, but it
22   says October 7, 2020, 1:03 UTC.
23   Q    So because of the eight-hour time difference --
24   A    Exactly.
25   Q    -- it would actually be October 6th?
```

1  A    Correct.

2  Q    So this is about three weeks before Jacob Lee dies?

3  A    Right.

4  Q    And this is about two weeks before you -- before the

5  message that you saw between Andre Brown and Winston Crockett

6  about Andre Brown selling some pills to Winston Crockett?

7  A    Yeah.  That was on October 26th.

8  Q    It was a couple weeks before that?

9  A    20 days, yeah.

10  Q    So what's the first message?  Who is it sent by?

11  A    Jacob Lee says, "Yo, new phone.  Hit my number up."

12  Q    And how does Crockett respond?

13  A    It looks like three days pass and he says, "What's up,

14  Buddy?"

15  Q    And then if you scroll down a bit on what shows as

16  October 10 at 3:11, what's the message?

17  A    Jacob Lee is asking for P's.

18  Q    What do you understand that to mean?

19  A    Percocet.

20  Q    And then another message from Jacob Lee to Crockett when

21  Crockett doesn't respond?

22  A    "Anything?"  Two days later, it looks like.

23  Q    Right above that, before that.

24  A    Oh, oh.  Let's see.  Jacob Lee says, "P's."

25       Winston says, "P's what?"

1    Jacob Lee says, "Yeah."

2    And then -- oh, sorry.  It's not -- yeah, no.

3    Two days later, Jacob says, "Anything?"

4  Q   And Crockett responds?

5  A   "Maybe in an hour or so.  I have to wait until my mom gets

6  back."

7  Q   And Jacob responds?

8  A   "Okay."

9  Q   And then the next message?

10  A   So that's October 24th.

11  Q   So would this have been October 24th or October 23rd?

12  A   Oh, right, yeah.  So eight hours before that, it would be

13  about 7:20 p.m., I believe, on October 23rd.

14  Q   All right.  And this is Winston Crockett to Jacob?

15  A   Correct.

16  Q   What's the message?

17  A   "What's up, Brother Man?  I got two Percocets I'm trying to

18  sell.  I'm at the library.  I got Percocet 15 and a Percocet

19  10.  50 bucks, you can have them both."

20  Q   Is there a response?

21  A   It looks like they had a 49-second voice call after that.

22  Q   All right.  So they have a voice call, so we don't have the

23  content of what was discussed?

24  A   Exactly.

25  Q   So we don't know from looking at this whether they met up

on the 23rd for those two Percocets that Crockett was trying to
sell?

A    Right.

Q    And then what's listed as October 24th, the next one down?

A    Uh-huh.  So this is about five hours later.  Jacob asks,
"Yo, what you doing?"

Q    What's the response from Crockett?

A    "I'm on my way back in from Nenana."

Q    Can you tell what happened after that?

A    Let's see.

Q    Looks like a picture was sent, or an image?

A    Yeah, like a thumbs-up emoji, whatever you want to call it.

Q    All right.  And then later, what's listed is the 24th, but
might actually be the 23rd; is that right?

A    Just like midnight, 12:30 on the 24th.

Q    Okay.  What's Jacob Lee say?

A    "Okay."

Q    And then Crockett's response?

A    "I'm almost back to town.  I'm probably about 20 minutes
away."

Q    And then Jacob's response?

A    "Okay.  LMK," which I would assume, let me know.

Q    So this is around midnight that there is this discussion
about meeting up?

A    Yeah.  It looks like my inference would be he's trying to

1  buy Percocet and just trying to work it out.

2  Q   All right.  About two days before October 26th?

3  A   Correct.

4  Q   And Winston Crockett is saying, "I'm 20 minutes away," and

5  Jacob is saying, "Let me know"?

6  A   Right.

7  Q   We don't know whether they actually met up or not?

8  A   We couldn't say, or I couldn't say.

9  Q   And then we get to the messages we've already seen on the

10 26th, right?

11 A   Right.

12 Q   Now, when Mr. Brown was arrested on November 6th, you also

13 arrested a Christopher Kearney, who was in the car with him?

14 A   Correct.

15 Q   Did you seize his phone?

16 A   I believe we did, but I don't think we were able to get

17 into it, if I recall right.

18 Q   I apologize.  One more.  I wanted to ask you about Exhibit

19 Z, the very last one in the book.

20 A   Z.  Okay.

21 Q   Does that look like a McDonald's paycheck that was found in

22 the house at Tipperary Court?

23 A   Yeah, that's what it looks like.  I didn't find it myself,

24 but looks like it's got Christopher Kearney's name on it and a

25 date of September 14, 2020.

1  Q   And did you know where Jacob Lee had been working before he

2  passed?

3  A   I'm not positive about that.  I know that there was some

4  calls to McDonald's and Wendy's that day.  So my understanding

5  was he was either working at McDonald's or Wendy's.

6  Q   Do you know whether Christopher Kearney had been working at

7  the same McDonald's as Jacob Lee?

8  A   I'm not sure about that.

9          MR. CAMIEL:  I would move to admit Defense Exhibit Z.

10         THE COURT:  Any objection to Z?

11         MS. WEBER:  No, Your Honor.

12         THE COURT:  Z is admitted.

13     (Exhibit Z admitted)

14         MR. CAMIEL:  Move to publish.

15         THE COURT:  All right.

16  BY MR. CAMIEL:

17  Q   Was that found in the garage as well?

18  A   I'm not sure where that would have been found.  But I know

19  Kearney had some items in the garage.

20  Q   I want to ask you about -- you talked a little bit about

21  just this 310 area code phone number?

22  A   Right.

23  Q   Did you ever get subscriber information for that phone?

24  A   Yes.

25  Q   Okay.  If you could look at Defense Exhibit R.  I'm going

```
 1   to direct you to look on page -- actually, have you look at
 2   paragraph 28, which is on page 9.
 3        So the phone number 310-482-1267, what name came back as
 4   the subscriber to that phone?
 5   A   I believe it was Lavel Wallace.
 6             MR. CAMIEL:  That's all I have.  Thank you.
 7             THE COURT:  Redirect?
 8                         REDIRECT EXAMINATION
 9   BY MS. WEBER:
10   Q   Sergeant Reuter, Mr. Camiel asked on direct examination if
11   you or law enforcement went to the post office that the package
12   said it was shipped from to check for video.  Did you look that
13   address up at any police law enforcement databases?
14   A   Yes.  And I believe other members of the team looked into
15   that.
16   Q   And was it a real address?
17   A   I believe so, but I don't recall.
18   Q   Do you know if the name on the package was associated with
19   the address?
20   A   I don't recall ever finding any record of that name in any
21   of the systems that we searched in.
22   Q   Mr. Camiel also asked about the cocaine that was recovered
23   from the Tipperary house.  Do you recall?
24   A   Yes.
25   Q   Where was the cocaine found?
```

1   A    In one of Christopher Kearney's shoes.  There was rack of,

2   like, Nikes.  It was in one of the shoes.

3   Q    Did he -- did anybody admit to whose cocaine that was?

4   A    If I recall, Mr. Kearney did admit eventually that that was

5   his.

6   Q    Did he plead guilty to the possession of that cocaine?

7   A    I didn't follow that closely Mr. Kearney's possession case.

8   Q    You mentioned in direct that the address at 310 Tipperary

9   Court was rented by a Kweka Warner?

10  A    Correct.

11  Q    Can you please describe the relationship between

12  Kweka Warner and Andre Brown, Christopher Kearney, and the

13  other names that have been brought up?

14  A    Sure.  So my understanding is that Kweka has a daughter

15  named Brooke Warner who has a child with Christopher Kearney,

16  and I know that Andre Brown and Kweka were friends and

17  sometimes she would help him out or he would stay the night at

18  her house.

19  Q    Does Kweka Warner have any other children?

20  A    Yes, I believe so.  Off the top of my head, I don't recall

21  all the children, but she has several.

22  Q    Mr. Camiel also mentioned that the stolen Hummer had been

23  seen at a different location while you were investigating a

24  different drug crime prior to the search warrant on

25  November 6th?

```
 1   A    Right.

 2   Q    What was the nature of that investigation?

 3   A    We were just doing surveillance on a known -- I believe it

 4   was a 7 Gables on the other side of town, off of the road that

 5   take you right to Anchorage.  It's near the halfway house.  I

 6   can't remember off the top of my head, but we were doing

 7   surveillance on that location because it's got a lot of drug

 8   activity, and that's where we saw the Hummer.

 9   Q    What sort of drug activity do you see there, what

10   substances?

11   A    Generally, heroin.

12   Q    Have you ever executed a search warrant at that location in

13   the past and recovered fentanyl?

14   A    Not -- no, not personally, not to my knowledge.

15   Q    Mr. Camiel also asked you about fingerprints being taken

16   from the bag of pills.  Do you recall that?

17   A    I do.

18   Q    Were the -- were the bags sent to the lab to be

19   fingerprinted?

20   A    I believe so.

21   Q    And did the lab -- were they able to obtain fingerprints

22   that were suitable for comparison?

