1     UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF ALASKA
2

3   UNITED STATES OF AMERICA,      )
                                   )
4            Plaintiff,            )
                                   )
5        vs.                       ) CASE NO. 4:23-cr-00003-SLG
                                   )
6   JUNIOR GUFATASI TULALI,        )
                                   )
7            Defendant.            )
    _____ )
8

9             TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 5
      **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10                  Friday - April 19, 2024
                    8:33 a.m. - 5:26 p.m.
11                   Fairbanks, Alaska

12

13  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
14       BY:  ALANA WEBER and CARLY VOSACEK
         101 12th Avenue, Suite 310
15       Fairbanks, Alaska 99701
         (907) 456-0336
16

17  **FOR THE DEFENDANT:**
         Camiel & Cheney, P.S.
18       BY:  PETER CAMIEL
         2800 First Avenue, Suite 309
19       Seattle, Washington 98121
         (206) 817-0778
20

21
    _____
22                      **SONJA L. REEVES**
                  **Registered Diplomate Reporter**
23                 **Certified Realtime Reporter**
                  **Federal Official Court Reporter**
24                  222 West 7th Avenue, #4
                    Anchorage, Alaska 99513
25          Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 8:30 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

4     United States District Court for the District of Alaska is now

5     in session, the Honorable Sharon L. Gleason presiding.

6          Please be seated.

7          THE COURT:  Good morning, everyone.  We're on record

8     without the jury present here.  And anything from the

9     government to take up at this point?

10         MS. WEBER:  Yes, Your Honor.  For the Aimee Ludwick

11    911 call, we played only a few seconds of it, but the entire

12    call is in evidence.  Because we did not end up presenting

13    evidence about the overdose of Evan Slongwhite, the government

14    wanted to know whether or not we'd be permitted to play a

15    longer version of the call that's in evidence or if we're only

16    allowed to admit that clip.

17         THE COURT:  Thank you for asking me that outside the

18    presence of the jury.  If it's admitted in evidence, which I

19    hear it is, then any portion can be played during your

20    45 minutes.

21         MS. WEBER:  Thank you.

22         THE COURT:  Did you have demonstratives, either side,

23    that were not admitted in evidence that you intend to use

24    during closing?

25         MS. VOSACEK:  I do, Your Honor.

1          THE COURT:  Have you showed those to Mr. Camiel?

2          MS. VOSACEK:  I can.  Yes, I can show him.

3          THE COURT:  I think that would be helpful, so we can

4    avoid any objections during closing.  If it's simply taking the

5    jury instructions that I sent you and putting those up, that's

6    fine.  But if it's a PowerPoint that has other information,

7    generally runs smoother if he can see it first.

8          MS. VOSACEK:  I'll show him my PowerPoint.

9          THE COURT:  Anything else from the government?

10          MS. WEBER:  The victim's family has requested that

11    when we get a jury note indicating they have reached a verdict,

12    if we can have, like, a 15-minute break to give them time to

13    come to court.

14          THE COURT:  That's fine.  We can do that.

15          Mr. Camiel, anything else?

16          MR. CAMIEL:  No, Your Honor.  My presentation would

17    only include either slides of the admitted exhibits or the

18    Court's instructions.

19          THE COURT:  Very good.  With that said, then, we'll

20    take a short break until we have all of our jurors.

21          DEPUTY CLERK:  We have them all.

22          THE COURT:  We have all our jurors.  All right.  Well,

23    then let's have Mr. Camiel just quickly review here, and then

24    let me know when we're ready to proceed or if there's any issue

25    there.

1       We'll go off record.

2       DEPUTY CLERK:  All rise.  This court now stands in a

3  brief recess.

4       (Recessed from 8:33 a.m. to 8:37 a.m.)

5       (Jury present)

6       DEPUTY CLERK:  Please be seated.

7       (Pause)

8       DEPUTY CLERK:  All rise.  Her Honor, the Court, the

9  United States District Court is again in session.

10      Please be seated.

11      THE COURT:  All right.  Well, good morning, ladies and

12  gentlemen, and thank you all for being so timely.  I'm going

13  to -- we're now at the next phase of our case, which is where

14  I'm going to give you some instructions on the applicable law.

15  Then we'll hear from the lawyers for each side in closing

16  arguments.

17      So I have asked -- I'll ask our courtroom deputy to

18  hand out the -- do you have these?

19      DEPUTY CLERK:  I do.

20      THE COURT:  She's going to hand out what are called

21  the preliminary closing jury instructions.  This is the bulk of

22  the instructions that I'm going to read now.  And then she'll

23  hand them out.  You can read along with me if you'd like, or

24  simply listen, whichever is your preference.

25      So ladies and gentlemen, you should each have what's

1    entitled "Court's Preliminary Closing Jury Instructions," and
2    I'm going to read these through now.

3         Instruction one:  Members of the jury, now that you
4    have heard all of the evidence, it's my duty to instruct you on
5    the law that applies to this case.  You will each have a copy
6    of these instructions in the jury room for you to consult.

7         It's your duty to weigh and to evaluate all the
8    evidence received in the case and, in that process, to decide
9    the facts.  It's also your duty to apply the law as I give it
10   to you to the facts as you find them, whether you agree with
11   the law or not.  You must decide the case solely on the
12   evidence and the law.  You will recall that you took an oath
13   promising to do so at the beginning of the case.

14        You should also not be influenced by any person's
15   race, color, religious beliefs, national ancestry, sexual
16   orientation, gender identity, gender, or economic
17   circumstances.  Also, do not allow yourself to be influenced by
18   personal likes or dislikes, sympathy, prejudice, fear, public
19   opinion, or biases, including unconscious biases.  Unconscious
20   biases are stereotypes, attitudes, or preferences that people
21   may consciously reject, but may be expressed with conscious
22   awareness, control, or intention.

23        You must follow all of these instructions and not
24   single out some and ignore others.  They are all important.
25   Please don't read into these instructions or into anything I

may have said or done, any suggestion as to what verdict you should return.  That's a matter entirely up to you.

Instruction two:  The indictment is not evidence.  The defendant has pleaded not guilty to the charge.  The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.

In addition, the defendant does not have to testify or present any evidence.  The defendant doesn't have to prove innocence.  The government has the burden of proving every element of the charge beyond a reasonable doubt.

Instruction three:  A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the defendant did not testify.

Instruction four:  Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.  A reasonable doubt is doubt based upon reason and common sense, and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.  If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt the defendant is guilty, it's your duty to find the defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the

evidence you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty.

Instruction five: The evidence you are to consider in deciding what the facts are consists of:

First, the sworn testimony of any witness;

Second, the exhibits received in evidence;

And third, any facts to which the parties have agreed.

Instruction six: In reaching your verdict you may consider only the testimony and exhibits received in evidence. The following things are not in evidence, and you may not consider them in deciding what the facts are:

One, questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.

Similarly, what the lawyers have said in their openings statements and what they'll say in their closing arguments and have said at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Second, any testimony that I have excluded, stricken, or instructed you to disregard is not evidence. In addition,

1  some evidence was received only for a limited purpose.  When I

2  have instructed you to consider certain evidence in a limited

3  way, you must do so.

4      Three, anything you may have heard or seen when the

5  court was not in session is not evidence.  You are to decide

6  the case solely on the evidence received at the trial.

7      Instruction seven:  Evidence may be direct or

8  circumstantial.  Direct evidence is direct proof of a fact,

9  such as testimony by a witness about what that witness

10  personally saw or heard or did.  Circumstantial evidence is

11  indirect evidence.  That is, it is proof of one or more facts

12  from which you can find another fact.  By way of example, if

13  you wake up in the morning and see that the sidewalk is wet,

14  you may find from that fact that it rained during the night.

15  However, other evidence, such as a turned-on garden hose may

16  provide an explanation for the water on the sidewalk.

17      Therefore, before you decide that a fact has been

18  proven by circumstantial evidence, you must consider all the

19  evidence in light of reason, experience and common sense.

20      You are to consider both direct evidence and

21  circumstantial evidence.  Either can be used to prove any fact.

22  The law makes no distinction between the weight to be given to

23  either direct or circumstantial evidence.  It's for you to

24  decide how much weight to give to any evidence.

25      Instruction eight:  In deciding the facts in this

case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.  In considering the testimony of any witness, you may take into account the following:

First, the opportunity and ability of the witness to see or hear or know the things testified to.

Second, the witness's memory.

Third, the witness's manner while testifying.

Fourth, the witness's interest in the outcome of the case, if any.

Fifth, the witness's bias or prejudice, if any.

Sixth, whether other evidence contradicted the witness's testimony.

Seventh, the reasonableness of the witness's testimony in light of all the evidence.

And eighth, any other factors that bear on believability.

Sometimes a witness may say something that's not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide the testimony is untrue just because it

1  differs from other testimony.

2          However, if you decide that a witness has deliberately

3  testified untruthfully about something important, you may

4  choose not to believe anything that witness said.  On the other

5  hand, if you think the witness testified untruthfully about

6  some things but told the truth about others, you may accept the

7  part you think is true and ignore the rest.

8          The weight of the evidence as to a fact does not

9  necessarily depend on the number of witnesses who testify.

10  What's important is how believable the witnesses were and how

11  much weight you think their testimony deserves.

12          Instruction nine:  You have heard evidence that the

13  defendant may have committed other acts not charged here.  You

14  may not consider this evidence as evidence of guilt of the

15  crime for which the defendant is now on trial.

16          Instruction ten:  You have heard evidence that

17  Andre Brown, a witness, was previously convicted of felony

18  misconduct involving a controlled substance and felony

19  distribution of fentanyl resulting in death.  You may consider

20  this evidence in deciding whether or not to believe this

21  witness and how much weight to give to the testimony of this

22  witness.

23          You have also heard evidence that Winston Crockett, a

24  witness, was previously convicted of felony distribution of a

25  controlled substance.  You may consider this evidence in

deciding whether or not to believe this witness and how much weight to give to the testimony of this witness.

Instruction 11:  You have heard testimony from Winston Crockett and Andre Brown, witnesses who received benefits from the government in connection with this case and were alleged to be accomplices to the crime charged.  An accomplice is one who voluntarily and intentionally joins with another person in committing a crime or who pleaded guilty to a crime arising out of the same events for which the defendant is on trial.  These guilty pleas are not evidence against the defendant, and you may consider it only in determining these witnesses' believability.

For these reasons, in evaluating the testimony of Winston Crockett and Andre Brown, you should consider the extent to which or whether their testimony may have been influenced by any of these factors.  In addition, you should examine the testimony of Winston Crockett and Andre Brown with greater caution than that of other witnesses.

Instruction 12:  You've heard testimony from four individuals, Son Hoang, Kelsey Roberts, Scott Larson, and Cristin Rolf, who testified to their opinions and the reasons for his or her opinion.  This opinion testimony is allowed because of the education or experience of these witnesses.  Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much

1  weight as you think it deserves considering the witness's

2  education and experience, the reasons given for the opinion,

3  and all the other evidence in the case.