23   A    I don't recall that.

24   Q    Is there anything that would refresh your recollection?

25   A    I'm assuming that information would be in a lab report.
```

1      MS. WEBER:  Your Honor, may I show this to counsel?

2      THE COURT:  Go ahead.

3      MS. WEBER:  May I approach?

4      THE COURT:  Go right ahead.

5      (Ms. Weber approaches witness)

6  BY MS. WEBER:

7  Q    Does that refresh your recollection?

8  A    Yes.

9  Q    Were the bags sent to the lab for fingerprint analysis?

10 A    They were.  And no latent prints suitable for comparison

11 were found.

12 Q    What does that mean?

13 A    Means they didn't find any useable evidence as far as

14 fingerprints.

15 Q    In some of the Facebook messages that we just reviewed

16 between Mr. Lee and Mr. Crockett, Mr. Crockett instructed

17 Jacob Lee to delete some messages.

18     As you were going through Mr. Lee's Facebook account and

19 cell phone, did you find that Jacob Lee deleted messages?

20 A    So sometimes you can tell if things have been deleted and

21 sometimes you can't.  So I couldn't really say for sure.

22 Nothing that stuck out to me, but...

23 Q    Did you see -- when you say sometimes you can tell and

24 sometimes you can't tell, can you not tell from Jacob Lee's

25 account or --

1   A   From his Facebook account or his phone?

2   Q   From his Facebook account.  Were you able to tell if

3  Jacob Lee deleted messages?

4   A   So not in the timeframe.  So what we'll do is send in a

5  preservation request, which I did pretty quickly after I saw

6  that Facebook messaging was relevant.  So if something had been

7  deleted around that time, then I probably would have been able

8  to see that.  But since nothing -- so nothing was deleted from

9  his Facebook account in that timeframe.

10  Q   Would you be able to tell whether or not he deleted

11  messages from his cell phone?

12  A   Not necessarily.

13  Q   Were you able to tell whether Winston Crockett deleted

14  Facebook messages?

15  A   Yes.

16  Q   And did he?

17  A   Yes.

18  Q   Were you able to retrieve those deleted messages?

19  A   Since I got the preservation request in in time, I got

20  basically two versions of the return, one with the messages

21  missing and one indicating the messages that had been unsent.

22  Q   So they were -- the deleted messages were able to be

23  retrieved?

24  A   Yes.

25  Q   In the -- in the prior drug investigation where you had

1  seen Andre Brown, the Hummer, did you see Andre Brown there as

2  well, or just the vehicle?

3  A    Just the vehicle.  As I recall, it was evening time and

4  couldn't see who was in it.

5  Q    Who was the subject of that investigation?

6  A    I believe that was sort of just general -- general

7  investigation.  Sometimes when we're not on something, we'll go

8  to a place where we know there's drug activity.  You can see

9  people leaving, coming and going, just gathering information,

10 sometimes stopping people and talking to them.  And just

11 general kind of proactive police work.

12 Q    When you looked through Winston Crockett's Facebook

13 account, did you find any contact between Winston Crockett and

14 Christopher Kearney?

15 A    No.

16 Q    When you looked through Jacob Lee's Facebook account, did

17 you find any contact between Mr. Lee and Christopher Kearney?

18 A    No.

19 Q    When you looked through Jacob Lee's cell phone content, did

20 you find any contact between Jacob Lee and Christopher Kearney?

21 A    No.

22 Q    When you looked through Jacob Lee's Facebook, did you see

23 any contact between him and Jamie Mobley?

24 A    No.

25 Q    Did you see any contact between Jacob Lee and Araka Taylor?

1  A    No.

2  Q    In fact, did you see any conversations between Jacob Lee

3  and another individual discussing the purchase of drugs?

4  A    No.

5  Q    Did you find conversations between Jacob Lee and anyone

6  else talking about conversations of drugs on his cell phone in

7  particular?

8  A    The only thing that I can recall was a conversation with a

9  person named Jeff, where this person Jeff asked about Subs,

10 which in my experience is Suboxone.

11 Q    Did you see any drug-related conversations with anyone

12 other than Winston Crockett on Jacob Lee's Facebook account?

13 A    Not that I recall, no.

14 Q    When you -- pursuant to this investigation, did you learn

15 from the family whether or not Jacob had ever purchased pills

16 from another individual other than Winston Crockett?

17         MR. CAMIEL:  I'm going to object.  Learned from the

18 family calls for hearsay.

19         THE COURT:  Seems to, Ms. Weber.

20 BY MS. WEBER:

21 Q    Did you identify another individual who may have sold

22 Jacob Lee pills in the past?

23 A    There was another individual brought up, but it appeared

24 that they had been blocked from Jacob's phone.

25 Q    How did you know that that individual had been blocked?

A    I can't recall off the top of my head.  I don't remember if
it was Facebook or the phone.

Q    Was it from looking through the phone?

A    It was either from looking through the phone or the
Facebook.  Again, sorry, it's been about four years.

Q    Were you familiar with Andre Brown before you arrested him
on November 6, 2020?

A    Personally, I wasn't.

Q    He was not a target or a suspect in any other drug-related
investigation that you were involved with?

A    Not one that I was involved in, no.

Q    After his arrest, did you learn where Andre Brown lives?

A    So as I understand, he has some children in Florida, I
believe.  It seems like he kind of bounces around.  He had a
wife up here in Fairbanks and some other contacts in Florida.

Q    Was there a particular place in Fairbanks where Mr. Brown
stayed, or was he bouncing around, as you say?

A    So I believe he had stayed the night at Kweka's house the
night before we arrested him, and I believe he had been staying
at 7 Gables temporarily in Fairbanks.

Q    Do you know what Andre Brown's wife's address was?

A    I believe she was staying at a place out in the Gold Stream
area.  But off the top of my head, I couldn't say.

Q    Mr. Camiel mentioned they found some mail with the names
Araka Taylor and Jamie Mobley in the home on Tipperary Court.

1  Is that right?

2  A    Right.

3  Q    Was there any other indication of Araka Taylor or

4  Jamie Mobley living at that home?

5  A    No.

6  Q    Did they have any clothing in the home?

7  A    Not that I know of.

8  Q    Or any of the belongings?  It was just a couple of pieces

9  of mail?

10  A    Like I said before, there was kind of a pile of stuff in

11  the middle of the garage.  I couldn't say.  You know, there was

12  no identifying names on the items.  But that's the same general

13  area where the mail was found.

14  Q    And based on your review of Andre Brown's phone, was there

15  any information related to his location and travel in 2020?

16  A    There was several indications.  You know, like I said,

17  sometimes there will be location data in the form of GPS.

18  Sometimes they will connect to WiFi in certain places, things

19  like that.  There was some stuff like that.

20  Q    What did you learn about his travel when you looked through

21  the phone?

22  A    So I found some messages talking about flying from

23  Alaska -- from Florida to Alaska on the 10th or 11th.  I found

24  that he had connected to the Gogo Inflight on the 11th, which

25  is the Alaska Airlines kind of infotainment.

1  Q   I'm sorry.  I'm just going to interrupt really quickly.

2      The 10th or 11th of which month?

3  A   September 2020.

4  Q   Thank you.  I apologize.

5      Please continue.

6  A   It looked like he had connected to some WiFi in Anchorage

7  after that, and then in the time, around late October,

8  everything I found was Fairbanks.

9          MS. WEBER:  I'm wrapping up, I promise.

10 BY MS. WEBER:

11 Q   In the search warrant that defense asked you to look at,

12 were you the agent who signed that warrant?

13 A   No.

14 Q   And it mentioned that the phone number had been subscribed

15 to a Lavel Wallace?

16 A   Correct.

17 Q   And that was true as of when the warrant was submitted

18 on -- in November of 2020, right?

19 A   Right.

20 Q   To your knowledge, did the subscriber information for that

21 phone number change after the arrests were made in this case?

22 A   I believe so.  I don't know exactly when they changed, but

23 I know they did change.

24 Q   What did they change to?

25 A   I believe they were to Junior Tulali.

1      MS. WEBER:  No further questions, Your Honor.

2      THE COURT:  All right.  Are you going to be really

3 short or should we take our break now?

4      MR. CAMIEL:  I'll be pretty short.

5      THE COURT:  We've been going quite a bit.

6                     RECROSS-EXAMINATION

7 BY MR. CAMIEL:

8 Q   To touch on the last question, so that phone in November

9 of 2020 and before then, that phone, the subscriber of that

10 phone wasn't anybody named Tulali, it was this Lavel Wallace;

11 is that right?

12 A   Right.  It was in Lavel Wallace's name.

13 Q   And then sometime later, it was changed to Tulali?

14 A   Correct.

15 Q   Okay.  The Hummer, you mentioned the Hummer.  When it was

16 seen during this early investigation -- earlier investigation,

17 it was by the 7 Gables motel?

18 A   I believe so.

19 Q   That's the same place that you learned Mr. Brown had been

20 staying at?

21 A   So there are -- the 7 Gables is kind of like, there's

22 probably four or five of those around the west side of town,

23 but it would be the same, by the same name.

24 Q   I wanted to ask you about deleted messages and your

25 preservation requests.

1    If I understand correctly, if law enforcement puts in a

2 preservation request to a cell phone provider or Facebook, they

3 will then not allow somebody to delete anything once they get

4 that request?

5 A   Right.  I mean, they can't stop them from deleting it, but

6 they will retain it for a certain amount of time.

7 Q   Before you put in the preservation request, things can be

8 deleted and you wouldn't know it?

9 A   Right.  I believe some of things were deleted before I was

10 able to get the preservation request in, but there's sort of

11 a -- there's a period of time where things can be preserved

12 still even after they have been deleted, and that depends on

13 the company, how much time that is.  But with Facebook, we were

14 able to get that data.

15 Q   And then you mentioned the address on that receipt, the

16 package receipt.  That's a real house, right?

17 A   As I remember.

18 Q   Would something -- if I were to show you something, do you

19 think that would help you refresh your recollection?

20 A   It probably would.

21          MR. CAMIEL:  Your Honor, sorry I'm taking longer.

22          THE COURT:  I really think we should take our break.

23 So let's take our break here, and then we'll finish up with

24 this witness.  We'll take a 15-minute break.  Please leave your

25 notepads here in the courtroom.  Remember my admonition not to

1    discuss the case or do any research.

2          DEPUTY CLERK:  All rise.  This matter now stands in

3    recess until 3:15 p.m.

4        (Recessed from 3:03 p.m. to 3:18 p.m.)

5        (Jury present)

6        (Pause)

7          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

8    United States District Court is again in session.

9            Please be seated.

10          THE COURT:  All right.  Very good.  Mr. Camiel, go

11   right ahead, please.

12          MR. CAMIEL:  Thank you.

13   BY MR. CAMIEL:

14   Q   I was asking you about the address, the sender's address

15   that was on the package label.  You got a picture off of

16   Mr. Brown's phone, and I asked you whether looking at something

17   might help you determine that it was an actual real address.

18   A   Correct.

19          MR. CAMIEL:  Your Honor, could I approach?

20          THE COURT:  Show it to Ms. Weber.

21        (Mr. Camiel approaches witness.)

22   BY MR. CAMIEL:

23   Q   Does that help refresh your recollection?

24   A   Yes.  I remember looking at that.

25   Q   So it's an actual address?

1  A    Correct.

2  Q    Not a fake address?

3  A    Correct.

4  Q    I'm going to ask you to look -- before I do that, you

5  mentioned -- you were asked questions about whether there were

6  any -- any information you received regarding other names of

7  other people that Jacob Lee might have been getting controlled

8  substances from.

9  A    Correct.

10 Q    Do you recall the name Zianna Torix, Z-i-a-n-n-a,

11 T-o-r-i-x?

12 A    So I'm not 100 percent, but I'm -- I'm -- I want to say

13 that was the person that he blocked.

14 Q    And you understood that that was somebody else that he

15 communicated with about drugs before he blocked her?

16 A    I believe in the past.

17 Q    Now, I wanted to ask you a couple questions about

18 Mr. Brown's travels, and I'm going to have you take a look at

19 Defense Exhibit K in the notebook that has the lettered

20 exhibits.

21 A    Okay.

22 Q    And do you have that in front of you?

23 A    Yes.

24 Q    Okay.  Does that look like one of the screen shots that you

25 took from Mr. Brown's phone?

1   A    Yes.

2           MR. CAMIEL:  I would move to admit Defense Exhibit J.

3           THE COURT:  J or K?

4           MR. CAMIEL:  I'm sorry.  This is K.

5           THE COURT:  All right.

6           MR. CAMIEL:  Thank you, Your Honor.

7           MS. WEBER:  Your Honor, it's hearsay.  The other party

8   to the conversation is not here on this exhibit.

9           THE COURT:  Is this already in evidence?  This was not

10  in your submission?

11          MS. WEBER:  No, Your Honor.

12          THE COURT:  All right.  So I need to hear more

13  foundation of what this is.

14          MR. CAMIEL:  All right.

15  BY MR. CAMIEL:

16  Q    So you took screen shots from Mr. Brown's photo, is that

17  right, after you seized his phone?

18  A    Correct.

19  Q    And you were asked questions about Mr. Brown's travels?

20  A    Correct.

21  Q    All right.  The screen shot we're looking at -- actually, I

22  apologize.

23          MR. CAMIEL:  We're looking at J.  I'm sorry.

24          THE COURT:  Okay.

25  BY MR. CAMIEL:

Q   The green highlighting, that would be Mr. Brown?

A   Correct.

THE COURT:  I think that's on K, is the green highlighting, at least my version of K.

MR. CAMIEL:  You're right.  That is K.  I'm looking at the wrong one.

BY MR. CAMIEL:

Q   The green highlighting on Exhibit K, that's Mr. Brown speaking?

A   So it looks like what I have in front of me is J.  K is a picture.  But -- but for me, J does have green highlighting, and it looks like it's from Mr. Brown's Facebook records.

Q   Okay.  And is it referencing him indicating something about his travel?

A   No.  This one is talking about, he's asking if you know anybody who would be wanting those Percs.  But it looks like maybe K is a picture that --

Q   Yeah.

A   -- is referencing that.

Q   Yeah.

A   Between Kiki, which is Kweka Warner, and Andre Brown.

Q   Yeah.

A   So let's see.  On November 3rd, Kweka says, "Kilo looking for you."

Q   How about November 1st, before that?