4       Instruction 13:  You are here only to determine

5  whether the defendant is guilty or not guilty of the charge in

6  the indictment.  The defendant is not on trial for any conduct

7  or offense not charged in the indictment.

8       Instruction 14:  The defendant is charged in Count 1

9  of the indictment with distribution of fentanyl resulting in

10  death, in violation of Sections 841(a)(1) and B(1)(c) of

11  Title 21 of the United States Code.  For the defendant to be

12  found guilty of that charge, the government must prove each of

13  the following elements beyond a reasonable doubt.

14       First, between on or about October 13, 2020 and

15  October 17, 2020, within the District of Alaska and elsewhere,

16  the defendant knowingly and intentionally distributed fentanyl.

17       Second, the defendant knew it was fentanyl or some

18  other federally controlled substance.

19       Distributing means delivering or transferring

20  possession of fentanyl to another person with or without any

21  financial interest in that transaction.

22       The government is not required to prove the amount or

23  quantity of fentanyl.  It need only prove beyond a reasonable

24  doubt that there was a measurable or detectable amount of

25  fentanyl.

It does not matter whether the defendant knew that the substance was fentanyl.  It is sufficient that the defendant knew that it was some kind of a federally controlled substance.

Instruction 15:  A person has possession of something if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it.

Instruction 16:  An act is done knowingly if the defendant is aware of the act and doesn't act through ignorance, mistake, or accident.  The government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence in deciding whether the defendant acted knowingly.

Instruction 17:  If you find that the defendant is guilty of distributing fentanyl, then you must determine whether Jacob Lee's death was a result of the fentanyl distributed by the defendant.  To find that a drug resulted in death, you must unanimously and beyond a reasonable doubt find that but for the use of the fentanyl that the defendant distributed, Jacob Lee would not have died.

In deciding whether use of the fentanyl that the defendant distributed resulted in death, you are instructed that the government must prove beyond a reasonable doubt that the use of the fentanyl was either a but-for cause of death or

1    an independently sufficient cause of death.  The government
2    need not prove both alternatives; either is sufficient.

3              To find a particular controlled substance distributed
4    or dispensed by the defendant was a but-for cause of death, you
5    must find beyond a reasonable doubt that but for the decedent's
6    house of the fentanyl, the decedent would have lived.

7              For example, where A shoots B, who was hit and dies,
8    we can say that A's conduct was a but-for cause of B's death
9    since, but for A's conduct, B would not have died.  The same
10   thing is true if a person's act combines with other factors to
11   produce the result, so long as the other factors alone would
12   have not produced the result if, so to speak, the person's act
13   was the straw that broke the camel's back.  Thus, if poison is
14   administered to a man debilitated by multiple diseases, the
15   poison is a but-for cause of his death even in those diseases
16   played a part in his demise, so long as, without the
17   incremental effect of the poison, he would not have died at
18   that time.

19             To find that a particular controlled substance
20   distributed or dispensed by the defendant was an independently
21   sufficient cause of death, you must find beyond a reasonable
22   doubt that the decedent's use of the fentanyl was sufficient to
23   cause the decedent's death regardless of, for example, the
24   decedent's use of any other controlled substances.

25             For example, if A stabs B, inflicting a fatal wound,

while at the same moment X, acting independently, shoots B in the head, also inflicting a fatal wound, and B dies from the combined effects of the two wounds, A's conduct is an independently sufficient cause of B's death, even though A's conduct was not a but-for cause of B's death, since B would have died from X's actions in any event.

The government does not have the burden of establishing that the defendant intended that death result from the use of fentanyl, nor does the government have the burden of establishing that the defendant knew or should have known that death would result from the distribution or ingestion of the fentanyl.

Instruction 18: The indictment charges that the offense alleged was committed on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the date charged.

And finally, instruction 19: A verdict form has been prepared for you. You will each receive your own copy of the verdict form, but the goldenrod-colored verdict form is the official form you will be asked to return to the Court.

After you've reached a unanimous agreement on a verdict, your foreperson should complete the goldenrod-colored

1  verdict form according to your deliberations, sign and date it,

2  and advise the clerk you are ready to return to the courtroom.

3          At this point, I'm going to ask our courtroom deputy.

4  She has the goldenrod, which is the official form to complete,

5  and she'll give that to you later when you go to deliberate,

6  but now she's going to hand out the copy of the verdict form to

7  each of you, simply to take a look at, which is -- I think is

8  helpful for you so that you can understand during the lawyer's

9  closing arguments what it is that you are being tasked with

10  determining.

11          So the verdict form, she'll be handing out.  Take a

12  moment, ladies and gentlemen, and just read that silently to

13  yourself.  And when you're done, if you could put down all your

14  paperwork, and then we'll move on to the closing arguments in

15  just a bit.

16      (Pause)

17          THE COURT:  Everybody had a chance to look through

18  that paperwork?  All right.  Then I think we are ready for

19  closing arguments.  Since the government has the burden of

20  proof, the government has the opportunity to start the closing

21  arguments.  Then the defense has an opportunity to make the

22  closing arguments on behalf of the defendant, and then the

23  government has an opportunity for a rebuttal at the end.

24          So go ahead, Ms. Vosacek.  Good morning.

25                  CLOSING ARGUMENT BY THE GOVERNMENT

1          MS. VOSACEK:  Good morning, Your Honor.

2          May it please the Court, counsel, ladies and gentlemen

3    of the jury.

4          (Audio playing in open court.)

5          October 28, 2020, is the day that Ray Lee found his

6    youngest son dead in his bedroom.  It's the day that

7    Deborah Lee's heart was broken.  It's the day that Josh,

8    Jeffrey, and Jason Lee lost their baby brother.  And it's the

9    day that the defendant and the downstream distributors robbed

10   Chase Lee of his father.  Why?  $5,000.  To make money.

11         The defendant bought 500 fentanyl pills in Southern

12   California for $5 a pill.  He sold those pills to Andre Brown

13   for $10 a pill.  Andre Brown sold those pills to Winston

14   Crockett for $30 a pill.  Winston Crockett sold those pills to

15   Jacob Lee for $60 a pill.  And they killed him.

16         The defendant knew that if he could ship the drugs to

17   Fairbanks, he would make more money.  Andre Brown told you that

18   he and the defendant talked about drug prices throughout the

19   country and where they could make the most money.  Fairbanks

20   was a target.  Make no mistake, they chose this community on

21   purpose, because you can make more money here.

22         They chose to feed off the addiction of addicts like

23   Jacob Lee, to put fentanyl into a form that looks exactly like

24   a Percocet pill, a prescription drug.  Jacob Lee was not

25   seeking fentanyl.  He was seeking a Percocet.  And he was

1  tricked.  And he took that pill, and it caused his death.

2       The judge has instructed you on the law, that the

3  government has the burden of proof beyond a reasonable doubt

4  that the defendant distributed fentanyl, that he did it

5  knowingly and intentionally.  I submit that we have proven

6  this.

7       She's given you the definition of distributing, which

8  includes transferring possession to another person with or

9  without a financial interest.  We also have shown the defendant

10  knew it was fentanyl or some other federally controlled

11  substance.

12       I'm going to walk you through the evidence and how we

13  know that this is true.

14       We've shown you Facebook records from a Facebook

15  account, and the name on that Facebook account is OJ Tulali.

16  We've shown you Facebook records from Andre Brown.  And we've

17  shown you that the Facebook account from OJ Tulali communicated

18  with Andre Brown's Facebook account via Facebook Messenger.

19       You can determine if the picture taken from

20  OJ Tulali's Facebook is, in fact, the man who's been in court

21  with you this week.  That's for you to decide.

22       We also have a voice recording from the Facebook

23  account OJ Tulali that was left on Andre Brown's Facebook

24  account.

25            (Audio playing in open court.)

1    MS. VOSACEK:  All this evidence will go back to you in

2  the jury room.  You will be able to review that audio.  Pay

3  attention to his manner of speech, the sound of his voice, to

4  the words that he says.  Pay attention to whether or not that

5  manner of speech, the words that he uses is consistent with the

6  messages going back and forth between OJ Tulali and

7  Andre Brown.  You will find that they are consistent.  So with

8  all that evidence we have shown, it is the defendant that is

9  communicating with Andre Brown.

10    You will then have to decide whether or not the

11  defendant distributed fentanyl.  So how do we know that

12  OJ Tulali, through that account, intended to knowingly

13  distribute fentanyl?  Well, we have messages from Andre Brown's

14  phone.  You have pictures of the actual text exchange in

15  evidence.  We also have the phone records from Andre Brown's

16  phone.

17    In Andre Brown's phone, you have a contact listed as

18  OJ.  That contact sends a message to Andre Brown, and it's got

19  pictures of Percocet pills.  They're blue.  They have the same

20  imprint as a real Percocet.  They look exactly like the

21  pharmaceutical pill Percocet.  He sends a picture to

22  Andre Brown.  Andre Brown responds with an address, and that

23  address is 310 Tipperary Court, Apartment A, Fairbanks, Alaska.

24  Andre Brown -- I'm sorry.  OJ says, "Got it."  Andre Brown,

25  thumbs up emoji, heart emoji.

1          Later on, we see that OJ sends a picture of a shipping

2    label that has that same address, 310 Tipperary Court,

3    Apartment A, Fairbanks, Alaska.  You also heard testimony from

4    Andre Brown that he received that package here in Fairbanks,

5    Alaska.

6          Now, how do we know that it's fentanyl?  Well, you

7    heard testimony from Andre Brown that he's a drug dealer and

8    that he's basically been dealing drugs his entire adult life.

9    And he told you that he picked up that package from the post

10   office with Marley Warner, and that was on October 19th.

11         We showed you WiFi connections from Andre Brown's

12   phone in the area of that post office on October 19th.  He told

13   you he took the package to 310 Tipperary Court and then began

14   reaching out to his other distributors to see if he could start

15   offloading these pills.  We've provided you Facebook records

16   from Andre Brown, and also his phone records.  You can review

17   those, and you can see that he does not discuss buying pills

18   with anybody else except for the contact OJ.  But he does

19   discuss selling pills to a bunch of other people, because he's

20   reaching out to his distributors to start offloading these

21   drugs.

22         He was arrested on November 6th of 2020, and he told

23   you that when he was arrested, he had some of these pills left,

24   about 59.  They were found in his coat pocket with money and

25   his ID.  He told you they were his and that these were the

pills that the defendant shipped to him.

Well, we know they are fentanyl because we took those pills and we sent them to the lab and they were confirmed to be fentanyl. But don't just take my word for it. You're going to have all of this evidence when you go deliberate. I submit to you, if you follow the money, you will see it is, in fact, the defendant that shipped these pills to Andre Brown.

OJ says, "Hit me with about 5K. Let's close out first run and hit for the second wave. Enlighten me further." Strong emoji. He gives a name, Junior Gufatasi Tulali.

Now, I've told you how valuable these pills are, right? So you would think that the person who shipped these pills has an interest in getting paid. And you can go and review the messages between Andre Brown and OJ Tulali and see that they discussed payment and how that payment was going to be effectuated. He gave his Paypal account name, Junior. He confirmed receipt of the money from Andre Brown.