```
 1    A    Oh, sure.  No.  She says --

 2              THE COURT:  Excuse me.  Right.  We haven't -- it's not

 3    been admitted.

 4              MR. CAMIEL:  All right.

 5    BY MR. CAMIEL:

 6    Q    You recognize this as a screen shot you took off

 7    Mr. Brown's phone?

 8    A    Yeah, I took a picture of the screen.

 9    Q    And this is Mr. Brown speaking about his own travels at the

10    top?

11    A    Right.  Yeah.  He's talking to Kweka Warner.

12              MS. WEBER:  Your Honor.

13              THE COURT:  What's the objection?

14              MS. WEBER:  Hearsay, foundation as to who the parties

15    are.

16              THE COURT:  Sustained as to hearsay.

17    BY MR. CAMIEL:

18    Q    Were you familiar with a term that Mr. Brown used about

19    going down to Anchorage?  Did you ever see or read of him using

20    the term "had to dip down to Anchorage"?

21    A    Yeah, that sounds familiar.

22    Q    What's Exhibit J?

23    A    Okay.  That's the one I was referring to.  That's from

24    Andre Brown's Facebook.

25    Q    And that's the Facebook that you got the warrant to search?
```

```
 1   A    Correct.
 2   Q    Okay.  And does that look like a page you pulled from his
 3   Facebook?
 4   A    Yes.
 5             MR. CAMIEL:  I would move to admit Defense Exhibit J.
 6             MS. WEBER:  No objection.
 7             THE COURT:  All right.  J is admitted.
 8        (Exhibit J admitted)
 9             MR. CAMIEL:  Can we publish?
10             THE COURT:  Yes.  Go ahead.
11   BY MR. CAMIEL:
12   Q    The highlighted portion, can you read that?
13   A    Sure.  That's a message from Andre Brown on the 23rd of
14   October.  Says, "I had to dip and get into some other shit.
15   You know anybody who be wanting those Perc 30s?"
16   Q    So that's the term he would use when he was going to dip
17   down to Anchorage, based on what you've read the way the way he
18   wrote things and spoke?
19             MS. WEBER:  Objection, Your Honor.  It calls for
20   speculation as to what Mr. Brown was thinking.
21             THE COURT:  I'm allowing the witness to answer based
22   on what his understanding was.
23             THE WITNESS:  "Dip" is slang for leaving or going
24   somewhere.
25   BY MR. CAMIEL:
```