You heard testimony from Agent Carr that when he arrested the defendant, that he had a phone. He had the phone number that was saved in Andre Brown's phone as the contact OJ. He called that number, and the phone that the defendant had when he was arrested rang.

Agent Carr told you that that phone number was associated with a real person. That person is the defendant. That person had an address in Southern California. That phone

1    was pinging in Southern California.

2           Exhibit No. 31 was admitted into evidence, and you

3    will be able to play it when you go back into the jury room.

4    You can decide for yourself what the defendant is saying in

5    this conversation.  I apologize, but you're not going to

6    probably be able to hear it very well here today.

7           (Exhibit No. 31 playing in open court.)

8           MS. VOSACEK:  Go back and listen to that recording,

9    Exhibit No. 31.  The defendant says, "They got to get those

10   dudes, though."  He's talking about this trial.  He says, "They

11   got to get those dudes, though."  He says, "But are they going

12   to come?  I don't know.  If they don't come, they don't come."

13          Well, they showed up.  They came here and they

14   testified, and their testimony was consistent with the other

15   evidence that we have presented.  Their testimony was

16   consistent with their phone records, with their Facebook

17   records.

18          Why didn't the defendant want them to come?  Because

19   he knew if they testified truthfully, he could be found guilty.

20          On your verdict form, the first question that you're

21   going to have to answer is whether or not the government has

22   met our burden to show that the defendant distributed fentanyl.

23          I submit that we have met that burden and that you

24   will find the defendant guilty.  If you do, you will move on to

25   the second question.  Did that distribution of fentanyl result

1  in Jacob Lee's death?

2          I submit that we have proven that as well.  Two hours

3  and 20 minutes is how long it took for Andre Brown to deliver

4  pills to Winston Crockett, to deliver pills to Jacob Lee.  How

5  do we know this?  Well, we have Facebook records.  We have

6  phone records that show those communications.  You heard

7  testimony from Andre Brown and Winston Crockett that was

8  consistent about where they met, what they did, who the pills

9  went to.  We've got a very short time window here, two hours

10  and 20 minutes.

11          You can look through those records yourself and see

12  that Andre Brown and Winston Crockett are communicating with

13  each other, that Winston Crockett is not communicating with

14  anyone else to get pills from anyone else, that Jacob Lee is

15  not communicating with anyone else to get pills from anyone

16  else.

17          Two hours and 20 minutes.

18          Why is Winston Crockett's overdose important?  It goes

19  to show how potent these pills were, that the pills that were

20  delivered to Andre Brown, in fact, caused people to overdose.

21  Winston Crockett told you that right after he delivered those

22  pills to Jacob Lee, that he took a half a pill, and he told you

23  about the symptoms that he had, constricted vision, nausea and

24  vomiting, that he lost consciousness, that he lost time, that

25  he woke up in his hallway he didn't know how long later, and

1  that he had difficulty breathing.  Scott Larson told you, the

2  toxicologist, that those symptoms are consistent with acute

3  fentanyl toxicity.

4       And you don't have to believe Winston Crockett.  Look

5  at his records.  For about nine hours, he stops all

6  communication.  He goes silent.  He doesn't respond to the

7  people that are messaging him.  What does he do nine hours

8  later?  Does he respond to the messages waiting on his phone?

9  He reaches out to Andre Brown, says, "Them 30 are the real

10 thing, right?  There's some crazy shit going around."  And

11 what's the second thing that he does?  He reaches out to

12 Jacob Lee, his friend and customer, to see if he's okay.  Why?

13 Because he's knows there's something wrong with these pills.

14      We know a good bit of information about Jacob Lee's

15 last days through his phone records, which you will have while

16 you deliberate.

17      We know that on October 26, 2020, at approximately

18 2:20 p.m., Jacob Lee got the pills from Winston Crockett.  At

19 2:26 p.m., just minutes later, Jacob Lee Googles "Pill

20 Identifier."  Now, Sergeant Reuter testified for you that he

21 tallied up all of the step information on Jacob Lee's phone,

22 and you'll have that when you deliberate.

23      On October 25th, Jacob Lee took about 11,000 steps.

24 On the 26th, about 3,700.  On the 27th, about 59, and no steps

25 on the 28th.

We know the last thing that Jacob did with his phone. On October 27th, at 7:34 p.m., he Google searched "acclimated." That's last thing that Jacob did. He -- all of the calls after that go to voicemail. The phone doesn't move until on the 28th at 7:00 p.m., when first responders and law enforcement are already at the residence.

So sometime between 2:20 p.m. and 7:34 p.m., which is about 29 hours, Jacob Lee took the pills that he got from Winston Crockett, and he overdosed. You can look through those phone records for those 29 hours. Jacob Lee does not talk to anybody about buying any other pills or any other controlled substance. He took the pill that he got from Winston Crockett, the pill that Winston Crockett got from Andre Brown, the pill that Andre Brown got from the defendant, and died.

You heard testimony that the cause of death of Jacob Lee is acute toxic effects of fentanyl. This is a 22-year-old healthy man who should still be alive, but for the use of fentanyl.

You heard from the toxicologist that Jacob Lee had three times the amount of a potentially lethal dose of fentanyl in his system.

Aimee Ludwick. Why is Aimee Ludwick's overdose important? Again, it goes to show that the pills that the defendant distributed are, in fact, deadly and caused yet another overdose. We know that Aimee took a pill from the same

1  batch that was delivered to Andre Brown.  Why do we know that?

2  You can look through the records and think back to the

3  testimony.

4         Now, on November 6, 2020, Aimee Ludwick told you that

5  she was a drug addict at the time and that she was trying to

6  find somewhere to get a pill, somewhere to get high, and she

7  reached out to somebody she didn't know, that she had gotten

8  contact information from a buddy, and she called this man and

9  they met and she got the pill on November 6th and she took it

10  about 20 minutes later, and the next thing she knows, she's

11  waking up and there's people around her and she had had an

12  overdose.

13         But how do we know that that pill came from the

14  defendant's batch?  Well, if you recall, Andre Brown testified

15  that he sold pills to Clifford Andrews and Aimee Lee --

16  Aimee Ludwick, I'm sorry, when she woke up, she told law

17  enforcement, here's the phone number from the guy I bought the

18  pills from, and here is his physical description.

19         Law enforcement knew that that phone number was

20  associated with Clifford Andrews, so they go talk to

21  Clifford Andrews.  Sergeant Reuter told you he called the

22  number that Aimee Ludwick gave him while Clifford Andrews was

23  walking away, and Clifford answers the phone.  So again, the

24  pill that Clifford Andrews gave Aimee came from Andre Brown,

25  which came from the defendant, showing just how potent this

1    batch was.

2         (Audio playing in open court.)

3         MS. VOSACEK:  You will have that evidence back with

4    you in the jury room, where you can listen to it.  It's the

5    sound of Aimee Ludwick overdosing.

6         The second question that you have to answer is whether

7    or not you find that the fentanyl distributed by the defendant

8    resulted in the death of Jacob Lee.  I submit that you will

9    find that we have met the burden and proven that those pills

10    came from the defendant.

11         People talk about distribution of controlled

12    substances as being a victimless crime.  Is it?

13         THE COURT:  Thank you.

14         Do you want to take a short break or are you ready to

15    proceed?

16         MR. CAMIEL:  Five minutes.

17         THE COURT:  Let's take about five minutes.  Please

18    leave your notepads and all the paperwork I give you here in

19    the courtroom, and we'll be back in about five minutes, when

20    the defense is ready to proceed.  Please don't discuss the case

21    or do any research.

22         DEPUTY CLERK:  All rise.  This matter now stands in a

23    five-minute recess.

24       (Recessed from 9:20 a.m. to 9:26 a.m.)

25       (Jury present)

 1          DEPUTY CLERK:  Please be seated.

 2      (Pause)

 3          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

 4  United States District Court is again in session.

 5          Please be seated.

 6          THE COURT:  All right.  We are back on record.  Ready

 7  to proceed?

 8          MR. CAMIEL:  Yes.

 9              CLOSING ARGUMENT BY THE DEFENSE

10          MR. CAMIEL:  May it please the Court, counsel,

11  Mr. Tulali, and his family, ladies and gentlemen.  How many

12  times did you just hear the assistant United States Attorney

13  mention the name Andre Brown?  I was going to keep count

14  because I knew she would.  I lost track.  Now, we're going to

15  talk about that because the government's case relies on him and

16  it's dependent on your believing what that man had to say

17  beyond a reasonable doubt.

18          There has been a lot of talk about Facebook and all

19  the messages, and we'll talk more about it on Facebook.  You

20  had Mr. Brown's Facebook messages.  You got to see those.  You

21  had Winston Crockett's Facebook messages.  You got to see

22  those.  Jacob Lee's Facebook messages.  And in Brown's Facebook

23  messages, there were these messages with OJ, drug-related

24  messages, no doubt about them, right?

25          But you heard the testimony from Special Agent Carr

1    yesterday that he got and scoured through Mr. Tulali's Facebook

2    account.  Remember what he showed you yesterday?  Family

3    pictures, picture after picture.  This all starts at

4    Exhibit 43.  Goes through Mr. Tulali with his family at a

5    cemetery plot.  All kinds of pictures of him, right?  Where are

6    the messages on his Facebook that he's supposed to be having

7    with Mr. Brown?  Where are the drug-related messages?  The most

8    incriminating thing he could find were family photos on

9    Mr. Tulali's Facebook account.

10           If he would have found anything else remotely

11   incriminating, they would have brought it to you in this

12   courtroom, and they didn't because it wasn't there.  Now, in a

13   few moments, this case is going to be your responsibility.  The

14   lawyers are going to be done talking, and I know you'll be

15   happy about that.  And Judge Gleason will give you the final

16   instructions, and then 12 of you are going to stand up and walk

17   back into the jury room, and it is then your case and your

18   responsibility.

19           And as jurors, you meet as a group and you will talk

20   to each other and you will go through the evidence together,

21   but ultimately, you make an individual decision.  Each one of

22   you will decide for yourself after talking to all of your

23   fellow jurors and listening to what they have to say.

24           And no juror's opinion has any greater weight than

25   anyone else's.  You're all equals back in that jury room.  And

1   you're going to have an instruction that says you have to

2   decide the case for yourself after you consider what your

3   fellow jurors have to say, and you don't surrender to the

4   loudest voice and you don't surrender to the lateness of the

5   hour.  You take your time, you think about what you're hearing

6   from your fellow jurors, and then you stick with your honest

7   opinion about what you believe.

8          Now, your task as jurors isn't to come back and tell

9   us what happened, to fill in the gaps in the evidence, to

10  explain a narrative of who did what and when, and how

11  everything happened.  That's not what you're asked to do.  When

12  you look at the jury instructions and you look at the verdict

13  form, what you're going to see is that what you're asked to do

14  is answer one question:  Has the government proven to you

15  beyond a reasonable doubt, beyond any and all reasonable doubt?

16  And I say "any and all" because if there is even one reasonable

17  doubt, the instructions tell you that you're required to return

18  a verdict of not guilty.