```
 1   Q   So in this message, he indicates he's going somewhere to
 2   get some other stuff, right?
 3   A   Yes, something else.
 4   Q   Okay.  And then he asks, "Do you know anybody who wants
 5   those Perc 30s?"
 6   A   Correct.
 7   Q   And the date on this is October 23rd?
 8   A   Correct.
 9   Q   Which is three days before the messages that show him
10   selling anything to Mr. Crockett?
11   A   Correct.
12            MR. CAMIEL:  You can take that all down.
13            That's all I have.  Thank you.
14            THE COURT:  All right.  I'm trying to remember where
15   we are.  I think that was recross.
16            Very good.  You're excused, sir.
17       (Witness excused)
18            THE COURT:  Your next witness, please, Ms. Weber.
19            MS. VOSACEK:  The government calls Kelsey Roberts.
20   She's via Zoom, Your Honor.
21            THE COURT:  Okay.  Are we ready for that?
22            DEPUTY CLERK:  Not quite.
23            THE COURT:  We were not expecting a Zoom today, right?
24            DEPUTY CLERK:  No.
25            THE COURT:  Want to take about a five-minute break?
```

1          We're going to take about five minutes, we hope five

2    minutes, to get our technology organized here, and I'll ask you

3    to leave your notepads here.  We'll get you back in just as

4    soon as we can, ladies and gentlemen.

5          And we'll go off record here after I say one quick

6    thing, but you're all excused.  And please don't discuss the

7    case or do any research during this short interlude.

8       (Jury absent)

9          THE COURT:  All right.  Very good.  Please be seated,

10   everyone.  Heads up to give as much notice as possible on the

11   Zoom witnesses.  We've got IT here, but they need time to get

12   it together.  We'll try to get it on as soon as possible, and

13   we'll take a short break to achieve that.

14         DEPUTY CLERK:  This court now stands in a brief

15   recess.

16      (Recessed from 3:29 p.m. to 3:40 p.m.)

17      (Jury present)

18      (Pause)

19         DEPUTY CLERK:  All rise.  Her Honor, the Court, the

20   United States District Court is again in session.

21         Please be seated.

22         THE COURT:  We are back on record with our Zoom.  And

23   ready to call your next witness?

24         MS. VOSACEK:  Yes, Your Honor.  The government calls

25   Kelsey Roberts.

1          (Oath administered to the witness)

2                DEPUTY CLERK:  Please state and spell your name for

3    the record.

4                THE WITNESS:  My name is Kelsey Roberts.  Last name is

5    R-o-b-e-r-t-s.

6                MS. VOSACEK:  Thank you.

7                THE COURT:  Go ahead, please.

8                Thank you, Your Honor.  I just want to make sure that

9    everybody can hear because I can't hear her very well.

10               THE COURT:  Can you speak up a bit for us,

11   Ms. Roberts?

12               THE WITNESS:  Yes.  I can actually try to increase my

13   speaker volume, as well, really quick.

14               THE COURT:  That helps already when you leaned a

15   little closer.

16               THE WITNESS:  Okay.

17            KELSEY ROBERTS, GOVERNMENT WITNESS, SWORN

18                          DIRECT EXAMINATION

19   BY MS. VOSACEK:

20   Q    Ms. Roberts, what do you do for your occupation?

21   A    I am a forensic chemist for the Drug Enforcement

22   Administration, or DEA.

23   Q    What lab do you work at?

24   A    I'm currently employed by the New England Laboratory in

25   Bedford, New Hampshire.

1    Q    And you said you were a forensic chemist, right?

2    A    Yes.  That's correct.

3    Q    What is a forensic chemist?

4    A    My duties as a forensic chemist for the DEA are to analyze

5    evidence for the presence or absence of controlled substances,

6    provide reports of my findings, and testify in court when

7    needed.

8    Q    How long have you been employed with the DEA lab?

9    A    I have been employed with DEA since January of 2020.

10   Q    And what is -- what type of schooling have you received to

11   become a forensic chemist?

12   A    I have my Bachelor of Science in forensic science from

13   Roberts Wesleyan College.  I also have a Master of Science in

14   forensic science with a concentration in criminalistics from

15   the University of New Haven.

16   Q    Did you receive any additional training to obtain this

17   position?

18   A    Once I started with the DEA, I had to go through a basic

19   forensic chemist training course, which was 18 weeks, based in

20   Quantico, Virginia.

21   Q    Do you have any type of annual training updates?

22   A    Once we get to our laboratory of hire, we do go through

23   more training, and then we are required to do training every

24   year.

25   Q    What required training?  Like, what type of training do you

1  do every year?

2  A    It depends on the year.  But we're competency tested every

3  year to make sure that we are relevant and meeting the

4  standards for our accreditation, and then we are required to do

5  up to 20 hours of training annually that can be a mixture of

6  technical training and professional development, but ensure

7  that we pass that competency every year.

8  Q    What is a competency evaluation?

9  A    For us, it's just us doing a case.  It comes into us as a

10  regular exhibit, and we analyze it.  And as long as it is fit,

11  then we are competency tested for that year.

12  Q    And you mentioned that the lab was accredited.  What does

13  that mean?

14  A    That is correct, we are accredited.  "We" being the entire

15  DEA lab system is accredited by ANAB, which is an acronym

16  within an acronym.  It's the ANSI National Accreditation board,

17  and they have standards that we have to meet in order to keep

18  our accreditation every year with them.

19  Q    Is your casework supervised?

20  A    I independently work on my casework, but the casework is

21  reviewed.  It goes through a technical and administrative

22  review process.

23  Q    Does that person that reviews your work have to agree with

24  your conclusions?

25  A    Yes, they do.

Q   Are you a member of any professional organizations?

A   I am a member of CLIC, which is the Clandestine Laboratory Investigation -- I don't remember the "C," sorry, at the moment.  And that is all that I am a part of currently.

Q   Approximately how many cases have you worked on since joining the DEA lab?

A   Since being with the DEA, I've worked on approximately 1300 exhibits.

Q   Are you familiar with fentanyl?

A   Yes, I am.

Q   What is fentanyl?

A   It's a controlled substance that I've seen in my casework.

Q   In the course of your duties, do you perform tests that detect the presence of fentanyl?

A   Yes, I do.

Q   Have you personally chemically analyzed samples and determined them to be fentanyl?

A   Yes, I have.

Q   Approximately how many samples have you analyzed to determine the presence of fentanyl?

A   I believe it's been approximately 400 exhibits out of my 1300.

Q   I want to talk about kind of the difference -- the different kind of tests that you do when you're working with fentanyl, specifically the difference between quantitative and

1  qualitative.  Let's define those terms.

2      What's qualitative testing?

3  A   Qualitative testing just gives an identification of the

4  substance so that I would be able to determine whether it is,

5  say, fentanyl or some other substance in that exhibit that I am

6  testing.  So it just gives identity.

7  Q   What does --

8  A   And then quantitative, that's used in the DEA to determine

9  purity analysis or potency.

10 Q   Have you previously testified and given opinion testimony

11 in terms of the analysis of controlled substances?

12 A   Yes, I have.

13 Q   Approximately how many times have you been qualified to

14 give an opinion?

15 A   I have testified about 25 times.

16         MS. VOSACEK:  At this time, I would move to have the

17 witness qualified to give an opinion in the field of analysis

18 of controlled substances, and specifically fentanyl.

19         THE COURT:  Any objection?

20         MR. CAMIEL:  No.

21         THE COURT:  I'll find the witness so qualified.  Go

22 ahead.

23 BY MS. VOSACEK:

24 Q   Ms. Roberts, I would like to talk about some procedures

25 that you have in place in quality control at the DEA lab.  Can

1   you describe generally the process in which the DEA lab

2   receives evidence for testing?

3   A    Yes.  So this isn't a role I do directly, but evidence is

4   submitted to the laboratory either by being hand-delivered or

5   sent through a trackable commercial carrier in the mail.  When

6   it is received by the laboratory, it needs to also have a DEA 7

7   submission form.  The evidence specialists, majority of the

8   time, are the ones receiving the evidence.  They then take the

9   submission form and input it into our laboratory information

10  management system, or LIMS, and give it a unique laboratory

11  number.  And this is barcoded so that we're able to

12  electronically track our chain of custody.

13      Once they submit it into -- or accept it into this LIMS

14  system, it then gets placed into our secure evidence vault

15  until it's assigned to a chemist for analysis.

16  Q    What happens once it's assigned to a chemist for analysis?

17  A    Once it's assigned to a chemist, in this case, me, I would

18  go to the evidence vault and retrieve that piece of evidence.

19  I can then take it back to my workspace and proceed with

20  testing that evidence.

21  Q    Once you receive the evidence, what do you do with it?

22  A    If I'm going to work on that evidence, I will first then

23  take a gross weight, which is a weight of the entire piece of

24  evidence, including any packaging that it gets submitted with.

25  From there, I compare what is inside the exhibit with that DEA

7 form that I described, that submission form.

    And then once I open up the evidence, I then will take a net weight, which is the weight of the material without any packaging, and then I'll proceed with analysis, depending on what suspected drug it may be.

Q    Contemporaneous to this process, are you recording the weights and taking notes?

A    Yes.  So this is all done in that LIMS system that I described.

Q    And you describe -- you'll type in, like, a description of what you see when you open the exhibit?

A    That's correct.

Q    And you record all of those weights that you mentioned?

A    Yes.

Q    After you've done all of that, what do you do next?

A    I would proceed with doing testing of the exhibit.  So I would take two portions of each unit in the sample and do a presumptive test, and then also performed a confirmatory test on that.

Q    Let's talk about those terms.

    What's a presumptive test?

A    Presumptive test is just a screening tool or a technique that we're able to use to give us a general idea of the substance that we're working with.  It helps us narrow down what kind of technique we would need to use for confirmatory

1   testing or how to move forward with the exhibit.

2   Q   Can you give some examples of presumptive tests?

3   A   So some type of presumptive tests are color tests.  In this

4   case, I happened to use gas chromatography with flame

5   ionization detection, which is an instrumentation technique.

6   Q   Can you -- there's a lot there to unpack that I'm sure the

7   jury would love to understand better.

8       Let's start with gas chromatography.

9   A   So gas chromatography with flame ionization detection, or

10   GCFID, like I said, is what I used for the reading technique in

11   this exhibit.  Basically, I would take a portion of the sample,

12   I would put it in a solvent, and then that solvent gets

13   injected into this instrument.  A gas chromatograph is just a

14   heated coil column, and it allows the substance to separate

15   into different components.  So if it is a mixture, we would be

16   able to separate those components, and then it's detected by a

17   flame.  And it provides an output similar to a graph, and then

18   I can take that graph and compare it to known reference

19   materials to give it -- to give me a basic idea of what the

20   substance may be, and then I can move forward with confirmatory

21   testing.

22   Q   Just to unpack that a little bit, you have a mixture and

23   you run it through this column that separates it out into its

24   different, like, portions of a mixture, right?

25   A   Correct.

1  Q   And then it gives you a graph that gives you an idea of

2  what that portion of that mixture might be?

3  A   Correct.

4  Q   And that's because you compare it to a known sample where

5  you know exactly what that compound is?

6  A   Yes.  So also with just gas chromatography, I would use a

7  tension time or the amount of time that it takes that substance

8  to get out of the column, and that time is what is compared to

9  that known reference material because that known reference

10 material will also come out with a similar time.  So that's how

11 I get the general idea of how to move forward.

12 Q   So, for example, fentanyl in a solvent will always come out

13 at the same time, roughly?

14 A   Dependent on the instrument parameters, yes, like, it would

15 roughly come out around the same time.

16 Q   Okay.  So once you do that, you kind of have an idea of

17 what you're working with, and then you decide what you're

18 confirmatory test is, right?

19 A   Right.  So in this case, I did gas chromatography mass

20 spectometry.

21 Q   Can you just define, quickly, confirmatory test?

22 A   Confirmatory test allows you to make an identification of

23 the substance, meaning that in this case with GCMS, I'm able to

24 get a spectrum that is unique to that sample that I can compare

25 to known reference material.  It's kind of like being able to

1  determine, like, the sample fingerprint that I can then

2  compare, which is unique to itself.

3  Q   You used the term for the instrument GCMS.  Can you

4  describe that instrument?

5  A   Yes.  So beginning is similar to what I previously

6  described, which is -- (indiscernible).  So I put the sample

7  into the solvent.  It gets injected onto that column again, a

8  similar column.  And once it gets to the end of the column, it

9  gets bombarded by energy on the mass spectrometer, and what

10 that does is it breaks that portion of that mixture into a

11 bunch of little pieces and makes a different kind of graph that

12 is very unique to that substance itself.  And I can then

13 compare that spectrum to known reference materials, and I would

14 be able to make my identification.

15 Q   So once you perform both a presumptive test and a

16 confirmatory test, you're able to say, there is -- you know,

17 that substance is in that material; is that right?

18 A   Correct.

19 Q   But you have to do both?

20 A   It is policy that we do have to do both.  We would have one

21 screening technique and one confirmatory technique.

22 Q   Let's talk about this case.  I believe that it's

23 Government's Exhibit 18, and you should have a copy.

24 A   Yes, I do.

25 Q   In this case, what did you receive?