19         So your task is to determine whether the government

20  has proven beyond a reasonable doubt the charge that they

21  brought against my client, Junior Tulali.

22         And there are some tools in the jury instructions,

23  legal principles that help you accomplish that task.

24         You've got instruction number two that explains to

25  you -- so there are really three legal principles to help you.

1    They're kind of your toolbox to use.

2         And the first of those is the presumption of

3    innocence.  My client, just like anyone else charged with a

4    crime in this country, is presumed to be innocent.  What that

5    means is that you start off assuming that what you're going to

6    do is circle the not guilty on the verdict form.  That's where

7    you start.  You don't start even, with both sides even, you

8    start with the presumption that this man is not guilty.  You

9    know, in your everyday life, when you're online and you're

10   reading about a crime story, or pick up, if you still read a

11   newspaper, a crime story, you might form an opinion about

12   whether somebody is guilty or not.  You're not starting with a

13   presumption of innocence.

14        But you're in a different place now.  You're in a

15   different room.  You're in a very special room.  And the rules

16   here are different, and so you start with that presumption of

17   innocence.

18        The second thing that you see this instruction tells

19   you is the government has the burden of proof.  Somebody

20   charged with a crime in this country doesn't have to come to

21   court and prove that they are innocent.  The government has to

22   do the proving.  We don't have to call any witnesses.  We don't

23   have to present any evidence.  It's on the government.  And the

24   burden of proof that's on them is proof beyond a reasonable

25   doubt.

1         And you will have an instruction that explains to you

2    what reasonable doubt is.  Beyond a reasonable doubt is the

3    highest legal standard in any court in this country.  You know,

4    you heard Special Agent Carr talk about you need probable cause

5    to get a search warrant.  He said 51 percent.  Well, beyond a

6    reasonable doubt is way, way above that.  You have to be so

7    firmly convinced that you can't think of a reason to doubt the

8    truth of the charges that the government brought.

9         You have to be firmly convinced.  And a reasonable

10   doubt can arise from the evidence or the lack of evidence.  And

11   I want to talk to you about a few different words that

12   sometimes come up or you hear when you hear arguments.  One of

13   them is the word "maybe," maybe he did this, maybe he did that.

14   Or "perhaps" or "possibly."  Those are all words that indicate

15   there is doubt.  Those are words of uncertainty.  So if you're

16   thinking, well, maybe Jacob Lee saved the pills that he got

17   from Winston Crockett on the 26th and didn't take them until

18   the morning of the 28th, or maybe something else happened,

19   maybe is not beyond a reasonable doubt.

20        You're also not supposed to speculate and fill in the

21   blanks.  You've got what you've got.  The evidence the

22   government presented, that's it.  You don't speculate about

23   what they might have been able to find had they done a more

24   complete or thorough investigation.

25        There are two instructions that I want to talk to you

1  about that are special.  There are two witnesses in this case

2  that are singled out for special cautionary instructions,

3  instruction number 11 and instruction number 10, Andre Brown

4  and Winston Crockett.  They are singled out because they made a

5  deal with the government.  They got something in return for

6  their testimony.

7      Both of these men were facing mandatory minimum prison

8  sentences.  Andre Brown was facing a potential of a mandatory

9  life sentence.  Think about that, the pressure that would be on

10 you.  Winston Crockett, mandatory 20 years.

11     And they made a deal, and the benefit they got in

12 return for their deal was they got a whole lot less time.  But

13 what they had to do was come in and testify against Mr. Tulali.

14 That's the deal they made.  And this instruction is almost like

15 a poison symbol you would see on a bottle.  It's like the skull

16 and crossbones in red, warning you to be careful about the

17 testimony of these witnesses.

18     You're already going to be careful.  We know that.

19 You're already going to hold the government to its burden of

20 proof and apply beyond a reasonable doubt as the standard.  But

21 this instruction tells you you've got to treat these witnesses

22 even more carefully, and it tells you you have to consider

23 their testimony with greater caution than other witnesses.

24 It's because of who they are and why they're testifying.

25     But there's a second instruction that also singles out

1   these two men.  They're both convicted felons.  And under the
2   law, that means you get to consider whether that bears on their
3   credibility.  You've got two different warning instructions
4   telling you, be careful with these guys.  But you heard the
5   government attorney, how many times she mentioned Andre Brown,
6   how heavily they rely on him to make their case.

7          I want to talk a little bit about the government
8   investigation.

9          You probably -- I'm sure you saw that when I
10  cross-examined Officer Brubeck and Detective Reuter and Special
11  Agent Carr, I questioned them a bit about all the things that
12  they didn't do as part of the investigation, the places they
13  didn't look.  Right?  And they had a whole host of excuses
14  about why they didn't go get a search warrant for this place or
15  that place, why they didn't try to examine a phone, why they
16  didn't get certain records.

17         But the real reason, the real reason they didn't do
18  any of those things was it was much easier and quicker to rely
19  on the likes of Andre Brown and Winston Crockett rather than
20  going out and doing the legwork and the thorough investigation
21  that you would hope would be done when you're investigating the
22  death of a young man by overdose.  Instead, they decided, we'll
23  just rely on these guys.

24         So think about all the things that didn't get done.
25  Andre Brown gets arrested on November 6th driving a stolen

Hummer, and in that Hummer they find 59 little blue pills in
his jacket, with a bunch of money. He gets arrested right then
and there. He tells them, I'm staying at the 7 Gables motel
here in town.

Wouldn't you think, kind of investigation 101, you go
get -- you go to a judge and you get a search warrant? You
don't think the judge would give you a search warrant for that
place after you've arrested a guy in a stolen vehicle with
contraband counterfeit Percocet pills who tells you where he's
staying? Wouldn't you want to go there and see, does he have
any other phones, does he have any other pills, does he have
other drugs, is there money there? They don't do any of that.
Okay.

So what else don't they do? They've got a picture of
a package label, right? They never recover a package. They
never actually find the label. But they've got a picture on
Andre Brown's phone of a label with a sender's address in
Gardena, California.

We were talking about the house in Gardena,
California, the sending address for what was supposed to be a
package, right? And there's a name and there's an address, and
you hear that the police never bothered to go out there. Why
not? Well, sometimes it's a vacant lot and sometimes it's
just a -- there's nobody living there. And sometimes it's even
a fake address. Well, they conceded it's a real address, it's

 1  not a vacant lot, and they never go out there.  They didn't get

 2  a search warrant for the place, but they didn't even need to do

 3  that.  Why don't they go out there and knock on the door?

 4  Don't need a search warrant.  See who lives there.  Ask them if

 5  they know the name of the person on the package label.

 6       Or if you don't want to get out of your car, you could

 7  at least drive up and watch the place for a few minutes, take

 8  down the license plates numbers, do something to investigate

 9  that location.  Isn't that a great lead?  Now, maybe it leads

10  nowhere, but maybe, just maybe, it helps you identify if there

11  was a package, where it came from, and who sent it.  They don't

12  do that.

13       Mr. Tulali gets arrested and he's got a cell phone

14  with him, and it's the same number that they've been tracking,

15  except at the time in November of 2020, that cell phone

16  belonged to somebody named Lavel Wallace.  That's who the

17  subscriber was.  But you heard Agent Carr.  They get that cell

18  phone.  Why don't you look in it, like you looked in

19  Mr. Brown's phone or Crockett's phone or Jacob Lee's phone?  He

20  says, well, it was locked.  Well, you heard from him, the

21  government can unlock those things.  All they have to do is

22  try, and they didn't even try.

23       How about getting Paypal records?  Supposedly there

24  were payments sent through Paypal records, right?  Or how about

25  the phone records?  So you've got this phone with the phone

number, and a subscriber is Lavel Wallace, right?  Who is
paying the bill?  This isn't a burner phone.  It's not a
prepaid phone.  Somebody is paying the bill for that phone.
Why don't you get the records to see?  They don't do that.

So let's talk about 310 Tipperary Court, the house
that Mr. Brown was driving away from with somebody named
Mr. Kearney, who you didn't get to hear from.  So they go to
that house.  They do get a search warrant for that house and
they find some cocaine in the garage, in a shoe, and they find
some pills in a microwave -- or in a cabinet above the
microwave in the house, a house that is rented by a woman named
Kweka Warner, who is apparently called Mama.  And you saw the
note from Mr. Kearney about him helping Mama sell her pills.

Well, where is Kweka Warner?  What happened to her?
What does she have to say about those pills?  Where did those
pills come from?  Now, the government is going to say, well,
those are part of Mr. Brown's stash that he says were missing.
There is no corroboration of that.  There's nothing to prove
that.

Or how about -- how about Marley Warner?  That was the
14-year-old girl who Mr. Brown had her name put on that
sending -- or recipient name for a package.  14-year-old girl,
Mr. Brown has her name put on there.  She would be 18 years old
now, right?  17, 18.  Don't you think she would remember if
Mr. Brown pulled her out of school or picked her up from

school, took her to the post office, had her use her ID to pick
up a package?  She probably wouldn't know what was in the
package, but she would be able to corroborate whether that
happened or not.  We don't hear from her.

You know, the government's theory of the case is that,
well, Mr. Brown has got these phone calls and messages with OJ,
and my client is sometimes known as OJ, and he ends up with a
phone that was used back in 2020, and they say, okay, that's
it, that's all we need, that and Mr. Brown.

But, I mean, think about it.  Mr. Brown is arrested on
November 6th, and he's had all these messages, Facebook and on
his phone, with whoever is at the other end of that phone, 310
phone number, so -- and that phone at the time was subscribed
to by this Lavel Wallace.  And so wouldn't you think you'd want
to get -- if you were the sender of the pills, you would get
rid of that phone, you'd dump it, and maybe somebody else ends
up with it?  But what you wouldn't do is put it in your own
name after that, would you?  Is that really what would happen?

So let's talk now about some of the witnesses who did
testify.  And I want to start and talk about some of the
experts, the scientific people, and I'll start with Dr. Rolf,
the medical examiner here in the State of Alaska.  She's in
Anchorage.  She's the one who did the autopsy on Jacob Lee.
She's the one who collected the blood and other samples and had
them sent to a lab, a toxicology lab.  What did she tell us

that she found?  Well, first of all, she got a history, and the
history was polysubstance abuse.  And what she was told was
heroin and methamphetamine and alcohol and marijuana.  And she
had information that she could see from examining the body that
there were puncture marks on the arm that may or may not be
injection sites for using drugs.

And she indicated that she classified the death -- you
will see this in the report -- as an accident.  Government
didn't ask her about that, but if you look at the report,
that's the way she classified it.  But she said that Jacob Lee
died from a lethal dose of fentanyl in his blood.  But she also
told you she couldn't tell you how it got there or what he
took.  She relies on the toxicology report in terms of making
the determination that it was a lethal dose of fentanyl.