```
 1   A    So I received the exhibit with laboratory number
 2   2020SFL705597, and it was nine blue tablets.
 3   Q    What exhibit number was that?
 4   A    Can I refer to my notes to get the exhibit number?
 5           MS. VOSACEK:  Your Honor, may she refer to her notes?
 6           THE COURT:  That's fine.
 7           THE WITNESS:  It is Exhibit No. 3.
 8   BY MS. VOSACEK:
 9   Q    And you said what was in Exhibit No. 3?  I'm sorry.
10   A    Nine blue tablets.
11   Q    And did you measure the net weight?
12   A    Yes, I did.
13   Q    That includes the packaging?
14   A    The net weight does not include the packaging.
15   Q    What was the net weight?
16   A    The net weight was 0.911 grams.
17   Q    What did you do once you opened the package?
18   A    Once I opened the package and took that net weight, I then
19   took two portions from each tablet, each of the nine tablets,
20   and did the testing that I just previously described.  So I
21   took one portion and put it on the GCFRD, and then I took a
22   second portion and did my confirmatory testing on the GCMS.
23   Q    And you did this for each of those nine tablets?
24   A    That is correct.
25   Q    And were -- what were the results of the presumptive test
```

 1   that you did on each of those nine tablets?

 2   A   So the presumptive test, or GCFID, indicated the presence

 3   of acetaminophen and fentanyl.

 4   Q   And what was the result of the confirmatory test you did on

 5   those nine tablets?

 6   A   The confirmatory testing, I was able to identify

 7   acetaminophen and fentanyl.

 8   Q   What is acetaminophen?

 9   A   It's a pain reliever commonly seen in some of these

10   exhibits.  It's Tylenol.

11   Q   Do you frequently see acetaminophen when you're testing for

12   fentanyl?

13   A   It's seen fairly often.

14   Q   Okay.  And did you put together a report of your findings?

15   A   Yes, I did.

16   Q   Can you please look at what's been previously marked as

17   Government Exhibit 18?

18   A   Yes.

19   Q   And is this a -- is this a copy of your report?

20   A   Yes, it is.

21   Q   And is your signature or electronic signature at the

22   bottom?

23   A   Yes, it is.

24   Q   And is it also signed by your technical reviewer?

25   A   Yes, it is.

1  Q   And did your technical reviewer concur with your

2  conclusion?

3  A   Yes, she did.

4          MS. VOSACEK:  I would offer Exhibit 18.

5          MR. CAMIEL:  No objection.

6          THE COURT:  18 is admitted.

7      (Exhibit 18 admitted)

8  BY MS. VOSACEK:

9  Q   I want to talk a little bit about some of your experience

10 in general testing fentanyl.

11     Would it be fair to say that fentanyl comes in all forms?

12 A   I have seen fentanyl in a variety of forms throughout my

13 time here at DEA.

14 Q   Can you just describe some of the more common forms that

15 you see?

16 A   A lot of times tablet form is common, and then fentanyl is

17 also seen as powder.

18 Q   Do you see it ever mixed with other controlled substances?

19 A   There are instances where other controlled substances are

20 within fentanyl, yes.

21 Q   Now, in this case, you did not measure how much fentanyl is

22 in each tablet; is that right?

23 A   That is correct.

24 Q   Are there occasions where you do that kind of testing?

25 A   Purity testing could be performed.  It was not in this

1  instance.

2  Q   What would you do differently if you were testing for

3  purity?

4  A   Additional testing just would have been performed if purity

5  was required for this exhibit.  It was not in this case.

6  Q   What would be your process for doing purity testing?

7  A   If I was going to do purity testing, we would form what is

8  called a composite, which is a uniform homogenous mixture that

9  is representative of the entire sample.  We would take samples

10  from that composite and we would run it on an appropriate

11  quantitative technique in order to determine the purity, and we

12  have a variety of methods that we're able to use to do that.

13  Q   When you're testing for purity, I guess what would the

14  output be?  What would the -- are you measuring milligrams per

15  the size of the sample, or what does that result look like?

16  A   So I would report purity as a percentage of the substance

17  as a whole, so it would be reported as a percentage based on

18  the weight that I -- or the net weight.

19  Q   In this case, you did do a composite.  Is that right?

20  A   Yes, I did.

21  Q   Why did you do a composite in this case?

22  A   At the time of testing, it was part of our policy that we

23  would form a composite and just perform additional testing on

24  that composite.

25  Q   And what did the results of the testing on this

composite -- what were those results?

A    The results were similar with how it was previous, where I was able to identify acetaminophen and fentanyl.

Q    But again, no purity testing was done?

A    That's correct, no purity.

Q    Hypothetically, if someone were to submit two samples of pills that contained fentanyl, would you be able to identify if they were made by the same person or the same place?

A    No.  So I'm just able to identify what is present in the, say, tablets or pill or powder, whatever is submitted.  I do not do any sort of testing that is able to determine where or specifically where it came from.

Q    Fentanyl is also a prescribed substance; is that right?

A    Yes.

Q    Have you ever had opportunity to perform purity testing on pharmaceutical-grade fentanyl?

A    I do not believe I have ever received any known pharmaceutical fentanyl exhibits.

Q    Would most of your exhibits be counterfeit fentanyl?

A    I have received tablet exhibits and powder exhibits that have been found to contain fentanyl.

Q    Do the purity -- does the purity measurement vary between submissions?

A    Yes.  We see a variety, or I have seen a variety, of different purities of fentanyl in my experience.

Q    So just could you estimate how many cases of counterfeit fentanyl pills you have tested?

A    Hard to say.  Like I described earlier, I have tested approximately 400 exhibits that were found to contain fentanyl or a fentanyl-related substance, and I'd say majority of those exhibits came in tablet form.

Q    Do you have any understanding or knowledge as to why counterfeit fentanyl pills would vary in their potency from tablet to tablet?

A    Well, just speaking about counterfeit means that they're not necessarily regulated by any person or organization; therefore, they're just being made by someone or something.

Q    So within a batch of pills, would it be possible that two pills within the same batch would have different potency?

A    That is a possibility, yes.

Q    Would it be possible that if you took two different samples from the same pill, that they would have a different potency?

A    That is possible when I'm describing taking two samples prior to forming that composite, which makes a uniform mixture, but in the prior testing, you could definitely have an instance where one portion of the pill may have different levels of certain substances than another portion of that same tablet.

         MS. VOSACEK:  May I have a moment, Your Honor?

         THE COURT:  Yes, that's fine.

         (Pause)

BY MS. VOSACEK:

Q   Ms. Roberts, you also were sent Government's Exhibit 18.01. Do you have that in front of you?

A   Yes, I do.

Q   Can you please turn to page -- let's see -- 2 of 34 -- or 2 of 44?  I'm sorry.

A   I believe I'm on the page you're referencing.

Q   Okay.  What are we looking at here?

A   If we are on the same page, page 2 would have -- it's my case details report, and it's the description of exhibit and sampling at the top of the page.

Q   Did you take this picture?

A   Yes, I did.

Q   And if we're looking at the same document, there's a picture with two pills; is that right?

A   Yes.

Q   Why did you take this picture?

A   So this picture was taken because I had only had nine tablets.  And then I formed that composite that I described, so now the residual exhibit is a powder and this is documenting what it once looked like.

Q   So do you have -- have them arranged so you can see the imprint on each side?

A   That is correct.

Q   And what are the imprints?

```
1   A   One side has a capital "M" in a box, and the other side is
2   marked with a 30 over a score.
3   Q   Is this a fair and accurate representation of the tablets
4   that you analyzed?
5   A   Yes, it is.
6           MS. VOSACEK:  I would offer to move just page 2 of 44
7   out of 18.01 into evidence.
8           MR. CAMIEL:  No objection.
9           THE COURT:  All right.  That page will be admitted.
10      (Exhibit 18.01, page 2, is admitted)
11          THE COURT:  Mr. Camiel.
12                          CROSS-EXAMINATION
13  BY MR. CAMIEL:
14  Q   Ms. Roberts, I'm looking at your -- at Exhibit 18.  That's
15  your report.  You have that still in front of you?
16  A   Yes, I do.
17  Q   And so the substances identified, you told us it was
18  fentanyl and acetaminophen, right?
19  A   Yes, that's correct.
20  Q   And I see that you have a net weight next to the fentanyl,
21  but you don't have a net weight next to the acetaminophen.
22  A   Yes.  So that is just how the report is displayed.  It's
23  just a table.  So that net weight is associated with both
24  substances in this exhibit because that is the weight of all of
25  those nine tablets.
```

1  Q   All right.  And you've already testified you didn't do an

2  analysis for substance purity, but I wanted to ask you, what

3  was the -- could you say what the percentage of fentanyl was

4  versus acetaminophen in any given -- of the nine pills?

5  A   I can't say in terms of purity or an exact number what the

6  amounts are.

7      But typically, we see very large peaks, and I did in this

8  instance, of acetaminophen on those spectrums that I was

9  describing, and typically much smaller of fentanyl.

10  Q   So what does that tell you?

11  A   That is just describing that there was more acetaminophen

12  there than fentanyl, but it does not give an accurate number as

13  to what those specific numbers are.

14  Q   So you can't quantify it, but you can see there's much more

15  acetaminophen than fentanyl in the pills that you looked at?

16  A   Yes, that is correct.

17  Q   And I just wanted to clarify, you have nine -- you've got

18  nine pills and that's what you received in the mail.  That's

19  what the lab received, right?

20  A   Correct.

21  Q   Okay.  And you can't tell whether all nine of those pills

22  came from the same source or were manufactured from the same

23  place?

24  A   All I can do is, once I received that exhibit of those nine

25  tablets, I can just tell you what I was able to identify.