But one of the other things she told you was her
estimate of the time of death.  She's done thousands of
autopsies, and she said her estimate was that when he was found
at 5:22 p.m. on October 28th, he had been dead for about eight
hours, she said give or take, eight hours.  Now, the government
didn't like that answer because it doesn't fit their theory of
the case.  But if you back that up, if you back that up,
5:22 p.m.  So if you go back to noon -- or 12:22, that's five
hours, another three would be 9:22, that's pretty important
information as you think about this case.

The other people we heard from were the chemists, the

1   people who examined the two batches of pills that were found --
2   there was the batch -- the baggie that was found in Mr. Brown's
3   jacket and there was the little baggie that was found in that
4   house above the microwave, two separate batches of pills.  Now,
5   one of the things you heard from the chemist was they can't
6   tell you if they're from the same source.  They can't say they
7   all came together as a group or whether there were different
8   sources and Mama had her own source for pills and Mr. Brown had
9   his source.  But they examined the pills, and they told you
10  something that's very, very important in terms of your
11  consideration of this case.  They told you that they found
12  fentanyl, but they also found acetaminophen in the pills.  And
13  that becomes very important when we get to the toxicologist,
14  right?

15          So we get the toxicology guy.  He came in yesterday,
16  Mr. Larson, and he told you he wasn't the one who did the
17  original work on the case, but he did the reexamination of the
18  data they collected.  He told you there were a couple problems
19  that the lab had.  One just had to do with some interfering
20  substance with the marijuana.  They put that in their report.
21  But then there was this other problem with their testing of the
22  femoral blood that they didn't put in their report and let
23  Dr. Rolf know.  But totally separate from that, you have his
24  findings, and he talked about finding fentanyl and norfentanyl
25  and THC.  But there's nothing in there about acetaminophen.

1    And the reason there's nothing in there about acetaminophen is
2    because they didn't test for it.  They could have.  He said
3    they do that.  But they didn't.
4         Why is that critically important?  Well, the pill --
5    the government says Jacob Lee ended up with pills that
6    Mr. Brown had.  And the government's theory is Mr. Brown got
7    those pills from Mr. Tulali.  And the pills that Mr. Brown had
8    had acetaminophen and fentanyl, but the toxicology report just
9    says fentanyl.
10        Well, what if the toxicology report -- what if the
11   toxicology lab had done a thorough exam and tested for
12   acetaminophen and it didn't come back, no acetaminophen?  Then
13   you would be able to say very easily, well, what Jacob Lee took
14   didn't come from what Mr. Brown was selling.  But instead, they
15   don't do the test, a critical test.  If that's not glaring,
16   flashing reasonable doubt, what is?  That's a critical step in
17   the investigation, and they didn't do it.
18        That's the note that Mr. Kearney sent Mr. Brown about
19   Mama's pills, right?  The Mr. Kearney that we didn't hear from.
20   Where was Mama getting her pills?
21        There's some other witnesses that testified that I
22   wanted to talk about a little bit.  One of them was Jacob Lee's
23   brother Jeff.  And, you know, it's really hard when family
24   members have to testify in a situation like this.  And Jeff has
25   had his own struggles with drug addiction, drug use.  You heard

1    about his heroin use and his use of pills.  He had been buying

2    pills from Mr. Crockett for a long, long time.  There were some

3    significant things that he said that I suggest are very

4    important.

5        One of them was, he didn't know his brother borrowed

6    his Subaru on the 26th to go meet with Mr. Crockett, which

7    shows that Jacob Lee was probably sneaking around and not

8    letting people know when he was going out and where he was

9    going.

10        The other thing that's important to remember is

11   Jeff Lee's bedroom was right downstairs, next to his brother's.

12   And you remember that when Officer Brubeck testified at the

13   beginning of the trial, he was one of the first policemen at

14   the scene, investigating the death, and he pretty quickly

15   suspected it might be a drug overdose and he looked around in

16   Jacob Lee's room and he did a cursory look in the bathroom, but

17   he didn't look anywhere else.  He didn't look in Jeff's room,

18   didn't look in any other rooms, didn't look in the vehicles.

19   So we don't know whether there was anything to be found or not.

20        But the other thing that Jeff mentioned was how

21   frequently and what he had been getting from Mr. Crockett, and

22   it contradicted what Mr. Crockett told you in terms of his

23   selling 30s and how much he was selling and how frequently.

24   But the other critical thing that Jeff Lee mentioned was, he

25   said a few weeks before his brother died, Jacob came to him and

asked him for pills. Now, Jeff Lee testified that he quit

pills quite some time before that. He said years before that.

If that's not true, I'm not sure why Jacob Lee would be coming

to him asking him for pills. But he also said Jacob said he

couldn't find any anywhere, which meant he wasn't just looking

to Mr. Crockett. He had other people he reached out to try to

find pills, which begs the question, after he got the pills on

the 26th from Mr. Crockett, did he reach out and get something

from somebody else?

And that gets us to Mr. Brown, the guy who is arrested

driving a stolen Hummer, who the government is relying on to

make their case. So Andre Brown is an admitted drug dealer.

He says he came out from Florida and brought cocaine with him,

which I thought was interesting for him to say because then

later in his testimony he said, well, he wouldn't fly with

drugs on a plane because of the way things are now. So he

contradicted himself right there. He admitted he would go to

Arizona and get drugs and bring them back. He admitted that he

went down when he rented that Hummer under somebody else's name

with no intent on returning it. So it became a stolen vehicle.

He came back with a load of heroin and then he bought

methamphetamine here. So he's a busy guy. He's selling all

kinds of drugs.

And he makes the claim, totally uncorroborated, that

the first time he gets involved in pills was on this occasion.

Can you believe that one?  Look how quickly he got rid of the
pills.  He knew just what to charge.  He knew just who to go
to.  But think of all the things that Mr. Brown said that
weren't true.  I mean, when he was first arrested, he lied
about the vehicle.  He just said he borrowed it from somebody
in Fairbanks.  Then he denies knowing about the jacket.  Then
he denies knowing about the pills.  Then when they finally
confront him with the fact his ID is in the jacket with the
pills, he wants to make a deal with the police.

They've now got him at the police station.  He said, I
wanted to go home, and he told them he would tell them the
truth.  Just like he took the oath on the witness stand to say
he was going to tell you the truth, he said he was going to
tell the police the truth.  So they said, okay, where did the
pills come from?  And he says from Melvin Williams and he tells
them who Melvin is, he used to sell cocaine with him, and what
he drove and where he met him.  And now he tells you, well,
that wasn't true.  I was just getting back at Melvin.  It was
just retaliation because I thought maybe he turned me in.

Let's look at the list of people that Mr. Brown throws
under the bus to protect himself.  There is whoever the guy is
whose ID and name he used to rent the vehicle so when that
vehicle is reported stolen it doesn't come back on Mr. Brown,
it's on that guy.  This 14-year-old girl whose name is on the
label of the package.  Melvin Williams, who he tells the

police, he's the guy I got the pills from.  And now add to the
list Junior Tulali.

Mr. Brown will throw anybody under the bus to protect
himself.  You know, the government might try to tell you that
what he says is all corroborated, but you got to ask yourself,
is that true?  Is that really true?  Remember there are those
messages that Mr. Brown has about being in Arizona, and he
says, oh, I wasn't really in Arizona, I was just lying to
somebody about where I was, or the messages about dipping down,
I had to dip.  None of that is corroborated.  What he's saying
isn't corroborated.

You heard from Winston Crockett.  He's the other guy
that made the deal.  He tells -- he sells pills to Jacob Lee on
the 24th, two days before the 26th, two pills.  Where did he
get those from?  You know, he said he had half a dozen sources,
is what he said, right?  How do you know the pills he sold on
the 26th to Jacob Lee didn't come from the source that he had
on the 24th?  You don't.  You have to take Mr. Crockett's word
for it, the guy who when he's first confronted by the police
lies to them and then after they arrest him lies to them again,
and then after he agrees to cooperate and there's a cooperation
agreement, lies to them again, the guy who says he overdosed.
There is no corroboration of that.  Yeah, he wasn't on the
phone for a while, but you will see messages where he had to
use -- he had to use the library WiFi or hadn't paid his phone

1   bill. But he claims, yeah, after I passed out from using the

2   pill, I flushed them all down the toilet. Turns out that

3   wasn't true. He was still selling them.

4        If he thought those pills were so bad, he's still out

5   there selling them. But that's the second guy the government

6   is relying on. That's the guy who ultimately gave something to

7   Jacob Lee on the 24th and on the 26th. We don't know what, if

8   anything, Jacob got after that.

9        Erase the messages. That's what Winston Crockett is

10   telling Jacob Lee, erase the messages. And for all we know, a

11   lot were erased. When we had Mr. Crockett on the stand, we

12   showed a bunch of the messages that were recovered way back in

13   January of 2020 when he was selling the pills. He certainly

14   seemed to have a ready supply, a ready source of pills long

15   before October 26th.

16        This is the Andre Brown down in Arizona. Remember he

17   said that wasn't true, he wasn't really in Arizona, even though

18   he texted somebody he was about to fly back to Alaska? What's

19   he doing down there? What he told you, he went down there to

20   get drugs. He admitted that. He denied pills. But he's

21   coming back with something, and he just happens to have pills

22   when he gets back.

23        Then you had the, "I had to dip and get some other

24   shit. You know anybody who would be wanting those Perc 30s?"

25   The term "dip," meaning he had to go down to Anchorage. He

came back with pills, again.  He had a source of supply totally
separate from whoever he's messaging with.

         And then there's, "Just touched the soil with some
30s."  This is the message to Mr. Crockett, "Know you be in
that lane."  "Just touched the soil."  That's not, you know,
just got my shipment or just got my package.  That's just came
back with something.  With what?  With some 30s.  "Know you be
in that lane" means he dealt with Mr. Crockett before regarding
pills.  That's the lane that Mr. Crockett was in.

         You know, the government's case relies on people who
lied to the police repeatedly, who throw other people under the
bus.  Those are the people now they want you to rely on as you
try to figure out whether the government proved its case beyond
a reasonable doubt.

         But let me ask you this.  Okay.  Let's say you got
beyond the credibility problems of Mr. Brown and Mr. Crockett
and you decided, okay, despite all the problems with those
witnesses, we're going to believe the pills came from
Mr. Tulali.  The government's case still falls short in proving
whatever it was Jacob Lee took came from what Mr. Brown got
because what you heard from Aimee Ludwick, she had ten
different sources out there.  Mr. Crockett said he had six.  So
there are a lot of people here selling pills.

         And most important, you get back to the medical
examiner can't tell you what he took and the toxicology report

1  totally left out the acetaminophen.

2       And so the government's attempt to prove where the

3  fentanyl came from that was in Jacob Lee's blood just fails.

4  They just can't prove it.

5       We talked about Mr. Tulali's messages, that there were

6  no drug messages whatsoever found in his Facebook.  Whatever

7  his Facebook had didn't match up with Mr. Brown's, that's for

8  sure, because all they found were the family photos.