```
 1   Q   So is that -- is the answer to that question no, that you
 2   can't say they're from the same source?
 3   A   No.  I don't have that capability.
 4           MR. CAMIEL:  Thank you.
 5           THE COURT:  Any follow-up?
 6           MS. VOSACEK:  No, Your Honor.
 7           THE COURT:  All right.  Thank you, ma'am.  You may be
 8   excused at this time.
 9       (Witness excused)
10           THE COURT:  All right.  The government's next witness?
11           MS. VOSACEK:  That would be Mr. Hoang, who is also by
12   Zoom.  I'm not entirely sure if he's notified to be on the
13   line.  Let me check.
14       (Pause)
15           THE COURT:  The witness -- can you contact the witness
16   and let him know we're ready?
17           MS. VOSACEK:  He's on the line, according to our
18   witness coordinator, Your Honor.  Or he should be connecting to
19   the line now.
20       (Pause)
21           THE COURT:  He's not on the line.  Why don't we take
22   about five minutes and see if we can track him down, and we'll
23   go off record.
24           Please leave your notepads here in the courtroom.
25   Remember my admonition not to discuss the case or do any
```

```
 1    research, and we'll get you back in when we can solve this.
 2         (Jury absent)
 3              THE COURT:  Thank you.  So please be seated.  I'm
 4    pretty sure we have the waiting room feature, which means that
 5    just like we have all the live witnesses waiting out in the
 6    hall, all the Zoom witnesses should be ready to go when the
 7    witness before them is called and in touch with our IT
 8    coordinator.  But let's see if we can find him and/or her and
 9    proceed from there.  We'll go off record.
10              Can you work with IT and get the people into the
11    waiting room so we're ready to go?
12              MR. CAMIEL:  Your Honor, in mentioning that, one of
13    the defense witnesses is going to be a Zoom witness, and I need
14    a pretty good idea of when she should be on the line.
15              THE COURT:  Good to know.  All right.  Well, I don't
16    think we're quite there, yet, Mr. Camiel.
17              MR. CAMIEL:  I understand that.  But she needs ample
18    warning.
19              THE COURT:  All right.
20         (Pause)
21         (Jury present)
22              THE COURT:  Please be seated, everyone.  Go ahead and
23    be seated and we'll wait for our last person.
24         (Pause)
25              THE COURT:  Very good.  All right.  I think you're
```

1  ready to call the next witness, then, Ms. Vosacek.

2       MS. VOSACEK:  The government calls Son Hoang.

3       THE COURT:  Madam Clerk, if you could administer the

4  oath, please.

5     (Oath administered to the witness)

6       DEPUTY CLERK:  Please state and spell your name for

7  the record.

8       THE WITNESS:  My name is Son Hoang, S-o-n, H-o-a-n-g.

9                 SON HOANG, GOVERNMENT WITNESS, SWORN

10                      DIRECT EXAMINATION

11  BY MS. VOSACEK:

12  Q    Where do you work?

13  A    I'm working for the Drug Enforcement Administration, DEA,

14  Western Laboratory located in Pleasanton, California.

15  Q    And what is your occupation?

16  A    My occupation is senior forensic chemist.

17  Q    And what are your duties?

18  A    My duties is to analyze for the presence and absence of

19  controlled substance, assisting crime lab with local and

20  federal enforcement officer, and also maintaining instrument

21  for the analysis of controlled substance within the laboratory.

22  Q    And how long have you been employed with the DEA?

23  A    I am employed with the DEA since 2016, so about eight

24  years.

25  Q    What kind of education did you receive to become a forensic

1  chemist?

2  A    I have a BS in biochemistry and a minor in statistics from

3  University of UC Davis, University of California at Davis.  I

4  have my Ph.D. from the University of the Pacific in Stockton in

5  pharmaceutical chemistry.  And I have my MBA with the

6  University of State California in San Francisco, California.

7  Q    When you joined the DEA lab, did you undergo any additional

8  training?

9  A    Yes.  Before I worked on the bench, I underwent 18 weeks in

10  Quantico, where I trained on the regulation and rules and how

11  to analyze controlled substance, and I have passed two rigorous

12  test in final before I graduated.  And coming back to Western

13  Lab, I underwent another seven weeks for additional technique

14  that's available in the field lab.  And I have to pass an exam,

15  a testing exam, before the laboratory director can approve me

16  to work on the bench.

17  Q    Do you undergo any continuing education?

18  A    Yes.  So each year we are -- we must undergo at least

19  16 hours of continuing education training.

20  Q    Are you a member of any professional organizations?

21  A    I am a member of American Chemical Society.

22  Q    Do you perform any competency testing on a yearly basis?

23  A    Yes.  Yearly basis, we are required to do at least testing

24  either from other lab or from external, and we have document

25  and everybody must pass in order to continue working on the

1  bench.

2  Q   When you say "on the bench," what do you mean by that?

3  A   So that means I analyze controlled substance.  We work in

4  the bench as a wet area where we analyze chemical.  That's why

5  I call it a bench, working bench as in chemistry terms.

6  Q   Approximately how many cases have you worked for the DEA?

7  A   Up to now, I analyze about 2,200 cases.

8  Q   Are you familiar with fentanyl?

9  A   Of those over 2,000 exhibits, about one-third of them are

10  fentanyl, one half of them are meth and other drugs.

11  Q   I'm sorry.  Can you -- did you say about a third of them

12  are fentanyl?

13  A   Yes.

14  Q   Okay.  Have you previously testified and given an opinion

15  in court about the analysis of controlled substances?

16  A   Yes.  I have testified, and I'm certified nine times at the

17  federal level.

18        MS. VOSACEK:  At this time, I would move to have him

19  qualified in the field of analysis of controlled substances,

20  specifically fentanyl.

21        MR. CAMIEL:  No objection.

22        THE COURT:  I'll find the witness so qualified.

23  BY MS. VOSACEK:

24  Q   Can you please describe the process at the DEA that is in

25  place for receiving drug exhibits for testing?

A    The lab receive, as a whole, through two means, either by

shipping in through a carrier like FedEx or ground shipment,

and when we receive that, there is evidence tech logging in and

compare with the form called the DEA-7, log it into the system.

And that person has to verify everything correct before

admitted to the system.  If something wrong, then the evidence

technician will contact the sender and make sure everything is

sorted out before admitting to the vault for safekeeping.

Q    Upon receiving the evidence, does the DEA assign it a LIMS

number?

A    That's correct.  We have our own LIMS number.

Q    And do they also track the case numbers from the submitting

agency?

A    Yes.  So all the exhibits have case numbers and unique LIMS

number and an exhibit number.  So case number can have many

exhibit number.

Q    And how does a case get assigned to you at the DEA for

analysis?

A    So we have -- in my field, we have a system.  I can select

for a case what I want to analyze, and I give that to my

supervisor, who will assign me.  When he assign me, then I --

in my system, I mark to pick up at the vault window.  You can

imagine a small window for pickup.  And when I mark that, I

went to the window where the evidence technician will hand me

the evidence.  Before he or she hand me the evidence, they will

scan it and have the password saying that they passed on the
evidence to me, and I will have my own password saying that I
received the evidence, and everything is logged in the system
for tracing.

Q   Is that to ensure a proper chain of custody?

A   That's correct.

Q   So making sure that the evidence submitted in one case and
that's tested, it actually came from that case; is that right?

A   That's correct.

Q   Once you obtain the exhibit, then what do you do?

A   The first thing when I receive in the window, I check for
if any opening or tampering that I can see.  So sender has no
opening of the evidence, I can take to my bench.

    And the first thing I will do is take a gross weight of
whatever I receive and compare that to the submitting
paperwork, which is a DEA-7, and verify that is the same.  Then
I can continue to open the evidence to analyze.

Q   Do you happen to have the DEA-7 form for this case
available to you?

A   No.  I do not have it in front of me.

Q   Were you emailed Government Exhibit 17 and 17.01?

A   Yes, I did.  I was.

Q   Let's go back to what you do after you open the package.
What kind of testing do you do?

A   When I open the package, and as part of procedure that I

1    must write everything I see and describe what I observe inside

2    out, outside in, and then I take a net weight, which is the

3    content, the substance inside alone without any packaging.

4        When I determine the net weight, whatever in the exhibit,

5    then I take two portions, two tests of that substance, to test

6    by two different methods by two different portions and to

7    confirm whether the exhibit contain a substance or not.

8    Q    Why do you take two portions and do two separate tests?

9    A    The reason is, the two portions must independent verify the

10   compound, and to also ensure that there is no

11   cross-contamination between sample or make mistake with other

12   sample.  And also, the two tests signify that one is the

13   confirmed measurement and one is a presumptive, just to fulfill

14   the certification requirement for analyzing controlled

15   substance.

16   Q    So you do a screening or presumptive test and a

17   confirmatory test before identifying a substance?

18   A    That's correct.

19   Q    In this case, I would ask you to look at Government

20   Exhibit 17.  Do you have that in front of you?

21   A    Yes, I do.

22   Q    Let's start with, who is the submitting agency in this

23   case?

24   A    So this is called a DEA-113, is a report.  The submitting

25   agency is on the right-hand corner.  It's Fairbanks post-op

1  duty.

2  Q   Is there a case number associated with the submission?

3  A   Yes.  The case number is right across, which is RC-21-0004,

4  and the VIN number for this specific exhibit is right

5  underneath.

6  Q   Would every exhibit submitted under that case number have

7  the same LIMS number?

8  A   No.  For each exhibit -- for example, this is Exhibit

9  No. 1.  It has a unique LIMS number.  So for Exhibit No. 2, it

10 will also have a unique LIMS number.  In this case, you see --

11 Q   Sorry.  Go ahead.

12 A   In this case, you see Exhibit 1.01 and 1.02.  That is

13 because this exhibit is qualified for arbitrary sample, and

14 arbitrary sample is I just take one tablet from the whole

15 package and analyze that tablet, and the remaining tablet I do

16 not analyze, and I split that to be 1.02.

17 Q   So what was Exhibit 1 when you received it?

18 A   So Exhibit 1 contained two package with multiple tablets,

19 round tablets.

20 Q   What did they look like?

21     If you're going to refer to your notes, please just ask so

22 I can get permission.

23 A   So I refer to the 17.01 exhibit, on the first page.  So

24 that have my description there.  There's one SSEE evidence

25 envelope, and then two Ziploc bags and then two Ziploc bags.

1    But each bag contain multiple round-shape blue-color tablets,

2    one side bearing a letter "M" and the other side bearing a

3    number 30.

4    Q   Now, you said that -- did you count the tablets or no?

5    A   In this case, I did not count the tablets.  But the

6    procedure is, we quantify weight, both portions, the analyzed

7    and the unanalyzed portion of it.

8    Q   So your procedures do not require you to physically count

9    out how many tablets are present?

10    A   When I need to have the amount of tablets, that call full

11    analysis, I am required to count full amount.  This two I do

12    not analyze; therefore, I'm not required to count, but I'm

13    required to weigh the net weight of it.

14    Q   Understood.  So you weigh the entire weight of all the

15    tablets together; is that right?

16    A   That's correct.

17    Q   So what is arbitrary sampling and when is it approved, or

18    is that the method that you use?

19    A   So back when I analyzed it, arbitrary is just randomly pull

20    out a tablet, only if they all look the same.  In this case,

21    the two packages, they all look the same, so I just randomly

22    pull out one tablet from randomly choosing bag and analyze that

23    one tablet.  I also weigh -- weight that single tablet that is

24    net weight of 1.01.

25    Q   What testing did you do on 1.01?

1  A   I performed two tests.  One is called gas chromatography

2  and the other one is called gas chromatography mass

3  spectrometry, or GCMS.

4  Q   And just the gas chromatography would be your presumptive

5  test?

6  A   That is correct.  We separate the other components on

7  there, but it doesn't give me a confirmed picture of what it is

8  until I run the standard to compare with it to put it into a

9  group.

10  Q   What was the result of the presumptive test on

11  Exhibit 1.01?

12  A   So on the presumptive test, I saw two peaks and I run a

13  standard compare with it.  One is fentanyl and the other is

14  acetaminophen.

15  Q   And what was the result of the confirmatory test on Exhibit

16  No. 1.01?

17  A   The confirmation test also identified two components in

18  there.  One is fentanyl and the other is acetaminophen.  And

19  they, both technique, suggest two item only in there.

20  Q   So both techniques suggested there were two components or

21  compounds?

22  A   There are two major components, but also a little bit of

23  other minor stuff, like binders that put a tablet together, but

24  they are too small for me to see in the spectrum.

25  Q   After you did your testing, did you produce a report?

1   A    When I confirmed all the substance in there, then I do a

2   reserve weight.  The reserve weight is whatever remaining of

3   the single tablet I analyzed.  And then I close the exhibit and

4   seal it and did a closed weight after analysis, meaning that

5   when I complete everything, that's what the exhibit weight is.

6   Q    Okay.  And then after that, did you produce a report?

7   A    Yes.  And I did the report and submit it for review and

8   approval.  Once reviewer approved, then the report can send

9   out.

10  Q    Can you take a look at Government -- what's been previously

11  marked as Government's Exhibit 17.

12       Do you recognize this document?

13  A    Yes, I do.

14  Q    Is this your report?

15  A    Yes, this is my report with my name on there, analyzed by,

16  and approved by another chemist.

17  Q    Is it a fair and accurate reporting of the testing

18  procedures you did on Exhibit No. 1?

19  A    Yes.  The report can only approve if I follow all the

20  procedure correctly.

21          MS. VOSACEK:  I would offer Exhibit 17 at this time.

22          MR. CAMIEL:  No objection.

23          THE COURT:  17 is admitted.

24       (Exhibit 17 admitted)

25  BY MS. VOSACEK:

1   Q   Can you please turn to what's been previously marked as

2   Government's Exhibit 1701 and flip to page 2 of 16?

3       Do you recognize this photograph?

4   A   I do not receive the pictures.

5           THE COURT:  That's because you've got two sets of

6   numbering in this exhibit.

7           THE WITNESS:  Oh, okay.

8   BY MS. VOSACEK:

9   Q   It's in the second --

10  A   Yes, I see it.

11  Q   Two of 16 --

12  A   I see two pictures.  First is a bag and two tablets, and

13  the second picture is two tablets.

14  Q   Do you recognize this photograph?

15  A   Yes.  It has my initials and the date that I took it.

16  Q   What are you depicting in this picture?

17  A   So in the first picture, it has the bag that I took it

18  from, and the purpose is to see what is the tablet.  So I'm --

19  back then, we're required to take picture of the tablet and at

20  least visible of the imprint on there, so the second picture

21  have the front and the back, which is "M" and the "30."

22  Q   For the record, the second picture would be labeled 3 of

23  16?

24  A   That's correct.

25  Q   Okay.  Did you take the photograph with the indicator that

1  it is 3 of 16?  Do you recognize that?

2  A    Yes.

3  Q    Is it a fair and accurate representation of the pills that

4  you received from Exhibit No. 1?

5  A    Yes.

6        MS. VOSACEK:  I would offer 3 of 16 and 2 of 16 from

7  Government's Exhibit 17.01.

8        MR. CAMIEL:  No objection.

9        THE COURT:  Those two pages will be admitted.

10       (Exhibit 17.01, page 3 and 2, admitted)

11       MS. VOSACEK:  Permission to publish.

12       So this is a -- I'm not sure if the witness can see

13  these via Zoom.

14       THE COURT:  Well, that's all right, because you can

15  refer him to his page.

16  BY MS. VOSACEK:

17  Q    I'm looking at the image that's marked 2 of 16.  Can you

18  just briefly tell the jury what you were depicting with this

19  image?

20  A    Randomly picking from, and it show that what the color of

21  the tablet is.  And you can also slightly see the imprint on

22  the tablet.

23  Q    Okay.  And I'm going to flip to 3 of 16.  Again, briefly,

24  just describe the image.

25  A    So 3 of the 16 is they zoom up on the left-hand side with a