9       Now, there's no dispute that fentanyl is a real

10  serious problem and a lot of people have been hurt by it, and

11  there are a lot of people who are angry over it and very

12  frustrated and want to do something about it.  But we don't

13  relax the rules of the justice system because of the nature of

14  the charge.  We don't say, well, we're going to dispense with

15  the fact that the government has the burden of proof because a

16  young man died of a fentanyl overdose, or we're going to shift

17  the burden of proof or relax the beyond a reasonable doubt

18  standard.

19       In fact, it's this kind of case where those legal

20  standards are most important, to make sure that the wrong

21  person isn't held accountable in such a serious case.  And so

22  now more than ever, making sure the burden stays on the

23  government, the presumption of innocence isn't relaxed or

24  dispensed with, it stays with my client, and the government is

25  held to that beyond a reasonable doubt standard.

1          You know, at the end of this trial, whatever the

2    verdict is, you're going to walk out of the courthouse feeling

3    maybe a little bit of despair or sadness about such a tragic

4    situation, and that's understandable.  And whatever your

5    verdict is, it's not going to bring Jacob Lee back to his

6    family.  But you should also walk out of the courthouse knowing

7    that you did your constitutional duty, that you followed the

8    instructions, that you didn't succumb to any temptation to give

9    the government a break.

10          So I know you're going to examine the evidence and

11   you're going to consider the testimony of Mr. Brown and how

12   heavily the government has relied on him, and those warning

13   instructions, and you're going to consider whether he has any

14   credibility at all, let alone whether you could believe him

15   beyond a reasonable doubt.  And the same for Mr. Crockett.

16          And I know you're going to consider the way the

17   government and law enforcement went about the investigation and

18   the fact that they didn't do some of the most basic things you

19   would have hoped as citizens they would do in investigating a

20   serious crime.  And I know you're going to consider the fact

21   that the toxicology lab didn't test for acetaminophen, which

22   would have been real helpful to know when you take on this

23   case.  And I suggest that after you have considered all of

24   those things, you're going to find that this case is so riddled

25   with reasonable doubt that you're going to come back with a

1  verdict of not guilty.

2          Thank you.

3          THE COURT:  Thank you, Mr. Camiel.

4          Is the government ready to proceed, or would you

5  request a short break?

6          MS. WEBER:  We're ready to proceed, Your Honor.

7          THE COURT:  All right.  Very good.

8          MS. WEBER:  Ladies and gentlemen, one thing that is

9  not in contest, not in dispute, is that the burden of proof

10 rests entirely on the government.  The defense is presumed

11 innocent.  And I submit to you that over the course of this

12 trial, the government has met that burden.

13         The judge is going to instruct you, and she has

14 instructed you, on the definition of reasonable doubt.  There

15 is no sign outside of the courtroom that says leave your common

16 sense at the door.  Use your life experience.  Use your common

17 sense when you evaluate the evidence in this case.

18         Proof beyond a reasonable doubt is proof that leaves

19 you firmly convinced that the defendant is guilty.  It's not

20 proof of guilt beyond all possible doubt.

21         Reasonable doubt is doubt based upon reason and common

22 sense.  It is not based purely on speculation.  And there's

23 little to speculate.  The timeline here is so tight, we know

24 what happened to Jacob Lee.

25         10-15-20, the defendant, Junior "OJ" Gufatasi Tulali

shipped a package with 500 counterfeit fentanyl pills --
counterfeit Percocet pills containing fentanyl to Andre Brown.
We know this because we have the shipping label.  The defendant
made it very easy.  He highlighted the date that it was sent,
10-15-20, and he highlighted the date that it was expected to
be delivered, 10-17-2020.  Andre Brown testified that
10-17-2020 was a Saturday.  He missed the package.  The post
office was closed and he went back on the 19th, which was a
Monday, and he picked it up.

On 10-19-2020, Andre Brown got the package with 500
pills containing fentanyl.  He told you that he had sold most
of them by the time he even reached out to Winston Crockett.
He sold them to Melvin Williams.  He sold them to a person
referred to as Cortez.  And on October 6th -- on November 6th,
when he was arrested, he only had 59 of these pills left.

We also know that on October 26, 2020, Andre Brown
sold six of those pills to Winston Crockett, who minutes later
met with Jacob Lee, sold Jacob Lee two of those pills, and
Jacob Lee took them that day and the next day and died of a
fentanyl overdose.

How do we know this?  Because Officer Brubeck
testified that he searched Jacob Lee's room.  He did not find
more drugs.  He did not find one pill left over.  He did not
find foil or heroin or layers or any other paraphernalia you
would expect to see had Jacob been using anything else.

1   Winston Crockett may have sold Jacob two pills on October 24th.

2   How do we know that those aren't the pills that killed him?

3   Because he was alive on the 26th.  How do we know the pills

4   from the defendant killed him?  Because they contained

5   fentanyl, and that's what was in Jacob Lee's blood and that was

6   the cause of his death.

7          Also, we know because Andre Brown also sold pills to

8   Clifford Andrews on November 6, 2020.  Clifford Andrews sold

9   the pills to Aimee Ludwick, and she took the pill 20 minutes

10  later, overdosed.  Winston Crockett, right after he got the

11  pill from Andre Brown, took half of one and overdosed.  I

12  submit that when you go back to deliberate and you go through

13  all of the evidence that's been presented to you, you will find

14  that the government has met its burden of proof and there is

15  proof beyond a reasonable doubt that the defendant knowingly

16  distributed a substance containing a detectable amount of

17  fentanyl to others, resulting in the death of Jacob Lee.

18         THE COURT:  All right.  Thank you, Ms. Weber.

19         Ladies and gentlemen, now I'm going to ask our

20  courtroom deputy to hand out just a few more additional

21  instructions I have, the final closing jury instructions.

22         After she does that, we'll read through them.

23         All right.  So this picks up where we left off, which

24  is instruction 20.

25         When you begin your deliberations, elect one member of

1   the jury as your foreperson who will preside over the

2   deliberations and speak for you here in court.  You will then

3   discuss the case with your fellow jurors to reach agreement, if

4   you can do so.  Your verdict, whether or not guilty, must be

5   unanimous.

6          Each of you must decide the case for yourself, but you

7   should do so only after you have considered all the evidence,

8   discussed it with your fellow jurors, and listened to views of

9   fellow jurors.  Do not be afraid to change your opinion if the

10  discussion persuades you you should, but do not come to a

11  decision simply because other jurors think it's right.

12         It is important that you attempt to reach a unanimous

13  verdict, but, of course, only if each of you can do so after

14  having made your own conscientious decision.  Do not change an

15  honest belief about the weight and effect of the evidence

16  simply to reach a verdict.

17         Perform these duties fairly and impartially.  You

18  should also not be influenced by a person's race, color,

19  religious beliefs, national ancestry, sexual orientation,

20  gender identity, gender, or economic circumstances.  Also, do

21  not allow yourself to be influenced by personal likes or

22  dislikes, sympathy, prejudice, fear, public opinion, or biases,

23  including unconscious biases.  Unconscious biases are

24  stereotypes, attitudes, or preferences that people may

25  consciously reject, but may be expressed without conscious

1  awareness, control, or intention.  It is your duty as jurors to

2  consult with one another to deliberate with an honest view

3  towards reaching agreement, if you can do so.

4       During your deliberations, you should not hesitate to

5  reexamine your own views and change your opinion if you become

6  persuaded that it is wrong.

7       Instruction 21:  Because you must base your verdict on

8  the evidence received in the case and on these instructions, I

9  remind you that you must not be exposed to any other

10  information about the case or to the issues it involves.

11  Except for discussing the case with your fellow jurors during

12  your deliberations, do not communicate with anyone in any way

13  and do not let anyone else communicate with you in any way

14  about the merits of this case or anything to do with it.  This

15  restriction includes discussing the case in person, in writing,

16  by phone, tablet, computer, or any other means, via email, text

17  messaging, or any internet chat room, blog, website, or other

18  forms of social media.  This restriction applies to

19  communicating with your family members, your employer, the

20  media or press, and the people involved in the trial.

21       If you're asked or approached in any way about your

22  jury service or anything about the case, you must respond you

23  have been ordered not to discuss the matter and report that

24  contact to the Court.

25       Do not read, watch, or listen to any news or media

commentary about the case or anything to do with it.  Do not do

any research, such as consulting dictionaries, searching the

internet, or use other reference materials, and do not make any

investigation or in any other way try to learn about the case

on your own.  The law requires these restrictions to ensure the

parties have a fair trial based on the same evidence that each

party has had an opportunity to address.  A juror who violates

these restrictions jeopardizes the fairness of these

proceedings and a mistrial could result that would require the

entire trial process to start over.

So if any juror is exposed to any outside information,

please notify the Court immediately.

Instruction 22:  Some of you have taken notes during

the trial.  Whether or not you took notes, you should rely on

your own memory of what was said.  Notes are only to assist

your memory.  You should not be overly influenced by your notes

or those of fellow jurors.

Instruction 23:  The punishment provided by law for

this crime is for the Court to decide.  You must not consider

punishment in deciding whether or not the government has proved

its case against the defendant beyond a reasonable doubt.

Finally, instruction 24:  If it becomes necessary

during deliberations to communicate with me, you may send a

note through the clerk, signed by any one or more of you.  No

member of the jury should ever attempt to communicate with me,

 1   except by signed writing.  I will respond to the jury

 2   concerning the case only in writing or here in open court.  If

 3   you send out a question, I'll consult with the lawyers before

 4   answering it, which may take some time.  You may continue your

 5   deliberations while waiting for the answer to any question.

 6        Remember that you are not to tell anyone, including

 7   me, how the jury stands numerically or otherwise on any

 8   question submitted to you, including the question of the guilt

 9   of the defendant, until after you have reached a unanimous

10   verdict or have been discharged.

11        That concludes my instructions, ladies and gentlemen.

12        We're now at the stage of the case where we are going

13   to select the two alternates.  Before I ask the courtroom

14   deputy to do that, is there anyone that feels, for whatever

15   reason, you cannot deliberate in this case?

16        All right.  Not seeing any hands raised, I'm going to

17   ask our courtroom deputy to pick from our box.  She's putting

18   in the numbers.  And this is how we used to do it back in the

19   day for the entire process, but now we computerized most of it.

20        DEPUTY CLERK:  No. 11.

21        THE COURT:  Juror 11.  All right.  One more, please.

22        DEPUTY CLERK:  No. 10.

23        THE COURT:  So Jurors 10 and 11.  All right.  I want

24   to thank you on behalf of the District of Alaska for your

25   service here.  I'm going to do what's permitted in one of our

1    rules, Criminal Rules, 24(c)(3), and that is retain you even

2    though the rest of the jury is going to deliberate, which means

3    I'm going to excuse you at this time, but if for whatever

4    reason it turns out we need to replace a juror that's

5    deliberating, we'll call you in in the order that the numbers

6    were drawn, 11 then 10, and then have the jury begin

7    deliberations again, in the unlikely event that one or more

8    jurors was unable to continue to deliberate at some point.

9           And therefore, I'm going to have you still subject to

10    those same provisions not to discuss the case or do any

11    research.  Our court clerk will be sure to call you as soon as

12    the jury reaches a verdict or is discharged, and then you

13    would, of course, be free to communicate about the case or not

14    as you may choose.  Once again, I thank you both for your

15    service.