```
 1   label code to see the imprint on the tablet, and you can see
 2   there's -- there's an "M" and a "30."
 3   Q    And you did not do any kind of purity testing on these
 4   tablets; is that right?
 5   A    That is correct.  I did identification on this, and for
 6   purity test is -- there's a special case where the exhibit must
 7   be purchased, a special request by the sender.
 8   Q    And if you were, say, given two tablets, were you -- are
 9   you able to determine if they came from the same source, or
10   were made by the same person?
11   A    There was two tablet, that would be -- from my experience,
12   that would be too low to determine the purity, from what I
13   observed.  What I've been testing with fentanyl so far in
14   tablet, it's only about 2 percent.  For two tablets, that would
15   be too low for me to use to determine purity on the two tablets
16   only.  The minimum I can determine purity is at least 12
17   tablets.
18   Q    In you experience, the percentage of fentanyl in these
19   tablets is around 2 percent.  Is that what you said?
20   A    That's correct.  From all my testing with fentanyl table
21   that I quantify, they are about 2 percent.
22               MS. VOSACEK:  I don't have any further questions.
23               THE COURT:  All right.  Mr. Camiel.
24               MR. CAMIEL:  Thank you.
25                              CROSS-EXAMINATION
```

BY MR. CAMIEL:

Q    Good afternoon.  I wanted to ask you about your report, which is Exhibit No. 17.  Do you still have that in front of you?

A    Yes, I do.

Q    Do you understand correctly that in addition to finding fentanyl and acetaminophen, you found a third substance, but it was too small to be able to identify?

A    Which page do you refer to?

Q    Well, I'm looking at --

A    On 17?

Q    -- Exhibit 17, the report.

A    So in the report, 1.01 are referring to the single tablet.

Q    Right.  And did I --

A    And 1.02 --

Q    Sorry.

A    And 1.02 are the remaining tablet I did not analyze.  So I therefore, I said no analysis perform on the remaining tablet.

Q    All right.  But did I hear you correctly that there was a third substance that was detected where you did the gas chromatography mass spectrometry, but that it was too small to be able to identify?

A    Yes.  On what I observed, there was half the binder.  Those are called tablet binder.  That's a very small, very small, that I don't see it in the baseline.

1  Q   So a binder is something that's used when the tablet is

2  manufactured, to hold the substances together?

3  A   Tablet binder -- that's correct.  Tablet binder is what

4  hold everything together to make it become a tablet.

5  Q   Okay.  Then I just wanted to turn to the pictures that you

6  just looked at in Exhibit 17.01.  It's page 2 of 16.  Do you

7  still have that in front of you?

8  A   Yes, I do.

9  Q   Okay.  So did I understand correctly that when you received

10 the exhibit when it came in the mail, they were actually -- the

11 pills were in two different bags?

12 A   That's what my description, they are in two different bags.

13 Q   Okay.  And in the picture we're looking at, page 2 of 16,

14 is that just one of the two bags?

15 A   That is correct.

16      MR. CAMIEL:  Can we put the ELMO back up?

17 A   And the reason I put on one bag because they all look the

18 same and I just randomly pulled up one bag and take a picture

19 of it.

20 Q   So you -- you pulled one pill out of one of the two bags?

21 A   That's correct.

22 Q   Did you have any indication when you received the two

23 packages that they were part of the same -- they came from the

24 same original bag?

25 A   I don't know.  That is something that I don't know.  I can