16           And can you then escort them out?  And we'll come back

17    here in a bit.  You can be excused at this time.  Leave your

18    notepads, yes, and the instructions there.  The courtroom

19    deputy will preserve those until the end of the case, and then

20    they will be destroyed.

21           And then when they're on their way, we will have the

22    rest of you go.  And you can take all your papers with you, and

23    your notepads.

24           Are they ready to go?  Very good.

25           While she's doing that, I will tell you, we will get

1  you all the evidence.  There will be a slight delay, but it

2  will all come to you as soon as we can get it all together in

3  that regard.  So very good.  Go right ahead.

4       (Jury absent)

5           THE COURT:  Please be seated, everyone.  A couple of

6  housekeeping things here.

7           Please confirm that you've got all your exhibits,

8  admitted exhibits, with the courtroom deputy, if you haven't

9  already done so.  We do have a laptop, I know, here that is

10  available for the jury.  There's nothing on it except for the

11  ability to listen to CDs or DVDs that are in evidence.

12          And leave your phone numbers, of course, where we can

13  reach you with the courtroom deputy.

14          Does the defense seek to be present if there are any

15  readbacks, Mr. Camiel?

16          MR. CAMIEL:  Yes.

17          THE COURT:  Does the government seek to as well?

18          MS. WEBER:  Yes, Your Honor.

19          THE COURT:  We'll be sure to notify you, then.

20          And with regard to jury questions, if there is a

21  purely administrative question, such as, "can we have a magic

22  marker, I would intend to do those without bringing in the

23  parties and answer it myself, and then have the clerk notify

24  you of that having occurred.  Obviously, if there's any

25  substantive instruction of any nature, I would first consult

```
 1   with the parties.
 2           Is that approach acceptable to the government?
 3           MS. WEBER:  It is, Your Honor.
 4           THE COURT:  Mr. Camiel?
 5           MR. CAMIEL:  Yes.
 6           THE COURT:  All right.  Very good.  I don't have any
 7   other issues at this time.  Anything from the government?
 8           MS. WEBER:  No.
 9           THE COURT:  Anything from the defense?
10           MR. CAMIEL:  No.
11           THE COURT:  Very good.  Then we'll go off record at
12   this time.
13           DEPUTY CLERK:  All rise.  This matter now stands in
14   recess.
15       (Recessed from 10:28 a.m. to 1:28 p.m.)
16       (Jury absent)
17           DEPUTY CLERK:  All rise.  Her Honor, the Court, the
18   United States District Court is again in session.
19           Please be seated.
20           THE COURT:  All right.  So we have had a request for a
21   readback.  You have already shared that with them, I assume,
22   Madam Clerk.
23           DEPUTY CLERK:  Yes.
24           THE COURT:  We can bring in the jury and we have our
25   court reporter ready to proceed.  So go ahead.
```

1     (Jury present)

2          THE COURT:  Go ahead and be seated, everyone.  I

3     understand, ladies and gentlemen, you have have asked for a

4     readback of certain testimony, and we have our court reporter

5     here in the courtroom.  The parties asked to be present for

6     this, so I'm present too.  And you can listen to all of this

7     and then we will excuse you once again.

8          And so whenever you're ready, Madam Court Reporter.

9     It's DEA Agent Carr.

10          (Court Reporter read back Agent Carr's entire

11     testimony)

12          (Jury absent)

13          THE COURT:  Very good.  We can go off record then at

14     this time.

15     (Recessed from 2:14 p.m. to 4:16 p.m.)

16     (Jury absent)

17          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

18     United States District Court is again in session.

19          Please be seated.

20          THE COURT:  All right.  We received a note that the

21     jury has reached a verdict, so Madam Clerk, you can bring them

22     in if you would, please.

23     (Pause)

24     (Jury present)

25          THE COURT:  All right.  Please be seated.

1          The clerk is handing me the verdict from the jury, and

2     I will review it.

3               (Pause.)

4          THE COURT:  It appears to be in order.  So I will

5     publish the verdict at this time.

6          With regard to Count 1, we, the jury, unanimously find

7     the defendant, Junior Gufatasi Tulali, guilty of distribution

8     of fentanyl in violation of Title 21 United States Code

9     Sections 841(a)(1) and (b)(1)(C) as charged in Count 1 of the

10    indictment.

11         The jury proceeded to Count 2 as instructed as

12    follows:

13         We, the jury, unanimously find the fentanyl

14    distributed by Junior Gufatasi Tulali resulted in the death of

15    Jacob Lee as charged in Count 1, and the jury answered yes.

16         And this appears to be signed and dated by the

17    foreperson.

18         And have I read that correctly?

19         FOREPERSON:  Yes.

20         THE COURT:  All right.  Either side can ask to poll

21    the jury.  What that means is that the courtroom deputy would

22    ask each juror individually if these were your true and correct

23    verdicts.  Does the government seek to poll the jury?

24         MS. WEBER:  Yes, Your Honor.

25         THE COURT:  I would ask Madam Clerk to do so.

```
 1   BY THE DEPUTY CLERK:

 2   Q   Juror No. 1, is this your true verdict?

 3   A   Yes, it is.

 4   Q   Juror No. 2, is this your true verdict?

 5   A   Yes, it is.

 6   Q   Juror No. 3, is this your true verdict?

 7   A   Yes, it is.

 8   Q   Juror No. 4, is this your true verdict?

 9   A   Yes, it is.

10   Q   Juror No. 5, is this your true verdict?

11   A   It is.

12   Q   Juror No. 6, is this your true verdict?

13   A   Yes, it is.

14   Q   Juror No. 7, is this your true verdict?

15   A   Yes.

16   Q   Juror No. 8, is this your true verdict?

17   A   Yes.

18   Q   Juror No. 9, is this your true verdict?

19   A   Yes, it is.

20   Q   Juror No. 12 --

21   A   Yes, it is.

22   Q   -- is this your true verdict?

23   A   Yes, it is.

24   Q   Juror No. 13?

25   A   Yes, it is.
```

Q   And Juror No. 14, is this your true verdict?

A   Yes.

          DEPUTY CLERK:  So say you one, so say you all.  Your
Honor, the jurors have been polled and all have answered in the
affirmative.

          THE COURT:  Ladies and gentlemen, normally at this
stage in the proceedings I would ask the lawyers if there was
any reason I couldn't discharge you, but there is actually in
this particular case one additional matter that I will need for
you to consider that is distinct from the questions that you
have been presented.  It should require considerably less
evidence and time to present, but at this point what I'm going
to do is briefly excuse you so I can confer with the attorneys
on that topic and we'll get you back in here as soon as
practicable to discuss where we proceed in the next 5 to
10 minutes, have you back in the courtroom.

          I will excuse you to the jury room at this time, and
we'll get you back in here as soon as practicable.

     (Jury absent)

          THE COURT:  Thank you.  All right.  Please be seated.
The jury has left the courtroom.  In terms of presenting
additional evidence for the government, Ms. Weber, what's the
plan from your perspective?

          MS. WEBER:  We have the certificate of judgment and a
902(11) and (13) certificate with the Bureau of Prisons

1  records, so both are self-authenticating.  The plan would be to

2  admit them, have a brief closing argument and --

3          THE COURT:  Have you provided those to the defense?

4          MS. WEBER:  Yes.

5          THE COURT:  Any disagreement with that approach?

6          MR. CAMIEL:  No disagreement with the approach.  After

7  the government presents the evidence, though, and before it's

8  argued to the jury, once the government closes, I would have a

9  motion.

10          THE COURT:  Very good.  We can do that.  So ready to

11  proceed on that?

12          MS. WEBER:  I would just have to go run to the office,

13  but I'll be ready in a few minutes.

14          THE COURT:  Back within five?

15          MS. WEBER:  Yes.

16          THE COURT:  Very good.  We'll go off record then.

17          DEPUTY CLERK:  All rise.  This matter stands in a

18  brief recess.

19      (Recessed from 4:23 p.m. to 4:32 p.m.)

20      (Jury absent)

21          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

22  United States District Court is again in session.

23          Please be seated.

24          THE COURT:  We are back on record here.  Ready to

25  proceed, Ms. Weber?

1          MS. WEBER:  Yes, Your Honor.

2          THE COURT:  Mr. Camiel?

3          MR. CAMIEL:  Yes.

4          THE COURT:  So let's bring the jury in.  If you wanted

5  to make a very brief opening statement and proceed to the

6  evidence, you can do so.

7          Do you seek to make an opening statement as well?

8          MR. CAMIEL:  No.

9     (Jury present)

10          THE COURT:  Please be seated, everyone.

11          We are now going to proceed to the second and final

12  phase of this trial, and we may well be able to conclude today,

13  but if we're not, that's fine too, we can conclude on Monday.

14          So I will allow each side an opportunity to make a

15  brief statement of what this topic is about for you to

16  consider.  Actually, I could just go ahead and read the

17  instruction at this point in time, might make the most sense.

18          I'll read you instruction 25 and 26 at this time and

19  then we can proceed from there.

20          Madam Clerk, I would ask you to hand out the set of

21  instructions that we gave you.

22          Looks like everybody has got a copy there.  So this

23  picks up right where we left off the next instruction.

24          This is instruction 25.  Now that you have completed

25  your initial deliberations, there is one additional matter for

1  you to consider.  In this case, a portion of the indictment not

2  previously discussed at the trial alleges that before

3  committing the offense charged in Count 1, the defendant had

4  been convicted of a serious drug felony.  The government may

5  now present evidence to you as this count.

6       The instructions previously given to you concerning

7  your consideration of the evidence, the credibility of the

8  witnesses, your duty to deliberate together and the necessity

9  of a unanimous verdict apply during your deliberations as to

10  this count.  In your deliberations you may consider any

11  evidence admitted before or after your previous deliberations,

12  including witness testimony, exhibits and stipulations.

13       But I remind you that the lawyers' statements are not

14  evidence.  You should not reconsider whether the defendant is

15  guilty or not guilty on Count 1.  Your previous verdict is

16  final.

17       Instruction 26 states:  The indictment alleges that

18  before committing the offense charged in Count 1, the defendant

19  had been convicted of a serious drug felony for which he served

20  a term of imprisonment of more than 12 months and was released

21  within 15 years of commencing the conduct charged in Count 1.

22       For you to find this fact, the government must prove

23  each of the following elements beyond a reasonable doubt:

24       First, that before committing the offense charged in

25  Count 1, the defendant had been convicted of possession with

1   the intent to distribute cocaine base in violation of Title 21

2   of the United States Code Section 841(a)(1).

3          Second, that the defendant served a term of

4   imprisonment of more than 12 months for that conviction.

5          And third, that the defendant was released from the

6   term of imprisonment imposed for that conviction within

7   15 years of the commencement of the offense charged in Count 1.

8          Finally, instruction number 27:  Another verdict form

9   has been prepared for you.  You will each receive your own copy

10  of the verdict form, but the goldenrod-colored verdict form is

11  the official verdict form that you will return to the Court.