```
 1   only describe what I observed with exhibit coming out to me.
 2   To the original of where it coming from, I'm not aware.
 3   Q   Okay.  The bag that we're looking at in Exhibit 1701, page
 4   2 of 16, is that the original bag that those pills came in?
 5   A   No, it isn't.  That is my new bag that I put it in there so
 6   that I can see through.
 7   Q   What happened to the bag that they originally came in?
 8   A   The original bag that came with it, and then you can see my
 9   report in the exhibit details, that I separate for latent print
10   examination and I submit for fingerprint analysis.
11   Q   Okay.  So did you do that with both of the original bags?
12   A   Since this is one exhibit, so everything going out at one
13   exhibit for fingerprint analysis.
14   Q   Okay.  But I'm not sure I understand.
15       So if I understand correctly, you received a package that
16   had two bags of pills, right?
17   A   That's correct.
18   Q   Okay.  And then you submitted one of those two bags, one of
19   those two bags, for fingerprint analysis?
20   A   Yes.  I submit two bags for fingerprint analysis.  Right.
21   Q   All right.
22   A   That's because everything is in one exhibit.
23   Q   All right.  Thank you.
24           MR. CAMIEL:  I have nothing further.
25           THE COURT:  Any follow-up at all?
```

1          MS. VOSACEK:  No, Your Honor.

2          THE COURT:  All right.  Thank you, sir.  You may be

3    excused.

4          THE WITNESS:  Thank you, Ma'am.

5          THE COURT:  All right.  Goodbye.

6      (Witness excused)

7          THE COURT:  This seems to be a good place to call it a

8    day, ladies and gentlemen.  We will have you back at 8:45 a.m.

9    again tomorrow, so I can meet with counsel before then.  And I

10   will read you just a brief instruction here before I send you

11   on your way.

12         As I indicated before the trial started, you as jurors

13   will decide this case based solely on the evidence presented in

14   the courtroom.  And what this means is that after you leave

15   here for the evening, you must not conduct any independent

16   research about the case, the matters in the case, the legal

17   issues in the case, or the individuals or other entities

18   involved in the case.  This is important for the same reasons

19   that jurors have long been instructed to limit exposure to

20   traditional forms of media information, such as television and

21   newspapers.

22         You must also not communicate with anyone in any way

23   about this case, and you must ignore any information about the

24   case that you might see while browsing the internet or your

25   internet or social media feeds.

1          On that note, please leave your notepads here.

2     Remember my admonition that I just gave you here.  And we'll

3     see you at 8:45 a.m.  I hope you have a very pleasant evening.

4        (Jury absent)

5               THE COURT:  Please be seated, everyone.

6               How are we doing on the government's case in terms of

7     getting through witnesses?

8               MS. WEBER:  Your Honor, we got through more than we

9     expected to today, so we will send counsel a list of the

10    witnesses we expect to call tomorrow.

11              THE COURT:  All right.  And in terms of finishing the

12    government's case in chief, is Thursday a possibility or Friday

13    more likely?

14              MS. WEBER:  Thursday is a possibility, Your Honor.

15    The government does want to renew its motion regarding the

16    evidence of other drug overdoses, so that may impact the

17    timeline; however, Thursday or Friday seems likely at this

18    point.

19              THE COURT:  All right.  Very good.  Anything to take

20    up from the government at this time?

21              MS. WEBER:  May I remain seated?  Sorry.

22              THE COURT:  Yes, that's fine.

23              MS. WEBER:  Your Honor, the government is going to

24    renew its motion once again to introduce evidence of the

25    overdose of Amy Ludwick (ph) in November of 2020, and evidence.

1    THE COURT:  Amy Ludwick.  This -- is this the first
2    time I've heard her name?
3        MS. WEBER:  Yes.  It was mentioned in the motion by
4    her initials.
5        THE COURT:  Oh.  All right.  All right.
6        MR. CAMIEL:  One of the jurors was friends or knew
7    her.
8        THE COURT:  I didn't recognize it from the initials,
9    you're correct, in the motion.  That's fine.
10       MS. WEBER:  As well as evidence on Slongwhite, who is
11   also mentioned by initial.  It seems likely, based on
12   questioning on cross-examination as well as the opening
13   statement, that it's the defense's intent to argue that there
14   is other -- a number of other drug dealers in this area that
15   are dealing in fentanyl.  There is the names mentioned and
16   other drug investigations, which makes it much more relevant to
17   prove that the drugs Mr. Lee took were from Andre -- were from
18   Winston Crockett, from Andre Brown, from the defendant, and not
19   Zianna Torix or Araka Taylor or any of the other names.
20       The potency of the pills that Jacob Lee bought from
21   Winston Crockett becomes much more relevant and the probative
22   value outweighs any prejudicial effect and, therefore, we
23   believe that the door has been opened.
24       THE COURT:  Are you prepared to address this at this
25   time?

 1          MR. CAMIEL:  Well, Your Honor, yeah, I'm fine

 2    addressing it now.  I still don't see how it's relevant.  They

 3    have the evidence they've put in showing the -- the arrest of

 4    Mr. Brown.  He's going to testify about his relationship with

 5    Mr. Crockett.  Mr. Crockett is going to testify about him

 6    providing pills to Mr. Jacob Lee.

 7          You start getting -- you start getting into other

 8    overdoses.  You're going to bring in another witness, Mr.

 9    Kearney, another witness, Mr. Edwards.  These are other people

10    who provided the pills to other people who overdosed.  In

11    particular, Mr. Kearney is the one who provided -- apparently

12    provided pills to Mr. Slongwhite.

13          I don't see how it gets them any further, other than

14    to just bring in that there was this rash of overdoses going on

15    at the time.  And so I think it's still, the probative value is

16    outweighed by the prejudice.

17          THE COURT:  Well, at this point, I haven't heard

18    enough from the government on the proffer to be able to address

19    it, but we can certainly, as I indicated, renew the motion.  Do

20    you plan to do it in writing or on the record?

21          MS. WEBER:  Your Honor, I'd like to do it on the

22    record, if I may.

23          THE COURT:  All right.  Well, then why don't we take

24    that up at -- would it be helpful for me to review what the

25    police reports are?  I just know nothing about these people.

1   You all do, but I don't.  I have seen no discovery.

2          MS. WEBER:  I would be happy --

3          THE COURT:  I mean, I don't -- but why don't I hear

4   the proffer.  How would you intend to present this proffer?

5          MS. WEBER:  Your Honor, Amy Ludwick overdosed --

6          THE COURT:  No.  I'm just asking how.  Are you making

7   a statement or are you seeking to present evidence?

8          MS. WEBER:  We would seek to present evidence from law

9   enforcement that responded, as well as maybe one of the victims

10  of the nonfatal overdose.

11         THE COURT:  So why don't you be prepared to do the

12  following.

13         At 8:30 a.m. tomorrow, give a detailed explanation not

14  of the facts, but how you intend to present the proffer, and

15  then we'll be in a position to address it at noon, assuming

16  Mr. Camiel can do two things at once, which we'll take it up at

17  some time during the noon hour as to where we proceed, and I

18  can hear the defense response.

19         So I don't want the facts of that point.  I want what

20  evidence you would seek to present outside the presence of the

21  jury as to why this should be admitted at this stage of the

22  trial.

23         And then I can hear argument as to the other point you

24  raised about why you believe that the questions to date by the

25  defense have opened this door.

1          All right.  Anything else we can take up?  Ms. Weber,

2   anything further?

3          MS. WEBER:  No, Your Honor.

4          THE COURT:  Mr. Camiel?

5          MR. CAMIEL:  No.

6          THE COURT:  All right.  We'll see you at 8:30 a.m.

7          DEPUTY CLERK:  All rise.  This matter is now

8   adjourned.  This matter will resume tomorrow morning at

9   8:30 a.m.

10       (Proceedings concluded at 4:58 p.m.)

11                         CERTIFICATE

12       I, Sonja L. Reeves, Federal Official Court Reporter in and
    for the United States District Court of the District of
13   Columbia, do hereby certify that the foregoing transcript is a
    true and accurate transcript from the original stenographic
14   record in the above-entitled matter and that the transcript
    page format is in conformance with the regulations of the
15   Judicial Conference of the United States.

16       Dated this 10th day of December, 2024.

17

18                              /s/ Sonja L. Reeves
                            SONJA L. REEVES, RDR-CRR
19                          FEDERAL OFFICIAL COURT REPORTER

20

21

22

23

24

25