12         After you have reached unanimous agreement on a

13  verdict, your foreperson should complete the golden-colored

14  verdict form according to your deliberations, sign and date it,

15  and advise the clerk that you're ready to return to the

16  courtroom.

17         I would ask Madam Clerk now to hand out the verdict

18  form for this phase of the trial, and then we'll proceed with

19  the government's evidence.  Take a moment to review that

20  verdict form, ladies and gentlemen, and then we'll continue on.

21         Take a moment, if you would, and read that through.

22  Everybody had a chance to look that over?

23         Ms. Weber, do you seek to present any evidence on this

24  count on this issue?

25         MS. WEBER:  Yes, Your Honor.

1         THE COURT:  Go right ahead.

2         MS. WEBER:  Your Honor, I have what's been previously

3   marked as Government's Exhibit 22.  It's the certified judgment

4   of conviction from the District Court of Hawaii.  Government

5   moves to admit under 902(1) or (2).

6         THE COURT:  Any objection there?

7         MR. CAMIEL:  No.

8         THE COURT:  22 is admitted.

9     (Exhibit 22 admitted)

10         MS. WEBER:  I also have Exhibit 53.

11         MR. CAMIEL:  We would object to counsel describing

12   what the document is.

13         MS. WEBER:  Exhibit 53 I would move into evidence

14   under 902(11) and (13), with the certificate provided to the

15   Court.

16         MR. CAMIEL:  There is no objection as to that

17   document.

18         THE COURT:  53 is admitted.

19     (Exhibit 53 admitted)

20         THE COURT:  Any additional evidence from the

21   government?

22         MS. WEBER:  No, Your Honor.

23         THE COURT:  Any from the defense?

24         MR. CAMIEL:  No, Your Honor.

25         THE COURT:  Do you seek to make a brief closing

1    argument on this topic?

2            MS. WEBER:  I'm just going to from Exhibit 22.  It's a

3    judgment in a criminal case, *United States of America versus OJ*

4    *Tulali*, Case 1:95-cr-01095-001, Title and Section 21 U.S.C.

5    841(a)(1).

6            "Nature of offense:  Possessed with intent to

7    distribute substance containing cocaine base, schedule two.

8    Date of offense concluded 10-26-1995.  Date of imposition of

9    judgment, 5-20-1996.

10           "The defendant is hereby committed to the custody of

11   the United States Bureau of Prisons to be imprisoned for a

12   total term of 292 months."

13           MR. CAMIEL:  Your Honor, before counsel reads from the

14   other document, I have a motion.

15           THE COURT:  All right.  Do you want to take that up in

16   a sidebar here?

17           MR. CAMIEL:  Sure.

18           THE COURT:  Let's do that.

19      (Begin bench conference)

20           THE COURT:  Go ahead, Mr. Camiel.

21           MR. CAMIEL:  Your Honor, the government has presented

22   its evidence and rested as to this phase, and I'm going to move

23   to dismiss because --

24           THE COURT:  The enhancement?

25           MR. CAMIEL:  -- the enhancement, yes.  The document

1    that they are -- this is as to the third element, release

2    within 15 years.  And the document that they are introducing is

3    a sentencing monitoring computation data document that does not

4    indicate when he was released.  It indicates when he was

5    scheduled for release, but that's all it says.  It never

6    indicates when he was released.

7          THE COURT:  Can I see it?  I'm sorry to take your

8    copy.  I should have brought it out here.

9          MR. CAMIEL:  That's the second page.

10          THE COURT:  Was scheduled for release 12-31 -- I

11    thought there was another page I was looking at, where it

12    talked about serving 99 percent of the time.

13         MS. WEBER:  Your Honor, there was a sentence reduction

14    after the 2011, and that's taken into account.  It says, "7-20

15    jail credit updated to correct sentence recalculated following

16    court order in relation to changes and sentencing guidelines,

17    crack cocaine, time reduced from 292 to 235 months."

18         So the release date, I believe, was 12-31-2012, unless

19    defense has evidence that there was another release date, then

20    they are free to present that.

21         THE COURT:  The motion is made, but it is denied which

22    side can argue what's here and what's not, but the exhibit has

23    been admitted, the government is going to rely on it, I'll

24    allow that, and then you can make your point to the jury with

25    your document that it's inadequate to make that finding beyond

1 a reasonable doubt.  All right.  Very good.  Go ahead.

2     (End bench conference)

3          THE COURT:  All right.  Please go ahead, Ms. Weber.

4          MS. WEBER:  I'm going to read from Government Exhibit

5 53.  It's a document from the Bureau of Prisons.  It states at

6 the top, "OJ Tulali; date of birth, January 15, 1976; court of

7 jurisdiction, Hawaii; docket number 1:95-cr-01095-001, Judge

8 Ezra; date committed 6-25-1996."

9          On the third and last page of the document, it states,

10 "Sentence recalculated following court order in relation to

11 changes in sentencing guidelines, crack cocaine.  Time reduced

12 from 292 to 235 months."

13          The actual satisfaction date, 12-31-2012, which is

14 less than 15 years before the instant offense, which was

15 committed on October 15th of 2020.

16          THE COURT:  Thank you, Ms. Weber.

17          Mr. Camiel, go ahead, please.

18          MR. CAMIEL:  Ladies and gentlemen, the only comments

19 that I'll make to you are that the document submitted by the

20 government regarding the time calculation for Mr. Tulali does

21 not indicate when he was actually released.  It indicates what

22 his sentence was, but it doesn't indicate when he was actually

23 released, so there is no evidence for you to consider as to

24 whether he was released early or whether he served out the full

25 term as indicated here.  And the government is required to

1  prove when he was actually released from custody, and they have

2  not done that, and, therefore, you should not be finding this

3  enhancement committed.

4  　　　　THE COURT:  Thank you, Mr. Camiel.

5  　　　　THE COURT:  Any rebuttal at all?

6  　　　　MS. WEBER:  Yes, Your Honor.

7  　　　　Even with the sentence reduction, the defendant

8  received 232 months.  Even if that was significantly less, it

9  was still within 15 years.

10  　　　　THE COURT:  All right.  Thank you, Counsel.

11  　　　　Ladies and gentlemen, you can now retire back to the

12  jury room.  We'll get these exhibits to you as soon as

13  practicable and the verdict form the clerk has as well.  And

14  we'll get that you as soon as we can.  You may all be excused

15  at this time.

16  　　(Jury absent)

17  　　　　THE COURT:  Please be seated.

18  　　　　Anything else to address at this time, Ms. Weber?

19  　　　　MS. WEBER:  No, Your Honor.

20  　　　　THE COURT:  Anything else, Mr. Camiel?

21  　　　　MR. CAMIEL:  No, Your Honor.

22  　　　　THE COURT:  You wanted to make the motion.  I'm sorry.

23  Yes, go right ahead.

24  　　　　MR. CAMIEL:  I would move to dismiss the enhancement

25  based on insufficiency of evidence presented by the government

as to when Mr. Tulali was actually released. They presented a
judgment indicating what his sentence was. They presented a
sentence monitoring computation data document, which just
calculates his time and calculates a scheduled release date,
but it doesn't indicate when he was actually released and
whether he may have been released earlier than that.

It simply doesn't say when he left custody of the
Bureau of Prisons, and the jury is required to find that he
was released from the term of imprisonment imposed for that
conviction within 15 years.

This document leaves open the possibility that he
could have been released earlier. It just indicates what the
scheduled release date was, but says nothing about when he
actually left Bureau of Prisons custody.

THE COURT: All right. The motion is denied, because
I think your concern goes to the weight, whether it's
sufficient beyond a reasonable doubt. I think a reasonable
jury could read the term actual satisfaction date of 12-31-2012
to constitute the date of release that's consistent or closely
consistent with the statutory release date on this form of
January 1, 2013, the following day, and the expiration of the
full term date before the sentencing reduction was 5-26-2015.

So the motion is denied. And the jury can assess
whether it's been proven beyond a reasonable doubt with the BOP
record.

1          So anything further, Mr. Camiel?

2          MR. CAMIEL:  No, Your Honor.

3          THE COURT:  Very good.  We'll go off record.

4          DEPUTY CLERK:  All rise.  This matter is in a brief

5    recess.

6       (Recessed from 4:50 p.m. to 5:22 p.m.)

7       (Jury absent)

8          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

9    United States District Court is again in session.

10          Please be seated.

11          THE COURT:  All right.  We have a note from the jury

12    that they have reached a verdict, so Madam Clerk, if you could

13    bring them in, please.

14       (Pause)

15       (Jury present)

16          THE COURT:  Please be seated, everyone.  I understand,

17    ladies and gentlemen, you have reached a verdict in the second

18    phase; is that correct?

19          FOREPERSON:  That's correct.

20          THE COURT:  I would ask our courtroom deputy to go

21    retrieve that.  Very good.

22          All right.  And it appears to be in order.  I'll read

23    it as follows.

24          For phase two:  We, the jury, unanimously find that

25    before the defendant, Junior Gufatasi Tulali, committed the

offense charged in Count 1, he had been previously convicted of
possession with the intent to distribute cocaine base in
violation of 21 U.S.C. Section 841(a)(1), and the jury circled
yes.

The jury went to question two, as instructed. We, the
jury, unanimously find that the defendant, Junior Gufatasi
Tulali, served a term of imprisonment of more than 12 months
for that conviction, and the verdict form indicates yes.

We, the jury, unanimously find that the defendant,
Junior Gufatasi Tulali, was released from this term of
imprisonment within 15 years of the commencement of the offense
charged in Count 1 of the indictment, and the jury has circled
yes. And that appears to be signed and dated today.

Have I read that correctly?

FOREPERSON: Yes.

THE COURT: Do you seek to poll the jury?

MS. WEBER: No, Your Honor.

THE COURT: I'm sorry?

MS. WEBER: No, Your Honor.

THE COURT: Do you seek to poll the jury?

MR. CAMIEL: No, Your Honor.

THE COURT: Well, then, any reason any reason this
jury cannot be discharged at this time?

MS. WEBER: No, Your Honor.

MR. CAMIEL: No.

1        THE COURT:  That is what we will do.  And we'll be

2    issuing an order with regard to further proceedings, but

3    anything else to take up at this time?

4        MS. WEBER:  Not at this time.

5        MR. CAMIEL:  No, Your Honor.  Thank you.

6        THE COURT:  Ladies and gentlemen, you are all

7    discharged from the jury at this time.  I thank you for your

8    service.  I'm going to come in, and you're free to remain or

9    free to go about your way, but answer any questions and

10   personally thank you for your service here.

11       And we'll be sure to inform the other two jurors as

12   well that they are discharged, free to talk about the case or

13   not or do research or not.

14       Anyway, thank you again for your service and you can

15   all be excused at this time.

16       Thank you, counsel.  We'll go off record.

17       DEPUTY CLERK:  All rise.  The this matter is now

18   adjourned.  This court now stands adjourned subject to call.

19       (Proceedings concluded at 5:26 p.m.)

20

21

22

23

24

25

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 13th day of December, 2024.


/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER